## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

-----------------------------------------------------------x

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

                              Plaintiff,

v.                                                    **DEMAND FOR JURY TRIAL**

UNIVERSAL HEALTH GROUP, INC.
A/K/A MICHIGAN SPINE AND REHAB,
UHG MANAGEMENT, LLC,
PROFESSIONAL HEALTH SYSTEMS,
LLC A/K/A PROFESSIONAL MEDICAL
BILLING, LLC, SCOTT P. ZACK, D.C.,
DAVID M. KATZ, D.C.,
LOREN C. CHUDLER, D.O.,
JOSEPH F. DESANTO, HORIZON
IMAGING, LLC, CLEAR IMAGING, LLC,
JEFF S. PIERCE, D.O.,
THOMAS D. CARUSO, D.O., and
KATHERINE H. KARO, D.O.,

                              Defendants.

-----------------------------------------------------------x

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm"), for its complaint against Defendants Universal Health Group, Inc. a/k/a Michigan Spine and Rehab ("Universal"), UHG Management, LLC ("UHG"), Professional Health Systems, LLC a/k/a Professional Medical Billing, LLC ("Professional Health Systems"), Scott P. Zack, D.C. ("Zack"), David M. Katz, D.C. ("Katz"), Loren C. Chudler, D.O. ("Chudler"), Joseph F. DeSanto ("DeSanto"), Clear Imaging, LLC

("Clear"), Horizon Imaging, LLC ("Horizon"), Jeff S. Pierce, D.O. ("Pierce"), Thomas D. Caruso, D.O. ("Caruso"), and Katherine H. Karo, D.O. ("Karo") alleges as follows:

## I.     NATURE OF THE ACTION

1.     This action involves a widespread fraud scheme in which Zack, Katz, DeSanto, Chudler, and possibly others control and operate a multi-disciplinary clinic, Universal, that was fraudulently incorporated to submit thousands of false medical bills and supporting documentation to insurance companies for medically unnecessary treatments and diagnostic tests.  Specifically, the Defendants have submitted, or caused to be submitted, fraudulent bills for medically unnecessary evaluations, chiropractic and physical therapy treatments, MRIs and electrodiagnostic tests ("EDX Tests") purportedly provided to patients (the "Patients") who were involved in motor vehicle accidents.  These bills and supporting documents submitted to State Farm were fraudulent because the services were performed pursuant to a fraudulent predetermined protocol (the "Predetermined Protocol"), as described below, rather than to address the unique needs of individual Patients.  To-date, the Defendants' fraud scheme has caused State Farm to pay over $4.7 million for medically unnecessary treatments and tests.

2.     In late 2006, Zack and Katz fraudulently incorporated Universal as a Michigan non-profit corporation to circumvent restrictions on the ownership and

control of multi-disciplinary clinics by chiropractors, such as Zack and Katz, or by lay persons, such as DeSanto and possibly others, who own, control and direct all aspects of Universal's operations and services.  Far from being organized to provide charitable services or avoid distribution of profits to its owner members, as required by its non-profit status, Universal is nothing more than a mill that provides medically unnecessary services for the enrichment of the Defendants and personal injury attorneys, not for the Patients' medical needs.

3.     Indeed, an attorney from the personal injury law firm, Weiner & Associates, PLLC, who represents many of the Patients at issue here, has served as a member on Universal's board of directors, as well as an officer, from its inception.

4.     Moreover, Universal is an active participant in an elaborate patient solicitation and referral network that uses "runners" to contact persons immediately after a motor vehicle accident and steer them toward personal injury attorneys and Universal.

5.     Zack, Katz, DeSanto, Chudler, and possibly others control Universal's operations and direct others to ensure that the Predetermined Protocol is followed. Universal's Predetermined Protocol is designed not only to enrich Defendants, but to inflate the value of bodily injury and under-insured or uninsured motorist claims, which, in turn increases the potential contingency fees for the attorneys.

6.      As described below, a central feature of Universal's Predetermined Protocol is an extraordinary – and medically unnecessary – number of chiropractic and physical therapy treatment modalities, often delivered concurrently, for excessive periods of time.  The vast majority of these treatments are passive modalities, rather than active modalities, which continue long beyond the period for which they could have therapeutic value.  In addition, the extensive chiropractic and physical therapy treatments are not individually tailored for Patients and are not adjusted despite the lack of documented progress for the Patients.  Over time, Universal has added lucrative components to its Predetermined Protocol, including medically unnecessary EDX Tests and MRIs, the purported findings of which are not considered or integrated into the chiropractic and physical therapy treatment plans.

7.      The Predetermined Protocol typically begins with fraudulent chiropractic evaluations and treatments.  Zack, Katz, and other chiropractors, operating under the direction and control of Zack and Katz (collectively, the "Chiropractors"), falsely diagnose every Patient with a "ligament injury," "sprain," and/or "subluxation" to ensure the Patient's "injuries" fit under the scope of chiropractic practice, which, in turn, is necessary to commence Universal's extensive – but medically unnecessary – chiropractic treatments.

8.      The next step in the Predetermined Protocol involves " evaluations" by Chudler, the "Medical Director" of Universal.  These "evaluations" are not necessary and are not legitimate medical evaluations, but are purportedly performed to confirm and thereby support the Chiropractors' predetermined "ligament/sprain/subluxation" diagnoses, and to support Chudler's subsequent "recommendations" for continued chiropractic treatment and, later, physical therapy treatments.  The charts attached hereto as Exhibits 1 and 3 set forth the fraudulent chiropractic evaluations and treatments, as well as Chudler's fraudulent evaluations, for which the Defendants submitted, or caused to be submitted, fraudulent bills and supporting documentation to State Farm for evaluations and chiropractic treatments purportedly performed on Patients.

9.      To-date, Universal has billed more than $4.3 million, and State Farm has paid more than $2 million for fraudulent chiropractic evaluations, treatments, and Chudler evaluations.

10.     The Predetermined Protocol also includes medically unnecessary physical therapy treatments.  Chudler is integral to this treatment component because as an osteopathic doctor only he, and not Zack, Katz or other chiropractors, can prescribe physical therapy for Patients.  Chudler prescribes extensive physical therapy treatments for many Patients.  When physical therapy sessions begin, Patients have already typically had an extensive number of

chiropractic treatments, with limited or no documented improvement, but nevertheless continue to receive chiropractic treatment concurrent with physical therapy treatments for a significant period of time.  Like the fraudulent chiropractic evaluations, the physical therapy evaluations are not credible, and the physical therapy that follows these evaluations is not individually tailored to the Patient's medical needs.  Instead, the physical therapy evaluations simply index an extensive list of "problems" and "goals," but involve no true diagnostic decision-making.  The charts attached hereto as Exhibits 2 and 3 set forth the fraudulent physical therapy evaluations and treatments for which Defendants submitted, or caused to be submitted, fraudulent bills to State Farm for evaluations and physical therapy purportedly performed on Universal's Patients.

11.    Patients in physical therapy are provided a laundry list of mostly passive modalities, such as hot packs, electrical stimulation, ultrasound, and manual therapy.  These modalities are medically unnecessary because they are typically administered long after the acute injury, and thus are likely to have little to no medical benefit.  Although Universal also purportedly provides active therapeutic exercises, they are not tailored to the unique needs of individual Patients.  Indeed, despite listing an extensive list of short-term goals to be met within two weeks of beginning treatment, the physical therapists (the "Physical Therapists") never document that any short-term goals have been met.  *See* Ex. 2.

Moreover, the physical therapy treatments are not coordinated with the extensive other treatments and tests ordered by Universal, including chiropractic care, MRIs, and EDX Tests.

12.    To-date, Universal has billed nearly $2 million, and State Farm has paid more than $750,000 for fraudulent physical therapy evaluations and treatments.

13.    Over time, Universal has added other lucrative treatment and testing components to the Predetermined Protocol, including medically unnecessary MRIs and EDX Tests.  In that regard, Zack, Katz, DeSanto, and possibly others secretly own and/or control two MRI "facilities," Horizon and Clear, which are nothing more than office spaces that are serviced by mobile MRI trucks that are temporarily stationed in the parking lots at Horizon or Clear.  The Predetermined Protocol includes improper self-referrals of Patients specifically to either Horizon or Clear for MRIs ordered by Chudler and/or the Chiropractors (the "MRI orders").

14.    The MRI orders are not medically necessary.  Instead, these MRI orders, which are routinely ordered for multiple regions of the spine, are merely another method to enrich Zack, Katz, DeSanto, and possibly others through the charges of Horizon and Clear, and to inflate the settlement value of Patients' personal injury cases to curry favor with the referring personal injury attorneys.  In addition, the MRI interpretive reports from Horizon and Clear contain non-credible

patterns of "findings" that purportedly support Universal's continued treatment of Patients.

15.     Consistent with the fraudulent nature of these MRI orders, neither Chudler nor the Chiropractors consider or integrate the MRI findings into Patients' treatment plans, even when the MRI findings suggest that continued chiropractic manipulations may be contraindicated.

16.     These medically unnecessary MRI orders are a highly lucrative component of the Defendants' fraud scheme.  To-date, Clear and Horizon have billed State Farm nearly $3 million, and State Farm has paid over $1.5 million, for medically unnecessary MRI tests performed on Universal Patients.  The chart attached as Exhibit 4 sets forth the fraudulent MRI interpretive reports and bills for the Universal Patients that the Defendants submitted, or caused to be submitted to State Farm.

17.     Universal has also added to the Predetermined Protocol lucrative EDX Tests performed by Defendants Pierce, Caruso, and Karo (collectively, the "EDX Providers").   These EDX Tests are fraudulent because they are medically unnecessary, improperly performed (if performed at all), contain fabricated or physiologically impossible data, and are not individually tailored to the Patients' specific needs.  The charts attached hereto as Exhibits 5-7  set forth the EDX Tests

for which the Defendants submitted, or caused to be submitted, fraudulent bills from Universal to State Farm for EDX Tests.

18.     To-date, Universal has billed nearly $1 million and State Farm has paid nearly $300,000 for fraudulent EDX Tests.

19.     Dr. Aria Sabit, a neurosurgeon who worked for Universal in 2012, has provided an affidavit in which he describes how Zack and DeSanto direct the activities of Universal and the Co-Defendants to take advantage of Michigan's No-Fault law by providing unnecessary treatments, including medically unnecessary chiropractic and physical therapy treatments, as well as medically unnecessary and unreliable EDX and MRI tests.  *See* Dr. Sabit Aff. ¶¶ 8-10, 13-14, 16, 19, attached as Exhibit 8.  Dr. Sabit also confirms that Patients were subjected to medically unnecessary chiropractic and physical therapy treatments, even though they were not showing substantial improvement.  *See* Ex. 8 ¶¶ 8-10.

20.     In his affidavit, Dr. Sabit confirms Universal's patient solicitation activities.   Specifically, Dr. Sabit describes how Zack, DeSanto, and others discussed their purchases and use of police reports to solicit accident victims to Universal, and how they discussed openly their use of and reliance on runners to call and meet the individuals identified by police reports.  *See* Ex. 8 ¶ 21.

21.     Dr. Sabit's affidavit also confirms the medically unnecessary nature of the MRIs, and how the MRI reads were often over-read, mis-read, or were

otherwise unreliable.  Dr. Sabit further describes how he was specifically directed by Zack to send Universal Patients to Clear or Horizon for MRIs because Zack, DeSanto, and possibly others affiliated with Universal owned and/or controlled these MRI facilities, and thereby directly profited from these MRIs.  *See* Ex. 8 ¶¶ 11-12.

22.    Dr. Sabit also attests that the EDX testing at Universal was not reliable and he was suspicious regarding the validity of these tests.  Specifically, he attests that he noticed an unusually high number of patients diagnosed with radiculopathies and, because of his concerns, he generally did not rely on the EDX testing performed at Universal.  Ex. 8 ¶¶ 11-12.

23.    Dr. Tolia, a neurologist who worked for Universal from 2010 through 2011 performing EDX tests has also provided an affidavit in which he describes how Zack and Katz directed the operations of Universal.  In his affidavit, Dr. Tolia attests that Katz instructed him to include the phrase "continue chiropractic care" on all his interpretive reports, even though Dr. Tolia did not make such recommendations for patients in his own professional practice.  *See* Ex. 9 ¶ 6.  Dr. Tolia generally disregarded this instruction and believes that he was terminated from Universal for this reason and/or because he did not refer enough Patients for additional care or sufficient additional tests.  Ex. 9 ¶13.

24.     Dr. Tolia also attests that he noticed that the MRI reports generated by Dr. Chintan Desai, the reading radiologist for Clear Imaging, were virtually all "over-read."     For instance, the MRI reports contained findings that were too excessive to be consistent with his clinical evaluation, such as often containing abnormalities that likely did not exist or had no clinical significance, or otherwise did not correlate with his clinical findings.  Dr. Tolia attests that he informed Katz of this issue and suggested that Universal obtain another radiologist to read the MRI films, but he never received a response from Katz.  *See* Ex. 9 ¶¶ 8,9.

25.     Dr. Tolia also attests that Chudler, the Medical Director of Universal, never once contacted him to discuss the findings of his EDX tests or to discuss or coordinate any care for any Patient.  *See* Ex. 9 ¶10.

26.     To date, State Farm has paid over $4.7 million for medically unnecessary chiropractic and physical therapy treatments and evaluations, MRIs, and EDX Tests as a result of the Defendants' conduct.

