*Exhibit 8*

## AFFIDAVIT OF ARIA O. SABIT, M.D.

1. I am over 18 years of age and I have personal knowledge of the statements that are made in this Affidavit and would testify to them in a Court of law if called upon to do so.

2. I give this Affidavit voluntarily and have consulted with my own counsel concerning its preparation and execution.

3. I am presently involving in several active litigation cases against State Farm, including Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 12-506-NF (Macomb County), Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 12-016159-NF (Wayne County), Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 12-2832-NF (Macomb County), Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 11-3051-NF (Wayne County), Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 11-015746-NF (Wayne County), Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 11-10216T-GC (Macomb County), Michigan Brain & Spine Physicians Group, PLLC v. SFMAIC, Case No. 12-008337-NF (Wayne County). This affidavit relates to these cases and is provided in addition to, or in lieu of, deposition testimony in those cases.

4. This Affidavit details some of my experiences with Universal Health Group, also known as Michigan Spine and Rehab, and its affiliated ambulatory surgical center, Associated Surgical, (collectively, "Universal"), as well as with the owners and operators of the Universal entities, namely, Scott Zack ("Zack"), Yisroel Sigler ("Sigler"), and Joseph DeSanto ("DeSanto'). Although this Affidavit details some of my experiences with these entities and individuals, it is not intended to be an exhaustive account with respect to the subjects discussed herein.

**Error! Bookmark not defined.**

5. I am a trained neurosurgeon and licensed to practice medicine in the State of Michigan since 2011.

6. In early 2012, I began working as an independent contractor for Universal to evaluate and perform, as needed, surgeries or other procedures for Universal patients at Associated Surgical. I terminated my association with Universal on or about February, 2012.

7. During the time of my work at Universal, I learned that Zack, DeSanto, and Sigler own and control the operations of Universal. As described below, I learned that Zack, DeSanto, and Sigler control a large network of chiropractic and physical therapy clinics in Michigan, as well as MRI facilities and ambulatory surgical centers. Based upon my experiences at Universal, including numerous meetings and conversations to which I was a party during my tenure working for Universal, I directly observed Zack, DeSanto, and Sigler, individually and collectively, direct and plan strategy for Universal's operations.

8. Based upon these meetings, conversations, and my personal observations throughout my time working at Universal, it is my opinion that Zack, DeSanto, and Sigler were operating Universal as a business organization engineered to take advantage of Michigan No-Fault law by providing medical treatments to patients involved in motor vehicle accidents that in my opinion were excessive and unnecessary in some cases. Zack, DeSanto, and Sigler have created an operation that seems to work such that once a patient got into the Universal system, he or she will rarely be able to "get out" of the Universal system without being subject to extensive treatment.

9. For example, I noticed that Universal patients received enormous amounts of chiropractic and physical therapy, which in many cases were not medically necessary in my

Error,

opinion. The patients continued extensive chiropractic and physical therapy treatments for many months or longer on end, even though they were not showing substantial improvement.

10. I also observed that patients at Universal not only received chiropractic and physical therapy treatments that in my opinion were unnecessary, but also seemed to progress through the same sequence of treatments. For instance, patients would begin with chiropractic and physical therapy, and would then often move on to electrodiagnostic testing, followed by pain injections. The next stage for these patients would often be consultations for surgery. Even those patients that were not good candidates for surgical interventions in my opinion would not be discharged from Universal, however. Instead, Universal providers would send them for more pain injections or other treatments.

11. I also learned during my time at Universal that Zack and DeSanto, and maybe others, owned and controlled MRI facilities, such as Clear Imaging ("Clear") and Horizon ("Horizon"). I also learned that Cory Mann was the manager of Clear MRI facilties and was also affiliated with Zack, DeSanto, and others at Universal.

12. During my time working at Universal, Zack and staff at Universal specifically directed me to send Universal patients to Clear or Horizon for MRIs. The prescriptions for MRI that I was instructed to use for Universal patients had specific boxes indicating that the MRI should occur at Clear or Horizon. It was my impression that Zack requested that I send Universal patients to Clear or Horizon Imaging because he and others affiliated with Universal directly profited from these MRI facilities.

13. I also observed that Universal patients were prescribed MRIs that in my opinion were excessive and unnecessary. For example, I noticed that Universal patients frequently received MRIs for all three regions of the spine: cervical, lumbar, and thoracic MRIs, as well as

3

Error,

brain. In my experience as a neurosurgeon who frequently orders MRIs, it is rare to order MRIs for the thoracic region under these circumstances because this region is rarely an area of concern based on the types of motor vehicle whiplash injuries reported by most of the Universal patients whom I evaluated.

