# EXHIBIT 8

1  KAMALA D. HARRIS
   Attorney General of California
2  ROBERT MCKIM BELL
   Supervising Deputy Attorney General
3  COLLEEN M. MCGURRIN
   Deputy Attorney General
4  State Bar Number 147250
     300 South Spring Street, Suite 1702
5    Los Angeles, California  90013
     Telephone:  (213) 620-2511
6    Facsimile:  (213) 897-9395
   *Attorneys for Complainant*

FILED
STATE OF CALIFORNIA
MEDICAL BOARD OF CALIFORNIA
SACRAMENTO *September 20, 13*
BY: *JMme* ANALYST

7

8  **BEFORE THE**
   **MEDICAL BOARD OF CALIFORNIA**
   **DEPARTMENT OF CONSUMER AFFAIRS**
9  **STATE OF CALIFORNIA**

10 | In the Matter of the Accusation Against:

11 | ARIA OMAR SABIT, M.D.
     29355 Northwestern Highway, Suite 130
12 | Southfield, MI 48034

13 | Physician's and Surgeon's Certificate Number
     A 108433
14 |
                              Respondent.
15 |

Case No. 05-2011-212383

**A C C U S A T I O N**

16     Complainant alleges:

17                              PARTIES

18     1.    Kimberly Kirchmeyer (Complainant) brings this Accusation solely in her official

19 capacity as the Interim Executive Director of the Medical Board of California, Department of

20 Consumer Affairs.

21     2.    On or about June 17, 2009, the Medical Board of California issued Physician's and

22 Surgeon's Certificate Number A 108433 to Aria Omar Sabit, M.D. (Respondent).  Said

23 Certificate was in full force and effect at all times relevant to the charges brought herein and will

24 expire on January 31, 2015, unless renewed.

25                              JURISDICTION

26     3.    This Accusation is brought before the Medical Board of California (Board),

27 Department of Consumer Affairs, under the authority of the following laws.  All section

28 references are to the Business and Professions Code unless otherwise indicated.

1

4.   Section 2004 of the Code states, in pertinent part:

"The board shall have the responsibility for the following:

"(a) The enforcement of the disciplinary and criminal provisions of the Medical Practice Act.

"(b) The administration and hearing of disciplinary actions.

"(c) Carrying out disciplinary actions appropriate to findings made by a panel or an administrative law judge.

"(d) Suspending, revoking, or otherwise limiting certificates after the conclusion of disciplinary actions.

"(e) Reviewing the quality of medical practice carried out by physician and surgeon certificate holders under the jurisdiction of the board.

"(f) . . . (i)."

5.   Section 2220 of the Code states:

"Except as otherwise provided by law, the Division of Medical Quality may take action against all persons guilty of violating this chapter [Chapter 5, the Medical Practice Act]. The division shall enforce and administer this article as to physician and surgeon certificate holders, and the division shall have all the powers granted in this chapter for these purposes including, but not limited to:

"(a) Investigating complaints from the public, from other licensees, from health care facilities, or from a division of the board that a physician and surgeon may be guilty of unprofessional conduct. The board shall investigate the circumstances underlying any report received pursuant to Section 805 within 30 days to determine if an interim suspension order or temporary restraining order should be issued. The board shall otherwise provide timely disposition of the reports received pursuant to Section 805.

"(b) Investigating the circumstances of practice of any physician and surgeon where there have been any judgments, settlements, or arbitration awards requiring the physician and surgeon or his or her professional liability insurer to pay an amount in damages in excess of a cumulative total of thirty thousand dollars ($30,000) with respect to any claim that injury or damage was

2

Accusation

1    proximately caused by the physician's and surgeon's error, negligence, or omission.

2        "(c)  Investigating the nature and causes of injuries from cases which shall be reported of a

3    high number of judgments, settlements, or arbitration awards against a physician and surgeon."

4        6.     Section 2230.5 of the Code provides, in pertinent part:

5        "(a)  Except as provided in subdivisions (b) and (c), and (e), any accusation filed against a

6    licensee pursuant to Section 11503 of the Government Code shall be filed within three years after

7    the board, or a division thereof, discovers the act or omission alleged as the ground for

8    disciplinary action, or within seven years after the act or omission alleged as the ground for

9    disciplinary action occurs, whichever occurs first.

10       "(b) . . . ."

11       "(c)  An accusation filed against a licensee pursuant to Section 11503 of the Government

12   Code alleging unprofessional conduct based on incompetence, gross negligence, or repeated

13   negligent acts of the licensee is not subject to the limitation provided for by subdivision (a) upon

14   proof that the licensee intentionally concealed from discovery his or her incompetence, gross

15   negligence, or repeated negligent acts."

