# EXHIBIT 12

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| Physiomatrix, Inc., | ) **PLAINTIFF DEMANDS** |
| Genex Physical Therapy, Inc., | ) **TRIAL BY JURY** |
| Kallil I. Kazan, D.C., | ) |
| Naim Khanafer, D.C., | ) |
| Sami Abu Farha, M.D., | ) |
| Sami Abu Farha, M.D., P.C., | ) |
| Tete Oniang'o, M.D., | ) |
| Tete Oniang'o, M.D., P.L.L.C., | ) |
| | ) |
| Defendants. | ) |

### COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm") for its Complaint ("Complaint"), alleges as follows:

### I.    NATURE OF THE ACTION

1.    This action seeks to recover money fraudulently obtained by the defendants from State Farm through the submission of hundreds of bills and related documentation from (a) physical therapy facilities, Physiomatrix, Inc. ("Physiomatrix") and Genex Physical Therapy, Inc. ("Genex") (collectively the "Clinics"), for treatment purportedly provided to individuals ("patients") who were involved in motor vehicle accidents and eligible for Personal Injury Protection benefits ("No-Fault Benefits") under State Farm's insurance policies and (b) physicians Sami Abu Farha, M.D. ("Dr. Abu Farha") and Tete Oniang'o, M.D. ("Dr. Oniang'o") (collectively the "Prescribing Physicians").

2.    As described below, the Clinics submitted to State Farm hundreds of bills and related documentation that were fraudulent because the services either were not performed or

were performed pursuant to a fraudulent predetermined protocol of treatment ("Predetermined Protocol"), rather than to address the unique needs of the individual patients. Specifically, pursuant to the Predetermined Protocol, Physiomatrix purports to provide the same five physical therapy modalities — hot and/or cold packs, electrical stimulation, ultrasound, therapeutic exercise and massage ("the Five Modalities") — to all patients on every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof. Similarly, pursuant to the Predetermined Protocol, Genex: (a) until approximately August 2010, purported to provide the same four physical therapy modalities – hot and/or cold packs, electrical stimulation, ultrasound and therapeutic exercise ("the Four Modalities") – to all patients on every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof; and (b) after August 2010, purported to provide the Five Modalities to all patients on every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof.

3.      State Farm also brings this action against the chiropractor owners of the Clinics, Naim Khanafer, D.C. ("Khanafer"), and Kallil I. Kazan, D.C. ("Kazan"), who are responsible for the design and implementation of the Predetermined Protocol and stand to profit the most. The Clinics, Khanafer, and Kazan are referred to collectively as the "Clinic Defendants." All defendants are referred to collectively as "Defendants."

4.      The Clinic Defendants act in concert with the Prescribing Physicians, with each needing each other to successfully carry out the scheme. Specifically, the Clinic Defendants need the Prescribing Physicians to: (a) fraudulently diagnose the patients and prescribe physical therapy initially, and then every four weeks, because the Clinics are prohibited by law from providing and billing for physical therapy unless it is based upon a prescription from a physician

or other specified licensed health care professional; and (b) certify many patients as disabled from work and/or driving which enables patients to receive transportation to and from the Clinics, at no cost to the patients, but at a significant cost to State Farm. The Prescribing Physicians need the Clinic Defendants to refer patients back to them for their re-examinations. The Prescribing Physicians purported to examine and diagnose more than 70% of patients whose claims are represented on the charts attached as Exs. 1-A through 1-C.

5.     Defendants have symbiotic relationships that enable each to profit substantially from their scheme.   Specifically, the Prescribing Physicians profit from the scheme by fraudulently billing State Farm directly for each instance in which they purportedly examine patients who treat at the Clinics. The Clinic Defendants profit from the scheme by billing State Farm for the physical therapy prescribed by the Prescribing Physicians after each examination.

6.     The Clinic Defendants and Prescribing Physicians submitted to State Farm hundreds of bills and related documentation that are the product of the Predetermined Protocol that Defendants designed and carried out for examining, diagnosing, and treating all patients of the Clinics for as long as possible, whether they need it or not. Defendants did not design the Predetermined Protocol to legitimately examine, diagnose, and provide medically necessary services that were designed to address the unique needs of the individual patients. Instead, the Predetermined Protocol was designed and carried out to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with a small group of personal injury attorneys ("PI Attorneys") with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships.

7.     Pursuant to the Predetermined Protocol, services continue until: (a) the patient finally refuses further treatment; (b) an independent medical examination ("IME") determines that further treatment is not medically necessary; or (c) the patient resolves his or her injury claim.

8.     As a result of the Predetermined Protocol: (a) patients are not legitimately examined, diagnosed, and appropriately treated for conditions they may have; (b) patients are subjected to a predetermined laundry list of treatments for conditions that they may not have; and (c) PI Attorneys with whom Defendants appear to have substantial *quid pro quo* cross-referral relationships use Defendants' fraudulent bills and related documentation to present inflated uninsured motorist claims ("UM Claims") against State Farm and bodily injury claims ("BI Claims") against at-fault drivers.

9.     Defendants' scheme began at least as early as October 2007, and has continued uninterrupted since that time.   Over the course of the scheme, Defendants have knowingly submitted or caused to be submitted hundreds of fraudulent bills and supporting documentation to State Farm.   State Farm justifiably relied on Defendants' fraudulent misrepresentations.

10.     This action seeks a declaratory judgment that State Farm is not liable for any pending bills or bills submitted during the pendency of this action by the Defendants based upon the above-described conduct.   This action also asserts common law claims for fraud and unjust enrichment, as well as statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO"), to recover actual damages of at least $1.9 million in No-Fault Benefits paid to the Defendants, plus treble damages and costs, including reasonable attorneys' fees.   State Farm has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association or any other source for any of the claims at issue in this case.

- 4 -

## II.     JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

12.     Pursuant to 28 U.S.C. §1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §1961 *et seq.* ("RICO") because they arise under the laws of the United States.

13.     This Court has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

14.     Pursuant to 28 U.S.C. 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.    THE PARTIES

### A.     Plaintiff

15.     State Farm Mutual Automobile Insurance Company is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed and engaged in the business of insurance in Michigan and virtually every state.

### B.     Defendants

#### 1.     The Clinics

16.     Defendant Physiomatrix is a Michigan corporation, with its principal place of business at 15841 W. Warren Avenue, in Detroit, Michigan.  From approximately October 2007 through the present, Physiomatrix has knowingly submitted, and caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C.  These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the

purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships.

17.     Defendant Genex is a Michigan corporation, with its principal place of business at 4953 Schaefer, in Dearborn, Michigan. From at least September 2009 through the present, Genex has knowingly submitted, and caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C. These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships.

18.     According to corporate filings: (1) Khanafer is a shareholder and officer of both Physiomatrix and Genex; and (2) Kazan is a shareholder and officer of Genex.  Although corporate filings do not identify Kazan as a shareholder or officer of Physiomatrix, he has stated to the media that he is an owner of Physiomatrix, and he has been identified in other documents and by patients as an owner of Physiomatrix.

2.     **The Clinics' Chiropractor Owners**

- 6 -

19.     Defendant Naim Khanafer, D.C. resides in and is a citizen of the State of Michigan.   Khanafer is a licensed chiropractor.   In August 2003, Khanafer opened a physical therapy facility in Dearborn, Michigan with Salma Kazan, the wife of defendant Kallil I. Kazan, that they operated under the name Metro Rehab + P.T until August 2006.   In August 2006, Metro Rehab + P.T changed its assumed name to Physio Matrix Physical Therapy and moved to 15841 W. Warren Avenue in Detroit, Michigan.   One month earlier, in July 2006, Khanafer formed defendant Physiomatrix, which was also located at 15841 W. Warren Avenue.   Khanafer is the President, Secretary and Treasurer of Physiomatrix, as well as a shareholder.