27.     As described below, the Defendants acted in concert, with each defendant needing the other Defendants to successfully carry out and profit from the scheme.  Specifically, (a) Universal was fraudulently incorporated by Zack and Katz as a non-profit corporation to avail themselves of the limited exception in Michigan that allows chiropractors like Zack and Katz, or even lay persons, like DeSanto, to operate multi-disciplinary clinics, which would include chiropractic

11

and physical therapy services, evaluations and office visits by osteopathic doctors like Chudler, Pierce, Caruso, or Karo, as well as EDX Tests; (b) Zack, Katz, DeSanto, and Chudler control, operate, and profit from Universal's medically unnecessary services and tests; (c) Zack, Katz, DeSanto, and Chudler profit by causing medically unnecessary MRIs to be performed by Horizon and Clear because they have a financial interest in Horizon and Clear's billings and/or benefit from the false MRI reads provided by Horizon and Clear to support the purported need for additional unnecessary treatments at Universal; (d) Horizon and Clear benefit from Universal's fraudulent MRI orders and provide false MRI interpretive reports for Patients to support the purported need for continued treatments at Universal; (e) Pierce, Caruso, and Karo are osteopathic doctors who purport to perform medically unnecessary EDX tests and provide correspondingly fraudulent EDX reports, and each EDX Provider profits through the payments received from Universal for the medically unnecessary consultations and EDX Tests.

28.     As a result of the scheme: (a) Patients were not legitimately examined, diagnosed, tested, and appropriately treated for conditions that they may have had; (b) Patients were subjected to a laundry list of treatments and tests for conditions that they may not have had; and (c) the fraudulent bills and related documentation have been used to inflate the value of injury claims against State Farm and at-fault drivers.

29.    The Defendants' scheme began in 2007, and has continued uninterrupted since that time.

30.    Based upon the Defendants' affirmative misrepresentations and acts of concealment, which are set forth below, State Farm did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this Complaint was filed.

31.    This action seeks a declaratory judgment that State Farm is not liable for any pending bills or bills submitted during the pendency of this action by the Defendants based upon the above-described conduct.   This action also asserts common law claims for fraud and unjust enrichment, as well as statutory claims under 18 U.S.C. §§1962(c) and (d) ("RICO"), to recover actual damages of at least $4.7 million in no-fault benefits paid pursuant to the fraudulent bills and reports that the Defendants have submitted, or caused to be submitted, to State Farm, plus treble damages and costs, including reasonable attorneys' fees.

32.    State Farm has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association or any other source for any of the claims at issue in this case.

## II.    JURISDICTION AND VENUE

33.    Pursuant to 28 U.S.C. §1332(a)(1), this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000,

exclusive of interest and costs, and are between citizens of different states. Pursuant to 28 U.S.C. §1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §1961 et seq. ("RICO") because they arise under the laws of the United States.

34.     Pursuant to 28 U.S.C. §1367(a), this Court also has supplemental jurisdiction over claims that are so related to the claims over which it has original jurisdiction that they form part of the same case or controversy.

35.     Pursuant to 28 U.S.C. §1391(a), venue is proper in this district because this is the jurisdiction where the Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.   PARTIES

### A.   Plaintiff

36.     State Farm is a corporation organized under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed and engaged in the business of insurance in Michigan.

### B.   Defendants

#### 1.   Universal

37.     Universal is a Michigan domestic non-profit corporation formed in 2006 with its principal place of business in Michigan.  According to its articles of incorporation, Universal's purpose is "[t]o provide health care services to the

community it serves, and to the extent that financial services permit, provide charity to persons in need."

38.    Scott Zack is listed as incorporator and resident agent of Universal.

39.    In 2007, 2008, and 2009, Universal's Annual Reports listed Bonnie Kaczor as its President, Eric Stone of the law firm Weiner & Associates, PLLC as its Treasurer, and Jodi Fox as its Secretary.  From 2007 through 2009, Universal's Annual Reports also listed these individuals as members of its Board of Directors.

40.    In 2010, Universal listed Bonnie Kaczor as its President, Scott Zack as Vice President, Valerie Thimm as Secretary, and Loren Chudler as Treasurer in its Annual Report.  In 2010, the Annual Report listed Bonnie Kaczor, Scott Zack, and Loren Chudler as members of its Board of Directors.

41.    In 2011 and 2012, Universal's Annual Report listed Bonnie Kaczor as its President, Loren Chudler as its Treasurer, and Valerie Thimm as both its Secretary and Vice President, and also listed these three individuals as members of its Board of Directors.  Universal has not filed a 2013 Annual Report, although it remains listed as an active corporation.

42.    Scott Zack is listed as Universal's resident agent in all of its Annual Reports, and is the signatory to Universal's Annual Reports from 2007 through 2010.

43.    On July 18, 2010, Universal filed a Certificate of Assumed Name to transact business under the assumed name of Michigan Spine and Rehab.  Because Michigan Spine and Rehab is an assumed name for Universal, its principal place of business, resident agent, and officers are the same as those of Universal. Throughout this Complaint, "Universal" shall refer to both Universal and Michigan Spine and Rehab.

### 2.    UHG Management, LLC

44.    UHG Management, LLC ("UHG Management") is a Michigan domestic limited liability company formed in 2007 with its principal place of business in Michigan.  Scott Zack is listed as incorporator and resident agent of UHG Management.

45.    UHG Management's 2011 Annual Statement filed with the State of Michigan lists Scott Zack as its owner.

46.    Scott Zack is the signatory on UHG Management's 2012 and 2013 Annual Statements.

47.    UHG Management is the corporate entity through which Zack, Katz, DeSanto, and possibly others manage and control Universal's operations and through which Universal's profits are funneled to them and possibly others under the guise of purportedly legitimate management fees paid by Universal to UHG Management.  The creation of UHG Management allowed Zack, Katz, DeSanto,

and possibly others to do indirectly what they are forbidden to do directly under Michigan law for non-profit corporations, namely distribute profits from Universal directly to themselves and possibly others.

48.    In 2012, UHG Management registered as a foreign limited liability company to transact business in Florida.  Zack was listed as the managing member of UHG Management and Vincent Celentano, a Florida resident, was listed as the registered agent.

### 3.    Professional Health Systems, LLC

49.    Professional Health Systems, LLC ("Professional Health Systems") is a Michigan limited liability company formed in February 2012.

50.    Professional Health Systems appears to have taken over the role and operations of UHG Management and is a successor-in-interest to UHG Management.  Specifically, in 2012, Professional Health Systems' website listed Universal clinics as facilities that it either "owned, operated or managed."  The website also listed Zack as the founder of Professional Health Systems and its Chief Executive Officer, and Katz as its Chief Operating Officer.

51.    According to its articles of incorporation, Professional Health Systems' purpose includes the "management of non-clinical aspects of health care providers and will not be authorized to and will not engage in the practice of medicine or its equivalent."

52.     Zack is identified as the "owner" of Professional Health Systems in its 2013 Annual Report.

53.     Professional Health Systems' registered office location is 2000 Town Center, Suite 625, Southfield, Michigan 48075, which is the corporate headquarters of Universal.

54.     On September 18, 2013, Professional Health Systems filed a Certificate of Amendment changing its name to Professional Medical Billing, Inc. Zack is identified as the "manager" of Professional Medical Billing, Inc.

### 4.     Zack

55.     Zack resides in and is a citizen of Michigan.  Zack has been a licensed chiropractor since 2002.

56.     In 2006, Zack incorporated Universal and he has been Universal's resident agent since its inception.

57.     In 2011, Zack was listed as Universal's Vice President in corporate filings.

58.     Zack owns and/or controls Universal, and directs its operations, including directing and controlling their medically unnecessary chiropractic, physical therapy, and EDX services, as well as Horizon's and Clear's medically unnecessary MRIs.  Zack receives direct financial benefits from State Farm's

payments to Universal, Horizon, and Clear based on the fraudulent bills and services at issue in this Complaint.

59.     The charts attached hereto as Exhibits 1-7 summarize the medically unnecessary chiropractic, physical therapy, EDX services, and MRI tests at issue, and the corresponding fraudulent charges.  In each instance in Exhibits 1-7, Zack has knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for medically unnecessary tests and services.

### 5.    Katz

60.     Katz resides in and is a citizen of Michigan.  Katz has been a licensed chiropractor since 1991.

61.     Katz owns and/or controls Universal and directs its operations, including directing and controlling their provision of medically unnecessary chiropractic, physical therapy, and EDX services, as well as Horizon's and Clear's medically unnecessary MRIs.  Katz receives direct financial benefits from State Farm's payments to Universal, Horizon, and Clear based on the fraudulent bills and services at issue in this Complaint.

62.     The charts attached hereto as Exhibits 1-7 summarize the medically unnecessary chiropractic, physical therapy, EDX services, and MRI tests at issue, and the corresponding fraudulent charges.  In each instance in Exhibits 1-7, Katz

has knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for medically unnecessary tests and services.

### 6.    Chudler

63.    Chudler resides in and is a citizen of Michigan.

64.    Chudler has been licensed as an osteopathic physician since 1996.

65.    In 2010 and 2011, Chudler served as both Treasurer and a member of Universal's Board of Directors.

66.    Chudler is the Medical Director of Universal and plays a vital role in directing the Predetermined Protocol by reporting fraudulent physical examinations and diagnoses, recommending medically unnecessary chiropractic and prescribing physical therapy treatments, MRI tests, and EDX tests, as described in this Complaint.

67.    Chudler receives direct financial benefits from State Farm's payments to Universal, Horizon, and Clear based on the fraudulent bills and services at issue in this Complaint.

68.    The charts attached hereto as Exhibits 1-7 summarize the medically unnecessary chiropractic, physical therapy, EDX services, and MRI tests at issue, and the corresponding fraudulent charges.   In each instance in Exhibits 1-7, Chudler has knowingly submitted, and caused to be submitted, to State Farm

20

fraudulent bills and supporting documentation for medically unnecessary tests and services.

### 7.    DeSanto

69.    DeSanto is regularly present in Michigan to direct the operations of Universal and, on information and belief, is a part-time resident and citizen of Michigan.

70.    DeSanto owns and/or controls Universal and directs its operations, including supervising its solicitation and runner operations, hiring and firing doctors, managing and reviewing Universal's financial operations, and ensuring that the Predetermined Protocol described in this Complaint is followed.  DeSanto receives direct financial benefits from State Farm's payments to Universal, Horizon, and Clear based on the fraudulent bills and services at issue in this Complaint.

71.    The charts attached hereto as Exhibits 1-7 summarize the medically unnecessary chiropractic, physical therapy, EDX services, and MRI tests at issue, and the corresponding fraudulent charges.   In each instance in Exhibits 1-7, DeSanto has knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for medically unnecessary tests and services.

### 8.      Horizon Imaging LLC

72.     Horizon is a Michigan domestic corporation with its principal place of business in Michigan.

73.     Horizon was incorporated on July 8, 2009, and its resident agent is Kenneth Boyer.

74.     Zack, Katz, DeSanto, and possibly others own and/or control Horizon and direct Chudler, the Chiropractors, and staff to steer patients to Horizon for medically unnecessary MRIs.  Zack, Katz, DeSanto, and possibly others profit from Horizon's medically unnecessary MRIs, and have taken affirmative steps to conceal that Universal's MRI referrals to Horizon violate Michigan's prohibition against self-referrals.

75.     The chart attached as Exhibit 4 summarizes the MRIs purportedly performed by Horizon on Universal's Patients and interpreted by radiologists working for Horizon.  In each instance, Defendants have knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for the MRIs performed by Horizon.

### 9.      Clear Imaging LLC

76.     Clear is a Michigan domestic corporation with its principal place of business in Michigan.

77.     Clear was incorporated on September 2, 2009, and its resident agent is Kenneth Boyer.

78.     Zack, Katz, DeSanto, and possibly others own and/or control Clear and direct Chudler, the Chiropractors, and staff to steer patients to Clear for medically unnecessary MRIs.  Zack, Katz, DeSanto, and possibly others profit from Clear's medically unnecessary MRIs, and have taken affirmative steps to conceal that Universal's MRI referrals to Clear violate Michigan's prohibition against self-referrals.

79.     The chart attached as Exhibit 4 summarizes the MRIs purportedly performed by Clear on Universal Patients and interpreted by radiologists working for Clear.  In each instance, Defendants have knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for the MRIs performed by Clear.

### 10.     Pierce

80.     Pierce resides in and is a citizen of Michigan.

81.     Pierce has been licensed as an osteopathic physician in Michigan since 1995.

82.     Pierce purports to perform and interpret medically unnecessary EDX tests.  The chart attached hereto as Exhibit 5 summarizes the EDX tests at issue purportedly performed and interpreted by Pierce and the corresponding fraudulent

23

charges.   In each instance, Pierce has knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for the EDX tests.

### 11.    Caruso

83.    Caruso resides in and is a citizen of Michigan.

84.    Caruso has been licensed as an osteopathic physician in Michigan since 2010.

85.    Caruso purports to perform and interpret medically unnecessary EDX tests.  The chart attached hereto as Exhibit 6 summarizes the EDX tests at issue purportedly performed and interpreted by Caruso at issue and the corresponding fraudulent charges.  In each instance, Caruso has knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for the EDX tests.

### 12.    Karo

86.    Karo resides in and is a citizen of Michigan.

87.    Karo has been licensed as an osteopathic physician in Michigan since 1998.

88.    Karo purports to perform and interpret medically unnecessary EDX tests.  The chart attached hereto as Exhibit 7 summarizes the EDX tests at issue purportedly performed and interpreted by Karo and the corresponding fraudulent

charges.   In each instance, Karo has knowingly submitted, and caused to be submitted, to State Farm fraudulent bills and supporting documentation for the EDX tests.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   First-Party Claims for Payment Under the No-Fault Act

89.   Under the Michigan No-Fault Act, insurers are required to pay personal protection insurance benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle" (hereinafter, "No-Fault Benefits").   MCL §§500.3105, 3107(1)(a).

90.   For the reasons described herein, the charges at issue in this Complaint were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation.

### B.   Third-Party Tort Claims For Non-Economic Loss Under The No-Fault Act

91.   Under the Michigan No-Fault Act, individuals who are not at fault for the accidents underlying their claims can also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accident ("At-Fault Drivers") through a claim for bodily injury (a "BI

Claim"), only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL §500.3135, or (b) if recovery under the BI Claim is insufficient, from the Patient's own insurance company through an uninsured or underinsured motorist claim (a "UM Claim").