14. The MRI reads and reports issued by Clear were often over-read, or misread, or otherwise unreliable. For example, the reading radiologist for Clear, Chintan Desai, frequently either identified abnormalities that did not exist on the MRI film or exaggerated the severity of any abnormalities that did exist on the film. I also noted that Chintan Desai rarely, if ever, commented on abnormalities caused by degenerative processes. In one instance, I noticed that he failed to note what appeared to be a brain tumor on a patient's brain MRI. Although I called him repeatedly to discuss his failure to identify this abnormality, he did not return my phone calls.

15. I am not aware of any Universal patient being informed that Zack or anyone else affiliated with Universal had a financial interest in Clear and Horizon.

16. Throughout my time at Universal, I also observed that the electrodiagnostic testing performed by providers affiliated with Universal was not reliable in certain situations. I noticed that an unusually high number of patients were diagnosed with radiculopathies and I questioned the validity of the testing. During my time at Universal, I generally did not rely on the electrodiagnostic testing conducted by providers affiliated with Universal, and instead conducted my own physical exams to determine the neurological status of patients.

17. It is possible that patients also did not know Associated Surgical was part of Universal and owned and controlled by Zack, DeSanto, Sigler, and perhaps others. I am not

4

Error,

aware of any disclosures that were ever provided to any Universal patients that Zack and others affiliated with Universal had financial interests in Associated Surgical.

18. Throughout my time at Universal, Zack, DeSanto, and Sigler never disclosed their ownership and control over Associated Surgical and Clear and Horizon. For instance, they would suggest that Cory Mann was the "owner" of Clear or Horizon, but I suspected based upon the instructions for referrals to Clear or Horizon that I received at Universal, that Zack, DeSanto, and Sigler, and maybe others affiliated with Universal, were the ones in control of Clear and Horizon.

19. During my time working at Universal, I observed that Zack, DeSanto, and Sigler paid very careful attention to the number of tests and services ordered by Universal providers. I learned that Universal had a call center and data center based in Florida that kept track of each Universal patient's course of treatment and the number of tests and services ordered by each provider. For instance, Sigler and others were aware of "conversion rates," which reflected the number of additional services ordered by a particular provider. Sigler would frequently tell me that some conversion rates were "low," and would question why I was not ordering more tests for Universal patients.

20. Throughout my time at Universal, I experienced pressure not to take Universal patients out of the "Universal system." Instead, I was led to believe that MRIs, electrodiagnostic testing, and other services, including pain injections, were to be performed at Universal entities. For instance, Sigler established a practice at Associated Surgical in which a minimally invasive pain device, called P-STIM, could be implanted in Universal patients. Even though P-STIM can be implanted through a simple procedure in a physician's outpatient office, Sigler insisted on stocking the P-STIM devices only at Associated Surgical's ambulatory surgical facility to ensure

Error,

that the P-STIM procedures were done there, rather than in a physician's office. This allowed Universal to bill thousands of dollars for Associated Surgical's facility fee for P-STIM procedures, even though in my opinion the procedure did not need to be performed in an ambulatory surgical center.

21. Zack, DeSanto, and Sigler discussed with me their purchase and use of police reports to solicit accident victims to obtain treatment at Universal. They also discussed openly their use and reliance on runners to call and meet with individuals identified by police reports.

22. I was told to ensure that certain patients who were represented by attorney Joumana Kayrouz were sent to certain MRI facilities, which I understood she owned or from which she received a financial benefit. In another instance, I was informed that attorney Michael Morse was "very unhappy" because he incorrectly believed that some of my surgeries were not performed properly, when in fact they were. I was informed that I would not be allowed to see Universal patients represented by Michael Morse until these issues were resolved.

23. I learned over time that Universal was incorrectly billing for my services. Specifically, Universal would bill for services that I did not render or would misstate the services I did perform. I asked Zack, DeSanto, and others to correct the bills, and was told that they would be corrected, although I do not believe the corrections, in fact, occurred.

24. The Universal operation controlled by Zack, DeSanto, and Sigler appears to be very profitable. For instance, Zack would frequently boast in conversations about how much money he and others were making from Universal's operations. I never knew during my time working at Universal that it was organized as a non-profit corporation.

25. On or about February, 2012, I terminated my relationship with Universal and Zack, DeSanto, Sigler, and other affiliated with Universal because I did not trust their billings for

6

Error,

my services, saw that they were not correcting mistakes in my bills, and otherwise believed that their treatments and services for Universal patients were driven by financial reasons, rather than legitimate medical reasons.

26.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Affidavit is true and correct.

Executed this 07 day of June, 2013 at _____, _____.

_____
Aria O. Sabit, M.D.