16       "(d) . . . (f)."

17       7.     Section 2227 of the Code provides that a licensee who is found guilty under the

18   Medical Practice Act may have his or her license revoked, suspended for a period not to exceed

19   one year, placed on probation and required to pay the costs of probation monitoring, or such other

20   action taken in relation to discipline as the Division deems proper.

21       8.     Section 2234 of the Code, provides, in pertinent part:

22       "The board shall take action against any licensee who is charged with unprofessional

23   conduct. In addition to other provisions of this article, unprofessional conduct includes, but is not

24   limited to, the following:

25       "(a) Violating or attempting to violate, directly or indirectly, assisting in or abetting the

26   violation of, or conspiring to violate any provision of this chapter.

27       "(b) Gross negligence.

28       "(c) Repeated negligent acts. To be repeated, there must be two or more negligent acts or

                                          3

                                                                              Accusation

omissions. An initial negligent act or omission followed by a separate and distinct departure from the applicable standard of care shall constitute repeated negligent acts.

"(1) An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act.

"(2) When the standard of care requires a change in the diagnosis, act, or omission that constitutes the negligent act described in paragraph (1), including, but not limited to, a reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the applicable standard of care, each departure constitutes a separate and distinct breach of the standard of care.

"(d) Incompetence.

"(e) The commission of any act involving dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon.

"(f) Any action or conduct which would have warranted the denial of a certificate.

"(g) . . . (h)."

9.     Section 2266 of the Code provides: "The failure of a physician and surgeon to maintain adequate and accurate records relating to the provision of services to their patients constitutes unprofessional conduct."

## FIRST CAUSE FOR DISCIPLINE

### (Gross Negligence)

10.     Respondent is subject to disciplinary action under Business and Professions Code section 2234, subdivision (b), in that he was grossly negligent in his care and treatment of patients J.S., M.S., R.S., D.B., and M.M.[1]  The circumstances are as follows:

**Patient J.S.**

11.     On or about June 26, 2009, patient J.S., a then 67-year old male, presented to the Ventura County Neurosurgical Associates (VCNA) for the evaluation of intense back pain and was referred to Respondent for surgical consultation and treatment.

---

[1] For privacy, the patients in the Accusation will be identified by their first and last initials. The full names will be disclosed to Respondent upon timely request for discovery pursuant to Government Code section 11507.6.

4

Accusation

12.     On or about July 10, 2009, Respondent saw J.S. at VCNA, and documented that the patient had "very severe stenosis[2] at L1 down to L5." However, the CT lumbar spine post-myelogram[3] reports "negative" findings at T12-L1, "no stenosis at L1-2," "mild canal stenosis at L2-3 and L3-4," and no stenosis at L5-S1. The only area of "severe stenosis" was reported at L4-5. Respondent also noted that J.S. had a scoliotic curvature of the spine, however, the lumbar CT myelogram and x-rays do not describe or mention scoliosis.[4] Respondent recommended surgery from L1 or L2 to L5 or S1, and ordered a discogram[5] prior to surgery.

13.     On or about August 7, 2009, Respondent saw J.S. and noted that the discogram was "positive from L3-L4 to L5-S1." The L5-S1 level, however, was not included in the levels to be studied nor was that level injected with contrast dye. Further, there were no demonstrated annular[6] fissures[7] at any of the injected levels (i.e., L2-3, L3-4 nor L4-5).

14.     On or about December 18, 2009, Respondent performed surgery on J.S. at Community Memorial Hospital (CMH). According to Respondent's operative report, he performed a "Posterior lateral fusion L3, L4, L5, S1. Laminectomy[8] for decompression[9] L3, L4, L5, S1. Pedicle screw fixation[10] L3, L4, L5. Allograft.[11] Autograft.[12] Fluoroscopy.[13] Repair

---

[2] Stenosis is the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine.

[3] A myelogram is an x-ray film taken after the injection of a radiopaque medium into the subarachnoid space to demonstrate any distortions of the spinal cord, spinal nerve roots, and subarachnoid space.

[4] Scoliosis is a side-to-side curvature of the spine.

[5] A discogram is an x-ray image produced by a discography. A discography is an examination of the intervertebral disk space using x-rays after injection of contrast media into the disk.

[6] Annular refers to shaped like or forming a ring.

[7] Fissure refers to a deep furrow, cleft, groove or slit, normal or otherwise.