20.     In June 2009, Khanafer and defendant Kallil Kazan formed defendant Genex. Khanafer is an officer and shareholder of Genex.

21.     In the foregoing roles, Khanafer has knowingly coordinated and controlled the implementation of the Predetermined Protocol for patients of the Clinics.   From at least October 2007 through the present, Khanafer, through Genex and Physiomatrix, has knowingly submitted, or caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C.   These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial quid pro quo cross-referral relationships.

22.     Defendant Kallil I. Kazan, D.C. resides in and is a citizen of the State of Michigan.  Kazan is a licensed chiropractor.  He is a shareholder of Physiomatrix.  Although Khanafer claims to be Physiomatrix's sole shareholder, in an article published on September 11, 2009 in the Arab American News, Kazan represented that he owns Physiomatrix with Khanafer and that they opened Genex because "'We were over office capacity [at Physiomatrix], getting 300 patient visits a week . . . . [W]e want to keep that up and running and transfer some of our patients to the Schaefer location [at Genex].'"  *See* Exhibit 2 (stating further that "Kazan's other office, Physio Matrix, is at 15841 W. Warren in Detroit").  Additionally, a 2011 brochure for the Lebanese American Heritage Club lists "PhysioMatrix Physical Therapy: Dr. Kallil Kazan," as a sponsor of the Arab American Scholarship Foundation.  *See* Exhibit 3 at 17.  Moreover, both treating physicians and patients refer to Physiomatrix as "Dr. Kazan's office."  *See, e.g.,* Exhibit 4, March 26, 2009 Michigan Head & Spine Institute, PC Consultation Note.

23.     In approximately June 2009, Kazan formed Genex with Naim Khanafer.  Kazan is an officer and shareholder of Genex.

24.     In the foregoing roles, Kazan has knowingly coordinated and controlled the implementation of the Predetermined Protocol for patients of the Clinics.  From at least October 2007 through the present, Kazan has knowingly submitted, or caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C.  These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of

personal injury claims in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial quid pro quo cross-referral relationships.

### 3.   The Prescribing Physicians

25.     Defendant Sami Abu Farha, M.D. ("Dr. Abu Farha") resides in and is a citizen of the State of Michigan. Dr. Abu Farha has been a licensed medical doctor in Michigan since 1994, and he is board certified in internal medicine. Dr. Abu Farha has his own medical practice, defendant Sami Abu Farha, P.C., and performs examinations at his office, located at 5280 Oakman Boulevard, Dearborn, Michigan. Beginning as early as October 2007, Dr. Abu Farha began examining, diagnosing and prescribing physical therapy for patients who treated at Physiomatrix. In September 2009, Dr. Abu Farha began examining, diagnosing and prescribing physical therapy for patients who treated at Genex.

26.     Dr. Abu Farha's role is essential to the success of the fraud scheme because Michigan law requires a prescription from a medical doctor or other licensed health care professionals specified in the Public Health Code before a physical therapist can perform physical therapy services on a patient. *See* Mich. Pub. Health Code § 333.17820(1) ("A person shall engage in the actual treatment of an individual only upon the prescription of an individual holding a license issued under part 166 [Dentistry], 170 [Medicine], 175 [Osteopathic Medicine & Surgery], or 180 [Podiatric Medicine & Surgery], or the equivalent license issued by another state"). Moreover, under Michigan law, physical therapy prescriptions are only "valid for 90 days from the date that the prescription was written unless the termination date is otherwise stated by the authorized licensee on the prescription." *See* 2010 Mich. Admin. Code R. 338.7122(d)(2). Therefore, the Clinics need Dr. Abu Farha's examinations and predetermined prescriptions for physical therapy, for which the Clinics bill State Farm.

27.     Sami Abu Farha, M.D., P.C ("Abu Farha PC") is a professional service corporation incorporated under the laws of the State of Michigan, with its principal place of business in West Bloomfield, Michigan.   At all relevant times, Dr. Abu Farha has been the president, director, and sole shareholder of Abu Farha PC, and has been primarily, if not solely, responsible for rendering and supervising medical services purportedly provided through Abu Farha PC.  As set forth in the chart attached hereto as Exhibit 1-A, from 2007 to the present, fraudulent claims related to more than 50 patients were knowingly submitted to State Farm by Dr. Abu Farha through and in conjunction with Abu Farha PC.

28.     Tete Oniang'o, M.D. ("Dr. Oniang'o") resides in and is a citizen of the State of Michigan.  Dr. Oniang'o has been a licensed medical doctor in Michigan since January 2009. He is not board certified in any specialty.   Beginning as early as March 2009, Dr. Oniang'o began examining, diagnosing and prescribing physical therapy for patients at Physiomatrix.  In August 2009, Dr. Oniang'o began examining, diagnosing and prescribing physical therapy for patients at Genex.

29.     Tete Oniang'o, M.D., P.L.L.C. ("Oniang'o PLLC") is a professional service limited liability company organized under the laws of the State of Michigan, with its principal place of business in Rochester Hills, Michigan.  At all relevant times, Dr. Oniang'o has been the registered agent and, upon information and belief, sole member and officer of Oniang'o PLLC, and has been primarily, if not solely, responsible for rendering and supervising medical services purportedly provided through Oniang'o PLLC.  As set forth in the chart attached hereto as Exhibit 1-B, from March 2009 to the present, fraudulent claims related to more than 50 patients were knowingly submitted to State Farm by Dr. Oniang'o through and in conjunction with Oniang'o PLLC.

30. Dr. Oniang'o's purported examinations of the patients take place at the Clinics. However, to conceal from State Farm his relationship with the Clinic Defendants, Dr. Oniang'o misrepresents on his bills that the examinations are performed at his office, located at 4241 Maple, Suite 250A, Dearborn, Michigan.

31. From March 2009 through August 2009, two entities owned and/or controlled by Paul Petre, M.D. and Ram Gunabalan, M.D., namely Paul Petre M.D., P.C. d/b/a Southwest Visiting Physicians ("Southwest Visiting Physicians") and Michigan Visiting Physicians P.C. ("Michigan Visiting Physicians"), also submitted bills and reports for the same examinations for which Oniang'o PLLC also billed State Farm. *See* Exhibit 5, sample duplicate bills.

32. Specifically, during the six month period from March to August 2009, virtually every time Dr. Oniang'o submitted a bill to State Farm for purportedly examining a patient, he submitted one bill from Oniang'o PLLC and a duplicate bill was also submitted by either Southwest Visiting Physicians or Michigan Visiting Physicians for the same patient and same date of service. In most instances, Dr. Oniang'o attempted to conceal these duplicate charges from State Farm by using different level CPT codes to bill for his services. In at least one instance, Dr. Oniang'o attempted to conceal his duplicate charges from State Farm by using consecutive dates of service for the same patient. Nine duplicate claims were submitted to State Farm through and in connection with Michigan Visiting Physicians, and more than 20 duplicate claims were submitted to State Farm through and in connection with Southwest Visiting Physicians. All of these claims were duplicates of claims that Dr. Oniang'o also submitted through and in connection with Oniang'o PLLC.

33. In August 2009, Southwest Visiting Physicians and Michigan Visiting Physicians ceased submitting bills for Dr. Oniang'o's services. Nevertheless, even after August 2009, when

bills for Dr. Oniang'o's services were submitted to State Farm through Oniang'o PLLC only, for at least four patients, Dr. Oniang'o always submitted duplicate bills to State Farm. For three of these patients, Dr. Oniang'o used different level CPT codes to conceal that he was submitting duplicate charges.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS

### A.   First-Party Claims For Payment Under The No-Fault Act.

34.     Under the Michigan No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those expenses are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle" MCL §§ 500.3105, 3107(1)(a). A claim for damage, loss or injury made by an insured against his or her own insurer is a "First Party Claim."