92.     An individual has suffered serious impairment of body function when his general ability to conduct the course of his normal life has been affected as a result of his injury.   A determination of whether this has occurred requires an analysis of the totality of the circumstances, including: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, (e) the prognosis for eventual recovery, and (f) whether there is "objective manifestation" of the injury.

93.     Virtually every Patient treated at Universal has attorney representation and has made a purported BI or UM Claim.

**C.     Defendants' Fraudulent Scheme**

**1.     Universal's Fraudulent Incorporation As A "Non-Profit" Corporation**

94.     The first step in this fraud scheme was for Zack and Katz to fraudulently incorporate Universal as a non-profit corporation to circumvent legal restrictions that prohibit chiropractors from employing and profiting from services provided by physicians and other professionals who are licensed to provide services beyond the scope of chiropractic medicine.   This allowed Zack and Katz

26

to unlawfully expand, control and profit from  Universal's services into lucrative EDX services, physical therapy services, pain injections, and Chudler's medical evaluations.

95.    The Michigan Professional Service Corporation Act and the Michigan Public Health Code prohibit chiropractors from organizing a for-profit professional service corporation with osteopathic physicians (or other non-chiropractic physicians) for the purpose of providing medical and chiropractic services.  MCL 450.224(3); *See* Mich. Attorney General Op. #7151 (March 9, 2004).  Specifically, with limited exceptions, Section 4(3) of the Professional Service Corporation Act requires that "all shareholders of the corporation must be licensed or legally authorized in this state to render the same professional service."  MCL 450.224(3).

96.    The Michigan Attorney General has determined that the Michigan Professional Service Corporation Act forbids a chiropractor to organize a professional service corporation with osteopathic physicians (or other physicians) to provide both medical and chiropractic services because the scope of practice of chiropractors is more limited than that of physicians.  Mich. Attorney General Op. #7151 at p. 4  (March 9, 2004).  The Michigan Attorney General has further determined that a professional service corporation can provide more than one professional service (such as chiropractic and medical services) only if each shareholder of the professional service corporation is "fully qualified to perform all

of the professional services rendered by the corporation." Mich. Attorney General Op. #6592 (July 10, 1989).

97.     There is a limited exception, however, under the Michigan Non-Profit Corporation Act that allows non-profit corporations to provide medical services through employed physicians, even where the owners are not all licensed to render the same professional service. *See* Mich. Attorney General Op. #6770 (September 17, 1993). Thus, a legitimate non-profit corporation can provide medical services and employ medical providers across different scopes of practice. *See id.* Indeed, the Michigan Attorney General has determined that the learned profession doctrine, which generally prohibits lay persons from owning for-profit corporations engaged in the practice of medicine, does not apply to non-profit corporations because concerns over laypersons interfering with the physician-patient relationship or the "commercialization of the practice of medicine" are only likely to arise "when the physician is being supervised by a profit-seeking employer." *See id., quoting* Hansmann, *Reforming Nonprofit Corporation Law*, 129 UPaLR, 497, 539-40 (1981).

98.     To avail itself to this limited exception, however, a corporation must qualify as a legitimate "non-profit" corporation under the Non-Profit Act. Specifically, the corporation must be "incorporated to carry out any lawful purpose or purposes not involving pecuniary profit or gain for its directors, officers,

28

shareholders, or members." *See* MCL 450.2108.  If the non-profit corporation is a "charitable purpose corporation," it must either qualify for exemption under Section 501(c)(3) of the Internal Revenue Code, be a corporation whose purposes, structure, or activities are exclusively those that are described under Section 501(c)(3), or be "organized and held out to be organized exclusively for 1 or more charitable purposes."  MCL 450.2106.

99.   Charitable purpose corporations are subject to supervision by the Michigan Attorney General under the Supervision of Trustees for Charitable Purposes Act.  MCL 14.251 *et seq.*; Dep. of Attorney Gen. Charitable Trust Rules and Regulations.  Specifically, charitable purpose organizations must register with the Attorney General's office by filing a registration statement and inventory of all assets used for charitable purposes.  In addition, the charitable purpose corporation must file annual certified financial accountings, containing balance sheets, statements of receipts and disbursements, and a list of assets including securities held.

100.   Universal has never been a legitimate non-profit corporation.  The fundamental requirement of a non-profit is that it be "incorporated to carry out any lawful purpose or purposes *not involving pecuniary profit or gain for its directors, officers, shareholders, or members.*"  *See* MCL 450.2108 (emphasis added).  Universal exists for exactly the opposite reason – to create pecuniary profit for

Zack, Katz, DeSanto, and possibly others, and thus violate this basic core tenet of a non-profit corporation under Michigan law.

101.   Moreover, Universal's stated purpose in its Articles of Incorporation is intentionally vague and does not specify either an intent to avoid pecuniary profit or a clear charitable purpose.  Instead, Universal's stated purpose is merely "[t]o provide health care services to the community it serves, and to the extent that financial services permit, provide charity to persons in need."  The provision of health care services to the community is consistent with a for-profit healthcare clinic, and the provision of potential charitable services "to the extent that financial services permit" is not consistent with a charitable purpose organization.

102.   While legitimate non-profit or charitable organizations routinely file required financial disclosures and other paperwork with federal and state governments to establish non-profit or charitable bona fides, Universal has purposely not filed any financial disclosures with either the IRS or the Michigan Attorney General.  For instance, Universal is not registered with the IRS as a 501(c)(3) charitable corporation, which would have required Zack, Katz, and DeSanto to provide detailed financial reporting and disclosures that would have revealed that Universal is not a legitimate non-profit or charitable organization.

103.   Similarly, Universal has not registered with the Michigan Attorney General as a charitable purpose corporation nor has it registered any charitable

trusts with the State of Michigan. Universal has not done so because it does not serve any charitable interest and seeks to avoid the financial disclosures required under the Charitable Trust Rules that would expose it as a for-profit corporation disguised as a non-profit corporation.

### 2.    The Defendants' Concealment of DeSanto's Participation In The Universal Network

104.   Defendants have intentionally concealed DeSanto's ownership and/or control in the Universal network because of DeSanto's past criminal conviction.

105.   In 2002, DeSanto, pled guilty to one count of criminal mail fraud in which he admitted knowingly and willingly defrauding stock investors by, among other things, attempting to artificially inflate securities prices of certain companies.

106.   DeSanto was sentenced to five years in prison followed by three years supervised release. He was also ordered to pay more than $11 million in restitution.

107.   The SEC also barred DeSanto from any association with any broker or dealer, and he was barred from participating in any offering or trading in penny stocks.

108.   Although DeSanto owns and/or controls Universal, his name does not appear in any of Universal's or affiliated companies' corporate filings.

### 3.   The Defendants Participation With Personal Injury Attorneys Through "Runner" Networks

109.   Michigan law prohibits any medical provider from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients." MCL 750.429.   Michigan law further defines a "fraudulent insurance act" as one in which "any person who knowingly, and with an intent to injure, defraud, or deceive . . . [e]mploys, uses, or acts as a runner, capper, or steerer with the intent to falsely or fraudulently obtain benefits under a contract of insurance . . . ."  MCL 500.4503.

110.   To maximize the profitability of their fraud scheme, Zack, Katz, DeSanto, and others employed and used runners, cappers, and steerers who were also affiliated with personal injury attorneys to procure or steer patients to Universal.

111.   Nicola Pavelka, a former Universal employee who was hired by DeSanto in 2011 to be the Director of Business Investment and Physician Relations, has testified in July and September 2013 depositions that Universal had its own in-house patient solicitation department that directly solicited accident victims to obtain treatment at Universal.  Pavelka testified that Universal initially used a call center based in Florida to solicit accident victims by telephone and arrange for appointments and transportation at Universal.  In approximately June 2012, Universal relocated its solicitation operations to its office in Southfield,

32

Michigan, which is where Pavelka worked.  She testified that Universal would obtain police records and then call accident victims from that office to solicit them to seek treatment at Universal and arrange transportation.  Pavelka testified that she heard Universal's callers soliciting accident victims, stating such things as "if you sign up with us, we'll send someone over to your house, get all the information. We'll get police reports for you.  We'll make sure that you start to be treated with whatever doctors that you need; we'll make sure we get the x-rays.  And if you don't have an attorney, we'll assign one to you."   Pavelka also testified that Universal would send individuals directly over to the solicited accident victims' homes.

112.   Pavelka testified that DeSanto and others, including Anthony Sereno, were directly involved in Universal's solicitation operations.

113.   Similarly, in his affidavit, Dr. Sabit attests that Zack, DeSanto and others discussed their purchases and use of police reports to solicit accident victims at Universal with Dr. Sabit.  *See* Ex. 8 ¶ 21.  Moreover, Dr. Sabit attests that Zack, DeSanto, and others openly discussed their use of and reliance on runners to solicit and meet the individuals identified by police reports.  *Id.*

114.   Furthermore, in his affidavit, Dr. Tolia attests that several Patients told him that they had been called by someone after their accident and directed to Universal for treatment.  *See* Ex. 9 ¶ 7.

33

115.   Universal Patients have confirmed that they were directly solicited after their accident to seek treatment at Universal clinics.  For example, patient L.B. testified that after her motor vehicle accident in 2008 she received a phone call in which a man identified himself as an "investigator" who helps those in accidents obtain lawyers and treatment.  The "investigator" told L.B. that he had obtained her name and information from her police report.  The "investigator" then visited L.B. at her home and directed L.B. to seek treatment at Universal's West Bloomfield clinic, telling L.B. that he had received beneficial treatment from Zack at Universal.

116.   Similarly, patient W.L. testified that a day after his accident in 2012 he received a call from a man who knew about his auto accident and claimed that he could "hook up" W.L. with doctors for treatment.  W.L. asked the unknown man how he obtained his phone number and the man claimed that he had a "black box method of getting numbers."  The man then sent another individual to visit W.L. in his home, and this individual directed W.L. to Universal for treatment.

117.  Universal appears to have a direct referral relationship with WCIS Media, a company that owns the website for 855painline.com ("855painline") and the website Who Can I Sue (whocanisue.com).  The 855painline is a service that purports to help auto accident victims locate medical professionals in Michigan.  The 855painline website displays a map of "affiliated with medical service

34

providers" in locations that appear to correspond closely to Universal-affiliated clinics. Pavelka testified that DeSanto was involved with the Who Can I Sue company, which was also used to solicit and steer patients to treat at Universal. According to Pavelka, individuals affiliated with Who Can I Sue would call auto accident victims and refer them to attorneys, who in turn would refer them to Universal.

118. WCIS Media refers patients directly to Universal, for example, through emails sent directly from WCIS Media to Universal personnel in which "investigators" appear to have made appointments at Universal clinics. In addition, Universal providers and administrative staff document referrals from WCIS Media on their treatment or intake forms.

119. DeSanto also owns or controls a company called Michigan Pro Consultants, which uses runners to solicit auto accident victims for law firms and medical clinics, including Universal. Operators from Michigan Pro Consultants, which apparently are or were based in Florida, arrange for runners to visit auto accident victims and arrange for them to sign up with law firms, including Weiner & Associates and the Law Firm of Michael Morse. Runners then notify Michigan Pro Consultants when they have successfully signed up accident victims with a law firm, and Michigan Pro Consultants then arranges initial appointments at clinics including Universal.

120.   Frederick Schwarze, a runner who directly solicited patients to sign up with personal injury attorneys, including Morse and Weiner, testified that he obtained his runner job through Zack and DeSanto.  Specifically Schwarze testified that he told Zack he was looking for work and Zack directed him to DeSanto, who, in turn, hired him to work as a runner for Michigan Pro Consultants and WCIS Media.  Schwarze also testified that when he signed up patients for personal injury attorneys he would also notify Michigan Pro Consultants, which in turn would set up appointments for patients at Universal and other affiliated clinics.

121.   Both WCIS Media and Michigan Pro Consultants are affiliated with Vincent L. Celentano.  WCIS Media is owned by Vincent L. Celentano, who is also listed on Professional Health Systems' website as its Chief Investment Officer.  Celentano's role is described as "responsible for all of our [Professional Health Systems'] investment related activities including the financing and negotiation of new facilities and ventures for Professional Health Systems."  Michigan Pro Consultants is an assumed name for Greater Michigan Professional Services, LLC, a Michigan company of which Vincent Celentano is the Managing Member and President.

122.   In 2012, when UHG Management registered as a foreign limited liability company to transact business in Florida, Vincent Celentano was listed as the registered agent, and Zack was listed as the managing member.

123.   The Universal runners also steer Patients directly to personal injury attorneys, who stand to benefit from Universal's Predetermined Protocol because it is designed to inflate the settlement value of any potential BI or UM claim.

124.   Pavelka has testified that both she and others, including DeSanto, took personal injury attorneys to lunches and dinners or brought them gift baskets to encourage them to refer clients to Universal for treatment.  Specifically, Pavelka testified that the personal injury attorneys were "looking for full service gas stations when it comes to medical care so they didn't have to chase all over everywhere to get reports on the conditions of their patients.  So we would talk about that and that we could do that."

125.   Pavelka also testified that Universal would keep patients in treatment too long, despite patients not improving, and would keep patients even past when insurers stated they would stop paying for treatment because personal injury attorneys said "it was a good case."  Pavelka testified that she specifically recalled personal injury attorney Cy Weiner making such a statement.

**D.     The Fraudulent Initial Examinations and Diagnoses**

126.   Universal implements the Predetermined Protocol to enrich Zack, Katz, DeSanto, Chudler, and possibly others, not to benefit or serve the unique needs of the Patients.

37

127.   As described below, the Predetermined Protocol is designed so that Patients are fraudulently diagnosed with "sprains" or "ligament injuries" or "subluxations" to ensure that their purported injuries fall under the scope of chiropractic treatment to begin initial treatment.  Following this, the Predetermined Protocol includes medically unnecessary chiropractic treatments, physical therapy treatments, MRIs, and EDX tests – none of which are tailored to the Patients' unique needs.