[8] A laminectomy is the surgical removal of the posterior arch of a vertebra.

[9] Decompression in spinal surgery refers to the surgical relief of pressure on the spinal cord.

[10] Pedicle screw fixation, in orthopedic surgery, refers to a multicomponent device constructed from stainless or titanium-based steel, consisting of solid, grooved, or slotted plates of rods that are longitudinally interconnected and anchored to adjacent vertebrae using bolts, hooks, or screws.

[11] An allograft is a graft of tissue obtained from a donor of the same species as, but with a different genetic make-up from, the recipient, as a tissue transplant between two humans.

[12] An autograft is a graft of tissue or organ that is grafted into a new position on the body of the individual from whom it was removed.

[13] Fluoroscopy is an examination by means of a fluoroscope. A fluoroscope is a device equipped with a fluorescent on which the internal structures of an optically opaque object, such as the human body, may be continuously viewed as shadowy images formed by the different transmission of x-rays through the object.

5

of CSF[14] leak, creation of shunt."[15]  J.S. signed a consent for an L4-5 interbody fusion with decompression and fusion from L3 to S1, however, Respondent's operative report narrative does not describe that an interbody fusion was performed at L4-5.  There is no explanation for this discrepancy documented in the patient's chart.  During an interview with the Board, Respondent stated that he "did not see the consent sheet" and "it was not the practice at the hospital to look at this consent sheet" before the procedure.  He further stated "I would have gone off whatever I had in my . . . dictation in my office, whatever I decided I was going to do" and that he "was not going to base [the procedure] on" the consent signed by the patient.  Respondent, however, failed to document any explanation for the discrepancies between the actual procedures performed and the procedures listed in the signed patient consent.

A).    Respondent's operative report narrative further describes that the instrumentation was inserted from L3 to L5, excluding S1 (the sacrum) from the instrumentation construct. In explaining why the S1 level was not included in the instrumentation construct, Respondent told the Board that there was no need to perform an extensive laminectomy at that level or to expose the nerve roots.  However, Respondent's operation report contradicts this and states that "[l]aminectomies were performed at L3, L4, L5, S1.  All nerve roots were exposed. Foraminotomies[16] were done at all levels.  Medial facetectomies[17] were also done at all levels." These procedures, however, are not supported by the post-operative lumbar x-ray which notes reports a laminectomy at L4.

B).    Respondent's operative report narrative further states that a "posterolateral fusion was . . . performed at L3, L4, L5, S1." However, this is not supported by the post-operative lumbar spine x-ray reports which notes a posterior fusion from L3 to L5.   Respondent failed to accurately dictate the procedures he performed during the operation and failed to correct his

---

[14] CSF is an abbreviation for cerebrospinal fluid.
[15] A shunt is a passage between two natural body channels, such as blood vessels, especially one created surgically to divert or permit flow from one pathway or region to another; a bypass.
[16] Foraminotomy is the removal of the intervertebral foramen (an aperture or perforation through a bone or a membranous structure).
[17] Facetectomy is the surgical removal or excision of a facet, particularly the articular facet (a relatively small articular surface of a bone) of a vertebra.

6

1   operative report after it was transcribed.

2       C).   Respondent further states, in his operative narrative, that "a week (sic) point in the

3   dura was visualized ... and repaired using 4-0 silk sutures. A shunt was created for CSF egress."

4   The creation of a shunt was also included in the operative report's list of procedures performed.

5   There is, however, no description why a shunt was necessary when Respondent's narrative states

6   he repaired the dura during the procedure. When questioned by the Board, Respondent admitted

7   that he did not create a shunt during the operation, and did not "know what . . . [his statement]

8   means." Further, he had "no idea" what he was referring to when he dictated his report and had

9   no explanation why this information was contained in two separate portions of his operative

10   report (i.e., the list of procedures performed section and the narrative section). Respondent failed

11   to accurately dictate the procedures he performed during the operation and failed to correct his

12   operative report after it was transcribed.

13       15.   Respondent committed acts of gross negligence in his care and treatment of patient

14   J.S. when he:

15       A).   Performed unnecessary surgical procedures at L3 and L5-S1 without evidence of

16   severe stenosis or other findings justifying the procedures at these levels;

17       B).   Excluded S1, the sacrum, from the instrumentation construct when attempting to fuse

18   the L3-S1 levels;

19       C).   Documented that he performed various procedures during the operation which were

20   not performed; and

21       D).   Repeatedly failed to adequately, appropriately and accurately document the patient's

22   chart.