### B.   Tort Claims For Non-Economic Loss

35.     Individuals who are not substantially at fault for the accidents underlying their claims may also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accidents ("At-Fault Drivers") through a BI Claim, only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL § 500.3135, and (b) if recovery under the BI Claim is insufficient, from the patients' own insurance companies through an UM Claim.

36.     An individual has suffered serious impairment of body function when his general ability to conduct the course of his normal life has been affected as a result of his injury. A determination of serious impairment requires an analysis of several factors, including: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the

duration of the impairment, (d) the extent of any residual impairment, (e) the prognosis for eventual recovery, and (f) whether there is "objective manifestation" of the injury.

**C.      *Quid Pro Quo* Relationships Between Defendants, PI Attorneys And Referring Doctors.**

37.     The success of Defendants' scheme depends heavily upon *quid pro quo* cross-referral relationships with PI Attorneys who represent patients in connection with BI Claims and UM Claims. Specifically, the PI Attorneys are motivated to refer patients to Defendants because the PI Attorneys can rely upon Defendants' Predetermined Protocol to (a) establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the patients and their other clients, and (b) inflate the value of the BI Claims and UM Claims. This, in turn, increases the amounts of the contingency fees available to the PI Attorneys through the BI Claims and UM Claims. At the same time, Defendants are motivated to refer patients to the PI Attorneys and provide them with fraudulent bills and reports to curry favor with and induce more patient referrals from the PI Attorneys.

38.     To illustrate, from 2007 to the present, at least 61 patients for whom the Clinics submitted bills to State Farm – or 59% of the patients who were represented by an attorney – were represented by attorney Michael Morse, who frequently represents individuals in UM or BI Claims. In addition, from 2009 to the present, 21 patients – or 19% of patients who were represented by an attorney – were represented by the law firm Weiner & Associates.

39.     In addition to the *quid pro quo* relationships with PI Attorneys, the Defendants need and depend upon the participation of referring doctors to accomplish their common purpose of defrauding State Farm through the fraudulent claims. In particular, as described above, Defendants depend on and need the Prescribinh Physicians to: (a) fraudulently diagnose the

patients both initially and then every four weeks; (b) write predetermined prescriptions for physical therapy services; and (c) continue to refer the patients to the Clinics. Indeed, the Prescribing Physicians examine, diagnose and prescribe physical therapy for more than 70% of the patients whose claims are represented on the charts attached as Exhibits 1-A through 1-C.

40.     In addition to providing their fraudulent diagnoses and referrals, the Prescribing Physicians also assist the Clinics by certifying many patients as disabled from work and/or driving. *See* Exhibits 1-A through 1-C. Among other things, these certifications enable patients to receive transportation to and from the Clinics, at no cost to the patients, but at a significant cost to State Farm. Representative examples of the Prescribing Physicians' disability certificates are attached hereto as Exhibit 6.

41.     Additionally, the disability findings: (a) support patients' claims for replacement services (maximum of $20 per day for three years); (b) support patients' claims for lost wages; (c) support patients' claims for attendant care; (d) enable some patients to collect disability benefits; and (e) support the patients' "objective manifestation" of injury to satisfy the threshold for a BI or UM Claims. Indeed, State Farm has paid the patients whom the Clinics purportedly treated more than $900,000 in replacement services, lost wages, and attendant care.

42.     The Prescribing Physicians certify that patients are disabled because they know it will increase the likelihood that the patients will continue to undergo treatment at the Clinics. Indeed, although soft-tissue injuries often resolve themselves spontaneously within a matter of weeks without any intervention, most patients purport to treat at the Clinics for well beyond the commonly accepted treatment period for soft tissue injuries of four to six weeks. Specifically, more than 40% of the patients went to the Clinics at least 50 times. And incredibly, 17% of the patients went to the Clinics more than 99 times. In terms of duration, more than 40% of the

patients treated at the Clinics for at least six months, and more than 20% of the patients treated at the Clinics for at least a year. Notably, many patients have stated that despite their extensive physical therapy, their physical condition did not improve.

43.     Each Defendant's participation and role is necessary to the success of the scheme. No one Defendant is capable of carrying out the scheme without the participation of the others. All of the Defendants act in concert with the common purpose of defrauding State Farm.

**D.     The Legitimate Treatment of Patients With Strains and Sprains**

44.     When an individual has been in a motor vehicle accident and complains of neck and back pain, a licensed professional must obtain a history and perform a legitimate examination to arrive at a legitimate diagnosis. Based upon a legitimate diagnosis, a licensed professional must engage in medical decision making to design a legitimate treatment plan that is tailored to the unique circumstances of each patient.

45.     Legitimate treatment plans for individuals with strains and sprains may involve no treatment at all because many of these kinds of injuries heal spontaneously within weeks without any intervention, pain medication, passive modalities such as electrical stimulation, heat and massage, and/or active therapies such as stretching, exercise, and muscle strengthening. The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency and duration of the various treatments, however, should be individualized depending on the patient's unique circumstances and response to treatment.

46.     Treatment plans should be periodically reassessed based upon updated histories, re-examination findings, reported pain levels, and return to functionality, and modified using medical decision-making processes.

47.     Patients should be discharged from treatment when they have reached maximum medical improvement, and/or when treatment result in no significant clinical improvement, such that no further treatment is likely to benefit the patient.

48.     The above-described process of history, examination, diagnostic studies, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm who must pay for reasonable and necessary treatment.

49.     As described next, patients were not legitimately examined, diagnosed, or treated for their individual conditions.   Instead, they were subjected to a Predetermined Protocol in which the Prescribing Doctors examine the patients to support predetermined prescriptions for physical therapy, and the Clinics purport to provide the same treatment to all patients on every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof.   Furthermore, the documentation of the examinations, diagnoses, and treatment submitted by the Prescribing Physicians and Clinics is fraudulent because the pervasive patterns in the documentation are not credible, and the documentation reflects services that either were not performed or were performed pursuant to the Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships.

E.     **Defendants' Scheme And Fraudulent Predetermined Protocol**

1.     **Solicitation**

50.     Patients are often referred to the Clinics by either their attorneys or investigators who work with their attorneys.  For example, at least three patients have testified that they were referred to the Clinics by attorney Michael Morse, his law office – Law Offices of Michael J. Morse P.C. &. The Auto Accident Claim Center – or investigator Kenneth Jackson ("Jackson") who identified himself as a representative of Michael Morse.  In at least one instance, Jackson made the appointment at Physiomatrix for the patient.

51.     Patients have also testified that they were solicited directly by the Clinics.  And, other patients have testified that once they contacted the Clinics, the Clinics referred them to Dr. Abu Farha or, that they were seen on-site by Dr. Oniang'o.

### 2.     The Medical Doctors' Fraudulent Initial and Follow-Up Examinations and Diagnoses, and Treatment Plans

52.     The Prescribing Physicians play an essential role in the scheme.  Under Michigan law, physical therapy services can only be performed if a licensed health care provider, such as a medical doctor, prescribes the services.  *See* Mich. Pub. Health Code § 333.17820(1).  Moreover, physical therapy prescriptions expire after 90 days, so if therapy is to continue beyond this point, a subsequent prescription is required.  *See* 2010 Mich. Admin. Code R. 338.7122.  As such, the Clinics rely on the Prescribing Physicians to prescribe physical therapy services.  Without these prescriptions, the Clinics would lose their only source of revenue.