### 1.   Legitimate Treatment of Patients with Strains and Sprains Generally

128.   When an individual has been in a motor vehicle accident and seeks treatment for neck or back pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis.  Based upon this legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique needs of each Patient.

129.   A sprain is a stretch and/or tear of a ligament, the fibrous band of connective tissue that joins the end of one bone with another.  Ligaments stabilize and support the joints.

130.   Signs of a mild, moderate and severe sprain include a tear or pop in the ligament, as well as pain, bruising, swelling, and inflammation in varying degrees of severity.  A severe sprain produces excruciating pain at the moment of

injury, as ligaments tear completely, or separate from the bone, making the joint nonfunctional. A moderate sprain partially tears the ligament, producing joint instability, and some swelling. In a mild sprain, the ligament is stretched but there is no joint instability.

131.   A strain is an injury to a muscle and/or tendon, the tissue that attaches muscles to bone. Typical symptoms of strain include pain, muscle spasm, muscle weakness, swelling, inflammation, and cramping. In severe strains, the muscle and/or tendon is significantly or completely ruptured, often incapacitating the extremity or muscle. Some muscle function will be lost with a moderate strain, where the muscle/tendon is overstretched and torn. With a mild strain, the muscle/tendon is stretched and/or pulled slightly, resulting in soreness.

132.   Legitimate treatment plans for individuals with strains and sprains may involve no treatment at all because many of these kinds of injuries heal within weeks without any intervention, anti-inflammatories and other pain medication, passive modalities such as electrical stimulation, heat and massage, and/or active therapies such as stretching, exercise, and muscle strengthening.

133.   The decision of which, if any, types of treatment are appropriate for each Patient, as well as the level, frequency and duration of the various treatments, however, should vary depending on the Patient's unique needs, including: (a) age

and medical history; (b) physical condition, limitations, and abilities; (c) location, nature, and severity of injury and symptoms; and (d) response to treatment.

134.   Treatment plans should be periodically reassessed based upon updated histories, re-examination findings, reported pain levels and return to functionality, and modified using medical decision-making processes.  Treatment plans should evaluate and integrate diagnostic tests and results, such as X-rays, MRIs, and EDX tests.

135.   At a minimum, the treatment plan for Patients who fail to show any significant medical improvement after several weeks should be altered to reach significant medical improvement.  Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the Patient.

136.   Chiropractors may perform certain passive and active modalities to treat sprains, if appropriate, depending on the nature and severity of the sprain, and other associated symptoms.  Passive modalities can include spinal manipulations, manual traction, and massage, as needed.  Active modalities include stretching exercises and muscle strengthening.

137.   Similarly, physical therapists may perform certain passive and active modalities to treat strains and sprains, if appropriate, depending on the nature of the injury.  Passive modalities include electrical stimulation, ultrasound, heat, and

manual therapy.   Active modalities include stretching, exercise, and muscle strengthening.

138.   Though the use of chiropractic passive modalities may be appropriate for certain sprains, typically no longer than one or two months following acute injury, and often less, legitimate chiropractic treatment of sprains requiring intervention should progress over time principally to the use of active modalities.

139.   Chiropractic spinal manipulations involve moving a joint beyond its usual range of motion in an attempt to relieve pain.   Typically, spinal manipulations are performed on one to four regions: cervical, thoracic, lumbar and pelvis/ribs.  For the typical types of mild strains or sprains that might be associated with auto accidents, it is unusual to require manipulations of three to four regions, particularly for extensive periods of time.  Importantly, spinal manipulations may also be contraindicated when Patients suffer from bulging/protruding discs or herniations, as evidenced on MRIs, and suffer from radicular pain, particularly bilateral radicular pain.  This is important because many of the Patients purportedly had those conditions but were repeatedly subjected to spinal manipulation.

140.   With respect to physical therapy treatments, passive modalities may also be appropriate following acute injury, and treatments such as hot or cold packs may be appropriate in the initial weeks following acute injury for purposes of addressing inflammation, for instance.   Physical therapy treatments, however,

should transition to predominantly, if not exclusively, active modalities, such as targeted therapeutic exercises, particularly if the physical therapy treatments have not begun until several months after the acute injury.  Under those circumstances, it would normally be expected that the physical therapy would focus nearly exclusively on active modalities and the treatment needs for, and expected benefits from, such passive modalities such as hot packs, electrical stimulation, ultrasound, and manual therapy at this stage would be negligible or none.

141.  Importantly, an individual passive or active modality may be appropriate for a particular individual visit, based on the particular treatment status and goals of the patient, it seldom, if ever, is appropriate for patients to receive combinations of extensive passive modalities, such as hot packs, manual traction, chiropractic manipulation, manual therapy, and massage, as well as active therapies concurrently, much less for extended periods of time.  Instead, as described above, the utility of passive therapies should decline significantly after the period of acute injury.

### 2.    The Fraudulent Initial Examinations and Diagnoses

142.  The first step in the fraudulent Predetermined Protocol is an initial examination by Zack, Katz, or other Chiropractors that typically results in false diagnoses of back "sprains/ligament injuries" to at least two regions of the Patients' spines, and often three regions of the spine (cervical, lumbar and

thoracic).  *See* Ex. 1.  The prevalence and uniformity of diagnoses of purported sprained ligaments that Zack, Katz, and the Chiropractors assign across virtually all Patients are not credible.  Sprained ligaments resulting from motor vehicle accidents are much less common than strained muscles, and yet Zack, Katz, and the Chiropractors purport to find exclusively sprained ligaments – not strained muscles.  Moreover, it is highly unusual to find sprained ligaments in multiple back regions, much less across three back regions (*e.g.,* cervical, thoracic, *and* lumbar) – a finding that Zack, Katz and the Chiropractors routinely make.

143.  Zack, Katz, and the Chiropractors' pattern of documenting solely sprained ligaments (which are related to purported joint dysfunctions) as opposed to more common muscular strains (which are not joint dysfunctions) is intentional.  Specifically, the Michigan Public Health Code limits the scope of chiropractic adjustments to conditions relating to "subluxations, misalignments, and *joint dysfunction*."  Michigan Public Health Code Part 164 (emphasis added).  As a result, the Predetermined Protocol of diagnosing virtually every Patient with a purported "sprain" or "ligament injury" or, beginning in 2012, "subluxation" (*i.e.,* joint dysfunction) is intended to create false diagnoses to ensure that all Patients' conditions fall under the scope of chiropractic treatment to begin the extensive medically unnecessary chiropractic treatments that are at the heart of the Predetermined Protocol.  Indeed, until 2012, Universal's boilerplate initial

evaluation templates include *only* sprain/ligament diagnoses as options for the Chiropractors to circle, with no options for muscular strains or other diagnoses that would indicate the patient's condition falls outside the scope of chiropractic treatment.

144.   Based upon these initial findings and diagnoses, Zack, Katz, and the Chiropractors routinely order x-rays, often to all three regions of the spine, irrespective of the Patients' reporting symptoms. *See* Ex. 3.   These x-rays are medically unnecessary and not tailored to the Patients' unique needs.   Indeed, Zack, Katz, and the Chiropractors do not document or even comment on the results of the x-rays, and do not alter treatment plans based on any x-ray findings.

145.  Zack, Katz, and the Chiropractors also initiate a treatment plan consisting of chiropractic manipulations of multiple spinal regions, and a laundry list of passive modalities combined with some active therapy.   The treatments typically commence with three-to-four times per week frequency.

146.   Zack, Katz, and the Chiropractors also document radiculitis symptoms or radiculopathies for the majority of Patients.   These findings across so many Patients are not credible and are intended to create the pretext for Chudler's subsequent EDX orders and the EDX testing by the EDX Providers, as well as the MRI orders by Chudler and the Chiropractors.

147. Zack, Katz, and the Chiropractors also routinely determine in the initial examination that Patients, as a result of their purported injuries, need household services and are disabled from work (if the Patient is working). These disability determinations curry favor with PI attorneys by increasing the value of the Patients' claims. In addition, these disability certificates enable patients to receive transportation to and from Universal, at no cost to the patients, but at a significant cost to State Farm. By providing transportation at no cost to the patients, the Defendants are also able to maximize the likelihood that Patients will attend their scheduled visits and continue treatment.

148. Zack, Katz, and the Chiropractors' initial evaluations uniformly conclude with a "guarded' prognosis. The Chiropractors virtually never indicate either a "good" or "poor" prognosis for a Patient. Such uniformity of prognosis for Patients is not credible, as legitimate evaluations would show variability in prognoses across such a wide range of Patients. Representative examples of the Chiropractors' Initial Exam Reports and corresponding bills are attached hereto as Exhibit 10.

### 3. Chudler's Fraudulent Examinations, Diagnoses, and Treatment Plans

149. Following Zack, Katz, and the Chiropractors' initial examinations, Patients are evaluated by Chudler, whose evaluations, diagnoses, and treatment plans are equally fraudulent, and are intended primarily, if not solely, to support

the fraudulent diagnoses and treatment recommendations of Zack, Katz, and the Chiropractors, as well as the Physical Therapists.

150.   For instance, Chudler's purported physical examinations are cursory, largely boilerplate and not credible.  The descriptions of his physical examinations vary little among Patients, and generally contain only non-specific descriptions of tenderness to palpation, pain (typically in multiple neck and back regions), and decreased range-of-motion, but with no specific measurements of pain severity or range-of-motion impairments.

151. Notably, although Chudler purports to conduct neurologic examinations, Chudler never documents any focal neurological deficits or muscle weakness during his physical exams.   This uniform absence of neurological deficits is not credible in light of the fact that the Chiropractors, Physical Therapists, and/or Chudler routinely document purported radicular symptoms (pain radiating from the neck or back into the extremities) for the great majority of Patients.   Indeed, many of these Patients are later diagnosed with purported radiculopathies (pinched nerve roots) by the EDX Providers, and many with purported bilateral radiculopathies. *See* Exs. 1 and 5-7 (the EDX testing).  Given these widespread purportedly significant neurological symptoms and diagnoses, Chudler's failure to find any focal neurological deficits is not credible and indicates that his physical examinations are fabricated and fraudulent.

152.   In addition, Chudler's documentation in his initial (and his follow-up) examinations, histories, diagnoses, and treatment plans contains pervasive patterns including: (a) chief complaints of pain and stiffness in multiple regions of the back and/or neck that are general and non-specific, and are typically symptoms of strained muscles (which are never diagnosed), not sprained ligaments (which are always diagnosed); (b) radiating pain; (c) muscle spasms and tenderness to palpations (with no indications of severity or specifics regarding the actual muscles or muscle groups purportedly affected); (d) recommendations for continued chiropractic spinal manipulative therapy; (e) the same diagnoses of sprains, typically to at least two, and often three regions of the spine, namely the cervical, thoracic and lumbar areas, as reflected in Exhibit 1; (f) discussion of "possible future diagnostic studies including EMG and MRI studies if no improvement over the next two to three months"; and (g) a re-evaluation in one month. Representative examples of Chudler's Initial Exam Reports and corresponding bills are attached hereto as Exhibit 11.

153.   Although Chudler is the titular "Medical Director" of Universal, his evaluations and re-evaluations contain no true diagnoses, much less attempts at differential diagnoses.   That is, Chudler's evaluations and re-evaluations do not discuss the potential mechanism(s) of injury or discuss any type of coherent proposed testing or treatment to help determine the cause, nature, and best course

of treatment for any injuries.  Nor does Chudler attempt to consider the various symptoms reported by Patients to create a coherent individualized diagnostic picture and individually tailored treatment plan.

154.   Instead, Chudler's treatment plans consist of boilerplate prescriptions to "continue chiropractic therapy" and/or "physical therapy," and instructions to send Patients for MRIs and EDX tests.  In his prescriptions for chiropractic and/or physical therapy treatments, Chudler never documents what potential mechanism or area of injury is his intended target for chiropractic or physical therapy treatment.  His treatment plans do not vary based upon the Patients' reported symptoms or improvement (or lack thereof) in treatment.  Nor, as described below, do his treatment plans describe any rationale for continuing chiropractic or physical therapy when the Patient has failed to show sufficient improvement over the course of many months, if not longer.

155.   Moreover, Chudler does not discuss the significance of – much less integrate – the findings of x-rays, MRIs or EDX tests in his "treatment plans." Instead, Chudler ignores the x-ray results and merely pastes the results of MRI or EDX studies verbatim into his diagnostic "impressions."  However, simply pasting in results like "disc bulges at C6-C7" is not a diagnostic "impression," and Chudler never documents if any x-ray, MRI or EDX results have any clinical significance or are consistent or not with his treatment plan.

48

**4.      The Fraudulent Chiropractic and Physical Therapy Treatments**

**a)      The Fraudulent Chiropractic Treatments**

156.   Based upon Chudler, Zack, Katz, and the Chiropractors' "treatment plans," Patients are scheduled to visit Universal for chiropractic treatment, typically at least three to four times per week for the first four to six weeks of treatment, with treatment sometimes reducing to two to three times per week thereafter until either the Patients, on their own volition, decide to stop treatment or State Farm communicates that it will not pay for further treatment, State Farm communicates that it is investigating the claim, or the claim settles.

157.   Tellingly, Zack's, Katz's, the Chiropractors', and Chudler's initial evaluations virtually never result in the determination that a Patient does not require treatment at Universal.   Instead, Patients evaluated at Universal are immediately diagnosed and prescribed treatment at Universal, and often begin treatment on the same day as the initial evaluation.

158.   The treatment that Patients purportedly receive on each visit is not individually tailored to the Patients' symptoms, diagnoses, progress or lack thereof. In most instances, the treatments provided to Patients are virtually identical, despite the wide range of unique circumstances presented by each Patient, including the Patients' ages, physical characteristics, symptoms, histories, abilities to participate in treatment, and their responses thereto.   On each visit, Patients

received spinal manipulations, often to three to four regions of the spine, hot packs, and typically manual traction. *See* Ex. 3. Many Patients also received massage on chiropractic visits. *Id.* Finally, as described below, many Patients also received concurrent physical therapy modalities, such as manual therapy and electric stimulation, during some of the time period in which they also received chiropractic treatments, and many received overlapping chiropractic and physical therapy treatments on the same day.