23   **Patient M.S.**

24       16.   On or about February 5, 2010, patient M.S., a then 64-year old female, presented to

25   the Ventura County Neurosurgical Associates (VCNA) for severe pain in her left lower extremity

26   and knee. M.S. was referred to another office for an epidural injection of her lumbar spine.

27       17.   On or about February 18, 2010, M.S. returned to VCNA when the epidural injection

28   failed to address her concerns. Respondent saw M.S. and recommended surgery as soon as

7

1  possible.

2      18.    On or about February 21, 2010, M.S. presented to the Community Memorial Hospital

3  (CMH) Emergency Department unable to ambulate.  Respondent saw M.S. for a neurosurgical

4  consult and recommended surgery the following morning.  However, Respondent's pre-operative

5  history and physical note failed to specifically detail what the  radiologic findings were and which

6  levels were involved.  M.S. signed a consent for a lumbar interbody fusion at L4-5 and a posterior

7  lumbar decompression and fusion at L4 to S1.

8      19.    On or about February 22, 2010, Respondent performed surgery on M.S. at CMH.

9  Respondent's operative report lists that he performed a posterior "decompression at L4, L5, S1;

10  posterior lateral fusion L4, L5, S1; plate fixation L4, L5, S1" and "interbody fusion L5-S1."

11  However, the post-operative CT scan report does not support this and notes laminar defects at L4

12  and an interbody cage and hardware at L4-5.

13      20.    M.S. was thereafter discharged and received physical therapy.  Respondent saw M.S.

14  for a follow-up office visit on March 2, 2010, which was unremarkable.

15      21.    In May 2010, M.S. presented to Respondent at VCNA to address the redevelopment

16  of some of her pain.  An MRI revealed increased pathology at L4-L5.

17      22.    On or about June 19, 2010, M.S., in preparation for surgery, signed a consent for an

18  interbody lumbar fusion of L5 to S1 with lumbar instrumentation.  Respondent saw M.S. prior to

19  the surgery and dictated a history and physical note in the patient's chart.  In that note,

20  Respondent states that M.S. had "a previous fusion from L4-L5."  Respondent's plan was to

21  "perform a full discectomy and interbody fusion at L5-S1."  However, Respondent had previously

22  decompressed, fused and instrumented L5-S1 four months earlier, according to his February 22,

23  2010 operative report.

24      A).    Respondent lists, in his June 19, 2010 operative report, that he performed a

25  "Laminectomy for decompression of the nerve roots at L4, L5, S1; lumbar disectomy L5-S1;

26  posterolateral fusion L4, L5, and S1; pedicle screw fixation L4, L5, S1" utilizing the Apex

27  pedicle screw system.  However, there was no documented diagnosis or justification requiring a

28  laminectomy and decompression at L4.  Additionally, the L4 level was not included in the

8

1  consent M.S. signed. Respondent, however, failed to document any explanation for the

2  discrepancies between the actual procedures performed and the procedures listed in the signed

3  patient consent and testified that he did not review the signed consent form before the operation.

4       23.  After the June 2010 surgery, M.S. developed right-sided foot drop and right leg pain,

5  a new post-operative neurological complaint.[18] This should have prompted an immediate work-

6  up and imaging to determine the cause of the problem. Several months later, however,

7  Respondent ordered an Electromyography[19] (EMG)/Nerve Conduction Velocity[20] (NCV) study.

8  The EMG/NCV was performed on November 23, 2010, and revealed malpositioning of the

9  pedicle screws at L4, L5 and S1.

10      24.  Respondent committed acts of gross negligence in his care and treatment of patient

11  M.S. when he:

12      A).  Failed to promptly evaluate and determine the cause of the patient's right-sided drop

13  foot and right leg pain, a new post-operative neurological finding; and

14      B).  Repeatedly failed to adequately, appropriately and accurately document the patient's

15  chart.

16  **Patient R.S.**

17      25.  On or about June 15, 2009, patient R.S., a then 57-year old female, presented to the

18  Ventura County Neurosurgical Associates (VCNA) for severe weakness in her lower left

19  extremity and foot, and numbness. R.S. was referred to Respondent for surgical consultation and

20  evaluation.

21      26.  On or about July 22, 2009, Respondent saw patient R.S. and opined that she would

22  need a decompression with microdiskectomy at L4-5. Respondent advised her that the surgical

23  correction of her scoliotic deformity would not relieve her symptoms. At that time, R.S. decided

24  not to have the procedure.