53.     Accordingly, the first step in the Predetermined Protocol is an initial examination by one of the Prescribing Physicians after which the Prescribing Physicians inevitably prescribe physical therapy.  Based on the initial examination findings, the Prescribing Physicians diagnose patients with sprains and strains of the cervical and lumbar regions of the back, as well as other conditions.  The Prescribing Physicians then conclude that physical therapy is medically

- 17 -

necessary for each patient they examine. The Prescribing Physicians specify that physical therapy should be provided three times per week for four weeks.

### a.   Dr. Abu Farha

54.     From approximately October 2007 through the present, Dr. Abu Farha has purported to perform the initial examination of a significant number of patients who purportedly received treatment at the Clinics. *See* Exhibit 1-A. Based on his initial examination findings, Dr. Abu Farha diagnoses patients with sprains and strains of the cervical and lumbar regions of the back, as well as other conditions.

55.     The documentation that Dr. Abu Farha submits to State Farm consists of a one-page, handwritten sheet with virtually illegible notes ("Initial Exam Report"). *See* Exhibit 7. The Initial Exam Reports establish that Dr. Abu Farha fails to properly examine the patients because he does not perform motor or sensory testing, and does not quantify limitations, if any, to range of motion, if he documents range of motion at all. Other pervasive patterns in Dr. Abu Farha's Initial Exam Report include: (a) chief complaints of pain in the neck and/or back, that are general and non-specific; (b) the lack of any medical or surgical history; (c) a negative review of all systems for virtually all patients, if any review is performed; (d) narrative descriptions of the motor vehicle accident consistent with a lack of fault on the part of the patient; and (e) routine prescriptions for narcotic pain medication. In addition, Dr. Abu Farha diagnoses some patients with radiculopathies (pinched nerve roots that run along both sides of the spine at each vertebra level), despite normal neurological exams or no neurological exams at all. It is virtually impossible to diagnosis a radiculopathy (a) without performing a neurological exam, or (b) when the results of a neurological exam are normal.

56.     Based upon his predetermined diagnoses, Dr. Abu Farha prescribes physical therapy using a form with check for either "Lumbo Sacral Sprain," "Cerrical [sic] Sprain," "R/L Shoulder Sprain," "R/L Knee Sprain," or "Ankle Sprain." *See* Exhibit 8. There are no other options for possible diagnoses on this template form, and Dr. Abu Farha rarely writes in any other diagnosis. On the prescription form, Dr. Abu Farha's standard recommended treatment plan, "Physical Therapy 3 times /wk. for 4 weeks," is pre-printed, there are no other options for possible treatment plans on this template, and Dr. Abu Farha rarely changes this prescription. Each of Dr. Abu Farha's prescription forms is an affirmative false representation that: (a) the diagnosis listed on the form is the patient's true diagnosis; (b) the diagnosis is rendered after a legitimate history and physical examination of the patient; and (c) the prescribed physical therapy is medically necessary.

57.     Additionally, Dr. Abu Farha routinely signs Medical Certificates, examples of which are attached as Exhibit 9, pursuant to which he finds patients to be partially or totally disabled, restricts standing, sitting, bending/twisting, pulling/pushing, lifiting, housekeeping activities, and/or driving.

58.     Dr. Abu Farha also prescribes narcotic pain medication to patients despite that, in most cases, narcotics would not be indicated. Dr. Abu Farha makes the same diagnoses and writes the same prescriptions every four weeks at the patients' re-evaluations.

59.     Thereafter, Dr. Abu Farha purports to re-examine the patient the following month, at which point he renders the same predetermined diagnosis, and sends the patient back to the Clinics for another four weeks of the same physical therapy.

60.     Dr. Abu Farha's cursory examinations, as well as the pervasive patterns in his findings, diagnoses, and prescriptions, are designed to enable the Clinics to continue to bill for

- 19 -

physical therapy that is not performed or is performed pursuant to a Predetermined Protocol, and to inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the Defendants have *quid pro quo* relationships.

**b.     Dr. Oniang'o**

61.     From approximately March 2009 through the present, Dr. Oniang'o has also purported to perform initial examinations of a significant number of patients who purportedly received treatment at the Clinics. *See* Exhibit 1-B. Based on his initial examination findings, Dr. Oniang'o diagnoses patients with sprains and strains of the cervical and lumbar regions of the back, as well as other conditions.

62.     Dr. Oniang'o's diagnoses of the patients and physical therapy prescriptions are also predetermined. For example, the vast majority of patients examined by Dr. Oniang'o are purportedly "tender to palpation" in the cervical and lumbar spine. *See* Exhibit 10. Dr. Oniang'o does not document that he performs any sensory or motor testing. Regardless of his purported "findings," Dr. Oniang'o prescribes the same treatment plan for patients, namely "[p]hysical therapy for the affected area 3 times a week for 4 weeks," with the same goal of "improvement of strength, range of motion, and flexibility." Notably, Dr. Oniang'o includes this goal in his reports despite that, in many instances, range of motion and/or strength are supposedly normal. *Id.* Dr. Oniang'o also prescribes painkillers, typically the narcotic Vicodin, and, for most patients, notes in his examination report that they are disabled from working and/or driving. Dr. Oniang'o further records that patients are to be scheduled for a follow-up re-assessment in four weeks.

63.     For his physical therapy prescriptions, Dr. Oniang'o uses a document titled "Physical Therapy Prescription," that contains pre-filled fields for the frequency and duration of

physical therapy – "Three times a week" for "One Month," as well as for the "Area," which Dr. Oniang'o specifies as "ROM, Flexibility." *See* Exhibit 11. Dr. Oniang'o typically prescribes physical therapy for the cervical and/or lumbar spine. *Id.*

64.     Thereafter, Dr. Oniang'o purports to re-examine the patient the following month, at which point he renders the same predetermined diagnosis, and sends the patient back to the Clinics for another four weeks of the same physical therapy.

65.     Notably, although Dr. Oniang'o purports to examine the patients at the Clinics, to conceal his relationship with the Clinic Defendants from State Farm, Dr. Oniang'o misrepresents on his bills that his services are performed at his office, located at 4241 Maple, Suite 250A, Dearborn, Michigan.

66.     Additionally, State Farm was routinely double-billed for Dr. Oniang'o's purported examinations of the patients. In particular, from March 2009 to August 2009, virtually every time Dr. Oniang'o submitted a bill through Oniang'o PLLC to State Farm for purportedly examining a patient, either Southwest Visiting Physicians or Michigan Visiting Physicians also billed State Farm for Dr. Oniang'o's examination of the same patient and same date of service. *See* examples, attached as Exhibit 5. In most instances, Dr. Oniang'o attempted to conceal his duplicate charges from State Farm by using different level CPT codes to bill for his services. In at least one instance, Dr. Oniang'o attempted to conceal his duplicate charges from State Farm by using consecutive dates of service for the same patient.

67.     In August 2009, Dr. Oniang'o ceased submitting bills through Southwest Visiting Physicians and Michigan Visiting Physicians, and began submitting his bills exclusively through Oniang'o PLLC. Although Dr. Oniang'o's duplicate billing practices subsided when his relationships ended with Southwest Visiting Physicians and Michigan Visiting Physicians, even

after August 2009, for at least four patients, Dr. Oniang'o always submitted duplicate bills to State Farm through Oniang'o PLLC. For three of these patients, Dr. Oniang'o used different level CPT codes on each bill to conceal that he was submitting duplicate charges.