159. While any one of the foregoing individual modalities might be medically appropriate for a particular Patient on a particular day, this comprehensive combination of treatments is seldom, if ever, medically necessary for a single Patient on any day, let alone for every Patient on virtually every visit over the extensive course of treatment at Universal.

160. If the Patients indeed suffered from sprained ligaments, especially sprains across all regions of the back and neck, along with significant muscle spasms, as Zack, Katz, the Chiropractors, and Chudler routinely document, many Patients would not have been able to tolerate the number of manipulations and/or manual traction treatments that they purportedly received, particularly with the documented frequency.

161. Indeed, the manipulations and/or manual traction may have been contraindicated for many Patients, such as those suffering from acute cervical disc

herniation with significant radicular symptoms, particularly bilateral radicular symptoms (as was the case with many Patients here). Indeed, as described below, the majority of Patients purportedly reported radicular symptoms, according to the initial evaluations by Zack, Katz, the Chiropractors, and Chudler, and the great majority of Patients who received EDX testing were diagnosed with purported radiculopathies, often bilaterally. *See* Exs. 5-7. In addition, the majority of MRI interpretations for the Patients at Clear and Horizon included purported disc herniations and protrusions, often across multiple regions of the spine.

162. Zack, Katz, the Chiropractors, and Chudler, however, do not modify Patients' treatment plans to account for either Patients' reports of radicular symptoms, MRI findings that indicate disc herniations or protrusions and/or EDX testing indicating radiculopathies. Instead, Patients continue to receive the same laundry list of treatment modalities, including multiple-region chiropractic spinal manipulations and manual traction, despite Patients' self-reported symptoms, MRI findings, and EDX tests suggesting that such treatments may be contraindicated.

163. Nor do Zack, Katz, the Chiropractors, or Chudler modify the Patients' treatment plan despite lack of documented improvement over significant periods of time. In fact, the vast majority of Patients at Universal show little or no improvement over the course of many months, and often not even over the course of a year, even though most soft tissue injuries resolve within weeks after injury.

51

164.   There is also no coordination of treatment at Universal.  Neither Zack, Katz, Chudler, the Chiropractors, the Physical Therapists nor the EDX Providers attempt to coordinate their various treatments and tests, nor treatment with providers other than Universal.   Indeed, Chiropractors and Physical Therapists have testified that entirely separate Patient files are kept by Chudler (the "medical" files), chiropractors (the "chiropractic" files) and physical therapists (the "physical therapy" files).  Neither Chudler nor any other provider at Universal has access to any other provider groups' files, and thus no one at Universal attempts to integrate or coordinate the treatments, findings, or ongoing symptoms reported across the medical, chiropractic, and physical therapy evaluations and treatments.

165.  Zack, Katz, the Chiropractors, and Chudler purport to re-examine Patients, typically every four weeks.  The re-examination reports ("Chiropractic Re-Exam Reports") are similar to the Initial Chiropractic Exam Reports in that they include pervasive and non-credible patterns, including: (a) boilerplate recommendations for continued spinal manipulative therapy, typically on three to four regions, regardless of a Patient's symptoms, lack of improvement, and/or irrespective of x-rays, MRIs, and/or EDX test results; (b) similar false diagnoses of sprains, often to all three regions of the spine, and radicular pain; (c) similar goals across all Patients, despite substantial differences in the unique circumstances of each Patient; and (d) identical prognoses of "guarded" and "dependent on further

treatment."  Representative examples of the Chiropractic Re-Exam Reports and corresponding bills are attached hereto as Exhibit 12.

166.  The vast majority of re-examinations do not reflect any significant medical improvement over time.  The Patients' treatment plans are not modified regardless of any documented medical improvement or lack thereof.  Additionally, despite the fact that the initial prognosis is contingent on "further testing," the treatment plans do not incorporate the results of any x-rays, MRIs or EDX testing, other than merely copying and pasting the results of the MRIs and EDX tests, and continuing with the same treatment regime, nor do the prognoses change from "guarded."

167.  The re-examinations are not performed to legitimately evaluate the Patients' conditions and progress and to make medical decisions that are tailored to the unique needs of the individual Patients.  Instead, the re-examinations are pretexts to support predetermined prescriptions for more chiropractic treatment.

168.  Such chiropractic treatments continue for an extended amount of time, often more than one year, and then abruptly stop regardless of whether there has been any documented improvement.  Universal typically discontinues chiropractic treatment only when: (a) an independent medical examination determines that further treatment is not medically necessary; (b) State Farm notifies Universal that it is investigating its chiropractic services; (c) the Patient resolves his or her claim,

or there is no BI/UM exposure; or (d) the Patient unilaterally decides to stop treatment.

169.   Beginning in mid-2011 through 2012, numerous Patients did not receive chiropractic treatment at Universal, receiving instead solely physical therapy and other treatments at Universal.  As documented in Exhibit 3, the vast majority of these physical therapy-only Patients were receiving their chiropractic treatment at other clinics owned or controlled by Zack and Katz, namely, Associated Chiropractic or United Wellness, and were sent to Universal for the physical therapy component of the Predetermined Protocol.  *See* Ex. 3 (documenting patients receiving physical therapy at Universal and chiropractic treatments at other facilities).  Consistent with the Predetermined Protocol, the large majority received both chiropractic and physical therapy modalities during the course of their concurrent treatment at Universal and those other clinics.

### b)   The Fraudulent Physical Therapy Treatments

170.  Based  upon  Chudler's  fraudulent  initial  evaluations  or  re-examinations,  Chudler  prescribes  physical  therapy  to  Patients,  typically approximately  six-to-eight  weeks  after  the  Patients  have  been  subjected  to extensive  chiropractic  treatments.  Chudler  is  essential  to  this  scheme  because Michigan  law  requires  a  prescription  from  a  medical  doctor  or  other  licensed health  care  professionals  specified  in  the  Public  Health  Code  before  a  physical

therapist can perform physical therapy services on a patient. *See* Mich. Pub. Health Code §333.17820(1) ("A person shall engage in the actual treatment of an individual only upon the prescription of an individual holding a license issued under part 166 [Dentistry], 170 [Medicine], 175 [Osteopathic Medicine & Surgery], or 180 [Podiatric Medicine & Surgery], or the equivalent license issued by another state"). Chudler qualifies as a prescribing person because he is licensed as an osteopathic doctor, but Zack, Katz, and the other Chiropractors do not qualify. Therefore, Zack, Katz, and DeSanto need Chudler's examinations and predetermined prescriptions to be able to bill for Universal's physical therapy treatments.

171. In prescribing physical therapy, Chudler does not specify any mechanisms of injury, targets of physical therapy, or make any specific recommendations for types of physical therapy. Moreover, Chudler's treatment plans do not address why treatment typically begins with chiropractic treatment for the great majority of Patients, rather than physical therapy. Instead, Chudler simply follows the Predetermined Protocol of commencing chiropractic treatment for Patients, even if their conditions and symptoms do not indicate the need for chiropractic treatment, or may in fact suggest that chiropractic treatments are contraindicated. Furthermore, because the vast majority of Patients fail to show significant therapeutic progress from the chiropractic treatments, this creates the

pretext for Chudler to then commence physical therapy treatments, often concurrent with chiropractic treatments.   Thus, the chiropractic and physical therapy treatment modalities selected for Patients are not individually tailored for Patients' symptoms and medical needs, but rather simply follow the assembly-line Predetermined Protocol.

172.   As with the fraudulent chiropractic evaluations, no Patient evaluated for physical therapy is ever determined to be an unsuitable candidate for physical therapy.   Indeed, no legitimate evaluations are made to determine the proper modalities and course of treatment.   Instead, the physical therapy evaluation and re-evaluation forms typically contain nothing more than a laundry list of pre-printed "problems" that are checked off by the Physical Therapists, with the Patients often purportedly having more than ten separate "problems."   These forms also contain a pre-printed list of long-term and short-term goals, the vast majority of which are also checked off.

173.   Other than simply listing "problems" and "goals," the physical therapy evaluation and re-evaluations, however, contain no discussion of any differential diagnostic decision-making, discussion of mechanism or injury or how the treatment plan is tailored to or seeks to address potential mechanisms of injury, nor any discussion of alterations in treatment plans because of a lack of

documented improvement.  Representative examples of the Physical Therapists'
initial evaluations and re-evaluations are attached hereto as Exhibit 13.

174.  The physical therapy evaluations and re-evaluations also do not
document any specific home exercise counseling or teaching, nor do they
document whether the Patient is complying with any home exercise regimen, and,
if so, what the response has been.  Instead, like Chudler's and the Chiropractors'
evaluations, to facilitate the assembly-line approach, the physical therapy
evaluations are purposely non-specific and contain no genuine documentation of
an individualized treatment plan to address the Patient's unique needs.

175.  Differences between the documented chiropractic and physical
therapy evaluations, on the one hand, and Chudler's purported physical
examinations, on the other hand, belie the credibility of the documented
examinations and evaluations.  For instance, the chiropractic and physical therapy
evaluations purportedly document positive neurological symptoms and/or
weakness in the vast majority of Patients, and many Patients are diagnosed with
purported radiculopathies – yet Chudler's concurrent physical examinations *never*
document focal neurological deficits or weakness.

176.  The Physical Therapists do not provide any quantification of any
"problems" or "short-term or long-term goals," such as numbered pain ratings or
range of motion measurements.  As a result, because neither Chudler nor the

Physical Therapists provide any true baseline measurements, they cannot – and do not attempt – to document whether any short or long-term goals have been met. Indeed, although the physical therapy daily treatments notes provide a check box for "Meets short-term goals" at every fifth visit, State Farm has not located a single instance in which the Physical Therapists have checked this box for *any* Patient to document that any short-term goals have ever been met. Chudler and the Physical Therapists purposely avoid establishing baselines at the outset so they can continue to provide indefinite treatment without showing the lack of improvement that most Patients experience throughout the treatment.

177. The physical therapy follows a Predetermined Protocol that is not individually tailored to Patients' medical needs. Specifically, Patients typically continue to receive all or most of the passive modalities of hot packs, electrical stimulation, manual therapy, along with the active modality of therapeutic exercises on each visit. The extensive use and combination of passive modalities, such as hot packs, electrical stimulation, ultrasound, and manual therapy is medically unnecessary for these Patients, given that the physical therapy treatments typically do not begin until many months after the acute injury. Moreover, as described above, most Patients are also receiving concurrent passive modalities of chiropractic treatment, including hot packs, manual traction, manipulations, and massage. Because these types of passive modalities typically are only medically

indicated, if at all, during the early stages of recovery from the types of soft tissue injuries suggested here, it is not medically necessary to continue providing this litany of passive modality treatments over the course of many months, and often more than one year, post-acute injury.

178.   Neither Chudler nor the Physical Therapists individually tailor the treatment to the Patients' needs.   Beyond providing the same laundry list of modalities to the Patients over time, they do not alter the treatment, even when the Patient has failed to show significant improvement over the course of several months, and often even longer.   Rather than modify the treatment plan or discontinue treatment altogether, Chudler and the Physical Therapists simply continue the same course, irrespective of Patients' symptomatology and course.

179.   Although the great majority of Patients receive both chiropractic and physical therapy treatments concurrently during significant portions of their treatment, and indeed many receive *both* chiropractic and physical therapy on the *same* day, there is no coordination of care between chiropractic and physical therapy treatments.   This level of concurrent care, particularly with the overlap of passive modalities so late into treatment, is medically unnecessary, and particularly so when there is no effort to coordinate treatments.

180.   Although Chudler is the purported Medical Director of Universal and writes the physical therapy prescriptions, he makes no effort to direct the course of

treatment or consider the Patients' lack of improvement into his diagnoses or treatment plans. Chudler fails to provide any specific baseline measures or maneuvers from which to gauge patient improvement. In fact, in his re-evaluations, Chudler never comments on the Patients' course and lack of response to either chiropractic or physical therapy treatments. Indeed, there is no evidence that Chudler even discusses patient care and progress with the Chiropractors or Physical Therapists. Instead, Chudler's sole function is to confirm the Patients' fraudulent diagnoses and continue to prescribe more treatment for Patients.

181. As with the chiropractic treatments, the Physical Therapists do not consider or integrate x-ray, MRI, or EDX tests results into their treatment plans. In fact, the Physical Therapists typically do not have access to the test results for Patients, and instead continue with their Predetermined Protocol without any attempt to learn or take into consideration these findings.

182. These physical therapy visits typically continue for an extended amount of time, often for many months, and then abruptly stop, often with little or no medical improvement. Universal typically discontinues physical therapy treatment only where: (a) an independent medical examination determines that further treatment is not medically necessary; (b) State Farm notifies Universal that it is investigating its physical therapy services; (c) the Patient resolves his or her

claim, or there is no BI/UM exposure; or (d) the Patient unilaterally decides to stop treatment.

183.   In instances in which Chudler does not prescribe physical therapy, the vast majority of the Patients have either (1) unilaterally dropped out of treatment prior to a point in time in Predetermined Protocol in which Chudler prescribes physical therapy, (2) are treating at Universal during a period of time in which Universal did not provide physical therapy at some or all of its locations, or (3) were already receiving (or had received) physical therapy at other medical facilities.  *See* Ex. 3 (documenting patients' with physical therapy treatments at other facilities).

### 5.    The Fraudulent MRI Self-Referrals to Horizon and Clear

184.   Zack, Katz, DeSanto, and possibly others own and/or control Horizon and Clear to profit from medically unnecessary MRIs, which are an important additional step in the Predetermined Protocol.  Chudler, the Chiropractors, and the Universal staff, at the direction of Zack, Katz, and DeSanto, steer Patients to obtain multiple MRIs from one of the two mobile MRI trucks in the parking lots of either Horizon or Clear.