25  _____

[18] All of the patient's pre-operative symptoms and findings had been limited to the left side.
[19] Electromyography (commonly referred to as EMG) is a type of test in which a nerve's function is tested
26  by stimulating a nerve with electricity, and then measuring the speed and strength of the corresponding muscle's
response.
27  [20] Nerve conduction velocity test (commonly referred to as NCV) is a test that measures the time it takes a
nerve impulse to travel a specific distance over the nerve after electronic stimulation.

28

9

1   scoliosis with osteoarthritis and a prior anterior interbody fusion at L2-3.

2      29.   On or about August 12, 2010, Respondent saw R.S. for another follow up visit.

3   Respondent scheduled her for a two-staged operation which included "a T12 to L5 anterior

4   release followed by a T4 to S1 decompression and fusion."

5      30.   On or about October 19, 2010, R.S. presented to Community Memorial Hospital

6   (CMH) and signed a consent for a lumbar interbody fusion from T12 to L5 and lumbar

7   instrumentation and cages. At that time, R.S. also signed a consent for the second stage of the

8   surgery scheduled to occur the following day.

9      A).   Respondent performed the first stage of the operation on R.S. In his operative report,

10   Respondent lists that he performed a "lumbar interbody fusion" from T12 to L5, an "interbody

11   cage placement, L4-L5, L3-L4," structural allograft in the interbody space, L2-L3, T12-L1,"

12   arthorodesis[19]/ instrumented fusion" from T12 to L5" with allograft and autograft. However, his

13   narrative description of the procedure does not describe the placement of any instrumentation as

14   referenced; only cages at L3-L4 and L4-5. Additionally, the post-operative CT report does not

15   note any hardware at these levels, only the interbody cages. Respondent, however, failed to

16   accurately dictate the procedures he performed during the operation and failed to correct his

17   operative report after it was transcribed.

18      31.   On or about October 20, 2010, Respondent performed the second stage of the

19   operation on R.S. Respondent lists, in his operative report, that he performed a "posterolateral

20   fusion, T4, T5, T6, T7, T8, T9, T10, T11, T12, L1, L2, L3 L4, L5, L6, S1. Pedicle screw

21   fixation, T5, T6, T7, T8, T9, T10, T11, T12, L1, L2, L3, L4, L5, L6, S1. Laminectomy for

22   decompression of nerve roots, T4, T5, T6, T7, T8, T9, T10, T11, T12, L1, L2, L3, L4, L5, L6, S1.

23   Partial vertebrectomy[20]-corpectomy[21], T7, T8, T10, T12, L2, L4. Correction of scoliotic

24   deformity, thoracic, lumbar, sacral." However, the consent R.S. signed does not include partial

25   vertebrectomies-corpectomies at any level, nor the correction of the patient's thoracic, lumbar, or

---

26      [19] Arthrodesiss is the surgical fixation of a joint by a procedure designed to accomplish fusion of the joint
27   surfaces by promoting the proliferation of bone cells.
        [20] Vertebrectomy is the excision of a vertebra.
28      [21] Corpectomy is the removal of a vertebra body during spinal surgery.

Accusation

1  sacral scoliotic deformity. Respondent told the Board that he does not look at the signed consent

2  before the procedure but goes off his own notes.  There is, however, no explanation documented

3  by Respondent for the discrepancies between the actual procedures performed and the procedures

4  listed in the signed consent.

5      A).  Respondent states, in his operative narrative, "that the patient has 6 lumbar

6  vertebrae."  This finding, however, is not documented in the lumbar CT scans reports, the lumbar

7  MRI reports, nor in Respondent's operative report narrative from the previous day.

8      B).  Respondent's operative report further states that he performed laminectomies from

9  T4-S1 in order to facilitate de-rotation of the scoliosis curve.  However, Respondent's

10  documentation lacks sufficient specificity to justify laminectomies at all these levels.

11  Additionally, the post-operative lumbar CT scan reports a post laminectomy at L3-4, and states

12  that "other than the prosthetic device at L3-4, there are no extradural abnormalities appreciated."

13  Had laminectomies of T4 down to S1 been performed, as described in Respondent's operative

14  report, these findings should have been noted in the post-operative CT reports.

15      C).  Respondent's operative report narrative describes performing "osteotomies" "at T6,

16  T8, T10, T12, L2 and L4" which "entailed removal of the superior and inferior articulating facets

17  as well as drilling into the pedicle in order to allow for derotation of the curve."  This description,

18  however, is consistent with a pedicle subtraction osteotomy, not a vertebrectomy/corpectomy as

19  listed in his procedures performed section of the operative report.  Had pedicle subtraction

20  osteotomies been performed, as described in Respondent's operative report, these findings should

21  have been noted in the post-operative CT reports.  Additionally, the post-operative thoracic CT

22  scan report states that notes that "despite the patient's scoliosis the central canal remains well-

23  preserved."  Respondent failed to accurately dictate the procedures he performed during the

24  operation and failed to correct his operative report after it was transcribed.