68.     The Prescribing Physicians repeatedly prescribe four weeks of physical therapy pursuant to the Predetermined Protocol and to ensure a steady stream of referrals from the Clinics and PI Attorneys, who they know will continue to refer patients for monthly follow-up examinations that result in predetermined diagnoses and prescriptions for the same physical therapy. Indeed, physical therapy is only compensable if it is prescribed by a properly licensed medical provider, such as a medical doctor. Accordingly, Dr. Abu Farha and Dr. Oniang'o are integral to the scheme.

### c.     Disability Certificates

69.     In addition, the Prescribing Physicians also sign a disability certificate stating that the patient is unable to work or drive, and/or a medical certificate restricting the patient from prolonged standing or sitting, excessive bending, twisting, pulling, pushing, lifting and housekeeping activities. *See* Exhibits 1-A through 1-C.

70.     Among other things, these certifications enable patients to receive transportation to and from the Clinics, at no cost to the patients, but at a significant cost to State Farm. By providing transportation at no cost to the patients, the Clinics are able to maximize the likelihood that patients will attend their scheduled visits and continue treatment.

71.     Additionally, two companies – Metro Medic Transportation, Inc. ("Metro Medic") and TransMedic, L.L.C. ("TransMedic") – which provide transportation to at least 20% of the patients who receive transportation, are associated with the Defendants. Specifically, (1) Khanafer is the registered agent and incorporator of Metro Medic, and (2) the TransMedic

registered office is located at 4241 Maple, Suite 250, in Dearborn, which is Dr. Oniang'o's office. Both Metro Medic and TransMedic have purchased vehicles from Ross Auto Deals, which is owned by Khanafer, and had inspections done at Eddy's Auto, which is also owned by Khanafer. See Exhibit 12.

72.     Thus, disabling the patients from driving not only ensures their attendance at the Clinics, it enables Khanafer and possibly other Defendants to receive additional profits. To date, State Farm has paid Metro Medic and TransMedic at least $60,000 for transporting patients who treat at the Clinics.

73.     Beyond transportation, the disability findings support patients' claims for replacement services, lost wages, attendant care, and disability benefits. Indeed, State Farm has paid the patients whom the Clinics purportedly treat more than $900,000 in replacement services, lost wages, and attendant care. The disability findings also support an "objective manifestation" of injury to satisfy the threshold for bringing a BI or UM Claim, which is critical to the success of the scheme because it enables the Clinics to curry favor with PI Attorneys who are a vital referral source.

74.     Moreover, the Prescribing Physicians certify that patients are disabled because they know it will increase the likelihood that patients will continue to undergo treatment at the Clinics. Indeed, although soft-tissue injuries often resolve themselves spontaneously within weeks without any intervention, most patients were treated at the Clinics for well beyond the commonly accepted treatment period for soft tissue injuries.

### 3.     The Clinics' Fraudulent Physical Therapy Examinations

75.     After patients receive their physical therapy prescriptions from the Prescribing Physicians, or another physician, they begin the Predetermined Protocol at either Physiomatrix or

Genex. Regardless of whether the patient goes to Physiomatrix or Genex, on the first visit, each patient is purportedly examined by one of the Clinics' physical therapists. *See* Exhibit 13.

76.     Although the Clinics submit bills for physical therapy evaluations, at least one patient has testified that she was not evaluated and proceeded directly to therapy. In addition, despite the fact that the only licensed physical therapists at the Clinics are male and only licensed physical therapists can perform and bill for physical therapy evaluations, at least one other patient has testified that he was never evaluated by any male employees of the Clinics.

77.     To support Physiomatrix's charges for the physical therapy evaluations and the subsequent treatment plan, the Clinic Defendants create a sham document called an Initial Evaluation/Examination ("PT Initial Evaluation"). The information in the PT Initial Evaluations is predetermined and the forms are fraudulent.

78.     For example, Physiomatrix's PT Initial Evaluations contain virtually identical "Rehabilitation Information/History" sections for each patient. Specifically, Physiomatrix and its owners represent that patients who treat at Physiomatrix have the following findings, all of which suggest that the patient is an excellent candidate for physical therapy:

| Category | Finding |
|---|---|
| Recent Physical Therapy | None within the last sixty days |
| Required Equipment | None |
| Prior Functional Status | Independent with no pain or limitation in ambulation, IADL's, work or recreation |
| Weight Bearing Status | No restrictions |
| Safety measures | Adhere to orthopedic precautions/restrictions |
| Rehabilitative Prognosis | Excellent rehab potential to reach and maintain prior level of function |
| Mental Status | Alert and oriented in all spheres – cooperative and motivated |
| Concerns that led patient to Physical Therapy | Decreased functional ability |
| Patient is aware of and understands his/her diagnosis and prognosis | Yes |
| Patient has a history of behavioral health risks | No |

| Known Significant Past Medical Diagnosis and Condition | None |
|---|---|
| Known Significant Operative and Diagnostic Procedures | None |
| Known Adverse and Allergic Drug Reactions | None |

These findings are not individualized and are not specific to the conditions of the patients.

79.     In addition, the PT Initial Evaluations consistently contain other findings which are designed to support the excessive physical therapy called for in the Predetermined Protocol at Physiomatrix.

80.     For example, the PT Initial Evaluations represent that patients have "poor" knowledge of exercise and fitness, a "good" emotional response to health status and "good" communication skills, all of which are included to suggest that the patient would benefit from physical therapy.

81.     Additionally, the PT Initial Evaluation findings for "Functional Measures" are virtually always the same for every patient who treats at Physiomatrix. These findings suggest that the patient cannot perform independent activities of daily living ("IADLs"). For example, the PT Initial Evaluations represent that patients experience: (a) "difficulty" in bed mobility, transferring to or from the bed, bath, chair, or car, and ambulation over even terrain; and (b) "moderate-severe" or "severe" pain and limitation in their IADLs, work activities, and recreational activities at the time of their initial evaluation. Physiomatrix and its owners also represent in the PT Initial Evaluations that patients purportedly stated that "Heat to the affected area" is a factor in relieving their pain.

82.     The PT Initial Evaluations consistently represent that rehabilitative goals in both the short and long term are as follows: "improved by 25% in 2 weeks" and "improved to prior

level of function," respectively. Additionally, where it is recorded, patients also have the same test result of "3/5" for strength testing on the lumbar and/or cervical regions of the spine (flexion, extension, lateral flexion, and lateral rotation). A patient with a 3/5 muscle strength would not be able to walk or rise from a chair. It is virtually impossible that most patients would have this finding.

83.     The above-described patterns in the PT Initial Evaluations are not credible because it defies common sense that the findings contained in the PT Initial Evaluations could be the same for virtually all patients.

84.     To support Genex's charges for the initial evaluation and subsequent treatment plan, Genex and its owners create a sham document called an Outpatient Physical Therapy Initial Evaluation ("Outpatient PT Initial Evaluation"). The Outpatient PT Initial Evaluation differs from the PT Initial Evaluation described above. Specifically, it is a one to two page form that contains handwritten notes, purportedly filled in by the physical therapist. Notably, the Outpatient PT Initial Evaluation does not outline a treatment plan or rehabilitative goals, nor does it make any recommendations regarding the type or duration of appropriate treatment. Nevertheless, as set forth below, each patient who purportedly undergoes an initial evaluation at Genex is put on almost the same fraudulent Predetermined Protocol as the patients at Physiomatrix.

### 4.     **Fraudulent Treatment**

85.     Patients typically begin physical therapy the same day that the initial evaluations are purportedly performed at the Clinics. Although it is well-established that stretching and physical exercise are the primary forms of treatment for soft tissue injuries of the neck and back, the Predetermined Protocol is heavily reliant on passive modalities that permit the Clinics to

submit multiple charges.    For example, on January 25, 2011, one patient testified in an examination under oath ("EUO") that she never performed any exercises at Physiomatrix, despite that Physiomatrix billed State Farm for therapeutic exercise.    Similarly, another patient submitted a handwritten note, attached as Exhibit 14, in which she told State Farm that she "did get on the exercise bike 1 time for 10 minutes but besides that there was no 97110 – Therapeutic exercises, 97035 – Ultrasound, 97140 – Manual therapy techniques."