185.   Zack, Katz, DeSanto, and others, including Cory Mann and Joshua Katke, who purportedly manage Clear and Horizon, have taken affirmative steps to conceal Zack's, Katz's, DeSanto's, and possibly others' ownership and/or control

of Horizon and Clear to circumvent the Michigan Public Health Code's prohibition against self-referrals. Specifically, the Michigan Public Health Code prohibits chiropractors from requiring any patient to obtain service from any facility in which the chiropractor has a financial interest. *See* MCL §333.16221(e)(iv)(A). In addition, the Michigan Public Health Code incorporates and applies the Federal Stark Law and regulations prohibiting referrals for designated health services, including MRIs, to any entity in which the medical provider has a financial relationship. *See* MCL §333.16221(e)(iv) (B); 42 USC §1395nn(h)(6). A "financial relationship" includes any ownership, investment, or compensation arrangement between the medical provider and the entity providing the designated health service. 42 USC §1395nn(a)(2). An ownership or investment interest may be through equity, debt, or other means, and includes an interest in an entity that holds an ownership or investment interest in any entity providing the designated health service. *Id.* Moreover, a compensation arrangement means any arrangement involving any remuneration between a medical provider and an entity providing the designated health service. 42 USC §1395nn(h)(1).

186. Under the Federal Stark Law, if a chiropractor or physician either directs or controls referrals made by his or her group practice, members, or staff, the referral may be imputed to the chiropractor or physician. 42 C.F.R. § 411.353.

187. Thus, under both Michigan and federal law, chiropractors and physicians may not refer, or direct others to refer, patients for MRIs to any facilities in which they have a financial relationship.  The policy rationale behind these prohibitions on self-referrals is that medical treatment should be guided solely by the Patient's legitimate medical needs and physicians' medical judgments should not be influenced by the potential for financial gain.  By prohibiting chiropractors and physicians from referring to facilities, like MRI facilities, in which they have a direct or indirect financial interest, the Michigan Public Health Code and the Federal Stark Law seek to reduce medically unnecessary services based on financial motives as opposed to Patient needs, and eliminate financial factors that may interfere with a provider's independent medical judgment.

### a) The Relationships Among Universal, Horizon, and Clear

188.  Universal's referrals to Horizon and Clear are not coincidental:  as noted above, Zack, Katz, DeSanto, and possibly others own and/or control Universal, Horizon, and Clear.  Zack, Katz, and DeSanto direct Chudler, the Chiropractors, other medial providers, and the staff to steer Patients to either Horizon or Clear for medically unnecessary MRIs.  For instance, Dr. Sabit describes how he was specifically directed by Zack and staff at Universal to send Patients to Clear or Horizon for MRIs and that the prescriptions for MRIs that he was instructed to use had specific boxes indicating that the MRI should occur at

Clear or Horizon.  Dr. Sabit further states that Zack requested him to send patients to Clear or Horizon because Zack, DeSanto, and possibly others affiliated with Universal, directly profited from these MRIs because they owned and/or controlled these mobile MRI units.  (Ex. 8 ¶¶11-12).

189.   In August 2013, Joshua Katke, the purported manager of Clear and Horizon, testified that the current owners of Clear include two entities, Bearon Imaging, LLC and United Investment Holdings LLC, which collectively own 75% of Clear.  Zack and Katz comprise two-thirds of the membership of both of these entities, and thus have a direct ownership interest in Clear.  Katke also testified that Professional Holdings Unlimited, LLC, a Florida corporation, previously had a 50% ownership interest in Clear that ceased at some point in 2013.  Vincent L. Celentano is the registered agent and managing member of Professional Holdings Unlimited, LLC.

190.   Furthermore, in 2010, Zack signed a Form W-9 Request for Taxpayer Identification Number on behalf of Horizon, which was submitted to State Farm to authorize payments to Horizon for MRIs.

191.   On its website, Professional Health Systems, which is a company that appears to have taken over UHG Management's role with respect to "managing" the Universal clinics, lists  Zack, Katz, and Cory Mann among its "management"

team, and also includes Horizon, Clear, and Universal clinics among the health care facilities that it purportedly "manages." *See* Ex. 14.

192.   In addition to the disclosed information on the Professional Health Systems website, there are also overlapping circumstances between Horizon and Clear indicating that they are commonly owned and/or controlled by Zack, Katz, DeSanto, and possibly others, and that these individuals have profited substantially by causing referrals of Patients to Horizon and Clear for medically unnecessary MRIs.  For instance:

a)   Horizon was incorporated on 7/8/2009.  Two months later, Clear was incorporated on 9/2/2009.

b)   Horizon and Clear were incorporated with the same registered agent (Kenneth Boyer).

c)   Horizon and Clear have the same representative on their separate Certificates of Need (Cory J. Mann).

d)   Horizon's address on its Certificate of Appointment for Authorized Agent filed with the State of Michigan is in fact *Clear's* street address, not Horizon's (907 S. Main Street, Royal Oak, Michigan 48067).

e)   Horizon's telephone number for its authorized agent on its Certificate of Need is the cell phone and fax number for an agent of *Clear*, not Horizon.

f)   Horizon and Clear list the same "Authorized Official/Credentialing Supervisor" (Jodie Burkett).

g)   Horizon and Clear have used the same reading radiologist located remotely in Florida (Chinton Desai).

h)   Horizon's and Clear's MRI reads contain similar patterns of unusual and non-credible findings, as described below.

65

193.   Although Horizon and Clear on paper are purportedly "separate" from each other and from Universal, they also frequently have been co-plaintiffs with Universal, and been represented by the same attorney in collection actions against State Farm for services provided to Patients.

194.   As described below, the MRI orders are not only improper self-referrals under the Michigan Public Health Code, but are medically unnecessary and generated to enrich Zack, Katz, DeSanto, and possibly others.

195.   Moreover, as described below, the MRI interpretive reports generated by Horizon and Clear are not credible and are created to support a purported objective manifestation of injury, which serves to curry favor with PI attorneys and purports to support Universal's continued treatment.

196.   Universal's fraudulent referrals to Horizon and Clear are highly lucrative because the charges by Horizon and Clear are exorbitant:  Specifically, Horizon and Clear charge over *$5,000* for MRIs performed on each spinal region. Thus, cervical and lumbar MRIs typically lead to charges of over *$10,000* for a single visit.  See Ex. 4.

197.   Tellingly, these extraordinary charges are a far cry from the average charges that Horizon and Clear represented to the State of Michigan in their applications for Certificates of Need.  Specifically, Horizon and Clear were both required to apply for Certificates of Need with the State of Michigan to obtain

permission to perform and bill for MRIs.  On Horizon's and Clear's Certificate of Need applications, they listed their projected average charge per scan to be $700 and $850 respectively – charges that are orders of magnitude below the $5,000 per scan amount they actually charge State Farm.

198.   Accordingly, it appears that Horizon and Clear are nothing more than captive companies owned and controlled by Zack, Katz, DeSanto, and possibly others to provide fraudulent MRIs from mobile MRI trucks in the parking lots of Horizon and Clear, to profit from No-Fault claims.

### b)      The Fraudulent Self-Referrals To Horizon and Clear

199.   Universal's Predetermined Protocol with respect to MRIs begins from the outset with initial "evaluations" by Chudler, and the Chiropractors.  For instance, during his first evaluation, Chudler often purports to have "discussed with Patient at length possible future diagnostic studies including MRI studies if no improvement."  *See* Ex. 11 (examples of Chudler's initial evaluations discussing future MRI studies).  Similarly, the initial chiropractic evaluations often note the recommendation of MRIs.  Chudler and the Chiropractors, in fact, are doing nothing more than planting seeds for MRI orders for Patients who have not dropped out of treatment before their next evaluation.  Specifically, because Universal rarely documents significant improvement for Patients within the first four to six weeks of treatment, nearly every Patient "re-evaluated" by Chudler or

the Chiropractors meets the predetermined criteria of showing "limited" or "no improvement," and thus is referred for MRIs by Chudler or the Chiropractors, unless the Patient has already had an MRI. Thus, the majority of Patients who remain in treatment following the initial four to six weeks of treatment are referred for MRIs at Horizon or Clear.

200. MRIs are advanced imaging procedures that should only be performed after an individualized determination is made on each patient that it is medically necessary. For example, MRIs may be ordered when a patient's diagnostic picture is particularly unclear, response to treatment is atypical or not significant, or there are legitimate concerns about structural damage or internal injuries to the patient. When MRIs are ordered, they should be limited to the targeted body part or area of interest. It is thus uncommon to order MRIs on all regions of the spine or often more than one region.

201. When MRIs are clinically indicated and ordered, medical providers should evaluate the significance of the MRI interpretations and incorporate those findings into diagnoses and ongoing or future treatment plans. Specifically, medical providers must seek clinical corroboration as to whether any of the identified abnormalities in the MRI interpretations are symptomatic and/or present any clinical significance to the patient. For instance, many abnormalities in MRI reads are asymptomatic or are related to patients' normal aging process or have no

direct correlation with any acute injury or symptoms.  As a result, it is important to determine which, if any, MRI abnormalities may be related to the patients' presenting symptoms and/or any acute injury.

202.   In contrast, the MRIs ordered by Chudler and the Chiropractors are not individually tailored to Patients' symptoms or needs.  Universal's pattern of ordering MRIs for the majority of its Patients who remain in treatment, and routinely ordering two and often three or more MRIs across so many Patients is highly unusual and not credible.  *See* Ex. 4 (exhibit showing Horizon and Clear MRIs for Patients).

203.   Moreover, regardless of the MRI findings, the treatment of patients at Universal did not change, proving that the MRIs were not ordered because they were medically necessary.  After receiving MRIs, Patients returned to Universal and continued with the same Predetermined Protocol they were getting before the MRIs were ordered.  Neither Chudler nor the Chiropractors evaluate or incorporate the findings of the MRIs they order into the Patients' treatment plans.  For instance, many Patients are diagnosed with bilateral radiculopathies, often at both cervical and lumbar levels, as well as with other neurological conditions, and have MRI interpretations purportedly showing disc herniations and protrusions at these same spinal levels.  Yet, neither Chudler nor the Chiropractors ever make note that these findings could pose a concern for continued chiropractic manipulations or

other treatments, much less modify the treatment plan to account for these conditions.

204.   Instead, Chudler's and the Chiropractors' sole use of the MRI findings is to merely copy and paste the results of the findings into their evaluations, without any commentary or consideration of their impact on the Patients' diagnoses or continued treatment.  They do so because their orders for MRIs are not for legitimate diagnostic or medical purposes.

### c)   Horizon and Clear's False MRI Interpretations

205.   As described above, Horizon and Clear are not independent MRI providers: they are owned and/or controlled by Zack, Katz, DeSanto, and possibly others.  Not surprisingly, the "findings" and "impressions" generated by Horizon and Clear are remarkably similar and contain non-credible patterns of findings, including:  (1) purported abnormal cervical lordosis (cervical straightening) for virtually every Patient who has a cervical MRI; (2) virtually every instance of cervical straightening to either "musculoligamentous sprain/spasm" or acute injury, and *never* to other common and non-pathological reasons for cervical straightening, such as posture and body positioning in the MRI machine, among other reasons; (3) other findings, such as marrow or ligamentous edema (swelling), that should often be present if cervical straightening were due to acute injury are virtually never documented, and (4) torn ligaments are never documented,

although virtually every Patient has been diagnosed with ligament injuries by Chudler and the Chiropractors; and (5) "sprains" and "spasms" are routinely documented in the impressions even though such diagnoses require clinical correlation and cannot be provided by MRI images alone. *See* Ex. 4.

206.   Cervical lordosis refers to the curvature of the cervical spine.  Most individuals' cervical spines have a degree of outward curvature that is considered "normal" for that person.  There is wide variability in what is considered "normal" for each person, and the degree of "normal" cervical spine curvature varies greatly.  For instance, some individuals' normal posture may result in very limited, if any, cervical curvature, while other individuals' normal posture may result in significant cervical curvature.

207.   In addition to an individual's normal posture, another common non-pathological reason for apparent cervical straightening in MRI images is simply the method by which the MRI technician positions the Patient in an MRI machine.  If Patients are positioned with their necks held in a relative degree of flexion, for instance with a pillow under their head, the resulting MRI images are likely to show artificial "cervical straightening" (*i.e.*, cervical straightening that has nothing to do with injury).  Thus, the way MRI technicians position Patients may cause a straightening of the cervical portion of the spine that has nothing to do with any pathology or clinical symptoms.

71

208.   Horizon and Clear's MRI interpretations *never* mention these other common causes of cervical straightening, such as normal posture (for the individual), patient positioning in the MRI machine, or other normal causes of cervical straightening.

209.   Horizon and Clear's attributions of the cause of abnormal lordosis to unspecified acute "injury" are designed to connect cervical straightening to trauma from an auto accident.   Following muscular, ligamentous, and bone trauma or injury, there are expected sequelae typically seen on an MRI that can be confirmatory of legitimate trauma.   For instance, marrow and/or ligamentous edema (by-products of swelling) or contusions (hemorrhage blood products) are seen in MRI images following the types of trauma that Universal purports to diagnose for its Patients.

210.   The MRI interpretive reports from Horizon and Clear, however, almost never document any of these types of findings associated with real trauma or injury.   In fact, many of the MRI reports state the opposite finding of "no significant marrow edema."   Moreover, the interpretive reports never document paraspinus muscle or interspinous process ligament edema, which should be present in virtually all of the Patients, given diagnoses by Universal providers of multi-region back and neck sprains across virtually every Patient.   The absence of these findings indicates that at least many of the purported disc bulges, protrusions

and herniations identified in Horizon's and Clear's MRI interpretive reports are likely the result of long-term degenerative conditions commonly found in the general population that are often asymptomatic and have nothing to do with auto accidents.

211.   Tellingly, the MRI interpretive reports from Horizon and Clear in fact *never* find an actual torn ligament in any Patient.  This in itself is astounding given that the Chiropractors and Chudler routinely diagnose widespread, multi-region ligament injuries and sprains for virtually every Patient.