25      32.  Respondent committed acts of gross negligence in his care and treatment of patient

26  R.S. when he:

27      A).  Performed unnecessary surgical procedures at T4 to S1 without clear indication or

28  other findings justifying the procedures;

11

1    B).    Documented that he performed various procedures during the operation which were

2  not performed; and

3    C).    Repeatedly failed to adequately, appropriately and accurately document the patient's

4  chart.

5  **Patient D.B.**

6    33.    On or about October 9, 2009, patient D.B., a then 24-year old female, presented to the

7  Emergency Department at Community Memorial Hospital (CMH) after having undergone a

8  lumbar puncture the prior evening to rule out a subarachnoid[22] hemorrhage.  Thereafter, she

9  developed back pain and bilateral weakness of her lower extremities. An MRI of her lumbar spine

10 revealed an epidural collection of fluid in the vertebral canal anteriorly extending from L2

11 through S1, presumed to be a hematoma.  The study also reflected no significant herniation of the

12 lumbar discs. Due to her complaints, a neurosurgical consultation was scheduled with

13 Respondent who saw her that day.

14   A).    After consultating with D.B., Respondent scheduled her for the "emergent evacuation

15 of the epidural hematoma." Respondent's operative report lists that he performed

16 "Laminectomies L3, L4, L5, S1; posterolateral fusion L3, L4, L5, S1; repair of cerebrospinal

17 fluid leak; creation of shunt; evacuation of epidural hematoma; autograft."   However,

18 Respondent's consultation report and operative narrative fail to document a clear indication for

19 performing a spinal fusion on this 24-year old woman. When questioned by the Board,

20 Respondent conceded that there was no clear indication to fuse the patient at that time.

21   B).    The consent D.B. signed lists the procedure as lumbar laminectomy at "L1-S1 with

22 possible posterior lateral fusion." The consent does not include the evacuation of epidural

23 hematoma.  Respondent testified that he does not look at the signed consent before the surgery

24 and relies on his own notes. However, Respondent failed to document an explanation in the

25

26    ───────────────

     [22] Subarachnoid hemorrhage is bleeding between the pia mater (the innermost of the three meninges
27 covering the brain and spinal cord) and the arachnoid (a delicate membrane interposed between the dura mater and
   the pia mater, separated from the latter by the subarachnoid space) of the brain.  .

28

                                         12

patient's chart for the discrepancies between the actual procedures performed and the procedures listed in the signed consent.

C).    Respondent's operative report states that he performed decompressive laminectomies at L3 to S1.  However, this is not supported by the post-operative lumbar MRI study report which notes laminectomies at L4 and L5.

D).    The narrative portion of Respondent's operative report states that the "dura was very thin in its entirety and a large area of leakage was found.  This was repaired and a shunt was created to allow for passage of CSF."  However, Respondent failed to describe why a shunt was necessary since he repaired the tear during the procedure.  When questioned by the Board, Respondent admitted that no shunt was created during the operation and did not "know what that [statement] means."  Further, he had "no idea" what he was referring to when he dictated his report and had no explanation why this information was contained in two separate portions of his operative report (i.e., the list of procedures performed section and the narrative section). Respondent failed to accurately dictate the procedures he performed during the operation and failed to correct his operative report after it was transcribed.

34.    On or about October 21, 2009, D.B. returned to the emergency room for the drainage of her lumbar epidural hematoma.

35.    On or about October 26, 2009, D.B. was readmitted into CMH for increased serosanguineous fluid from her surgical wound, increased back pain and right sciatica symptoms. An MRI revealed a new epidural hematoma extending from T11-12 through L2-3.

A).    Respondent saw D.B. and scheduled her for the evacuation of the hemotoma that day.  D.B. signed a consent for an epidural hematoma evacuation of the lumbar spine.  However, Respondent's operative report lists the procedures as a "laminectomy, L1; partial laminectomy, T12, repair of dural defect; evacuation of epidural hematoma."  Respondent reiterated that he does not look at the signed consent before the surgery and relies on his own notes.  However, Respondent failed to document an explanation in the patient's chart for the discrepancies between the actual procedures performed and the procedures listed in the signed consent.