86.    For each visit, Physiomatrix virtually always bills for all Five Modalities, including (a) hot and/or cold packs, (b) electrical stimulation, (c) therapeutic exercises, (d) massage or manual therapy; and (e) ultrasound.    *See* Exhibits 1-A through 1-C.    Similarly, for each visit, Genex virtually always bills for all Four Modalities, including (a) hot and/or cold packs, (b) electrical stimulation, (c) therapeutic exercises, and (d) ultrasound.

87.    The Clinic Defendants provide the foregoing modalities, if they provide them at all, pursuant to the Predetermined Protocol and to increase the charges they can submit to and collect from State Farm.    Indeed, while any one of these treatment modalities might be medically necessary for a particular patient on a particular day, this comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone on virtually every visit.

88.    Moreover, despite that stretching and physical exercise should be the primary forms of treatment for soft tissue injuries of the neck back, the Clinic Defendants rarely, if ever, document the exercises that are purportedly performed, or how the patient tolerated them.    To support their fraudulent charges for physical therapy, the Clinic Defendants submit to State Farm documents titled "Progress/Treatment Notes" that they generate using a software program called

- 27 -

ReDoc.  The Progress/Treatment Notes include the following boilerplate and vague language: "Therapeutic ex's include ROM, passive ROM, and strengthening x 15-13 min."

89.     In addition to fraudulently billing for treatments that were performed pursuant to a Predetermined Protocol, the Clinic Defendants also submitted, and caused to be submitted, to State Farm bills for treatment that was not performed at all.   For example, although the Clinic Defendants represent on their bills and reports that each patient receives therapeutic exercise on virtually every visit, as set forth above, some patients have stated that they never exercised at the Clinics.

90.     Moreover, the Clinic Defendants represent on their bills and reports that they provide massage and manual therapy and for these purported services, submit charges using the billing codes 97124 and 97140, respectively.  According to the American Medical Association's Current Procedural Terminology ("CPT") manual, to use the 97124 and 97140 codes, the therapist is "required to have direct (one-on-one) patient contact."  The patients, however, do not receive direct one-on-one contact from the therapists, but rather, lie on a mechanical massage table that has automatic rollers and the table "performs" the massage.  The Clinic Defendants' representation, through their use of the 97124 and 97140 codes, that a massage or manual therapy with direct patient contact was performed, is false.  With regard to their use of codes 97124 and 97140, the Clinic Defendants knowingly charge for a service they do not in fact provide.  *See* Exhibit 15, May 2005 issue of *CPT Assistant* (stating that it is not appropriate to use code 97124 for mechanical massage therapy).

91.     The Progress/Treatment Notes purport to represent the duration of time that each treatment was rendered to a patient.  The purported duration of the treatments, however, is false.  For example, a high percentage of the patients purportedly received manual therapy for exactly

23 minutes, and unattended electrical stimulation for 15 minutes. It is not credible that on each visit, each patient received the same treatments for the exact same amount of time.

92.     These bills and the supporting documentation are fraudulent because: (a) the sole purpose for providing the same combination of treatments on virtually every visit is because they are part and parcel of a Predetermined Protocol, not because they are medically necessary for the patients; and (b) they represent that services were rendered when they were not.

93.     By purporting to provide this combination of treatments, the Clinic Defendants are able to take advantage of the patient's No-Fault Benefits, and to inflate the value of BI Claims and UM Claims to curry favor with the PI Attorneys with whom Defendants have *quid pro quo* cross-referral relationships.

### 5.     Fraudulent Re-Evaluations and Re-Diagnoses

94.     In support of their charges for re-evaluations, the Clinic Defendants submit to State Farm "PT Re-Evaluation forms" that look nearly identical to the PT Initial Evaluation forms. The purported findings set forth on the PT Re-Evaluation Forms, such as range of motion, muscle strength and pain levels, are designed to show slight improvement as the patients continue treatment at the Clinics. Specifically, the Clinic Defendants designed the PT Re-Evaluation Forms to make it appear that the patients are improving to discourage State Farm from challenging the efficacy of the Predetermined Protocol. In fact, many patients have said that despite the extensive and excessive treatment they received at the Clinics, their physical condition did not improve. Despite their lack of improvement, however, the Clinics made no effort to modify their treatment plans.

95.     Since Michigan has no dollar limit on No-Fault Benefits, this pattern of re-diagnosis by the Prescribing Physicians and re-evaluation by the Clinics, followed by a barrage

of unnecessary and redundant treatment modalities continues indefinitely until: (a) the patient finally refuses further treatment; (b) an IME determines that further treatment is not medically necessary; or (c) the patient resolves his or her BI/UM claim.  The Defendants' fraudulent referral cycle – diagnosis by the Prescribing Physicians, fraudulent evaluation and treatment at the Clinics, and then back for another fraudulent diagnosis – typically lasts for months, if not years, as long as the No-Fault Benefits continue to flow.

    **F.    State Farm's Justifiable Reliance.**

    96.    Defendants are obligated legally and ethically to act honestly and with integrity. Yet, Defendants submit or caused to be submitted, medical records and bills that are fraudulent in that they represent that the services described on the bills and records were actually rendered and were submitted based on purported medical necessity when, in fact, they either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships.

    97.    State Farm is under statutory and contractual duties to pay No-Fault Benefits for medically necessary services promptly.  The bills and supporting documents that Defendants submitted, and caused to be submitted, to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.

    98.    As a result, State Farm has incurred damages of more than $1.9 million based upon the fraudulent charges.

    99.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not have reasonably

- 30 -

discovered that its damages were attributable to fraud until shortly before it filed this Complaint. Indeed, State Farm did not discover and could not have reasonably discovered Defendants' fraud scheme until it reviewed together hundreds of bills and supporting documentation submitted by Defendants to State Farm that, when considered together, revealed the Predetermined Protocol.

## V.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against the Clinic Defendants, Abu Farha and Abu Farha PC)

100.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

101.    The Clinic Defendants, Abu Farha and Abu Farha PC intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent bills and related documentation that contained false representations of material fact.

102.    The false statements of material fact include that: (a) Dr. Abu Farha legitimately examined and prescribed physical therapy that was medically necessary and tailored to the unique needs of each patient, when in fact he did not do so; (b) Dr. Abu Farha legitimately determined that patients were disabled and therefore unable to drive, work, perform household services and/or care for themselves, when in fact they were not disabled and unable to perform these functions; (c) the Clinics provided physically therapy services that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, they were not; and (f) the patients receive therapeutic exercise on every date of service when, in fact, they do not.   The fraudulent bills and

- 31 -

corresponding mailings are described in Exhibit 1-A, attached hereto. Representative samples of the Clinics' bills and supporting documentation are attached as Exhibit 16.

103. The Clinic Defendants, Abu Farha and Abu Farha PC knew that the above-described misrepresentations made to State Farm relating to the purported examination, evaluation, diagnoses, and treatment of patients were false and fraudulent when they were made.

104. The Clinic Defendants, Abu Farha and Abu Farha PC made the above-described misrepresentations and engaged in such conduct to induce State Farm into relying on the misrepresentations.

105. As a result of its justifiable reliance on these misrepresentations, State Farm has incurred damages of at least $850,000.