212.   In addition, the MRI interpretive reports from Horizon and Clear are replete with multiple purported "abnormalities" for virtually every Patient.  *See* Ex. 4.  Such uniform, widespread, and serious abnormalities across such a wide range of Patients are not credible, particularly among Patients under 30 years of age, where such widespread disc bulges, protrusions, and herniations are not commonly found.

213.   Indeed, for many Patients, the Horizon and Clear MRI interpretive reports document extensive, and often severe, abnormalities across multiple regions of the spine when, in fact, the MRI images are *entirely normal.* For instance, Patient Q.W., a 30 year-old male, had cervical, thoracic, and lumber MRIs ordered by Katz and purportedly interpreted by a radiologist for Clear.  *See* Ex. 15 (example of Q.W. and other MRI Interpretive Report)  As is the case with

virtually every MRI reviewed by Clear, the MRI report documented many purported abnormalities across multiple regions of the spine, including:

> (1)   "Cervical lordotic curvature is straightened probably due to musculoligamentous spasm/strain";
>
> (2)   Disc bulges at the C4, C5 and C6 levels impinging on the thecal sac;
>
> (3)   Broad based disc herniation at the L4 and L5 levels causing moderate bilateral neuroforaminal compromise
>
> (4)   Disc bulges at T4, T5, T9, T10, and T11 levels, all impinging on the thecal sac;
>
> (5)   Disc bulges at the L3, L4, L5 and S1 levels impinging on the thecal sac and causing mild neuroforaminal narrowing;

214.   Review of the actual MRI film for Patient Q.W., however, shows the cervical curvature is normal, with *no* cervical straightening whatsoever.   In addition, there are *no* disc bulges at the C4, C5 and C6 levels, much less bulges that impinge on the thecal sac (*i.e.,* the membrane of dura matter surrounding the spinal cord).   Similarly, there are *no* disc bulges at T4, T5, T9, T10, and T11 levels, much less impinging on the thecal sac.   Finally, there are *no* disc bulges at the L3-4 level, and the limited disc bulge at the L4-5 level is within accepted normal limits for this level of the spine.   Thus, the MRI "findings" and "impressions" are outright fabrications to create the misimpression of multiple and significant abnormalities when in fact the MRI images for this Patient demonstrate an essentially normal study for a 30 year-old man.

215.   Horizon's and Clear's interpretive reports also purposely avoid *any* mention of whether purported abnormalities are consistent with long-standing chronic degenerative conditions, rather than the product of acute traumatic injury. The MRI interpretive reports avoid any mention of degenerative conditions because those types of conditions do not support the continued treatments or injury claims, which are predicated on acute injuries from auto accidents.  For instance, although the interpretive reports frequently document so-called Modic signals (which are a hallmark symptom of longer-term disc degeneration), as well as disc "desiccation" (which is also a hallmark of long-term disc degeneration), the MRI interpretive reports from Horizon and Clear never use the terms "degeneration" or "degenerative condition."

216.   Similarly, neither Chudler, Zack, Katz, nor the Chiropractors make any attempt to determine whether any of the numerous purported abnormalities mentioned in Horizon's and Clear's interpretive reports have any clinical significance whatsoever for the Patient.  They do not do so because they know that MRI orders and the resulting MRI "interpretations" are merely part of the Predetermined Protocol and are not ordered for legitimate diagnostic or medical needs of the Patients.

217.   In short, the non-credible patterns of findings documented above in the Horizon and Clear MRI interpretive reports indicate that Zack, Katz, DeSanto,

and possibly others, via their ownership and/or control of Horizon and Clear, have caused the creation of false MRI interpretive reports to ensure that they appear to support continued treatment at Universal.

### E.   The EDX Providers' Fraudulent EDX Tests And Reports

218.   Pierce, Caruso, and Karo (collectively, the "EDX Providers") purport to perform and interpret EDX tests called nerve conduction velocity tests ("NCVs") and needle electromyography tests ("EMGs").  Legitimate EDX testing can be performed on Patients who report symptoms that may suggest neurological injury, such as pain in the neck and/or lower back region that radiates to the arms or legs, abnormal weakness in limbs, or significant changes in sensation in limbs. In many instances, the Patients do not exhibit these symptoms, but nonetheless purportedly receive extensive EDX tests from the EDX Providers.

219.   If NCV and EMG tests are properly performed and interpreted, they can be used to diagnose the existence, nature, extent, and specific location of nerve abnormalities that may be causing the purported symptoms, including peripheral nerve injuries (e.g., injuries to the nerves in the arms and legs) and radiculopathies (pinched nerve roots that run along both sides of the spine at each vertebra level).

### 1.   Nerve Conduction Velocity Tests ("NCV Tests")

220.   NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The velocities, amplitudes, and

shapes of the responses are then recorded by electrodes attached to the surface of the skin, and are compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of the peripheral nerves in the arms and legs.

221.   There are several peripheral nerves in the arms and legs that can be tested with NCVs.  Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.  The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve should be tailored to each Patient's unique circumstances.  In a legitimate clinical setting, this decision is based on a history and physical examination of the individual Patient, as well as the real-time test results obtained as the NCVs are performed on the sensory and/or motor fibers of each peripheral nerve.  As a result, the nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs should vary by Patient.

## 2.    Needle Electromyography Tests ("EMG Tests")

222.   EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence,

77

nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

223.  There are many different muscles and nerves in the arms and legs that can be tested with EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each Patient's unique circumstances.  In a legitimate clinical setting, this decision is determined based on a history and physical examination of the individual Patient, the presenting symptoms, the real-time results of NCVs which are typically performed in conjunction with EMGs, and the real-time results obtained from the EMGs as they are performed on each specific muscle.  As a result, the number of limbs, as well as the nature and number of muscles tested, should vary by Patient.  Moreover, legitimate EMG testing will likely show significant differences in results across Patients because of the inherent variability among Patients in both presenting symptoms and in real-time EMG results.

### 3.    The AANEM Recommended Policy

224.  The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM") was founded in 1953 and is the largest organization worldwide dedicated solely to the scientifically based advancement of neuromuscular medicine.  AANEM membership is comprised of over 5,000 physicians, primarily neurologists and physiatrists.  AANEM's primary goal is to

increase the quality of care for Patients with neurological disorders through programs in education, research, and quality assurance. AANEM has issued a Recommended Policy ("Recommended Policy") regarding the optimal use of EDX tests, including NCV and EMG tests, to diagnose various forms of nerve abnormalities, including peripheral nerve injuries and radiculopathies. A copy of the Recommended Policy is attached hereto as Exhibit 16. The AANEM's Recommended Policy has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

225. The Recommended Policy arises out of the recognition that EDX studies "have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources." Ex. 16 at 1. The AANEM's Recommended Policy accurately reflects the demonstrated utility of various forms of EDX studies, including NCVs and EMGs, for diagnosing radiculopathies and other disorders of the central and peripheral nervous systems.

226. The Recommended Policy correctly recognizes that "EDX studies are individually designed by the EDX consultant for each Patient" and that "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained." Ex. 16 at 3. Therefore, the decision of

which nerves and muscles, if any, should be tested with NCVs and EMGs should be individually tailored by a physician to address the unique circumstances of each Patient based upon a history and examination of the Patient, as well as the real-time results as the NCVs and EMGs are performed.

227.   According to the Recommended Policy, the maximum number of EDX tests that should be required to diagnose a radiculopathy in more than 90% of Patients is: (a) NCVs of three motor nerves and two sensory nerves, and (2) EMGs of two limbs.  These maximum numbers "are to be used as a tool to detect outliers so as to prevent abuse and overutilization."  Ex. 16 at 11.

### 4.   The Fraudulent NCV Tests and Bills

#### a)   Fraudulent Testing and Billing Practices

228.   The NCV Tests purportedly performed and interpreted by the EDX Providers, and billed by Universal, are fraudulent.  Universal submits to State Farm separate charges of several hundred dollars for the NCVs performed on each motor or sensory nerve by the EDX Providers.  *See* Ex. 5-7.  Thus, Universal has a direct financial incentive to bill excessive motor and sensory nerve tests because the greater the number of nerves purportedly tested, the higher the cumulative charges. Universal, in concert with the EDX Providers, does precisely this: it bills an extraordinarily high – and plainly unnecessary – number of nerves for Patients.

229.   For instance, Pierce, Caruso, and Karo routinely purport to test 10 nerves in the  upper extremities and four-to-six nerves in the lower extremities, which is approximately three times as many nerves as should be necessary to diagnose radiculopathy.  *See* Exs. 5-7.

230.   This excessive testing serves only one purpose: to maximize the charges to State Farm, as there is no legitimate medical justification for these numbers of nerve tests.

231.   In addition to the excessiveness of the NCVs, the EDX Providers purportedly perform their testing in a predetermined, cookie-cutter fashion, which does not individually tailor the tests to each Patient's unique needs.  Specifically, Pierce, Caruso, and Karo purportedly perform NCVs on virtually the *same* sensory and motor nerves for the great majority of Patients.  *See* Exs. 5-7.

232.   Moreover, for nearly every Patient tested by Pierce and Caruso, and for many of the Patients tested by Karo, the bills to State Farm include charges for NCV tests performed on more nerves than they actually purport to test. Specifically, Universal and EDX Providers  impermissibly double-bill NCV motor tests by billing *both* CPT Codes 95900 (motor nerve tests without an F-wave test) and 95903 (motor nerve test with an F-wave test) for the same nerve, when only 95903 is permitted for each nerve test under these circumstances.  *See* Exs. 5-7.

### b) Physiologically Impossible Or Highly Improbable Results

233.  The NCV tests purportedly performed by the EDX Providers are not performed properly, or are not performed at all, because they contain numerous technical errors, physiologically impossible or highly improbable results, and erroneous interpretations, many of which simply ignore impossible or highly abnormal data in the results.  The EDX Providers know these tests are not performed or interpreted properly, if they are performed at all, because: (a) the reported data from the NCVs is often physiologically impossible, such as impossible nerve conduction velocities and reported amplitudes that are higher on proximal stimulation sites (e.g., elbow) than distal stimulation sites (e.g., wrist), and/or wave forms contaminated by artifact or that are entirely mismarked, rendering them uninterpretable; (b) the NCVs often contain data that suggests serious abnormalities not consistent with the Patient's reported history and presenting complaints; and (c) the EDX Providers repeatedly fail to comment upon or factor into their NCV interpretations any of the physiologically impossible or highly improbable data.  *See* Ex. 17 for representative examples.

234.  For example, normal nerve conduction velocities are in the range of 50 to 60 meters per second (m/sec) range, and velocities significantly above the 80 m/sec range are physiologically impossible.  In Claim No. 22B149302, Pierce reported a nerve conduction velocity of 240.0 m/sec, which is physiologically

impossible.  Similarly, Caruso includes physiologically impossible amplitudes for sensory nerves in his studies.  And, as described below, all the EDX Providers report perfect bilateral parallelism in EDX findings that are physiologically impossible.  The EDX Providers never discuss or account for these physiologically impossible or highly abnormal results.  *See* Ex. 5-7.

235.  As a result of the above-described conduct, the Patients are:  (a) subjected to medically unnecessary NCVs; (b) diagnosed with serious conditions that they may not have; or (c) not diagnosed with conditions that they may have.

### 5.    The Fraudulent Needle EMG Tests

236.  As described below, the EDX Providers' cookie-cutter approaches to the EMGs that they purportedly perform are also not tailored to the unique circumstances of any Patient and are not based upon medical necessity.  For instance, the EDX Providers test the same muscles in the same order in each limb on the majority of Patients, rather than based upon the unique clinical presentations or real-time NCV and EMG results of the Patients.  Furthermore, they purportedly test a grossly excessive number of muscles in each limb, well beyond the bounds of legitimate medicine, which suggests that such tests may not have been actually performed.

237.  Moreover, the EMG results that the EDX Providers report show a pattern of near-identical abnormalities across many Patients that is simply not

credible. For instance, for nearly every Patient with abnormal results on the EMG tests, Pierce purportedly finds abnormalities of identical magnitude (1+) in virtually every Patient. As discussed below, Pierce also diagnoses radiculopathies in virtually every Patient, even when he reports contradictory normal *and* abnormal EMG findings on the *same* muscle.

238. Similarly, Caruso also purportedly finds abnormalities of identical magnitude (1+) in virtually every Patient. Like Pierce, Caruso also purports to diagnose radiculopathies in virtually every Patient.

239. Karo purportedly finds identical and perfect bilateralism of symptoms in virtually every Patient, on identical variables, and only on paraspinal muscles. Like Pierce and Caruso, Karo also purports to diagnose radiculopathies in virtually every Patient.

240. As described below, such uniformity of findings across such a wide range of Patients is simply not credible. The EDX Providers' results indicate that they are not performing these EMG tests as reported, and that at least many of the results are fabricated. In addition, even if the EDX Providers were performing these EMGs, their diagnostic interpretations are frequently erroneous and contrary to these purported results.

a)   **EMG Tests Are Not Individually Tailored to Patients**

241.   The EDX Providers' EMG tests are not individually tailored.  Instead, for each limb, each Provider has a sequence of the same muscles that they test in the same sequence for nearly every Patient.  Pierce, Caruso, and Karo purportedly perform EMGs on virtually the *same* muscles in essentially the *same* sequence for nearly every Patient.

242.   Strikingly, all of the EDX Providers purportedly test the same muscles for each limb irrespective of whether the real-time EMG results show abnormalities or not.  Patients with absolutely *no* abnormal EMG readings at all receive the exact same EMG tests as Patients with significant abnormalities.

b)   **Medically Unnecessary Numbers of Limbs and Muscles Tested**

243.   The EDX Providers purport to perform EMGs on an incredible – and medically unnecessary – number of muscles.  *See* Exs. 5-7.  For instance, Pierce and Caruso purport to test an astounding ***72 different muscles*** in their four-limb EMGs, and between 32 and 38 muscles in upper and lower extremity stand-alone EMGs.  *See* Exs. 5-6.  Karo purports to test approximately 36 to 38 muscles in many Patients.  *See* Ex. 7.