36.    On October 28, 2009, a post-operative lumbar MRI report notes that the "epidural

13

1   hematoma has not changed" from the pre-operative image and "extends from the L3-4 level

2   proximally to approximately T11."

3       37.    Respondent committed acts of gross negligence in his care and treatment of patient

4   D.B. when he:

5       A).    Performed an unnecessary fusion of the lumbar spine without a clear indication or

6   findings justifying the procedures performed;

7       B).    Documented that he performed various procedures during the operation which were

8   not performed; and

9       C).    Repeatedly failed to adequately, appropriately and accurately document the patient's

10   chart.

11   **Patient M.M.**

12       38.    On or about May 24, 2010, patient M.M, a then 58-year old female, presented to

13   Respondent at the Ventura County Neurosurgical Associates (VCNA) due to degenerative disc

14   disease, osteoarthritis and scoliosis. Respondent stated, in a letter to the referring physician, that

15   he told the patient if her symptoms returned he would "schedule her to undergo a minimally

16   invasive lateral correction of her scoliotic deformity supplemented by posterior pedicle screw

17   fixation." However, on that date Respondent completed a Surgery Scheduling Work Sheet noting

18   that the surgery date would be in "Mid July." The work sheet further listed a two-day staged

19   procedure as a "XLI7 L1-L2, L2-L3, L3-L4, L4-L5" and "posterior lumbar decomp./fusion" with

20   Nuvasive instrumentation, and a "T10 - L5" on the second day with Apex instrumentation.

21       39.    On or about July 22 and 23, 2010, M.M. was scheduled to undergo the two-day

22   staged surgery, however, the surgery was rescheduled to the beginning of August as the patient

23   was not feeling well.

24       40.    On or about August 5, 2010, M.M presented to Community Memorial Hospital

25   (CMH) and signed a consent for a anterior lumbar interbody fusion from L1 to L5 with

26   autograft/allograft and lumbar instrumentation. Respondent's operative report, however, does not

27   list or describe that an L1-2 anterior interbody fusion was performed that day. There is no

28   explanation documented in the patient's chart for the discrepancies between the actual procedures

1   performed and the procedures listed in the signed consent. When questioned, Respondent told the

2   Board that he does not review the signed consents before the procedure and probably never meant

3   to perform an anterior lumbar interbody fusion at L1-L2. Respondent, however, failed to

4   document this in the patient's chart.

5       41.   On or about August 6, 2010, M.M. underwent the second portion of the staged

6   procedure. Respondent's operative report lists that he performed "Laminectomy for

7   decompression of nerve roots" from T10 to S1, a "posterolateral fusion" from T10 to S1,

8   "pedicles screw fixation" from T10 to L5, and correction of scoliosis at T10 to S1. The post-

9   operative x-rays and MRI reports, however, do not reflect laminectomies or fusions at S1, but

10   pedicle screws and wires from T9 down to L5.

11       A).   Additionally, M.M signed a consent for a "lumbar decompression and fusion" of T10

12   to L5 with lumbar instrumentation. Respondent testified that he does not look at the signed

13   consent before the surgery and relies on his own notes. There is, however, no explanation

14   documented in the patient's chart for the discrepancies between the actual procedures performed

15   and the procedures listed in the signed consent.

16       B).   Even though Respondent's operative report lists and described laminectomies and

17   fusions from T10 to S1, Respondent admitted, during questioning by the Board, that he actually

18   performed "laminotomies,"[23] not "laminectomies" as described and listed in his operative report.

19   Respondent failed to accurately dictate and describe the actual procedures he performed and

20   failed to correct his operative report after it was transcribed.

21       C).   Respondent's operative report further lists and describes that the fusion extended to

22   the S1 level. This, however, is not supported by the post-operative imaging studies which

23   reflected pedicle screws and wires from T9 down to L5. Respondent, however, failed to

24   accurately report this in his operative report. Additionally, when performing long segment

25   fusions for scoliosis correction that extends to or near the lumbosacral junction, the fusion

26

27      [23] A laminotomy is the excision of a portion of a vertebral lamina resulting in enlargement of the
intervertebral foramen for the purpose of relieving pressure in a spinal nerve root. A laminectomy is the surgical
removal of the posterior arch of a vertebra.

28

Accusation

construct should incorporate the sacrum to avoid the creation of a lever-arm effect at the lumbosacral junction. Respondent, however, failed to include the sacrum (S1) in the instrumentation construct during the second procedures and failed to provide a clear rationale for failing to do so. Respondent also failed to accurately dictate the procedures he performed during the operation and failed to correct his operative report after it was transcribed.