106. The willful, reckless, and/or wanton conduct of the Clinic Defendants, Abu Farha and Abu Farha PC entitles State Farm to punitive damages.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Abu Farha and Abu Farha PC for compensatory damages, punitive damages, costs, and other such relief as this Court deems equitable, just and proper.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. §1962(c)
### (Against Clinic Defendants, Dr. Abu Farha, and Abu Farha PC)

107. State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

108. The Clinic Defendants, Dr. Abu Farha and Abu Farha PC formed an association-in-fact "enterprise" ("the Abu Farha/Clinic Defendants Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

109.    The members of the Abu Farha/Clinic Defendants Fraudulent Billing Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.   The Clinic Defendants, Dr. Abu Farha and Abu Farha PC forged symbiotic relationships and needed and depended upon the participation of the others to accomplish their common purpose of defrauding State Farm through fraudulent personal injury claims. Specifically, the Clinic Defendants depended on and needed Dr. Abu Farha and Abu Farha PC to coordinate and carry out the purported initial examination and diagnoses of the patients and to refer the patients to the Clinics, while Dr. Abu Farha needed the Clinic Defendants to refer the patients back to them for their re-diagnosis.   The Clinic Defendants, Dr. Abu Farha and Abu Farha PC needed one another to coordinate the treatment of all patients at the Clinics pursuant to the Predetermined Protocol and to complete and authorize the submission of fraudulent bills and supporting documentation to State Farm.   At the same, time, the Clinic Defendants, Dr. Abu Farha and Abu Farha PC needed one another to cultivate and foster *quid pro quo* cross-referral relationships with PI Attorneys and to coordinate and carry out the submission of fraudulent bills and supporting documentation to State Farm.   The participation and role of the Clinic Defendants, Dr. Abu Farha and Abu Farha PC was necessary to the success of the scheme. Neither the Clinic Defendants, Dr. Abu Farha, nor Abu Farha PC was capable of carrying out the scheme without the participation of the others.

110.    The Clinic Defendants, Dr. Abu Farha and Abu Farha PC are or have been employed by and associated with the Abu Farha/Clinic Defendants Fraudulent Billing Enterprise.

111.    The Clinic Defendants, Dr. Abu Farha and Abu Farha PC have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Abu Farha/Clinic

Defendants Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of United States mails to submit to State Farm hundreds of fraudulent bills for the examinations, diagnoses, and treatment, which were not performed or were performed pursuant to a Predetermined Protocol. The claims contained the following misrepresentations: (a) Dr. Abu Farha legitimately examined and prescribed physical therapy that was medically necessary and tailored to the unique needs of each patient, when in fact he did not do so; (b) Dr. Abu Farha legitimately determined that patients were disabled and therefore unable to drive, work, perform household services and/or care for themselves, when in fact they were not disabled and unable to perform these functions; (c) the Clinics provided physically therapy services that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) that the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, they were not; and (f) that the patients receive therapeutic exercise on every date of service when, in fact, they do not.

112.    The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-A, attached hereto. Representative samples of the Clinics' bills and supporting documentation are attached as Exhibit 16.

113.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $850,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Abu Farha and Abu Farha PC for compensatory damages, together with treble damages, costs and

reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. §1962(d)
### (Against the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC)

114.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

115.    The Clinic Defendants, Dr. Abu Farha, and Abu Farha PC have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Abu Farha/Clinic Defendants Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mail to submit to State Farm hundreds of fraudulent bills for examinations, diagnoses, and treatments, which were not performed or were performed pursuant to a Predetermined Protocol.

116.    The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-A, attached hereto.  Representative samples of the Clinics' bills and supporting documentation are attached as Exhibit 16.

117.    The Clinic Defendants, Dr. Abu Farha and Abu Farha PC, agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission to State Farm of fraudulent bills and related documentation for examinations, diagnoses, and treatments, which were not performed or were performed pursuant to a Predetermined Protocol.

118.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $850,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC)

119.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

120.    State Farm conferred a benefit upon the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

121.    Because the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC knowingly billed for services that were not rendered or were performed pursuant to a Predetermined Protocol, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

122.    As a direct and proximate result of the above-described conduct, State Farm has been damaged and the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC have been unjustly enriched by more than $850,000.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Abu Farha, and Abu Farha PC for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

### FIFTH CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC)

- 36 -

123. State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

124. The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent bills and related documentation that contained false representations of material fact.

125. The false statements of material fact include that: (a) Dr. Oniang'o legitimately examined and prescribed physical therapy that was medically necessary and tailored to the unique needs of each patient, when in fact he did not do so; (b) Dr. Oniang'o legitimately determined that patients were disabled and therefore unable to drive, work, perform household services and/or care for themselves, when in fact they were not disabled and unable to perform these functions; (c) the Clinics provided physically therapy services that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) that the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, they were not; and (f) that the patients receive therapeutic exercise on every date of service when, in fact, they do not. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-B, attached hereto.

126. In addition, Dr. Oniang'o, and Oniang'o PLLC intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, fraudulent bills that included duplicate charges for Dr. Oniang'o's purported services.

127.    The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC knew that the above-described misrepresentations made to State Farm relating to the purported examination, evaluation, diagnoses, and treatment of patients were false and fraudulent when they were made.

128.    The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC made the above-described misrepresentations and engaged in such conduct to induce State Farm into relying on the misrepresentations.

129.    As a result of its justifiable reliance on these misrepresentations, State Farm has incurred damages of at least $870,000.

130.    The willful, reckless, and/or wanton conduct of the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC entitles State Farm to punitive damages.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC for compensatory damages, punitive damages, costs, and other such relief as this Court deems equitable, just and proper.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. §1962(c)
### (Against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC)

131.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

132.    The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC formed an association-in-fact "enterprise" ("the Oniang'o/Clinic Defendants Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

133.    The members of the Oniang'o/Clinic Defendants Fraudulent Billing Enterprise are and have been joined in a common purpose, have relationships with and among each other,

- 38 -

and have associated through time sufficient to permit those associated to pursue the enterprise's purpose. The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC forged symbiotic relationships and needed and depended upon the participation of the others to accomplish their common purpose of defrauding State Farm through fraudulent personal injury claims. Specifically, the Clinic Defendants depended on and needed Dr. Oniang'o, and Oniang'o PLLC to coordinate and carry out the purported initial examination and diagnoses of the patients and to refer the patients to the Clinics, while Dr. Oniang'o needed the Clinic Defendants to refer the patients back to them for their re-diagnosis. The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC needed one another to coordinate the treatment of all patients at the Clinics pursuant to the Predetermined Protocol and to complete and authorize the submission of fraudulent bills and supporting documentation to State Farm. At the same, time, they needed one another to cultivate and foster *quid pro quo* cross-referral relationships with PI Attorneys and to coordinate and carry out the submission of fraudulent bills and supporting documentation to State Farm. The participation and role of the Clinic Defendants, Dr. Oniang'o and Oniang'o PLLC was necessary to the success of the scheme. Neither the Clinic Defendants, Dr. Oniang'o, nor Oniang'o PLLC was capable of carrying out the scheme without the participation of the others.

134. The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC are or have been employed by and associated with the Oniang'o/Clinic Defendants Fraudulent Billing Enterprise.

135. The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Oniang'o/Clinic Defendants Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of United States mails to submit to State Farm hundreds of fraudulent bills for the

examinations, diagnoses, and treatment, which were not performed or were performed pursuant to a Predetermined Protocol. The claims contained the following misrepresentations: (a) Dr. Oniang'o legitimately examined and prescribed physical therapy that was medically necessary and tailored to the unique needs of each patient, when in fact he did not do so; (b) Dr. Oniang'o legitimately determined that patients were disabled and therefore unable to drive, work, perform household services and/or care for themselves, when in fact they were not disabled and unable to perform these functions; (c) the Clinics provided physically therapy services that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) that the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, they were not; and (f) that the patients receive therapeutic exercise on every date of service when, in fact, they do not.