244.  If the EDX Providers actually perform EMGs on the number of muscles reflected in their reports, most Patients are subjected to dozens of medically unnecessary needle insertions during their EMG testing.

### c)   Extremely Improbable or Impossible Patterns of Abnormalities

245.   Even if the EMGs on the Patients were medically necessary, the EDX Providers know they are not performed or interpreted properly, if they are performed at all, because the EMG data and interpretations are not credible. Specifically, the EDX Providers' EMG reports all contain patterns of abnormal results that are extremely improbable and/or virtually impossible.  As described directly below, the results generated by the EDX Providers are so unlikely that they effectively demonstrate that the EDX Providers are fabricating results to generate false radiculopathies to support the continued fraudulent treatment of the Chiropractors, as well as curry favor with personal injury attorneys by creating "objective" – but false – EDX diagnoses.

246.   Pierce's and Caruso's EMG testing show dubious patterns of abnormalities.  Pierce and Caruso diagnose radiculopathies in virtually every Patient they test, which itself is highly unusual.  *See* Ex. 5-6.  In virtually every instance in which Pierce or Caruso report abnormalities and diagnose radiculopathies, they claim to "find" the same magnitude of abnormality. Specifically, they record solely 1+ magnitudes for nearly every Patients.  *See* Ex. 5-6.  A 1+ magnitude is the minimum rating that can be assigned to an abnormal reading – anything less than 1+ magnitude is considered a normal reading.

86

247.   While a magnitude grade of 1+ is not highly unusual in itself, it is extremely unusual that virtually every Patient Pierce and Caruso examine purportedly shows the exact same 1+ magnitude of electrical activity.  *See* Ex. 18 (representative examples of Pierce EDX reports) and Ex. 19 (representative examples of Caruso EDX reports.).

248.   Moreover, the fact that *both* Pierce and Caruso's EDX Tests, which are purportedly performed and interpreted by two independent doctors, show virtually identical patterns of extremely unusual results and indicates that Pierce and Caruso are simply following the same predetermined protocol and fabricating results to reach false radiculopathy diagnoses.

249.   Remarkably, in several instances, Pierce reports normal *and* abnormal results for the *same* muscle, but fails to comment on this striking finding.  *See* Ex. 5.  For instance, in Claim 22B190281, Pierce provides *four results* for the same left deltoid muscle, three of which are reported as normal, and the fourth is reported as abnormal.  *See* Ex. 18.  Pierce relies on these purported abnormalities on his fourth measurement of the right deltoid to support his diagnosis of right cervical radiculopathy.  *See* Ex. 18.   He does not, however, comment on the obvious contradictory – and highly unusual – measurements that he presumably obtained in the same muscle.   Similarly, in Claim No. 22B178522, Pierce provides two different results for the same right deltoid muscle.  *See* Ex. 18.  In the first result,

Pierce documents normal results on all variables for the right deltoid. However, he also reports a second result for this same right deltoid muscle, which shows purported abnormalities.

250. Karo's EMG results similarly contain highly dubious patterns that suggest that she too is fabricating results to reach a radiculopathy diagnosis to support the Chiropractors' continued treatment. Incredibly, in virtually every Patient Karo examines, she purports to "find" perfect bilateralism in reported abnormalities and, moreover, only in paraspinal muscles. *See* Ex. 7. Specifically, Karo purports to find identical electrical abnormalities solely in paraspinal muscles (i.e., muscles next to the spine), but not in the core muscle groups being tested in the limbs themselves, such as a bicep or quadricep muscle. It is not credible to find abnormalities solely in paraspinal muscles, and not in underlying core muscles, and particularly across so many Patients.

251. It is virtually impossible to find the types of perfect bilateral symmetry that Karo purports to find in virtually every Patient. Specifically, Karo purports to find *identical* abnormalities in paraspinals on both sides of the Patients, and in every instance where she diagnoses a radiculopathy, it is a "bilateral radiculopathy." Such findings are not credible and demonstrate that Karo is purposely fabricating her EMG findings. *See* Ex. 20 (representative examples of Karo EDX reports).

252.   Taken together, the types of extremely unusual and highly improbable findings documented above in the EDX Providers' reports are highly dubious, and, considered in light of the other dubious findings in the EDX Providers' tests, demonstrate that they are not performing legitimate EDX testing.

### F.   State Farm's Justifiable Reliance

253.   Defendants are obligated legally and ethically to act honestly and with integrity.   Yet, the Defendants submitted or caused to be submitted, medical records and bills, falsely representing that the services were performed and were medically necessary when, in fact, they were not.

254.   State Farm is under statutory and contractual duties to promptly pay PIP Benefits for medically necessary services.   The bills and supporting documents that the Defendants submitted, and caused to be submitted, to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.

255.   As a result, State Farm has incurred damages of over $4.7 million in no-fault benefits that it paid to the Defendants.

256. Based   on   Defendants'   material   misrepresentations   and   other affirmative acts to conceal their fraud from State Farm, State Farm did not discover

and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## V.     CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201**
**(Universal, Horizon, and Clear)**

257.   State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 256 above.

258.   This action is for declaratory relief pursuant to 28 U.S.C. §2201.

259.   There is an actual case and controversy between State Farm, on one hand, and Universal, on the other hand, as to all charges for examinations, treatments, and EDX Tests performed at Universal that have not been paid.  State Farm contends that Universal is not entitled to be paid for any of these charges.

260.   There is an actual case and controversy between State Farm, on one hand, and Horizon and Clear, on the other hand, as to all charges for MRI Tests ordered by Universal providers and performed at Horizon and Clear that have not been paid.  State Farm contends that Horizon and Clear are not entitled to be paid for any of these charges.

261.   Because Universal, Horizon and Clear have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and

circumstances regarding each claim that each of them has submitted to State Farm, they are not entitled to any reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that Universal is not entitled to reimbursement for any of the unpaid charges for examinations, EDX Tests, and chiropractic and physical therapy treatments performed at Universal, and, furthermore, Horizon and Clear are not entitled to reimbursement for any of the unpaid charges for MRI Tests, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

**SECOND CAUSE OF ACTION**
**COMMON LAW FRAUD**
**<u>(All Defendants)</u>**

262.   State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 256 above.

263.   Defendants intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, thousands of fraudulent bills and related documentation that contained false representations of material fact.

264.   The false statements of material fact include: (a) Zack, Katz, Chudler, and the Chiropractors and Physical Therapists legitimately examined, diagnosed, and prescribed chiropractic and physical therapy treatment that was medically

necessary and tailored to the unique needs of each Patient, when in fact they did not, including those set forth in Exs. 1-3; (b) Zack, Katz, Chudler, and the Chiropractors legitimately determined that patients were disabled; (c) Zack, Katz, Chudler, and the Chiropractors and Physical Therapists provided treatments that were medically necessary and tailored to the unique needs of each Patient, when in fact they were not, including those set forth in Exs. 1-3; (d) Chudler and the Chiropractors ordered diagnostic tests, x-rays and MRIs, that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, including those set forth in Ex. 4, (e) Clear and Horizon's MRI interpretive reports were medically necessary, legitimate and medically accurate, when they were not, including those set forth in Ex. 4; and (f) Zack, Katz, and Chudler ordered, and Pierce, Caruso, and Karo purportedly performed, EDX Tests that were medically necessary and tailored to the unique needs of each patient, and properly billed, when in fact they were not, including those set forth on Exs. 5-7. Representative examples of the fraudulent reports, documentation, and bills can be found in Exs. 10-13, 15 and 17-20.

265. The Defendants knew that the above-described misrepresentations made to State Farm relating to the purported examination, evaluation, diagnoses, and treatment of Patients were false and fraudulent when they were made.

266.   The Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm to rely on the misrepresentations.

267.   As a result of its justifiable reliance on these misrepresentations, State Farm has incurred damages of more than $4.7 million in benefits paid based upon the fraudulent charges for which it seeks reimbursement.

WHEREFORE, State Farm demands judgment against all the Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

## THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT
### (All Defendants)

268.   State Farm incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 256 above.

269.   State Farm conferred a benefit upon Defendants by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

270.   Because Defendants knowingly billed for services that were not rendered and were not medically necessary, the circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

271.   As a direct and proximate result of the above-described conduct, State Farm has been damaged and Defendants have been unjustly enriched by over $4.7 million.

272.   State Farm seeks restitution of payments conferred upon and unjustly retained by the Defendants due to their fraudulent conduct in connection with submitting bills for the examinations, chiropractic and physical therapy treatments, MRI Tests, and EDX Tests described, in part, in Exs. 1 through 7 attached hereto.

WHEREFORE, State Farm demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## FOURTH CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. §1962(c)
## (Against All Defendants)

273.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 256 above.

274.   All Defendants formed an association-in-fact "enterprise" ("the Universal Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. §1961(4), that engages in, and the activities of which affect, interstate commerce.

275.   The members of the Universal Fraudulent Billing Enterprise are and have been joined in a common purpose, have relationships with and among each

other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.

276. All Defendants forged symbiotic relationships and needed and depended upon the participation of the others to accomplish their common purpose of defrauding State Farm and other insurers through fraudulent claims. Specifically, Zack, Katz, DeSanto, and Universal depended on and needed Chudler to coordinate and carry out the purported medical examinations, diagnoses and justify the purported need for chiropractic and physical therapy treatments so that they could knowingly bill insurers for medically unnecessary examinations, chiropractic and physical therapy treatment, MRI Tests, and EDX Tests. Zack, Katz, and DeSanto depended on UHG Management, and Professional Health Systems to unlawfully siphon and direct profits from Universal to circumvent the legal prohibitions under Michigan law for distributing profits from Universal, a purported non-profit corporation, to Zack, Katz, DeSanto, and possibly others. Thus, through UHG Management and Professional Health Systems, Zack, Katz, and DeSanto accomplished indirectly what they were forbidden to do directly. Horizon and Clear needed Zack, Katz, Chudler and Universal to refer Patients for MRIs to enable Horizon and Clear to knowingly bill insurers for medically unnecessary MRI Tests and false MRI reports. Zack, Katz, DeSanto, Chudler, and Universal needed Horizon and Clear to generate false MRI reports to purportedly

justify continued treatment at Universal, to curry favor with personal injury attorneys, and to financially benefit Zack, Katz, DeSanto, and possibly others. Pierce, Caruso, and Karo needed Zack, Katz, Chudler, and Universal to refer them Patients for medically unnecessary consultations and EDX Tests. Zack, Katz, DeSanto, Chudler and Universal needed Pierce, Caruso, and Karo to purportedly perform consultations and EDX Testing to enable Universal to knowingly bill insurers for such services, as well as rely on the false findings from the EDX Tests to purportedly justify continued treatment of Patients at Universal. The participation and roles of each Defendant were necessary to the success of the scheme. None of these Defendants were capable of carrying out the scheme without the participation of the others.

277. Each defendant has been employed by and/or associated with the Universal Fraudulent Billing Enterprise.

278. Each defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Universal Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of United States mail to submit to State Farm and other insurers hundreds of fraudulent claims and bills for the examinations, diagnoses, treatments, and tests, which were medically unnecessary or were not performed, which are described in Rico Events 1-716 in

Exhibit 21 attached hereto. The claims contained the following misrepresentations: (a) Zack, Katz, Chudler, and the Chiropractors and Physical Therapists legitimately examined, diagnosed, and prescribed chiropractic and physical therapy treatment that was medically necessary and tailored to the unique needs of each Patient, when in fact they did not, including those set forth in Exhibits 1-3; (b) Zack, Katz, Chudler, and the Chiropractors legitimately determined that patients were disabled; (c) Zack, Katz, Chudler, and the Chiropractors and Physical Therapists provided treatments that were medically necessary and tailored to the unique needs of each Patient, when in fact they were not, including those set forth in Exhibits 1-3; (d) Chudler and the Chiropractors diagnostic tests, x-rays and MRIs, that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, including those set forth in Exhibit 4, (e) Clear and Horizon's MRI interpretive reports were medically necessary, legitimate and medically accurate, when they were not, including those set forth in Exhibit 4; and (f) Zack, Katz, and Chudler ordered, and Pierce, Caruso, and Karo purportedly performed, EDX Tests that were medically necessary and tailored to the unique needs of each patient, and properly billed, when in fact they were not, including those set forth on Exhibits 5-7. Representative examples of the fraudulent reports, documentation, and bills can be found in Exhibits 10-13, 15 and 17-20.

279. The fraudulent bills and corresponding mailings are described in Exs. 1 through 7 attached hereto. Representative samples of the bills and supporting documentation are attached as Exhibits 10-13, 15 and 17-20.

280. State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $4.7 million based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against all Defendants, compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964, plus interest, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION:
### VIOLATION OF 18 U.S.C. §1962(d)
### (Against All Defendants)

281. State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 256 above.

282. The Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Universal Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mail to submit to State Farm and other insurers

hundreds of fraudulent bills for examinations, diagnoses, treatments, and tests which were medically unnecessary or were not performed.

283.   The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibits 1 through 7, attached hereto.  Representative samples of the bills and supporting documentation are attached as Exhibits 10-13, 15 and 17-20.

284.   The Defendants agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of fraudulent bills and related documentation for examinations, diagnoses, treatments, and tests which were medically unnecessary or were not performed, to State Farm and other insurance companies.

285.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $4.7 million based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964, plus interest, and any other relief the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.


Dated: January 21, 2014

By   <u>s/ Eric T. Gortner</u>   _
One of the Attorneys for State Farm
Mutual Automobile Insurance
Company


Ross O. Silverman (IL 6226560)
Eric T. Gortner (IL 6275017)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
312.902.5200
ross.silverman@kattenlaw.com
eric.gortner@kattenlaw.com

Thomas Cranmer
Miller Canfield
840 W. Long Lake Road
Suite 200
Troy, MI  48098
(248)-267-3381
cranmer@millercanfield.com

*Attorneys for Plaintiff State Farm*
*Mutual Automobile Insurance Company*