42.     Respondent committed acts of gross negligence in his care and treatment of patient M.M. when he excluded the sacrum (S1) from the instrumentation construct when attempting to perform a long segment scoliosis deformity correction surgery.

SECOND CAUSE FOR DISCIPLINE

(Repeated Negligent Acts)

43.     Respondent is subject to disciplinary action under Business and Professions Code section 2234, subdivision (c), in that that he committed repeated negligent acts in his care and treatment of patients J.S., M.S., R.S., D.B., and M.M. The circumstances are as follows:

44.     Paragraphs 11 through 14C, 16 through 23, 25 through 31C, 33 through 36, and 38 through 41C, inclusive, above are incorporated herein by reference as if fully set forth.

**Patient J.S.**

A).     Performed unnecessary surgical procedures at L3 and L5-S1 without evidence of severe stenosis or other findings justifying the procedures at these levels;

B).     Excluded S1, the sacrum, from the instrumentation construct when attempting to fuse the L3-S1 levels;

C).     Documented that he performed various procedures during the operation which were not performed; and

D).     Repeatedly failed to adequately, appropriately and accurately document the patient's chart.

**Patient M.S.**

A).     Failed to promptly evaluate and determine the cause of the patient's right-sided drop foot and right leg pain, a new post-operative neurological finding; and

B).     Repeatedly failed to adequately, appropriately and accurately document the patient's

16

1   chart.

2   **Patient R.S.**

3       A).   Performed unnecessary surgical procedures at T4 to S1 without clear indication or

4   other findings justifying the procedures;

5       B).   Documented that he performed various procedures during the operation which were

6   not performed; and

7       C).   Repeatedly failed to adequately, appropriately and accurately document the patient's

8   chart.

9   **Patient D.B.**

10      A).   Performed an unnecessary fusion of the lumbar spine without a clear indication or

11  findings justifying the procedures performed;

12      B).   Documented that he performed various procedures during the operation which were

13  not performed; and

14      C).   Repeatedly failed to adequately, appropriately and accurately document the patient's

15  chart.

16  **Patient M.M.**

17      A).   Excluded the sacrum (S1) from the instrumentation construct when attempting to

18  perform a long segment scoliosis deformity correction surgery; and

19      B).   Repeatedly failed to adequately, appropriately and accurately document the patient's

20  chart.

21                  THIRD CAUSE FOR DISCIPLINE

22                      (Dishonest and Corrupt Acts)

23      45.   Respondent is subject to disciplinary action under Business and Professions Code

24  section 2234, subdivision (e), in that committed dishonest and corrupt acts in his care and

25  treatment of patients J.S., M.S., R.S., D.B. and M.M.   The circumstances are as follows:

26      46.   Paragraphs 11 through 14C, 16 through 23, 25 through 31C, 33 through 36, and 38

27  through 41C, inclusive, above are incorporated herein by reference as if fully set forth.

28  ///

                    17

treatment of patients J.S., M.S., R.S., D.B. and M.M.   The circumstances are as follows:

46.   Paragraphs 11 through 14C, 16 through 23, 25 through 31C, 33 through 36, and 38 through 41C, inclusive, above are incorporated herein by reference as if fully set forth.

### FOURTH CAUSE FOR DISCIPLINE

#### (Failure to Maintain Accurate and Adequate Records)

47.   Respondent is subject to disciplinary action under Business and Professions Code section 2266 in that he failed to maintain adequate and accurate records in his care and treatment of patients J.S., M.S., R.S., D.B., and M.M. The circumstances are as follows:

48.   Paragraphs 11 through 14C, 16 through 23, 25 through 31C, 33 through 36, and 38 through 41C, inclusive, above are incorporated herein by reference as if fully set forth.

### PRAYER

WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged, and that following the hearing, the Medical Board of California issue a decision:

1.   Revoking or suspending Physician's and Surgeon's Certificate Number A 108433, issued to Aria Omar Sabit, M.D.

2.   Revoking, suspending or denying approval of his authority to supervise physicians assistants, pursuant to section 3527 of the Code;

3.   If placed on probation, ordering Respondent to pay the Medical Board of California the costs of probation monitoring; and

4.   Taking such other and further action as deemed necessary and proper.

DATED:   September 17, 2013

KIMBERLY KIRCHMEYER
Interim Executive Director
Medical Board of California
Department of Consumer Affairs
State of California
*Complainant*

LA2013607634
61085544.docx

18

Accusation