136.    The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-B, attached hereto. Representative samples of the Clinics' bills and supporting documentation are attached as Exhibit 16.

137.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $870,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

### SEVENTH CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. §1962(d)
### (Against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC)

138.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

139.    The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Oniang'o/Clinic Defendants Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mail to submit to State Farm hundreds of fraudulent bills for examinations, diagnoses, and treatments, which were not performed or were performed pursuant to a Predetermined Protocol.

140.    The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-B, attached hereto.  Representative samples of the Clinics' bills and supporting documentation submitted are attached as Exhibit 16.

141.    The Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC knew of, agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission to State Farm of fraudulent bills and related documentation for examinations, diagnoses, and treatments, which were not performed or were performed pursuant to a Predetermined Protocol.

142.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $870,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC for compensatory damages, together with treble damages,

costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

**EIGHTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC)**

143.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

144.    State Farm conferred a benefit upon the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

145.    Because the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC knowingly billed for services that were not rendered or were performed pursuant to a Predetermined Protocol, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

146.    As a direct and proximate result of the above-described conduct of the Defendants, State Farm has been damaged and the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC have been unjustly enriched by more than $870,000.

WHEREFORE, State Farm demands judgment against the Clinic Defendants, Dr. Oniang'o, and Oniang'o PLLC for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

**NINTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**
**(Against Physiomatrix, Genex, Khanafer, and Kazan)**

147.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

- 42 -

148.    The Clinic Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent bills and related documentation that contained false representations of material fact.

149.    The false statements of material fact include that: (a) the Clinics provided physically therapy services that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (b) the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, they were not; and (c) that the patients receive therapeutic exercise on every date of service when, in fact, they do not. The fraudulent bills and corresponding mailings are described in Exhibit 1-C, attached hereto. Representative samples of the Clinics' bills and supporting documentation are attached as Exhibit 16.

150.    The Clinic Defendants knew that the above-described misrepresentations made to State Farm relating to the purported evaluations, diagnoses, and treatment of patients were false and fraudulent when they were made.

151.    The Clinic Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm into relying on the misrepresentations.

152.    As a result of its justifiable reliance on these misrepresentations, State Farm has incurred damages of at least $270,000.

153.    The willful, reckless, and/or wanton conduct of the Clinic Defendants entitles State Farm to punitive damages.

WHEREFORE, State Farm demands judgment against the Clinic Defendants for compensatory damages, punitive damages, costs, and other such relief as this Court deems equitable, just and proper.

## TENTH CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. §1962(c)
### (Against Kazan and Khanafer)

154.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

155.    Physiomatrix and Genex are an association-in-fact "enterprise" ("the PT Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the PT Fraudulent Billing Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.  Both Physiomatrix and Genex were formed by Kazan and Khanafer for the common purpose of facilitating the submission to State Farm of fraudulent bills for physical therapy that was not performed or was performed pursuant to a Predetermined Protocol.  Among other things, the creation and use of both Physiomatrix and Genex to submit those fraudulent bills, reduced the number of bills that otherwise would have had to have been submitted through either of those entities and reduced the likelihood that State Farm would identify the volume and pattern of bills coming from these facilities.

156.    Kazan and Khanafer are and have been employed by and/or associated with the PT Fraudulent Billing Enterprise.

157.    Kazan and Khanafer have knowingly conducted and/or participated, directly or indirectly, in the conduct of the PT Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills for physical therapy.   The claims contained the following misrepresentations:   (a) that an

individualized, tailored evaluation was performed on each patient when, in fact, it was not; (b) that the physical therapy is medically necessary when, in fact, it is not; (c) that the treatment plan is individualized and tailored to the unique needs of the patients when, in fact, it is not; (d) that the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, the modalities actually rendered to the patients are not within the definition of CPT Codes 97124 and 97140; and (e) that the patients receive therapeutic exercise on every date of service when, in fact, they do not. The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-C, attached hereto.

158.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $270,000 based upon the fraudulent charges.

159.   By reason of its injury, State Farm is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper..

WHEREFORE, State Farm demands judgment against Defendants Kazan and Khanafer for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. §1962(d)
### (Against Kazan and Khanafer)

160.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

161.    The PT Fraudulent Billing Enterprise is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

162.    Kazan and Khanafer have willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c) that is to conduct and/or participate, directly or indirectly, in the conduct of the PT Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills for physical therapy.  The claims contained the following misrepresentations:  (a) the Clinics provided physically therapy services that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (b) that the purported massage treatments as described by CPT Codes 97124 and 97140 were performed when, in fact, they were not; and (c) that the patients receive therapeutic exercise on every date of service when, in fact, they do not.  The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described in Exhibit 1-C, attached hereto.

163.    Kazan and Khanafer knew of, agreed to and acted in furtherance of the overall objective of the conspiracy by facilitating the submission to State Farm of fraudulent bills for physical therapy that were not medically necessary.  Specifically, Kazan and Khanafer owned and controlled Physiomatrix and Genex solely to profit from physical therapy that was either not performed or was not medically necessary.

164.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $270,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against Defendants Kazan and Khanafer for compensatory damages, together with treble damages, costs and reasonable attorneys' fees

pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

**TWELFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against the Clinic Defendants)**

165.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

166.   State Farm conferred a benefit upon the Clinic Defendants by paying their claims and the Clinic Defendants voluntarily accepted and retained the benefit of those payments.

167.   Because the Clinic Defendants knowingly billed for services that were not rendered or were rendered pursuant to a Predetermined Protocol, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

168.   As a direct and proximate result of the above-described conduct, State Farm has been damaged and the Clinic Defendants have been unjustly enriched by more than $270,000.

WHEREFORE, State Farm demands judgment against the Clinic Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

**THIRTEENTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Against Physiomatrix)**

169.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

170.   This is an action for declaratory relief pursuant to 28 U.S.C. §2201.

171.   There is an actual case and controversy between State Farm, on the one hand, and Physiomatrix, on the other hand as to all charges for examinations, diagnoses, and treatments

- 47 -

that have not been paid.  State Farm contends that Physiomatrix is not entitled to reimbursement for any of these charges.

172.    Because Physiomatrix and its owners have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, Physiomatrix is not entitled to not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that Physiomatrix is not entitled to reimbursement for any of the unpaid charges for the examinations, diagnoses, and treatments, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

## FOURTEENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against Genex)

173.    State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 99 above.

174.    This is an action for declaratory relief pursuant to 28 U.S.C. §2201.

175.    There is an actual case and controversy between State Farm, on the one hand, and Genex, on the other hand as to all charges for examinations, diagnoses, and treatments that have not been paid.  State Farm contends that Genex is not entitled to reimbursement for any of these charges.

176.    Because Genex and its owners have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, Genex is not entitled to not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that Genex is not entitled to reimbursement for any of the unpaid charges for the examinations, diagnoses, and treatments, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

Dated this 3rd day of April, 2012

KATTEN MUCHIN ROSENMAN, LLP

By: /s/ Ross O. Silverman
    Ross O. Silverman
    Eric T. Gortner
    Kathy P. Josephson
    Patrick C. Harrigan
    Katten Muchin Rosenman LLP
    525 West Monroe Street
    Chicago, IL  60661-3693
    (312) 902-5200
    Email:  ross.silverman@kattenlaw.com

    Morley Witus (P30895)
    BARRIS, SOTT, DENN & DRIKER PLLC
    211 West Fort St., 15th Floor
    Detroit, MI  48226-3281
    (313) 596-9308
    mwitus@bsdd.com

    Attorneys for Plaintiff State Farm Mutual
    Insurance Company

/50627654