# EXHIBIT 13

 **LexisNexis·**

**User Name:** Ziyad Hermiz
**Date and Time:** 04/04/2014 4:55 PM EDT
**Job Number:** 9157264

## Documents(10)

1.  Taylor Group v. ANR Storage Co., 24 Fed. Appx. 319
    **Client/Matter:** 999999999-0500

2.  Williams v. Pledged Prop. II, LLC, 508 Fed. Appx. 465
    **Client/Matter:** 999999999-0500

3.  All Erection & Crane Rental Corp. v. Acordia Northwest, Inc., 162 Fed. Appx. 554
    **Client/Matter:** 999999999-0500

4.  Cook v. Cashler, 2013 U.S. Dist. LEXIS 66663
    **Client/Matter:** 999999999-0500

5.  Haisha v. Countrywide Bank, FSB, 2011 U.S. Dist. LEXIS 61443
    **Client/Matter:** 999999999-0500

6.  Hanover Exch. v. Metro Equity Group LLC, 2009 U.S. Dist. LEXIS 59992
    **Client/Matter:** 999999999-0500

7.  Vickers Stock Research Corp. v. Quotron Sys., 1997 U.S. Dist. LEXIS 10837
    **Client/Matter:** 999999999-0500

8.  Vickers Stock Research Corp. v. Quotron Sys., 1998 U.S. App. LEXIS 22046
    **Client/Matter:** 999999999-0500

9.  Melton v. Blankenship, 2009 U.S. App. LEXIS 686
    **Client/Matter:** 999999999-0500

10. Yaldo v. Deutsche Bank Nat'l Trust Co., 2010 U.S. Dist. LEXIS 125784
    **Client/Matter:** 999999999-0500



Positive
As of: April 4, 2014 4:55 PM EDT

# Taylor Group v. ANR Storage Co.

United States Court of Appeals for the Sixth Circuit
November 8, 2001, Filed
No. 98-1671

**Reporter:** 24 Fed. Appx. 319; 2001 U.S. App. LEXIS 24478

THE TAYLOR GROUP, et al., Plaintiffs-Appellants, v. ANR STORAGE COMPANY, Defendant-Appellee.

**Notice:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Subsequent History:** Writ of certiorari denied: _Taylor Group v. ANR Storage Co., 2002 U.S. LEXIS 3859 (U.S. May 28, 2002)._

**Prior History:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN. 94-00600. Gibson. 05-07-98.

_Taylor Group v. ANR Storage Co., 1995 U.S. Dist. LEXIS 9174, (W.D. Mich. 1995)_

**Disposition:** Affirmed.

---

**Core Terms**

claim, prior, district court, judgment, appeal, statute of limitations, res judicata, summary judgment, amend, collateral estoppel, barred, basis, law, adjudication, requires, motion, trial, file, wire fraud, racketeering, preclusive, proceeding, state court, activity, mail fraud, represent, decision, pleading, reliance, element

---

**LexisNexis® Headnotes**

Civil Procedure > Judgments > Preclusion of Judgments > General Overview

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > General Overview

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > Full Faith & Credit Statutes

_HN1_ State judgments have the same full faith and credit in federal courts as they have by law or usage in the courts of such state. _28 U.S.C.S. § 1738._ Further, when state-federal jurisdiction is concurrent on the federal claim, the law of the state in which an earlier judgment is rendered governs its preclusive effect on factual issues raised in a subsequent federal action.

Civil Procedure > Judgments > Preclusion of Judgments > General Overview

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

_HN2_ In Michigan , claim preclusion bars a subsequent action when (1) the prior action was decided on the merits, (2) the claim in the subsequent action was resolved in the prior action, or arose from the same transaction and could have been resolved in the prior action, and (3) both actions involve the same parties or their privies. Actions arise from the same transaction if the same facts or evidence are essential to the maintenance of the two actions.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

Governments > Legislation > Statute of Limitations > General Overview

_HN3_ Under Michigan law a prior decision may lose its preclusive effect if it is affirmed on appeal solely on grounds that are not on the merits. Further, under Michigan law, a decision on the basis of the statute of limitations is not a decision on the merits.

Civil Procedure > Judgments > Preclusion of Judgments > General Overview

Civil Procedure > ... > Preclusion of Judgments > Estoppel > General Overview

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Collateral Estoppel

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

_HN4_ Collateral estoppel balances judicial economy, i.e., the need to eliminate repetitious and needless litigation, and the interests of litigants in a full and fair adjudication of their claims. Specifically, issue preclusion precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the

Ziyad Hermiz

prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding. Unlike res judicata, a prior judgment on the merits is not an element of collateral estoppel. The issue in the second action must be the same issue as in the first action. Further, the issue in the first action must have been essential to the resulting judgment. If the judgment did not depend on resolving that issue, collateral estoppel does not apply. Also, collateral estoppel generally requires mutuality. Collateral estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him.

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

**HN5** A Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961 et seq.,* claim requires proof of two or more predicate offenses that formed a pattern of racketeering activity and involved an enterprise that was connected to the racketeering activity, which injured a plaintiff's business or property. *18 U.S.C.S. § 1961(1)* defines racketeering activity to include mail fraud and wire fraud. *18 U.S.C.S. §§ 1341, 1343.* Mail fraud and wire fraud require showing a scheme to defraud using either a mailing or a wire communication to execute the scheme. *18 U.S.C.S. §§ 1341, 1343.* Under RICO, an element of both mail fraud and wire fraud is reliance on the fraudulent representation.

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > Statute of Limitations

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

**HN6** A civil Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961 et seq.,* action has a four-year limitation period. The limitations period for RICO claims accrues when a plaintiff knew or should have known of an injury.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > Dismissal > Voluntary Dismissals > Appellate Review

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

**HN7** An appellate court reviews a district court's denial of a motion to amend for abuse of discretion.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

**HN8** Under *Fed. R. Civ. P. 15(a),* leave to amend shall be freely given when justice so requires. Courts construe *Fed. R. Civ. P. 15(a)* liberally. *Fed. R. Civ. P. 15(a)* reinforces the principle that cases should be tried on their merits rather than on the technicalities of pleadings. Nevertheless, the court may affirm a denial of a motion to amend a pleading where there is undue delay, bad faith, dilatory motive, undue prejudice, repeated failure to cure deficiencies in the pleading, or futility of the amendment.

**Counsel:** For THE TAYLOR GROUP, CHARLES R. NEWMAN, STEPHEN R. NEWMAN, MARILYN DODDS, CHRISTINE NEWMAN, IRMA NEWMAN, KEITH DEMPSEY, CAROLYN DEMPSEY, ROLAND J.W. LINDER, RUTH DEMPSEY, NARLYN D. VINYARD, BASIL DEMPSEY, BRYNA M. DYE, WINIFRED Y. BLOSSOM, RAY BULLOCK, KRIS A. BULLOCK, JEANNE L. BULLOCK, JACK L. WHITE, WILLIAM J. WHITE, CAROL JANE HARSHMAN, DEE ANN PETERSON, KEN A. STOOPS, SHERYL L. WHITE, CHRISTINE M. WEISS, STEVEN P. NEIDECK, ROBERT R. NEIDECK, JR., MARGARET C. NEIDECK, LAWRENCE N. WILLIAMSON, MARIE E. WILLIAMSON, VIRGIL BURKHOLDER, ALISON M. BURKHOLDER, CAROLYN ROSE BURKHOLDER, JOLEEN M. HURT, TIM BURKHOLDER, JOHN AYERS, JOHN S. BURD, PATRICIA A. BURD, JIM MATHIS, PAUL NUSSBAUM, KURT EVAN BULLOCK, ELMER NUSSBAUM, JEFFREY [**2] DEMPSEY, ERICA L. DYESON, HAROLD SNYDER, ELLEN SNYDER, JAMES A. SNYDER, MARIAN S. WILLEY, RUTH E. WHITE, CLARENCE A. SNYDER, ARTHUR H. SNYDER, HAROLD SNYDER, ELLEN SNYDER, Plaintiffs - Appellants: Peter J. Zirnhelt, Richard P. Carroll, Leonard J. Zielinski, Zirnhelt & Associates, Traverse City, MI.

For ANR STORAGE COMPANY, Defendant - Appellee: John M. DeVries, Mika, Meyers, Beckett & Jones, Grand Rapids, MI.

For ANR STORAGE COMPANY, Defendant - Appellee: James W. Seitz, El Paso Corporation, Houston, TX.

**Judges:** BEFORE: JONES, SUHRHEINRICH, and DAUGHTREY, Circuit Judges.

**Opinion by:** SUHRHEINRICH

| Opinion |
| --- |

[*320] **SUHRHEINRICH, Circuit Judge:** Plaintiffs appeal the grant of summary judgment in favor of Defendant ANR Storage Company ("ANR") on Plaintiffs's RICO claim under *18 U.S.C. §§ 1961-1968.*

24 Fed. Appx. 319, *320; 2001 U.S. App. LEXIS 24478, **2

The district court granted summary judgment to Defendant after finding that Plaintiffs were barred by *res judicata* from asserting this claim because of a prior adjudication in Michigan state court in an action in which they could have brought this claim. Plaintiffs argue that (1) *res judicata* does not apply because the prior state suit was not adjudicated on its merits [**3] but on the basis of a statute of limitations; (2) *res judicata* does not apply because ANR did not object to Plaintiffs' failure to join claims, as required under state law; (3) *res judicata* does not apply because the issues in this case are not identical to those in the prior state action; and (4) the court abused its discretion in [*321] denying Plaintiffs' motion to amend their Complaint. We **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Plaintiffs are the Taylor Group and about fifty other people or their estates or trusts that purchased property in Kalkaska County, Michigan, around 1970. After natural gas was discovered in the area, the Taylor Group received about $ 40,000.00 per month for several years in royalties. As the natural gas reservoir began to be depleted, Defendant ANR became interested in using it as a storage reservoir. In 1983, ANR began acquiring mineral and storage rights from some of the owners. Plaintiffs, after seeking the advice of their well operator, accepted ANR's offer and received payment.

ANR's plans to convert the reservoir to a storage facility were indefinitely delayed when the Federal Energy Regulatory Commission ("FERC") [**4] refused to approve the project. However, later in 1991, ANR again applied for and received FERC certification. ANR then resumed negotiating with the owners of the remaining mineral rights, who had not sold their interests in 1983.

When Plaintiffs learned of ANR's renewed negotiations, they complained to ANR that it should have calculated its 1983 offer to them to reflect additional gas condensate present in the field, which they claimed that ANR knowingly failed to disclose in 1983.

On January 14, 1993, Plaintiffs sued ANR in state court alleging that ANR defrauded them in 1983 by misrepresenting to them the amount of natural gas condensate remaining in the reservoir. The state court granted ANR's motion to dismiss on February 7, 1994. On September 2, 1994, Plaintiffs sued ANR in federal district court alleging that ANR and other entities violated the Racketeering Influenced and Corrupt Organization Act ("RICO"), *18 U.S.C. §§ 1961-1968*, by using the United States postal service in an open-ended scheme or enterprise to defraud mineral owners of their property, thereby violating RICO.

Defendant moved for summary judgment on October 31, 1994, contending that [**5] (1) the statute of limitations barred the RICO action, (2) *res judicata* barred the RICO action, and (3) Plaintiffs had failed to state a RICO claim. The district court denied the motion because a genuine issue of material fact existed as to whether *res judicata* barred the action. Plaintiffs claimed that they learned of their RICO claim during discovery in the state case but could not raise it because the state trial court did not allow them to amend their pleading.

On February 15, 1995, Defendant again moved for summary judgment claiming that *res judicata* barred Plaintiffs' RICO claim and submitted additional briefing and documentary evidence as to Plaintiffs' knowledge of its potential RICO claim. On June 2, 1995, the district court granted Defendant's motion for summary judgment based on the additional briefing and documentary evidence. However, the district court also permitted Plaintiffs to amend their Complaint and add new Defendants.

On June 7, 1995, Plaintiffs filed their amended complaint adding new Defendants but did not serve them. Rather, on June 29, 1995, Plaintiffs appealed the summary judgment. This Court dismissed the appeal on August 24, 1995, finding [**6] that the order was not a final appealable order. On August 31, 1995, Plaintiffs voluntarily dismissed the Defendants that they had added on June 7, 1995, but never served, in order to appeal the summary judgment as a final order.

[*322] Meanwhile in state court, the Michigan Court of Appeals had affirmed the trial court's dismissal of Plaintiffs' claim. But on July 23, 1996, the Michigan Supreme Court reversed the appellate court and remanded the case to the trial court. Thereupon, this Court also remanded this case to the district court for further proceedings. After a status conference in the district court, Plaintiffs filed a Second Amended Complaint, naming ANR and eight additional Defendants.

On April 30, 1997, and on June 9, 1997, Plaintiffs moved for leave to file a Third Amended Complaint, which the district court denied on July 2, 1997, and July 21, 1997, respectively. On September 16, 1997, the state trial court dismissed Plaintiffs' case because (1) fraud could not be shown under Michigan law since ANR owed no legal duty to disclose all information in its possession pertinent to the Plaintiffs' reservoir; (2) ANR did nothing to hinder Plaintiffs from obtaining an independent [**7] appraisal; and (3) Plaintiffs' claim was barred by the statute of limitations. Based on the dismissal of the state case, ANR again moved for summary judgment in the federal case on the basis of *res judicata*. On May 7, 1998, the district court granted summary judgment to ANR.

Ziyad Hermiz

24 Fed. Appx. 319, *322; 2001 U.S. App. LEXIS 24478, **7

Meanwhile, Plaintiffs appealed the dismissal of their claim in state court. After the district court had granted Defendant summary judgment, the Michigan Court Appeals affirmed the circuit court -- but only on the grounds of the statute of limitation. Plaintiffs applied for leave to Michigan Supreme Court, which denied leave.

## II DISCUSSION

Plaintiffs raise four issues on appeal. Three of the issues involve prior adjudication. A fourth deals with their attempt to amend their complaint.

### A. Prior Adjudication

*HN1* State judgments "have the same full faith and credit" in federal courts as "they have by law or usage in the courts of such state." *28 U.S.C. § 1738*. Further, "when state-federal jurisdiction is concurrent on the federal claim, the law of the state in which an earlier judgment is rendered governs its preclusive effect on factual issues raised in a subsequent federal [**8] action." *Kaufman v. BDO Seidman, 984 F.2d 182, 183 (6th Cir. 1993)*. *HN2* In Michigan, claim preclusion bars a subsequent action when (1) the prior action was decided on the merits, (2) the claim in the subsequent action was resolved in the prior action, or arose from the same transaction and could have been resolved in the prior action, and (3) both actions involve the same parties or their privies. *Bd. of County Rd. Comm'rs v. Schultz, 205 Mich. App. 371, 521 N.W.2d 847, 850 (Mich. Ct. App. 1994)*. Actions arise from the same transaction if the same facts or evidence are essential to the maintenance of the two actions. *Schwartz v. City of Flint, 187 Mich. App. 191, 466 N.W.2d 357, 360 (Mich. Ct. App. 1991)*.

Plaintiffs contend that the district court improperly dismissed their suit on the basis of *res judicata* for three reasons: (1) the prior state action was not decided on the merits; (2) the instant action and the prior state action arose from different transactions; and (3) ANR waived its *res judicata* defense by failing to request joinder of claims in the state proceeding under Michigan Court Rule 2.203(A)(2).

We observe that [**9] initially the federal district court properly granted summary judgment to Defendant on the basis of *res judicata* when it relied on the prior judgment of the state trial court. The state trial court had found for Defendant both on the merits of Plaintiffs' claims and on the basis of the statute of limitations. [*323] However, *HN3* under Michigan law a prior decision may lose its preclusive effect if it is affirmed on appeal solely on grounds that are not on the merits. *Amalgamated Transit Union, Local 1564 v. Southeastern Michigan Transp. Auth., 437 Mich. 441, 473 N.W.2d 249, 255 (Mich. 1991)*;

*see also* 18 James Wm. Moore et al., Federal Practice P 131.30[2][c][iii] (3d ed. 2001). Further, under Michigan law, a decision on the basis of the statute of limitations is not a decision on the merits. *Bd. of County Rd. Comm'rs v. Schultz, 205 Mich. App. 371, 521 N.W.2d 847, 850 (Mich. Ct. App. 1994)*.

Here, the Michigan Court of Appeals limited its review of Plaintiffs' appellate issues to the statute of limitation and affirmed the trial court solely on the basis of the statute of limitations. *Taylor Group v. ANR Storage Co., 1999 Mich. App. LEXIS 1252*, No. 206534, slip op. at 4 [**10] (Mich. Ct. App. July 13, 1999), *leave denied, Taylor Group v. ANR Storage Co., 461 Mich. 1015, 622 N.W.2d 524 (Mich. 2000)*. Thus, the state court judgment lost its preclusive effect on appeal because it was no longer decided on the merits. Accordingly, *res judicata* does not bar Plaintiffs' RICO action in federal court. Because we have decided that *res judicata* does not apply on this basis, we need not discuss Plaintiffs other two arguments.

Nevertheless, on a close reading of the Michigan Court of Appeals' opinion, we find that another doctrine of prior adjudication, collateral estoppel, applies and precludes relitigation of the fact and time of Plaintiffs' unreasonable reliance on Defendant's alleged mail and wire fraud. The adjudicated fact that Plaintiffs' reliance was unreasonable precludes a finding of Plaintiffs' reasonable reliance on Defendant's alleged mail and wire fraud, which is an essential element of Plaintiffs' RICO claim. The adjudicated fact that Plaintiffs reasonably should have known of this alleged misrepresentation in 1983, also time-bars Plaintiffs' RICO claim as outside of RICO's four-year limitation period. Although the parties did [**11] not brief this issue, we may affirm a grant of summary judgment for different reasons than those set forth in the district court if the alternative grounds have adequate support in the record. *Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co., 53 F.3d 762, 767 (6th Cir. 1995)*.

*HN4* Collateral estoppel balances judicial economy, i.e., "the the need to eliminate repetitious and needless litigation," and the interests of litigants in a "full and fair adjudication" of their claims. *Storey v. Meijer, Inc., 431 Mich. 368, 429 N.W.2d 169, 171 (Mich. 1988)*; *Howell v. Vito's Trucking & Excavating Co., 386 Mich. 37, 191 N.W.2d 313, 318-19 (Mich. 1971)*; *Senior Accountants, Analysts & Appraisers Asso. v. Detroit, 399 Mich. 449, 249 N.W.2d 121, 124-25 (Mich. 1976)*. Specifically, issue preclusion "precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior

Ziyad Hermiz

24 Fed. Appx. 319, *323; 2001 U.S. App. LEXIS 24478, **11

proceeding." *People v. Gates, 434 Mich. 146, 452 N.W.2d 627, 630 (Mich. 1990)*; [**12] *McMichael v. McMichael, 217 Mich. App. 723, 552 N.W.2d 688, 690 (Mich. Ct. App. 1996)*; *Porter v. Royal Oak, 214 Mich. App. 478, 542 N.W.2d 905, 908 (Mich. Ct. App. 1995)*. Unlike *res judicata*, a prior judgment on the merits is not an element of collateral estoppel. The issue in the second action must be the same issue as in the first action. *Detroit v Qualls, 434 Mich. 340, 454 N.W.2d 374 (Mich. 1990)*; *Wilcox v Sealey, 132 Mich. App. 38, 346 N.W.2d 889 (1984)*. Further, the issue in the first action must have been essential to the resulting judgment. If the judgment did not depend on resolving that [*324] issue, collateral estoppel does not apply. *Qualls, 454 N.W.2d at 391*; *People v Gates, 452 N.W.2d at 639 (1990)*. Also, collateral estoppel generally requires mutuality. *Howell v. Vito's Trucking & Excavating Co., 386 Mich. 37, 191 N.W.2d 313, 315-16 (Mich. 1971)*; *Barrow v. Pritchard, 235 Mich. App. 478, 597 N.W.2d 853, 855-56 (Mich. Ct. App. 1999)*. Collateral estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound [**13] by it, had it gone against him. *Howell, 191 N.W.2d at 315*.

*HN5* A RICO claim requires proof of two or more predicate offenses that formed a pattern of racketeering activity and involved an enterprise that was connected to the racketeering activity, which injured a plaintiff's business or property. *18 U.S.C. § 1961-1964*; *VanDen Broeck v. Commonpoint Mortgage Co., 210 F.3d 696, 699 (6th Cir. 2000)*. *Section 1961(1)* defines racketeering activity to include mail fraud and wire fraud. *18 U.S.C. §§ 1341, 1343*. Plaintiffs allege mail fraud and wire fraud as the predicate acts for their RICO claim. Mail fraud and wire fraud require showing a scheme to defraud using either a mailing or a wire communication to execute the scheme. *18 U.S.C. §§ 1341, 1343*. Under RICO, an element of both mail fraud and wire fraud is reliance on the fraudulent representation. *VanDen Broeck, 210 F.3d at 701*; *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 321-323 (6th Cir. 1999)*; *Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389-90 (6th Cir. 1996)*; [**14] *Central Distrib. of Beer, Inc. v. Conn, 5 F.3d 181,* (6th Cir. 1993); *Blount Fin. Servs., Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir.1987)*.

In affirming the state circuit court's ruling that the statute of limitation had run on Plaintiffs' fraud claim, the Michigan Court of Appeals found that under the discovery rule, Plaintiffs should have known in June 1983 that Defendant's representations were fraudulent because their reliance on the representations were not reasonable. In rejecting Plaintiffs' arguments, the Michigan Court of Appeals reasoned as follows:

> We agree with the trial court that plaintiffs, through the exercise of reasonable diligence,

should have discovered that they had a cause of action against defendant in June 1983. . . . The question is not whether plaintiffs were actually induced by Ross not to verify the accuracy of defendant's estimate of the value of plaintiffs' mineral rights, rather, whether their reliance on Ross' representations was reasonable under the circumstances of this case. In our opinion, the exercise of reasonable diligence should have caused plaintiffs to seek an independent appraisal of the [**15] volume of natural gas condensate remaining in their own property, notwithstanding the representation of Ross.

*Taylor Group v. ANR Storage Co., 1999 Mich. App. LEXIS 1252*, No. 206534, slip op. at 4 (Mich. Ct. App. July 13, 1999).

This finding satisfies all the elements of collateral estoppel. In order to affirm the state circuit court on the basis of the statute of limitations, the Michigan Court of Appeals had to review when Plaintiffs' claim accrued, which in this case occurred when Plaintiffs reasonably should have known of their alleged claim against Defendant. The issue when Plaintiffs reasonably should have known of their claim was actually litigated and necessarily determined by the state courts in finding that the statute of limitations barred Plaintiffs' claim. Further, this finding was part of a final judgment of the state trial and appellate courts on which the Michigan Supreme Court denied leave. Moreover, the [*325] judgment appears valid in all respects. Finally, as a party to that action, Defendant would have been bound by the decision had it been decided Plaintiffs' favor. Accordingly, as a matter of collateral estoppel, Plaintiffs did not reasonably rely on Defendant's allegedly fraudulent [**16] representations and should have known of their potential RICO claim in 1983. Therefore, Plaintiffs cannot show in the present case that they reasonably relied on Defendant's alleged fraudulent conduct for purposes of their RICO claim, which is an essential element of their RICO claim. Therefore, we **AFFIRM** the summary judgment of district court, but on different grounds than the district court relied used.

We also find that, just as Plaintiffs' state law fraud claim was barred by the statute of limitations, so is their RICO claim. *HN6* A civil RICO action has a four-year limitation period. *Rotella v. Wood, 528 U.S. 549, 145 L. Ed. 2d 1047, 120 S. Ct. 1075 (2000)*; *Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987)*. The limitations period for RICO claims accrues when a plaintiff knew or should have

24 Fed. Appx. 319, *325; 2001 U.S. App. LEXIS 24478, **16

known of an injury. *Rotella, 528 U.S. at 554-55.* [1] As the Michigan Court of Appeals determined, "we agree with the trial court that plaintiffs, through the exercise of reasonable diligence, should have discovered that they had a cause of action against defendant in June 1983." [**17] Applying the four-year statute of limitations to Plaintiffs' RICO claim requires that Plaintiffs would have had to file their RICO claim by June of 1987. However, Plaintiffs did not file their RICO claim until 1994, well after the statute of limitations had run. Accordingly, their RICO claim is time barred. Therefore, we also **AFFIRM** the summary judgment of district court on another basis than that relied on by the district court.

**B. Denial of Leave to File [**18]  Third Amended Complaint Was Proper**

Plaintiffs also claim that the district court erred by denying their motion for leave to file a Third Amended Complaint. The Third Amended Complaint proposed adding the same defendants that Plaintiffs had voluntarily dismissed in order to create a final, appealable order. *HN7* We review a district court's denial of a motion to amend for abuse of discretion. *Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 522 (6th Cir. 1999).*

*HN8* Under *Fed R. Civ. P. 15(a)*, leave to amend shall be "freely given when justice so requires." Courts construe *Rule 15(a)* liberally. *Janikowski v. Bendix Corp., 823 F.2d 945, 951 (6th Cir. 1987). Rule 15(a)* reinforces "the principle that cases should be tried on their merits rather than on the technicalities of pleadings." *Id.* (quoting *Tefft v. Seward, 689 F.2d 637, 639 (6th Cir.1982)).*

Nevertheless, this Court may affirm a denial of a motion to amend a pleading where there is undue delay, bad faith, dilatory motive, undue prejudice, repeated failure to cure deficiencies in the pleading, or futility of the amendment. *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; [**19] *Troxel [*326] Mfg. Co. v. Schwinn Bicycle Co., 489 F.2d 968, 970 (6th Cir. 1973).*

Here, after litigating in state court, Plaintiffs filed in federal court. Then almost three years after filing their initial Complaint, which they had already amended twice, they moved for leave to file their proposed Third Amended Complaint. This delay would have prejudiced Defendant. While substantially the same as their First Amended Complaint, Plaintiffs' Third Amended Complaint adds defendants that they had previously voluntarily dismissed. Although Defendant ANR and Plaintiffs had stipulated to use the discovery from the state proceeding, the proposed new defendants would have to repeat the discovery process because they were not parties to the state proceeding. This would have prejudiced ANR by subjecting it to repeated discovery. Further, one of the key witnesses, the author of an opinion letter on the fairness of ANR's offer in 1983, had died. After considering this protracted proceeding and its consequent prejudice, we cannot find that the district court abused its discretion in denying Plaintiffs' motion for leave to file a Third Amended Complaint.

**III. CONCLUSION**

For the [**20]  foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[1]  Before *Rotella*, this Circuit applied the "injury and pattern discovery rule," under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity. *See, e.g., Caproni v. Prudential Securities, Inc., 15 F.3d 614, 619-620 (6th Cir. 1994).* Application of the injury and pattern discovery rule would not have delayed the accrual of the statute because discovery of Ross' alleged misrepresentation would have implicated the alleged pattern of racketeering activity.

Ziyad Hermiz



Positive
As of: April 4, 2014 4:55 PM EDT

# Williams v. Pledged Prop. II, LLC

United States Court of Appeals for the Sixth Circuit
December 13, 2012, Filed
No. 12-1056

**Reporter:** 508 Fed. Appx. 465; 2012 U.S. App. LEXIS 25585; 2012 FED App. 1287N (6th Cir.); 2012 WL 6200270

CEDRIC M. WILLIAMS, Plaintiff-Appellant, v. PLEDGED PROPERTY II, LLC, and LITTON LOAN SERVICING LP, Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Subsequent History:** US Supreme Court certiorari denied by *Williams v. Pledged Prop. II, LLC, 2013 U.S. LEXIS 5810 (U.S., Oct. 7, 2013)*

**Prior History:** [**1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.
*Williams v. Pledged Prop. II, LLC, 2011 U.S. Dist. LEXIS 141038 ( E.D. Mich., Dec. 8, 2011)*

## Core Terms

foreclosure, claim, fraud, motion, foreclosure sale, summary judgment, irregularity, redemption period, promise, law, statute, financial, standing, title, loan, district court, agreement, contract, legal, party, proceed, amend, filed, home, unjust enrichment, mortgagor, judgment, requires, expire, period

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1* Appellate courts review a district court's grant of summary judgment de novo.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN2* A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. In deciding a motion for summary judgment, the court examines all evidence in the light most favorable to the non-moving party.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN3* Appellate courts review the denial of a motion to amend for abuse of discretion.

Civil Procedure > ... > Justiciability > Standing > Personal Stake

*HN4* Under Michigan law, a party must have a legal or equitable right, title, or interest in the subject matter of the controversy to establish standing.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

*HN6* When a court is exercising diversity jurisdiction, it must apply the same substantive law as would have been applied if the action had been brought in a state court of the jurisdiction where the federal court is located.

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

*HN7* When jurisdiction is premised on diversity of citizenship, a plaintiff must have standing under both U.S. Const. art. III and state law in order to maintain a cause of action.

Civil Procedure > Preliminary Considerations > Equity > Adequate Remedy at Law

Real Property Law > Financing > Foreclosures > General Overview

*HN5* Upon foreclosure, the rights of both the mortgagor and mortgagee are controlled by statute. Michigan 's foreclosure statute provides that, once the redemption period is expired, all of the mortgagor's rights in the property are extinguished by operation of law. *Mich.*

508 Fed. Appx. 465, *465; 2012 U.S. App. LEXIS 25585, **1

*Comp. Laws § 600.3236*. This includes any rights arising under equity. Where a statute is applicable to the circumstances and dictates the requirements for relief by one party, equity will not interfere.

> Civil Procedure > ... > Justiciability > Standing > Burdens of Proof

> Real Property Law > ... > Mortgages & Other Security Instruments > Redemptions > Statutory Redemption

*HN8* The redemption period following a foreclosure is six months after the date of the sale, *Mich. Comp. Laws § 600.3240*, and Michigan law does not allow for an extension of the statutory redemption period absent a clear showing of fraud or irregularity. The Michigan courts have determined that, after the expiration of the redemption period, a mortgagor does not have standing to bring an action to quiet title or challenge the foreclosure proceedings.

> Real Property Law > ... > Mortgages & Other Security Instruments > Redemptions > Statutory Redemption

*HN9* In order to qualify for the exception and extend the redemption period, the fraud or irregularity must be in conducting the legal measures. This requires that the fraud or irregularity be present in the foreclosure procedure itself. A party can challenge the foreclosure after the redemption period only if there is clear evidence of fraud or irregularity in the foreclosure proceedings.

> Real Property Law > Deeds > Defenses Against Deed Enforcement > Statute of Frauds

*HN10* See *Mich. Comp. Laws § 566.132(2)*.

> Real Property Law > Deeds > Defenses Against Deed Enforcement > Statute of Frauds

*HN11* The language of *Mich. Comp. Laws § 566.132(2)* is unambiguous and should be read as an unqualified and broad ban of any claim – no matter its label – against a financial institution to enforce the terms of an oral promise waiving a loan provision.

> Real Property Law > Deeds > Defenses Against Deed Enforcement > Statute of Frauds

*HN12* The Michigan Court of Appeals has clearly interpreted *Mich. Comp. Laws § 566.132(2)* to include promises to delay foreclosure sales, holding that an agreement to delay a foreclosure sale is an agreement to make a financial accommodation.

> Contracts Law > Types of Contracts > Quasi Contracts

*HN13* Upon establishing the elements of unjust enrichment, the law will imply a contract, but only if there is no express contract governing the same subject matter.

**Counsel:** For CEDRIC M. WILLIAMS, Plaintiff - Appellant: Darwyn Prentiss Fair, Law Office, Detroit, MI.

For PLEDGED PROPERTY II, LLC, Defendant - Appellee: Robert J. Kinggo, III, Trott & Trott, Farmington Hills, MI.

For LITTON LOAN SERVICING LP, Defendant - Appellee: Deborah Sharon Lapin, Ari M. Charlip, Hertz Schram, Bloomfield Hills, MI.

**Judges:** BEFORE: CLAY and STRANCH, Circuit Judges; BELL, District Judge.[*]

**Opinion by:** BELL

---

**Opinion**

---

[*466] **BELL, District Judge.** Plaintiff-Appellant Cedric M. Williams ("Williams") appeals an order granting summary judgment to Defendant-Appellees, Pledged Property II, LLC ("Pledged Property") and Litton Loan Servicing, LP ("Litton"). For the following reasons, we **AFFIRM.**

**BACKGROUND**

This case arose out of a dispute over the foreclosure and subsequent sale of a home in Wayne County, Michigan. Williams purchased the home on March 23, 2007, and financed the purchase with a mortgage. Litton contracted to service the loan beginning March 30, 2007. Williams became past due on the mortgage in September [**2] of 2007, and received Notice of Default in December of 2007. At Williams's request, Litton agreed to a loan modification on January 2, 2008. Williams did not make his first three payments under the modified loan and filed for bankruptcy in July of 2008. The automatic bankruptcy stay was lifted to allow for the foreclosure to continue in March of 2009.

Notice of Foreclosure Sale was first published in the Detroit Legal News on June 8, 2009. Prior to the scheduled foreclosure sale, Williams requested a second loan modification from Litton. Litton adjourned the foreclosure sale to review the request. On October 2, 2009, Litton denied the loan modification request and proceeded with the foreclosure. Mortgage Electronic Registration Systems, Inc. (MERS) purchased the home at the foreclosure sale on October 14, 2009, and recorded its Sheriff's Deed on October 26, 2009. Thereafter, MERS conveyed its interest to Pledged Property by quit claim deed the same month. After the sale, Litton continued to discuss potential options with Williams until the lender released Litton from servicing the loan on March 1, 2010.

---

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

Ziyad Hermiz

On June 9, 2010, after the redemption period had run, Williams filed this action [**3] in Wayne County Circuit Court, bringing the following claims: (1) quiet title, (2) unjust enrichment, (3) breach of implied agreement, (4) misrepresentation, (5) fraud, (6) constructive trust, and (7) breach of *Mich. Comp. Laws § 600.3205*. Defendants removed the case to district court on July 12, 2010, on the basis of diversity jurisdiction. On December 17, 2010, Defendants filed a motion for summary judgment. On the same day, Williams filed a motion to amend the complaint to add a claim of "Deceptive Act and/or Unfair Trade Practice." The motion to amend was denied on February 17, 2011, without prejudice. Williams did not file a response to the motion for summary judgment, and the motion was granted by the district court on March 9, 2011. Williams filed a motion for reconsideration, which was granted on June 9, 2011.

[*467] After oral argument on November 22, 2011, the district court again granted Defendants' motion for summary judgment. The court explained in its oral opinion that it was granting the motion on two grounds: (1) lack of standing and (2) the Statute of Frauds. Williams appeals this ruling, claiming that Litton made an oral promise that it would not go forward with the foreclosure [**4] sale and would come to terms to let Williams keep the home. Williams argues that Litton breached its promise and acted fraudulently when it sold the house at the foreclosure sale. Williams also appeals the denial of his motion to amend.

## STANDARD OF REVIEW

*HN1* This Court reviews a district court's grant of summary judgment *de novo*. *Bowling Green v. Martin Land Dev. Co., 561 F.3d 556, 558 (6th Cir. 2009)*. *HN2* "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. In deciding a motion for summary judgment, the court examines all evidence in the light most favorable to the non-moving party. *Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012)*.

*HN3* This Court reviews the denial of a motion to amend for abuse of discretion. *Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417, 420 (6th Cir. 2000)*.

## DISCUSSION

The district court, in its oral decision, did not specify which claims failed due to lack of standing and which claims failed due to the Statute of Frauds. This opinion will address each of these issues separately.

## I. Standing under Michigan Law

*HN4* Under [**5] Michigan law[1], a party must have "a legal or equitable right, title, or interest in the subject matter of the controversy" to establish standing.[2] *MOSES, Inc. v. Se. Mich. Council of Gov'ts, 270 Mich. App. 401, 716 N.W.2d 278, 286 (Mich Ct. App. 2006)* (internal quotation marks omitted); *Awad v. Gen. Motors Acceptance Corp., No. 302692, 2012 Mich. App. LEXIS 804, 2012 WL 1415166, at *2 (Mich. Ct. App. Apr. 24, 2012)* (per curiam). *HN5* Upon foreclosure, the rights of both the mortgagor and mortgagee are controlled by statute. *Senters v. Ottawa Sav. Bank, FSB, 443 Mich. 45, 503 N.W.2d 639, 642 (Mich. 1993)*. Michigan's foreclosure statute provides that, once the redemption period is expired, all of the mortgagor's rights in the property are extinguished by operation of law. *Mich. Comp. Laws § 600.3236*; *Piotrowski v. State Land Office Bd., 302 Mich. 179, 4 N.W.2d 514, 517 (Mich. 1942)*. This includes any rights arising under equity. *Senters, 503 N.W.2d at 644* ("Where, as in the present case, a statute is applicable to the circumstances and dictates the requirements [*468] for relief by one party, equity will not interfere.").

*HN8* The redemption period following a foreclosure is six months after the date of the sale, *Mich. Comp. Laws § 600.3240*, and Michigan law does not allow for an extension of the statutory redemption period absent a clear showing of fraud or irregularity. *Schulthies v. Barron, 16 Mich. App. 246, 167 N.W.2d 784, 785 (Mich. Ct. App. 1969)*. The Michigan courts have determined that, after the expiration of the redemption [**7] period, a mortgagor does not have standing to bring an action to quiet title or challenge the foreclosure proceedings. *See Overton v. Mortg. Elec. Registration Sys., No. 284950, 2009 Mich. App. LEXIS 1209, 2009 WL 1507342, at *1 (Mich. Ct. App. May 28, 2009)* (per curiam); *Sagmani v. Lending Assocs. LLC, No. 302865, 2012 Mich. App. LEXIS 1548,*

---

[1]   *HN6* This Court is exercising diversity jurisdiction, thus it "must apply the same substantive law as would have been applied if the action had been brought [**6] in a state court of the jurisdiction where the federal court is located." *Corrigan v. U.S. Steel Corp., 478 F.3d 718, 723 (6th Cir. 2007)*.

[2]   In this case, the arguments brought by the parties and the conclusion stated by the district court are based on standing under Michigan state law, not Article III. Although not addressed, this Court is satisfied that Williams has standing under Article III to raise his claims. Therefore, the discussion is limited to Williams's standing under Michigan law. *See Morell v. Star Taxi, 343 F. App'x 54, 57 (6th Cir. 2009)* (*HN7* "When jurisdiction is premised on diversity of citizenship, a plaintiff must have standing under both Article III and state law in order to maintain a cause of action."); *see also Owen of Ga., Inc. v. Shelby Cnty., 648 F.2d 1084, 1088-90 (6th Cir. 1981)*.

508 Fed. Appx. 465, *468; 2012 U.S. App. LEXIS 25585, **7

2012 WL 3193940, at *1 (Mich. Ct. App. Aug. 7, 2012) (per curiam); Awad, 2012 Mich. App. LEXIS 804, 2012 WL 1415166, at *4.

In this case, the district court held that Williams lacked standing to bring this case because, after the redemption period expired, Williams did not have a legal interest in the house. The foreclosure sale occurred on October 26, 2009, and the case was filed on June 9, 2010, nearly eight months after the sale and well after the end of the statutory redemption period. Thus, absent a clear showing of fraud or irregularity, Williams's rights to the property were extinguished, and he lacked standing under Michigan law to challenge the foreclosure proceedings or the foreclosure sale. See Overton, 2009 Mich. App. LEXIS 1209, 2009 WL 1507342, at *1 (citing Mich. Comp. Laws § 600.3236).

Williams attempts to invoke the fraud or irregularity exception to extend the redemption period. HN9 In order to qualify for the exception and extend the redemption [**8] period, the fraud or irregularity must be in "conducting the legal measures." Heimerdinger v. Heimerdinger, 299 Mich. 149, 299 N.W. 844, 846 (Mich. 1941). This requires that the fraud or irregularity be present in the foreclosure procedure itself. Sagmani, 2012 Mich. App. LEXIS 1548, 2012 WL 3193940, at *1 ("A party can challenge the foreclosure after the redemption period only if there is clear evidence of fraud or irregularity in the foreclosure proceedings."). However, Williams's claim of fraud relies on oral assurances during a negotiation to change the terms of the contract. Despite the fact that the negotiations may have taken place during the foreclosure process, these negotiations remained separate from the foreclosure process itself. As such, even if assumed to be true, Williams's allegations of fraud would not qualify him for the fraud exception because they are not fraud or irregularity in "the legal measures" of the foreclosure process.

Consequently, Williams did not have standing to assert any claim to legal or equitable title in the home because the redemption period had expired and he did not allege any fraud or irregularity in the foreclosure process. Without any legal or equitable title in the home, Williams [**9] cannot receive injunctive relief restoring him to title in the home. Therefore, Williams's claims for quiet title and constructive trust were properly dismissed.

## II. Michigan Statute of Frauds

Williams also seeks relief for breach of implied agreement, misrepresentation, and fraud on account of an oral promise allegedly made by Litton to delay the foreclosure sale. However, the Michigan Statute of Frauds expressly states that HN10 "[a]n action shall not be brought against a financial institution to enforce [a promise or commitment to waive a provision of a loan or make any other financial accommodation] unless the promise or commitment is in writing and signed." Mich. Comp. Laws § 566.132(2). HN11 The language [*469] of this statute is unambiguous and should be read as an "unqualified and broad ban" of any claim – "no matter its label" – against a financial institution to enforce the terms of an oral promise waiving a loan provision. Crown Tech. Park v. D&N Bank, FSB, 242 Mich. App. 538, 619 N.W.2d 66, 72 (Mich. Ct. App. 2000).

Williams, relying on Schering-Plough Healthcare Products, Inc. v. NBD Bank, N.A., 98 F.3d 904 (6th Cir. 1996), argues that the meaning of "financial accommodation" in § 566.132(2) requires that the [**10] financial institution be exposed to some sort of risk of loss before there would be a writing requirement. Williams's argument is misplaced. In the period between Schering-Plough and this case, HN12 the Michigan Court of Appeals has clearly interpreted § 566.132(2) to include promises to delay foreclosure sales, holding that "an agreement to delay a foreclosure sale is an agreement to make a 'financial accommodation.'" FEI Co. v. Republic Bank, S.E., No. 268700, 2006 Mich. App. LEXIS 2477, 2006 WL 2313612, at *2 (Mich. Ct. App. Aug. 10, 2006) (quoting Mich. Comp. Laws § 566.132(2)(a)).

Here, Williams's claims relied on an alleged promise or agreement by Litton to delay the foreclosure sale. Although Williams does not specify whether these assurances happened before, after, or both before and after the foreclosure sale, this uncertainty does not affect the outcome of this case. Williams did not support his allegations with a writing. He relied solely on oral assurances allegedly made by Litton. The courts cannot enforce such a promise without evidence that would satisfy the Statute of Frauds. Because Williams did not come forward with a writing, his claims of breach of implied agreement, misrepresentation, and fraud [**11] were properly dismissed.

## III. Unjust Enrichment

Williams's claim of unjust enrichment was also properly dismissed, because this transaction was governed by contract. HN13 Upon establishing the elements of unjust enrichment, the law will imply a contract, but only if there is no express contract governing the same subject matter. Belle Isle Grill Corp. v. Detroit, 256 Mich. App. 463, 666 N.W.2d 271, 280 (Mich Ct. App. 2003). In this case, there was a contract which controlled the foreclosure, so a claim for unjust enrichment cannot succeed.

## IV. Violation of M.C.L. § 600.3205

Williams also claims that Defendants were in violation of § 600.3205. This statute applies only to proceedings in

508 Fed. Appx. 465, *469; 2012 U.S. App. LEXIS 25585, **11

which the first notice was published after July 5, 2009, and before December 31, 2012. *Mich. Comp. Laws § 600.3204(5)*. First notice of the foreclosure was published on June 9, 2009, before the effective date of the statute. Therefore, this statute could not have been violated, and this claim was also properly dismissed.

**V. Amended Complaint**

Finally, the district court did not abuse its discretion in denying, without prejudice, Williams's motion to amend his complaint to add a claim of "Deceptive Act and/or Unfair Trade Practice." [**12] The district court applied the correct standard in its determination and cited both the

untimely nature of the motion and also the prejudice that would have been suffered by the Defendants had it allowed the motion. Furthermore, any amendment would have been futile because Williams's vague and speculative assertions were insufficient to state a plausible claim of fraud or irregularity. *See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

**[*470] CONCLUSION**

For these reasons, we **AFFIRM** the judgment of the district court.

Ziyad Hermiz



Positive
As of: April 4, 2014 4:55 PM EDT

# All Erection & Crane Rental Corp. v. Acordia Northwest, Inc.

United States Court of Appeals for the Sixth Circuit
January 18, 2006, Filed
No. 04-3862

**Reporter:** 162 Fed. Appx. 554; 2006 U.S. App. LEXIS 1444; 2006 FED App. 0046N (6th Cir.)

ALL ERECTION & CRANE RENTAL CORPORATION, Plaintiff-Appellant, v. ACORDIA NORTHWEST, INC., and SWETT & CRAWFORD, INC., Defendants-Appellees.

**Notice:** [**1]   NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

---

**Core Terms**

---

claim, summary judgment, party, breach, loss, insurance, policy, contract, cancel, economic, duty, negligence, district court, civil conspiracy, information, coverage, district, unlawful act, arguments, granted, privity, misrepresent, renewal, motion, fraud, rule, commercial, failed, agreement, evidence

---

**LexisNexis® Headnotes**

---

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1* An appellate court reviews a district court's entry of summary judgment de novo.

Civil Procedure > Appeals > Standards of Review > De Novo Review
Governments > Legislation > Interpretation

*HN2* A district court's interpretation of state law is governed by the de novo standard.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN3* Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A genuine issue for trial exists only when there is sufficient evidence on which the jury could reasonably find for the plaintiff.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN4* An appellate court reviews a district court's order of dismissal pursuant to *Fed. R. Civ. P. 12(b)(6)* de novo.

Torts > Negligence > Defenses > General Overview

*HN5* A plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable. Parties lacking privity might be subject to the economic loss rule under some circumstances and, commercial parties lacking privity, as opposed to non-commercial parties, are foreclosed from recovering economic losses. As between commercial parties, then, the allocation of risks in accordance with their agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement.

Torts > ... > Concerted Action > Civil Conspiracy > Elements

*HN6* A civil conspiracy is the malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages. No cause of action for civil conspiracy exists without an underlying unlawful act. Indeed, the element of "malicious combination to injure" does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act.

Torts > ... > Concerted Action > Civil Conspiracy > Defenses

*HN7* A party cannot be held liable for conspiring to breach his own contract.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Ziyad Hermiz

162 Fed. Appx. 554, *555; 2006 U.S. App. LEXIS 1444, **1

*HN8* Appellate courts do not consider issues not presented to the district court.

**Counsel:** For ALL ERECTION & CRANE RENTAL CORP., Plaintiff - Appellant: Leonard F. Carr, Leonard F. Carr Company, Mayfield Heights, OH; L. Bryan Carr, L. Bryan Carr Company, Mayfield Heights, OH.

For ACORDIA NORTHEAST, INC., Defendant - Appellee: Andrew J. Dorman, Ellyn Tamulewicz Mehendale, Janik & Dorman, Cleveland, OH.

For SWETT & CRAWFORD, Defendant - Appellee: Michael K. Farrell, James A. Slater, Jr., Baker & Hostetler, Cleveland, OH.

**Judges:** BEFORE: SILER and GRIFFIN, Circuit Judges; and TARNOW, District Judge.*

---
**Opinion**
---

[*555] PER CURIAM.

Plaintiff All Erection & Crane Rental Corporation ("All Crane") appeals a summary judgment entered in the district [**2] court in favor of defendants Acordia Northeast, Inc. ("Acordia"), and Swett & Crawford ("S&C"). All Crane's complaint, filed originally against Acordia, S&C, and Royal Surplus Lines Insurance Company ("Royal"), arose from the cancellation of an insurance policy purchased by All Crane.[1] All Crane first asserts that the district court improperly granted summary judgment on its negligence claims. Second, All Crane contends that the court incorrectly held that defendants owed no fiduciary duty to All Crane. Third, All Crane assigns error to the district court's grant of summary judgment in favor of defendants on its claim for breach of the duty of good faith and fair dealing. Finally, All Crane argues that summary judgment was unwarranted on its claims of fraud, misrepresentation, and civil conspiracy. For the reasons set forth below, we affirm.

[**3] I.

Plaintiff All Crane is an Ohio corporation engaged in the business of renting large construction cranes. In or around 1998, All Crane contracted with Acordia, a New Jersey retail insurance broker, to seek out potential insurance carriers capable of offering two-year coverage commitments.[2] Acordia, in turn, retained S&C, a Pennsylvania partnership, to serve as the intermediary broker.[3] Acordia and S&C selected Royal as a suitable insurance provider for All Crane. The parties' communications between one another thereafter operated as follows: All Crane dealt with Acordia, Acordia interacted with S&C, and S&C dealt with Royal. No contractual relationship existed between All Crane and S&C.

Royal provided a policy of commercial liability insurance coverage to All Crane effective from March 25, 1998, to March 25, 1999 (hereinafter "the 1998 Policy"). Included among the policy's provisions was the following:

> SECOND YEAR RATE GUARANTEE ENDORSEMENT. It is hereby agreed and understood that if the loss ratio at anniversary on an incurred basis exceeds 100%, the policy is subject to anniversary rerating with an increase in rate not to exceed 25%.

The 1998 Policy likewise contained the following provision governing "cancellation" of the policy:

> We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation [**5] at least:
>
> [*556] a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

---

* The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] All Crane's complaint also originally listed Acordia employees Bette Gillum and Ronald Lenart and S&C employee William Trumblower individually. All Crane does not list them as appellees in this appeal.

[2] Acordia is an independent retail insurance agency, which aids clients in obtaining insurance from carriers. Acordia is not an insurance carrier. Retail brokers are not permitted to directly obtain quotes from surplus line insurers, like Royal. Thus, retail brokers like Acordia must contact a wholesale broker like S&C, which is capable of approaching the "surplus" market to obtain insurance rate quotes.

[3] S&C is an independent wholesale insurance broker, which is capable of securing quotations from "surplus carriers." A "surplus carrier" is not licensed to issue insurance in Ohio and generally writes insurance for high-risk accounts like those arising in the crane industry. Surplus carriers typically do not have direct contact with retail brokers, like Acordia, and choose instead to work through wholesale brokers like S&C.

162 Fed. Appx. 554, *556; 2006 U.S. App. LEXIS 1444, **5

b. [60] days before the effective date of cancellation if we cancel for any other reason. [4]

In an effort to restructure All Crane's insurance program, Acordia and All Crane entered into a Risk Management Service Agreement ("RMSA") on January 28, 1999. In doing so, Acordia agreed to administer All Crane's property and casualty coverages. The RMSA expressly noted that Acordia was to pay "particular attention" to "multi-rate guarantees and structuring the proper coverages to address [All Crane's] exposure to loss." For this effort, Acordia earned the monthly sum of $ 10,000, with the possibility of earning an additional $ 10,000 "for negotiating a two-year rate guarantee."

Royal thereafter issued a second general liability insurance policy to All Crane, with [**6] coverage beginning on March 25, 1999, and ending on March 25, 2000 (hereinafter "the 1999 Policy"). Like its predecessor, the 1999 Policy included a second-year guarantee endorsement with the following similar language:

> SECOND YEAR RATE GUARANTEE ENDORSEMENT. It is hereby agreed and understood that if the loss ratio at anniversary on an incurred basis exceeds 60%, the policy is subject to anniversary rerating with an increase in rate not to exceed 25%.

Also, like the 1998 Policy, the 1999 Policy included an identical cancellation provision.

In early 2000, discussions regarding a renewal policy began between Acordia, S&C, and Royal. In furtherance of those negotiations, Royal sought updated loss information from All Crane during the years 1996 and 1997. Armed with only "some" of the updated information, Royal informed S&C that it did not intend to renew the 1999 Policy because of losses it had experienced while insuring All Crane for the years 1998 and 1999. When All Crane thereafter learned of Royal's

decision from Acordia, All Crane responded with its belief that the "Second Year Rate Guarantee Endorsement" obligated Royal to offer a renewal policy for the year 2000 [**7] at a premium rate not to exceed a twenty-five percent increase over the 1999 rate.

A conference call between Acordia, S&C, and Royal then took place on January 27, 2000, in an effort to resolve All Crane's insurance situation. [5] Several options were apparently discussed, including the possibility of renewing the policy and then cancelling it, thereby allowing Acordia the time to find a replacement carrier for All Crane. The call ended without a resolution on how to proceed.

In or around February 2000, Acordia representatives again spoke with members of Royal's management and, after some discussion, Royal issued a new policy with coverage beginning on March 25, 2000, and terminating on March 25, 2001 ("the 2000 Policy"). Like its predecessors, the 2000 Policy contained a sixty-day cancellation provision. Unlike Royal's prior policies, continued coverage pursuant to the 2000 Policy was conditioned on Royal's ability to review the totality of the losses incurred [**8] by All Crane's predecessor insurance company, AIG, for the 1996-1997 period. [6]

On or around May 23, 2000, Royal finally received the updated 1996-1997 loss information. [*557] After reviewing the information, Royal learned that All Crane's loss values were substantially worse than expected. Thus, on May 25, 2000, Royal cancelled the policy and informed S&C. After Acordia informed All Crane, All Crane requested an explanation for the cancellation. Acordia relayed that request to S&C, which thereafter forwarded the request to Royal. By letter dated June 20, 2000, Royal [**9] indicated that it cancelled the 2000 Policy because the 1996 and 1997 loss information "presented a drastically different and greatly inflated loss picture." The letter further noted that "the insured's loss profile has continued to deteriorate, consistent with the loss information that was not supplied early on in the relationship. Consequently, we need to recognize that the pricing structure in place cannot support the exposure

---

[4]  The cancellation provision was modified by a Cancellation Amendment, which extended the notice period from thirty to sixty days.

[5]  An Acordia representative recorded the call.

[6]  Specifically, Royal addressed a letter to Acordia on April 18, 2000, indicating as follows:

> Please be advised that this policy was bound subject to currently valued loss runs for 1996 & 1997 and the most recent audited financial statements, which, I don't believe we have received. Please forward them to my attention as soon as possible. Our underwriter advised if they do not receive them by 5/12/00, legal notice of cancellation will be sent.

Ziyad Hermiz

potential." Pursuant to the terms of the cancellation provision, Royal continued to insure All Crane until the expiration of sixty days on July 27, 2000.

On May 25, 2001, All Crane filed suit in the Northern District of Ohio against Acordia, S&C, Royal, and Ron Lenart, an Acordia employee. The complaint alleged counts of negligence against all defendants, breach of fiduciary duty against Acordia and S&C, breach of contract against Royal, breach of the duty of good faith and fair dealing against all defendants, civil conspiracy against all defendants, fraud against all defendants, fraudulent misrepresentation against all defendants, and violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO") against all defendants. Defendants Royal [**10] and Acordia sought dismissal of the presented claims via motion on August 1, 2001. [7]

In response, the district court issued an order dated November 4, 2002, granting in part and denying in part defendants' motion. Specifically, the court dismissed All Crane's negligence and RICO claims noting that, with regard to its negligence claim, All Crane claimed purely economic damages against parties with whom it had a contractual relationship. Thus, the court concluded, "because Ohio law prohibits economic recovery when the parties are in privity of contract, Plaintiff may not maintain its negligence claim." The court thereafter dismissed All Crane's civil RICO claims noting that, to establish a civil RICO claim, a plaintiff must show (1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity. In this case, according to the court, All Crane's complaint failed even to address [**11] each of the prerequisite elements necessary to state a claim for civil RICO. The court did, however, conclude that All Crane stated claims for breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, civil conspiracy, fraud and fraudulent misrepresentation.

After conducting discovery, the parties filed cross-motions for summary judgment on September 29, 2003. Thus, specifically pending before the court were (1) All Crane's motion for partial summary judgment on its breach of contract claim against Royal, (2) S&C's motion for summary judgment, (3) Royal's motion for summary judgment, and (4) Acordia's motion for summary judgment.

In response, the court issued an order dated April 9, 2004, granting summary judgment in favor of All Crane on its

breach of contract claim against Royal. [8] [*558] The court likewise entered summary judgment in favor of Acordia and S&C, thereby eliminating the balance of All Crane's claims. First, in response to All Crane's negligence claim against S&C, the court concluded that "All Crane has not come forth with any evidence establishing that S&C caused any harm to All Crane." Moreover, the court again concluded that All [**12] Crane's damages allegations comprised solely economic damages and, although All Crane and S&C lacked contractual privity, the court held that "commercial parties lacking privity are subject to the economic loss rule."

The court then discussed All Crane's claims against Acordia and S&C for breach of fiduciary duty. Noting that All Crane failed to respond to Acordia's and S&C's arguments that their relationship with All Crane was nothing more than an ordinary business relationship, the court granted summary judgment in favor of Acordia and S&C. In response to All Crane's breach of the duty of good faith and fair dealing claims, the court highlighted that both Acordia and S&C contend that "they [**13] are each entitled to summary judgment on this claim because under Ohio law, this duty only arises between an insurer and its insured, and only where there is an underlying contract between the parties." After noting that, again, All Crane had failed to respond to such arguments, the court found Acordia's and S&C's position was well-supported and therefore granted summary judgment to them on All Crane's breach of good faith and fair dealing claims.

Moving next to All Crane's civil conspiracy claim, the court agreed with Acordia and S&C that All Crane's claim failed to set forth the requisite elements; in particular, the existence of an underlying unlawful act. The court noted that All Crane asserted the breach of the insurance contract as an underlying unlawful act which, as to Acordia, "cannot form the basis of a conspiracy claim[.]" As for S&C, the court held that, as a non-contracting party, S&C could not have conspired to breach the contract.

Finally, the court granted summary judgment to S&C and Acordia on All Crane's fraud and fraudulent misrepresentation claims. In doing so, the court observed that "All Crane has not produced any evidence that Acordia knew of, or participated [**14] in, Royal's initial decision on January 13, 2000 not to renew the policy." Instead, the court noted, it was Acordia that worked to talk Royal into renewal. According to the court, "these facts establish that Acordia did not knowingly make any false

---

[7]   Defendant Royal filed the motion to dismiss, and Acordia filed a motion to join Royal's motion, which the court granted.

[8]   The court also granted in part and denied in part Royal's motion for summary judgment, thus leaving a portion of All Crane's claims intact. Accordingly, the court initially set the matter for trial. Following the entry of summary judgment on this count, however, All Crane settled its breach of contract claim against Royal.

162 Fed. Appx. 554, *558; 2006 U.S. App. LEXIS 1444, **14

representations to All Crane." The court thereafter agreed with S&C's arguments that "All Crane's fraud and fraudulent misrepresentation claims fail because S&C never made any representations to All Crane." All Crane declined to provide the court with responsive arguments. This timely appeal followed.

II.

*HN1* We review the district court's entry of summary judgment de novo. *McWane, Inc. v. Fid. & Deposit Co. of Md., 372 F.3d 798, 802 (6th Cir. 2004). HN2* A district court's interpretation of state law is likewise governed by the de novo standard. *Ferro v. Garrison Ind., Inc., 142 F.3d 926, 931 (6th Cir. 1998). HN3* Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is  [*559]  entitled to judgment as a matter of law. *FED. R. CIV. P. 56(c).* A genuine issue for trial exists only when there is sufficient "evidence on which the jury [**15] could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (noting that, in deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party). *HN4* We also review a district court's order of dismissal pursuant to *FED. R. CIV. P. 12(b)(6)* de novo. *Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997).*

III.

All Crane first argues that the district court erred in granting the motions to dismiss and thereafter entering summary judgment in favor of defendants. Specifically, it contends that the court improperly limited its discussion solely to the economic loss rule. Rather than focus solely on the economic loss rule, All Crane urges us to view this case from the perspective of an insurance agent, who owes to its client a duty to exercise good faith and reasonable diligence in undertaking the acquisition of coverage. From that viewpoint, according to All Crane, it was a negligent breach of that duty [**16] for Acordia and S&C to allow a policy renewal problem to develop with Royal. All Crane further highlights the "pretextual" renewal of its insurance policy, arguing that Acordia, in particular, negligently failed to timely obtain current loss information from All Crane's prior insurer, AIG, "which contributed to Royal cancelling the policy[.]" At a minimum, All Crane concludes the foregoing arguments create an issue of fact with regard to "the extent and nature of insurance coverage and whether an agent breached any of its duties." We disagree.

A host of reasons exist to affirm the district court's dismissal of All Crane's negligence claims against Acordia

and subsequent award of summary judgment to S&C on All Crane's negligence claims. As a general matter, it is undisputed that All Crane seeks purely economic damages arising from Royal's mid-term cancellation of the 2000 Policy. The district court therefore properly cited and focused on the well-established rule that *HN5* "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co., 42 Ohio St. 3d 40, 537 N.E.2d 624, 630 (Ohio 1989)* [**17] (internal citation and quotation marks omitted). Although All Crane was not in privity of contract with S&C, whether parties were in privity of contract is relevant only to the extent that at least one litigant is a non-commercial party. *HDM Flugservice GmbH v. Parker Hannifin Corp., 332 F.3d 1025, 1029-30 (6th Cir. 2003)* (interpreting Ohio's economic loss rule and agreeing that "parties lacking privity might be subject to the economic loss rule under some circumstances and that commercial parties lacking privity, as opposed to non-commercial parties, would be foreclosed from recovering economic losses"). Both S&C and All Crane are commercial parties, as opposed to private consumers, and, as a result, All Crane's remedies are more properly restricted either to a traditional breach of contract claim or, if available, to the remedies provided by the Uniform Commercial Code. *Id. at 1030; see Midwest Ford, Inc. v. C. T. Taylor Co., Inc., 118 Ohio App. 3d 798, 694 N.E.2d 114, 118-19 (Ohio Ct. App. 1997)* ("As between commercial parties, then, the allocation of risks in accordance with their agreement better serves the  [**560]  public interest than an allocation achieved as [**18] a matter of policy without reference to that agreement."). The balance of All Crane's arguments lack merit and, accordingly, the district court properly dismissed All Crane's claims against Acordia and thereafter appropriately entered summary judgment in favor of S&C.

IV.

All Crane also contends that the district court erred by granting summary judgment to Acordia and S&C on its claim for civil conspiracy. All Crane asserts that Acordia and S&C committed the underlying unlawful act of "fraud and/or misrepresentation." For support, All Crane points to portions of a discussion between Royal, S&C, and Acordia during their January 27, 2000, conference call as evidence of the conspiracy.

*HN6* A civil conspiracy is "the malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co., 72 Ohio St. 3d 415, 1995 Ohio 61, 650 N.E.2d 863, 866 (Ohio 1995)*. No cause of action for civil conspiracy exists without an underlying unlawful act. *Gosden v.*

162 Fed. Appx. 554, *560; 2006 U.S. App. LEXIS 1444, **18

*Louis, 116 Ohio App. 3d 195, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)*. Indeed, "the element of 'malicious combination to injure' does not require [**19] a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Id.* (citation omitted); *see Universal Coach, Inc. v. New York City Transit Auth., Inc., 90 Ohio App. 3d 284, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)*.

In this case, the district court noted that All Crane asserted that the underlying unlawful act was a breach of the insurance contract. Thus, it concluded, "because a contract claim cannot form the basis of a conspiracy claim, and because non-contracting parties cannot conspire to breach a contract, Acordia and S&C are entitled to summary judgment on this count." This conclusion is wholly correct. *Wagoner v. Leach Co., No. 17580, 1999 Ohio App. LEXIS 3152, *51 (Ohio Ct. App. July 2, 1999)* ("[A] *HN7* party cannot be held liable for conspiring to breach his own contract." (citing *Schell v. Kaiser-Frazer Sales Corp., 28 Ohio App. 2d 16, 274 N.E.2d 315, 318 (Ohio Ct. App. 1971)*)). Although All Crane re-characterizes the unlawful act for purposes of appeal as "fraud and/or misrepresentation," it declined to draw that distinction

below and, accordingly, the argument is waived. [9] The district [**20] court therefore properly granted summary judgment to Acordia and S&C on All Crane's civil conspiracy claim.

V.

The balance of All Crane's issues are not properly preserved. Although All Crane asserts error with regard to its claims for breach of fiduciary claim, breach of good faith and fair dealing, fraud, and misrepresentation, the district court properly observed that All Crane's brief in opposition to summary judgment failed to address either Acordia or S&C's arguments with respect to those claims. Accordingly, All Crane has waived its opportunity [**21] to raise the appellate arguments it now asserts. *See, e.g., Wright v. Holbrook, [*561] 794 F.2d 1152, 1157 (6th Cir. 1986)* ("The general rule is that this court will not consider issues not raised in the district court.") (citations omitted); *Brown v. Marshall, 704 F.2d 333, 334 (6th Cir. 1983)* (noting *HN8* "appellate courts do not consider issues not presented to the district court") (citation omitted).

Affirmed.

---

[9]   All Crane's thematic reliance on the parties' tape-recorded conference call is misplaced. Although All Crane infers that S&C and Acordia somehow acted nefariously by merely participating in the call, the record reflects that S&C and Acordia representatives did so in order to ascertain Royal's position on renewing the 1999 Policy. Moreover, the record reflects that Acordia was responsible for All Crane receiving *any* post-1999 insurance coverage whatever.



Neutral
As of: April 4, 2014 4:55 PM EDT

# Cook v. Cashler

United States District Court for the Western District of Michigan, Southern Division

May 10, 2013, Decided; May 10, 2013, Filed

File no: 1:11-CV-637

**Reporter:** 2013 U.S. Dist. LEXIS 66663; 2013 WL 1962388

ROBERT CHARLES COOK #128535, Plaintiff, v. UNKNOWN CASHLER, et al., Defendants.

**Prior History:** *Cook v. Cashler, 2013 U.S. Dist. LEXIS 41127 (W.D. Mich., Mar. 25, 2013)*

| Core Terms |
| --- |

grievance, exhaust, misconduct, administrative remedy, ticket, settlement agreement, declaratory relief, summary judgment, retaliate, moot, reconsideration motion, frivolous, failure to state a claim, disciplinary, conspiracy, prison, theft, decisions made, first motion, no evidence, injunctive, reconsider, settlement, duplicate, grieve

**Counsel:** **[*1]** Robert Charles Cook, plaintiff, Pro se, Kincheloe, MI.

**Judges:** HON. ROBERT HOLMES BELL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT HOLMES BELL

| Opinion |
| --- |

On March 25, 2013, this Court approved and adopted Magistrate Judge Joseph G. Scoville's March 5 Report and Recommendation ("R&R"), denied Plaintiff's various pending motions, granted Defendant Jackson's motion to dismiss, granted Defendants Galiton, Gibson, Scrivens, Watson, Sutherby, McLellan, and Cashler's motions for summary judgment, dismissed Plaintiff's claim for declaratory relief against Defendant Jackson as moot, dismissed Plaintiff's claims against Defendant Wakefield for failure to state a claim upon which relief can be granted, dismissed Plaintiff's claims against Defendants Galiton, Gibson, Scrivens, Watson, Sutherby, McLellan, and Cashler for failure to properly exhaust any claim against said Defendants, and entered judgment in favor of Defendants. (Dkt. Nos. 60-61.)

Presently before the Court are two motions for extensions of time (Dkt. Nos. 63-63), and a motion for reconsideration (Dkt. No. 65), all filed by Plaintiff.

## A. First Motion for Extension

Plaintiff's first motion for an extension of time was filed on March 25, 2013, and sought an extension **[*2]** of time within which to file objections to the March 5 R&R. (Dkt. No. 62.) This motion and the attached objections were not received by the Court until after it issued the order approving and adopting the R&R and entered judgment in favor of Defendants. (Dkt. Nos. 60-61.)

Plaintiff subsequently provided a receipt indicating that his first motion for an extension and the attached objections were mailed on March 20, 2013, within the time allotted to file objections to the R&R. (Dkt. No. 63, Ex. A.) Documents prepared by pro se prisoners are considered "filed" at the time of delivery to prison authorities for forwarding to the court clerk, rather than on the date of receipt by the clerk. *Houston v. Lack, 487 U.S. 266, 276, 108 S. Ct. 2379, 101 L. Ed. 2d 245 (1988)*. Thus, in light of the date written on the legal mail forms, the Court will accept Plaintiff's objections as timely filed. Because the objections have been filed and will be considered at this time, the first motion for extension will be denied as moot. However, because these objections lack merit, the Court will affirm its March 25 order and judgment.

### 1. Law

This Court makes a *de novo* determination of those portions of an R&R to which specific objections are made. **[*3]** *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)*. "[A] general objection to a magistrate's report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995)*. The Court may accept, reject, or modify any or all of the Magistrate Judge's findings or recommendations. *Id.*

### 2. Objections

#### i. Defendants Cashler and McClellan

Plaintiff's first objection is that this Court, specifically with regard to Defendants Cashler and McClellan, ignored

the well-settled rule of law that prisoners cannot file grievances on disciplinary matters. Plaintiff provides no source for this "well-settled rule of law," although it appears to stem from Michigan Department of Corrections ("MDOC") Policy Directive 03-02-130, which provides that decisions made in grievance hearings and decisions made in minor misconduct hearings are non-grievable issues. (Dkt. No. 19, Ex. A, ¶ F.)

However, Plaintiff's allegations against Cashler do not regard decisions made in any hearings. Instead, throughout his many [*4] vague and oftentimes irrelevant allegations regarding Cashler, Plaintiff alleges the following: Cashler wrote fabricated theft tickets in retaliation; Cashler was part of a conspiracy to violate Plaintiff's constitutional rights; Cashler "went on a crime spree" by shaking cells down, reading legal papers, destroying prisoners' property, and yelling and screaming at Plaintiff; Cashler wrote Plaintiff a false major misconduct for refusing to obey a direct order; and Cashler wrote Plaintiff a false minor ticket for "Temporary out of Place." (Dkt. No. 1, at PageID# 10-11, 13, 17-20, 26.) All of these allegations could have been grieved because the behavior occurred outside of the disciplinary hearing context.

Nor do Plaintiff's allegations against McClellan, a hearings investigator, directly regard decisions made in any hearings. Plaintiff alleges that McClellan engaged in improper conduct (including the obstruction of justice and refusal to investigate Plaintiff's defenses) during the investigation of misconduct tickets, was part of the conspiracy to violate Plaintiff's constitutional rights, violated due process and equal protection of the law by illegally pulling a theft ticket from [*5] Plaintiff's file before a major disciplinary hearing on the ticket was held on June 1, 2008, refused to investigate or question witnesses before another hearing, and refused to give Plaintiff access to his records and files. (Dkt. No. 1, at PageID# 11-13, 27, 30, 32.) As with Cashler, this alleged behavior all occurred prior to any disciplinary hearing and could have been grieved.

Even if any of these claims against Cashler or McClellan (or any other defendant for that matter) could be considered non-grievable as claims regarding issues directly related to the hearing process, that does not mean that Plaintiff's administrative remedies were exhausted. While decisions made in misconduct hearings are non-grievable, the proper avenue of appeal (as made clear to Plaintiff in regard to an improperly filed grievance against Minnerick) is, for a major misconduct, to submit a Request for Rehearing form to the Hearings Administrator

in Lansing and, for a minor misconduct, to submit a Minor Misconduct Appeal to the ADW of Housing. (*See* Dkt. No. 19, Ex. Q, Step II Grievance Resp., at PageID# 263.) Plaintiff has provided no evidence of ever submitting either form with regard to his claims against [*6] Cashler and McClellan.[1] Moreover, even if Plaintiff had properly exhausted his administrative remedies against these two defendants, the Court finds Plaintiff's allegations against them to be frivolous and completely devoid of support. *See* 28 U.S.C. §§ 1915(e)(2) & 1915A; 42 U.S.C. § 1997e(c).

Relatedly, Plaintiff additionally alleges that Cashler, by presenting the "illegal" defense that Plaintiff never filed grievances regarding disciplinary matters, has "pleaded himself guilty." There is no such rule of law, and Cashler has not pleaded guilty by filing the defense of failure to exhaust administrative remedies.

### ii. Defendant Gibson

Plaintiff objects to the fact that the Magistrate Judge "chose to ignore" the fact that Plaintiff did file grievances against Defendant Gibson. Plaintiff has failed to provide any evidence that he did indeed file grievances naming Gibson. [*7] Moreover, even if Plaintiff did file such grievances, he concedes that they were rejected as untimely and/or in violation of MDOC policy. (Dkt. No.62, Attach. 1, at PageID# 481.) "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo, 548 U.S. 81, 90, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006).*

### iii. Defendant Jackson

Next, Plaintiff argues that footnote four in the Court's February 22, 2012, order (Dkt. No. 7, at 13 n.4), which stated that Defendant Jackson was entitled to immunity, was mistakenly entered. This footnote was not included in error. Instead, the footnote correctly stated that Jackson was entitled to absolute judicial immunity from monetary damages for his actions taken in his capacity as a hearings officer. *See Shelly v. Johnson, 849 F.2d 228, 230 (6th Cir. 1988).* As for Plaintiff's claim against Jackson for non-monetary damages — the claim seeking declaratory relief on his retaliation claim — the opinion stated that service on Jackson for that claim was warranted. (Dkt. No. 7, at 13.) Thus, the R&R was not in error when it explained that Plaintiff's claims against Jackson, other than the claim for declaratory relief, were dismissed on February [*8] 22. (Dkt. No. 59, at 2 n.1.)

Plaintiff next contends that Jackson's "secondary" defense of mootness for the non-monetary claim could only be

---

[1]   In his second motion for an extension of time, Plaintiff does attach a Minor Misconduct Appeal concerning his allegation that Defendant Minnerick falsified a misconduct ticket. (Dkt. No. 63, Ex. C.) However, as discussed in detail *infra*, the Court finds the claim against Minnerick, even if properly exhausted, to be frivolous.

2013 U.S. Dist. LEXIS 66663, *8

accepted by the Court if Plaintiff was seeking injunctive relief against Jackson. This argument is nonsensical. Plaintiff is no longer at the same facility as Jackson, and the Sixth Circuit has repeatedly held that claims against prison officials for both injunctive relief *and declaratory relief* are moot if the inmate is no longer at the facility where the alleged wrongdoing occurred. *Colvin v. Caruso, 605 F.3d 282, 289 (6th Cir. 2010)* ("This leaves Colvin's requests for declaratory and injunctive relief. But these forms of relief are moot because Colvin's requests were directed specifically at LMF's policies and procedures and were not targeted at the MDOC kosher-meal program as a whole."); *Dellis v. Corr. Corp. of Am., 257 F.3d 508, 510 n.1 (6th Cir. 2001)* ("We note that Plaintiff also requested injunctive and declaratory relief in his complaint; however, because he is no longer incarcerated in either Hardeman County Correctional Facility or Whiteville Correctional Facility, these prayers for relief are moot."); *Kensu v. Haigh, 87 F.3d 172, 175 (6th Cir. 1996)* [*9] ("However, to the extent Kensu seeks declaratory and injunctive relief his claims are now moot as he is no longer confined to the institution that searched his mail."). Thus, there was no error.

Then, contradicting his previous arguments and his complaint, Plaintiff argues that he has never asked for declaratory relief. Plaintiff's complaint states: "I would like the court to issue a declaratory judgement [sic] stating that all the defendants deliberately and maliciously violated my constitutional rights, under color of law, as explained in my complaint." (Dkt. No. 1, PageID# 33.) Plaintiff now claims that this statement "merely asks the court to enter an Order (called an initial screening process) and in its order define the rights & privileges of the parties involved, or what's expected of us." (Dkt. No. 62, Attach. 1, at PageID# 484.) However, whether Plaintiff intended to seek declaratory relief through the statement in his complaint is irrelevant. To the extent he was seeking declaratory relief against Jackson, it was moot as just discussed. If he was not seeking declaratory relief, then Jackson is still entitled to dismissal because all of the non-declaratory claims against him [*10] were dismissed on account of absolute judicial immunity in the February 22 opinion and order. (*See* Dkt. Nos. 7, 8.)

Last, Plaintiff argues that Jackson has no immunity to enter into a criminal conspiracy. Plaintiff misconstrues the law. A Michigan hearings officer is entitled to *absolute* immunity for all actions taken in his hearing officer capacity. *Barber v. Overton, 496 F.3d 449, 452 (6th Cir. 2007)*. Jackson's decisions to find Plaintiff guilty of misconducts, even if these decisions were somehow improperly motivated, were indisputably made in his hearing officer capacity.

**iv. Defendant Wakefield**

Plaintiff argues that the Court acted as counsel for Defendant Wakefield by stating that Plaintiff's claim against him should be dismissed for failure to state a claim, a defense that Wakefield did not raise. Plaintiff is correct that Wakefield never argued for dismissal for failure to state a claim and instead only argued for summary judgment for failure to exhaust administrative remedies. However, the Magistrate Judge was permitted to sua sponte dismiss the claims against Wakefield for failure to state a claim on which relief may be granted because Plaintiff brought this suit in forma pauperis, [*11] *28 U.S.C. § 1915(e)(2)*, and alternatively because Plaintiff was a prisoner bringing a *§ 1983* suit with respect to prison conditions, *28 U.S.C. § 1915A* and *42 U.S.C. § 1997e(c)*.

Plaintiff further argues that the fact that the Magistrate Judge acknowledged Plaintiff's injury but declared it inconsequential establishes Wakefield's guilt. On the contrary, when a *First Amendment* retaliation claim is brought on the basis of an inconsequential injury, the claim is properly dismissed as a matter of law. *Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 584 (6th Cir. 2012)*.

Last, Plaintiff argues that the R&R failed to account for the four theft tickets written out of retaliation and on Wakefield's order. Plaintiff never alleged in his complaint that Wakefield ordered any officer to write a theft ticket. Instead, the complaint only alleges that Wakefield ordered multiple "shakedowns." (Dkt. No. 1, at PageID# 31-32.) Plaintiff's response to the motions for summary judgment is also limited to allegations regarding Wakefield ordering "shakedowns." [*12] (Dkt. No. 39, at PageID# 348-49.) Consequently, the Magistrate Judge's failure to address Wakefield ordering the writing of four theft tickets was not erroneous.

**v. All Defendants**

Plaintiff objects to the fact that the Magistrate Judge complained that he did not submit any evidence. Plaintiff posits that he is relying on the exhibits Defendants provided, which support his claims. The R&R rejected Plaintiff's motions for summary judgment as frivolous because Plaintiff bore the burden of establishing his entitlement to summary judgment, and Plaintiff failed to submit any evidence to support his motions. (Dkt. No. 59, at 3.) Contrary to Plaintiff's objection, the exhibits submitted by Defendants do not establish Plaintiff's entitlement to judgment on any of his claims. Thus, the Magistrate Judge did not err in denying these motions.

Plaintiff next objects to the Magistrate Judge's conclusion that Defendants did not have to answer Plaintiff's cross-motions for summary judgment and motion for default. He claims that the Magistrate Judge was illegally acting as defense counsel by making arguments for the

defendants and speculating as to why they did not answer. The Magistrate Judge did not [*13] commit any error. As the Magistrate Judge correctly noted, a party is not required to respond to a motion. (Dkt. No. 59, at 4.) The Magistrate Judge never made arguments for defense counsel or speculated as to why Defendants did not answer. The Magistrate Judge's comment that Defendants were resting on their previously filed briefs and evidence was axiomatic given the fact they did not respond to Plaintiff's motions.

Plaintiff also contends that the Magistrate Judge failed to apply the applicable law, namely "parallel conspiracy." He argues that exhaustion is not required as to defendants who have engaged in a parallel conspiracy. The Court does not know what Plaintiff means by a "parallel conspiracy." Nevertheless, the argument is frivolous. Exhaustion of administrative remedies is always required for prisoners bringing a *§ 1983* suit. *42 U.S.C. § 1997e(a)*.

Next, Plaintiff argues that the Magistrate Judge neglected the law on settlements which appeared in *Spruytte v. Govorchin, 961 F. Supp. 1094 (W.D. Mich. 1997)*. However, the law on settlements, appearing in *Spruytte* or elsewhere, is inapplicable to the present suit because, as the Magistrate Judge correctly noted, Plaintiff has produced [*14] no evidence that any defendant ever entered into or violated any settlement agreement. (Dkt. No. 59, at 16.)

Plaintiff also objects to the Magistrate Judge's summary of the grievances filed. He points out that the Magistrate Judge indicated that four grievances, LRF-08-09-1021-28a, LRF-08-09-1043-28a, LRF-08-09-1023-28a, LRF-08-09-1024-28a, were rejected as duplicates. [2] He argues that the original grievances, of which these four were duplicates, were not presented by Defendants. This is incorrect. The first two of these duplicate grievances presented issues previously grieved in LRF-08-08-859-08a. (Dkt. No. 19, Exs. C, E.) That grievance, LRF-08-08-859-08a, was attached by Defendants. (*See* Dkt. No. 19, Ex. J.) The remaining two of these duplicate grievances presented issues previously grieved in LRF-08-09-960-17i. (Dkt. No. 19, Exs. G, H.) Again, LRF-08-09-960-17i was attached by Defendants. (*See* Dkt. No. 19, Ex. I.)

Plaintiff also argues that it was a contradiction [*15] for the Magistrate Judge to state that the rejections of grievances implicating Defendants Sutherby, Galiton, and Watson were upheld at Steps II and III, but then conclude that the administrative remedies against those defendants were not exhausted. This was not a contradiction. As discussed, proper exhaustion requires compliance with deadlines and procedural rules. *See Woodford, 548 U.S. at 90*. Thus, administrative remedies are not properly exhausted just because the rejection of a grievance is appealed through Step III. Each grievance against Sutherby, Galiton, and Watson that was appealed through Step III was rejected for failure to comply with agency deadlines and/or procedural rules.

Next, Plaintiff argues that whether the purported settlement agreements acted as a waiver of the exhaustion requirement was an issue of fact that should not have been decided by the Magistrate Judge. There was no issue of fact because there was no evidence whatsoever that any settlement agreement existed. Relatedly, Plaintiff argues that it was the Defendants' burden to prove that the settlement agreements did not exist and that Defendants' silence is uncontroverted proof of their existence. Because [*16] Plaintiff failed to create an issue of fact regarding the existence of settlement agreements, Defendants did not have to come forward with any affirmative evidence. Plaintiff further contends that multiple defendants will testify to the existence of the settlement agreements. This argument is speculative, and Plaintiff's assertion that Defendants will testify to the existence of settlement agreements is unsupported.

Last, Plaintiff argues that the four misconduct tickets for theft on which he was found not guilty are overwhelming evidence of the violation of his rights. Plaintiff has provided no evidence that he was found not guilty on multiple misconduct tickets. Even if Plaintiff did provide such evidence if would not be evidence that any of the defendants violated Plaintiff's rights as alleged in the complaint.

**C. Second Motion for Extension**

On April 11, Plaintiff filed a motion for an extension of time within which to file a motion for reconsideration and within which to file a certificate of appealability, citing his late receipt of certain photocopies previously unobtainable. Good cause having been shown, the Court will grant the motion. Consequently, the Court will consider the [*17] motion for reconsideration, which was filed on April 29, timely filed and will address it at this time.

**D. Motion for Reconsideration**

The Western District of Michigan's Local Civil Rules provide that a party that moves for reconsideration must demonstrate that there is a palpable and misleading defect

---

[2]   One of the grounds for the rejection of another grievance, LRF-08-04-366-28a, was that it was a duplicate. (Dkt. No. 19, Ex. S.) However, this grievance regarded allegations that are outside the scope of the instant complaint.

Ziyad Hermiz

as well as that a different result is required as a result of a correction of that defect. *W.D. Mich. LCivR 7.4(a).* As a general rule, "motions for reconsideration which merely present the same issues ruled upon by the Court shall not be granted." *Id.*

Although there is no specific provision for a motion for reconsideration in the Federal Rules of Civil Procedure, such a motion is to be evaluated as a motion to alter or amend the judgment under *Federal Rule of Civil Procedure 59(e). See Aero-Motive Co. v. William Becker, No. 1:99-CV-384, 2001 U.S. Dist. LEXIS 20621, 2001 WL 1699194, at *1 (W.D. Mich. Dec. 6, 2001) (citing Huff v. Metro. Life Ins. Co., 675 F.2d 119, 122 (6th Cir. 1982)).* A motion for reconsideration is an opportunity to "point out manifest error of law or present newly discovered evidence." *Aero-motive, 2001 U.S. Dist. LEXIS 20621, 2001 WL 1699194 at *1* (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler, 146 F.3d 367, 374 (6th Cir. 1998)).*

Plaintiff [*18] presents the following arguments in favor of reconsideration of this Court's order approving and adopting the R&R, and judgment in favor of Defendants:

1. Defendants admitted they committed at least eight documented felonies against the Plaintiff.

2. The facts are in dispute regarding the failure to exhaust administrative remedies defense.

3. The Court entered judgment without addressing Plaintiff's objections, which were timely pursuant to the mailbox rule.

4. The Plaintiff has just recently obtained copies of evidence that conclusively establish Plaintiff's entitlement to judgment in his favor.

5. The Court lacked jurisdiction to decide the summary judgment motions because Defendants violated settlement agreements. Additionally, by entering into settlement agreements, Defendants waived the burden of exhaustion.

6. Defendants lied to the Court and misrepresented the facts regarding whether Plaintiff exhausted his administrative remedies.

7. Defendants were required to answer the retaliation and settlement claims pursuant to this Court's February 22, 2012, order.

8. The Magistrate Judge had a conflict of interest because he made arguments on behalf of Wakefield.

9. Defendants were required [*19] to object to the R&R and to bring to the Court's attention a mistake the Magistrate Judge may have made.

10. Plaintiff's criminal conviction is null and void (because he was a juvenile and never had a juvenile waiver hearing), meaning that he has no obligation to exhaust his administrative remedies.

11. Grievances cannot be filed on any issue involving the disciplinary process.

(Dkt. No. 66, at PageID# 557-58.) The Court has already addressed arguments 1-3, 5-8, and 11, which lack merit. Argument 9 is frivolous because no party is obligated to file an objection to an R&R. Argument 10 is also frivolous because Plaintiff, as a prisoner suing with respect to prison conditions under *§ 1983*, was required to exhaust his administrative remedies. *42 U.S.C. § 1997e(a).*

Plaintiff's only remaining ground for reconsideration is based on newly obtained evidence. (*See* Dkt. No. 63, Exs. A-E.) None of this evidence establishes a palpable and misleading defect in this Court's order approving and adopting the R&R.

Exhibit A is a receipt indicating that Plaintiff's first motion for extension and the attached objections were mailed on March 20, 2013. (Dkt. No. 63, Ex. A.) This Court has already accepted this [*20] receipt as evidence that Plaintiff's objections to the R&R were timely filed. Because the Court has considered those objections on the merits in this opinion, Exhibit A does not justify further reconsideration.

Exhibit B contains the documents related to grievance LRF-08-05-00489-28b and purportedly establishes the existence of a settlement agreement. (Dkt. No. 63, Ex. B.) Exhibit B does no such thing. Instead, Exhibit B contains a statement by Plaintiff that a prior grievance against Cashler "was settled" with an agreement that Cashler "would refrain from any further harassment or retaliation." (Ex. B, PageID# 513-14.) Plaintiff then stated that Cashler proceeded to violate the agreement. (*Id.*) As a result, Plaintiff sought a "re-investigation" of "all issues" related to the prior grievance. (*Id.* at 514.) Plaintiff's unsubstantiated statements about a settlement in the grievance file is not evidence of any such settlement agreement. As the Step Three Response makes clear, "[t]he Grievant did not provide sufficient evidence to corroborate his allegations." (*Id.* at 515.) Moreover, this is not new evidence. Defendants attached this grievance to their brief filed on May 9, 2012. (Dkt. [*21] No. 19, Ex. Q.)

Ziyad Hermiz

2013 U.S. Dist. LEXIS 66663, *21

Exhibit C is an appeal of a minor misconduct appeal Plaintiff received for lying in a grievance. (Dkt. No. 63, Ex. C.) Plaintiff argues that this exhibit also establishes the existence of a settlement agreement. However, Exhibit C consists only of Plaintiff's statements, which as with the statements in Exhibit B, do not establish the existence of a settlement agreement. Nevertheless, Exhibit C does indicate that Plaintiff exhausted his administrative remedies with regard to his claim that the minor misconduct ticket was written by Minnerick in retaliation because MDOC policy requires the filing of such an appeal for exhaustion. (*See* Dkt. No. 19, Ex. A, at ¶ KK.)

However, the Court finds Plaintiff's allegation that Minnerick wrote the misconduct ticket in retaliation to be frivolous and completely devoid of support, and dismisses the claim pursuant to *28 U.S.C. §§ 1915(e)(2)* & *1915A*, and *42 U.S.C. § 1997e(c)* for failure to state a claim upon which relief may be granted. The ticket Minnerick wrote was approved by the warden and given to Plaintiff because grievance LRF-08-04-00365-17i, in which Plaintiff accused Cashier of various wrongdoings, was dismissed as completely [*22] lacking support. (Dkt. No. 19, Ex. R.) "If a grievant intentionally files a grievance which is investigated and determined to be unfounded which, if proven true, may have caused an employee or a prisoner to be disciplined or an employee to receive corrective action, the grievant may be issued a misconduct report if approved by the warden . . . ." (Dkt. No. 19, Ex. A, Policy Directive 03-02-130, ¶ L.) Even if Plaintiff's allegations that the grievance was not falsified were accepted as true, his allegations that Minnerick somehow knew that Plaintiff was telling the truth in the grievance consist solely of multiple levels of hearsay. (*See* Dkt. No. 1, at PageID# 16.) The Court is not required to accept such conclusory allegations and unwarranted factual inferences. *In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009)*. Thus, to the extent Plaintiff's claim against Minnerick was exhausted, the Court dismisses it for failure to state a claim.

Exhibit D consists of a series of eight letters written by Plaintiff. The first letter is a cover letter to "Director Patricia Caruso" which indicates that Plaintiff was enclosing seven grievances "for [*23] step III exhaustion purposes." (Dkt. No. 63, Ex. D, at PageID# 525.) The seven "grievances" enclosed consisted of the following: (a) one letter to a "Warden Berghuis" seeking to be treated as a Step II grievance form; (b) one letter to a "Deputy Smith" in which Plaintiff contends the letter constitutes an exhaustion of his administrative remedies; and (c) five letters to an "Inspector Walton" discussing issues Plaintiff wished to grieve but could not because he was on

Modified Grievance Status. Exhibit D does not establish exhaustion of administrative remedies. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford, 548 U.S. at 90*. MDOC policy requires a Step I grievance to be filed on form CSJ-47A and Steps II and III grievances to be filed on form CSJ-247B. (Dkt. No. 19, Ex. A, Policy Directive 03-02-130, ¶ R.) Prisoners are not permitted to make a grievance via letters. Moreover, MDOC policy permits a warden to limit a prisoner's access to the grievance process if the prisoner "files an excessive number of grievances which are vague, duplicative, raise non-grievable issues . . . or is found guilty of misconduct for filing [*24] an unfounded grievance . . . ." (*Id.* at ¶ HH.) Prisoners on modified access must still use form CSJ-47A for a Step I grievance, but this form may only be obtained from the Step I Grievance Coordinator upon a showing that the intended grievance will comply with MDOC policy. (*Id.* at ¶ KK.) Thus, the documents provided in Exhibit D do not establish proper exhaustion in accordance with *Woodford*.

Last, Exhibit E is a Security Classification Screen Review which Plaintiff contends was falsified. (Dkt. No. 63, Ex. E.) Plaintiff has offered no evidence that this review was falsified and submitting the review itself is not evidence of any falsification. Thus, Exhibit E does not demonstrate a palpable and misleading defect with this Court's order approving and adopting the R&R.

**D. Conclusion**

In sum, Plaintiff's objections to the R&R and motion for reconsideration of this Court's March 25 order approving and adopting the R&R lack merit. While Plaintiff's objections will be considered timely filed, the Court will affirm its March 25 order and judgment.

According to *28 U.S.C. § 1915(a)(3)*, an appeal may not be taken in forma pauperis if the district court certifies in writing that it is not taken in [*25] good faith. For the reasons stated in this opinion, the Court certifies, pursuant to *§ 1915(a)(3)*, that an appeal of this matter would be frivolous and not taken in good faith.

An order consistent with this opinion will be entered.

Dated: May 10, 2013

/s/ Robert Holmes Bell

ROBERT HOLMES BELL

UNITED STATES DISTRICT JUDGE

Ziyad Hermiz



Neutral
As of: April 4, 2014 4:55 PM EDT

# Haisha v. Countrywide Bank, FSB

United States District Court for the Eastern District of Michigan, Southern Division
June 8, 2011, Decided; June 8, 2011, Filed
Case No. 11-11276

**Reporter:** 2011 U.S. Dist. LEXIS 61443; 2011 WL 2271319

STEVEN H. HAISHA and NADIA A. HAISHA, Plaintiffs, v. COUNTRYWIDE BANK, FSB, et al., Defendants.

**Subsequent History:** Sanctions allowed by, in part, Sanctions disallowed by, in part *Haisha v. Countrywide Bank, FSB, 2011 U.S. Dist. LEXIS 83551 ( E.D. Mich., July 29, 2011)*

## Core Terms

financial institution, depository, motion to dismiss, lend, fraudulent, factual allegations, cause of action, predatory, recite, mortgage, notice, statute of limitations, breach of contract, entitled to relief, claim for relief, foreclosure, occurrence, charter, mortgage broker, fraud claim, three year, misrepresent, subsidiary, affiliate, refinance, lender, quiet

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN1* A pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. To avoid dismissal of a case for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*, the complaint must set forth enough facts to state a claim to relief that is plausible on its face.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN2* While a complaint attacked by a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > General Overview

*HN3* The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN4* A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN5* A court assumes the facts recited in the complaint are true, construes the complaint in the light most favorable to plaintiff, and determines whether a plaintiff has stated a plausible claim.

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Ziyad Hermiz

2011 U.S. Dist. LEXIS 61443, *61443

*HN6* In a diversity case, the court applies state law to substantive issues, and federal law to procedural issues.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

*HN7* A claim of fraud must be pleaded as a special matter under the Federal Rules of Civil Procedure. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. *Fed. R. Civ. P. 9(b)*.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN8* Any fraud claim must satisfy the particularity pleading requirements of *Fed. R. Civ. P. 9(b)*. Accordingly, a plaintiffs' complaint alleging fraudulent misrepresentation must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. At a minimum, the plaintiff must allege the time, place and contents of the misrepresentations upon which he relied.

Banking Law > Types of Banks & Financial Institutions > General Overview

Real Property Law > Financing > State Regulations

*HN9* Michigan 's Mortgage Brokers, Lenders, and Servicers Licensing Act, *Mich. Comp. Laws §§ 445.1651-.1684* does not apply to: A depository financial institution whether or not the depository financial institution is acting in a capacity of a trustee or fiduciary; or a mortgage broker, mortgage lender, or a mortgage servicer that is a subsidiary or affiliate of a depository financial institution or a subsidiary or affiliate of a holding company of a depository financial institution, if the depository financial institution maintains its main office or a branch office in Michigan . *Mich. Comp. Laws § 445.1675(a)*, *(m)*. A depository financial institution is a state or nationally chartered bank, a state or federally chartered savings and loan association, savings bank, or credit union, or an entity of the federally chartered farm credit system. *Mich. Comp. Laws § 445.1651a(f)*.

Contracts Law > Breach > Breach of Contract Actions > Elements of Contract Claims

*HN10* To state a claim for breach of contract in Michigan , a plaintiff is required to allege: 1) the existence of a valid contract, 2) the terms of the contract, 3) breach of the contract, and 4) an injury caused by the breach.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN11* A formulaic recitation of the elements of a cause of action will not do.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > General Overview

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > Statutory Sources

*HN12* Under the Real Estate Settlement Procedures Act, a court has jurisdiction only over actions filed pursuant to *12 U.S.C.S. §§ 2605*, 2607-2608. *12 U.S.C.S. § 2614*.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN13* The statute of limitations is one year for actions under *12 U.S.C.S. §§ 2607-2608*, and three years for actions under *12 U.S.C.S. § 2605*. The claim accrues on the date of the occurrence of the violation. The date of occurrence' language in *12 U.S.C.S. § 2614* refers to the date of the closing.

Banking Law > Consumer Protection > Truth in Lending > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN14* The Truth in Lending Act sets forth a one-year statute of limitations that runs from the date of the occurrence of the violation. *15 U.S.C.S. § 1640(e)*.

Banking Law > Consumer Protection > Truth in Lending > General Overview

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > General Overview

*HN15* *15 U.S.C.S. § 1640(e)* is subject to equitable tolling. For application of the doctrine of fraudulent concealment, the one year period will begin to run when the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of a Truth in Lending Act violation.

Banking Law > Consumer Protection > Truth in Lending > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

*HN16* *15 U.S.C.S. § 1639* cases may be filed only by the appropriate State attorney general, and in any case, not later than three years after the date on which the violation occurs. *15 U.S.C.S. § 1640(e)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN17* It is a plaintiff's burden to clearly state a claim upon which relief can be granted, and where the plaintiff has

2011 U.S. Dist. LEXIS 61443, *61443

failed to do so, it is the court's obligation to dismiss the claims.

Real Property Law > Title Quality > Adverse Claim Actions > Quiet Title Actions

*HN18* A person who claims an interest in land may bring a quiet title action in Michigan . *Mich. Comp. Laws § 600.2932(1).*

Real Property Law > Title Quality > Adverse Claim Actions > Quiet Title Actions

*HN19* See *Mich. Comp. Laws § 600.2932(3), (5).*

Real Property Law > Financing > Foreclosures > General Overview

*HN20* *Mich. Comp. Laws § 600.3205a* sets forth numerous items that must be included in a written notice served on the borrower under certain circumstances prior to a foreclosure sale under Michigan 's foreclosure by advertisement statute.

**Counsel:** [*1] For Steven H. Haisha, Nadia A. Haisha, Plaintiffs: Julian M. Levant, Levant & Levant, PLLC, West Bloomfield, MI.

For Countrywide Bank, FSB, BAC Home Loan Servicing, LP, Defendants: Melissa M. Benton, Bodman PLC, Troy, MI.

**Judges:** ROBERT H. CLELAND, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT H. CLELAND

---
| Opinion |
---

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DISMISSING DEFENDANTS COUNTRYWIDE BANK, FSB, AND BAC HOME LOANS SERVICING, LP**

This matter was removed to this court by Defendants Bank of America, N.A. ("BANA"), as successor in interest to Countrywide Bank, FSB ("Countrywide"), and by BAC Home Loans Servicing, LP ("BAC"), on March 29, 2011. [1]

[1] On April 5, 2011, those two Defendants moved to dismiss the case against them. Plaintiffs have not responded to the motion, and the time for responding has lapsed. After reviewing the complaint and Defendants' motion to dismiss, the court has determined a hearing on the matter is not necessary. E.D. Mich. *LR 7.1(h)(2)*. The court will grant Defendants' motion.

**I. BACKGROUND**

Plaintiff Steven Haisha refinanced a loan secured by a mortgage in March 2008. (Mot. Br. 2; Compl. ¶ 11.) [2] The refinanced principal amounted to $232,000, and the fixed interest rate of the loan was 6.125%, leading to a monthly payment of $1,409.66 for 360 months. (Mot. Br. 2-3.) [3] The loan was modified in April 2010. (Compl. ¶ 20 & Ex. 3.) Plaintiffs defaulted on the loan.

Defendant BANA, which acquired Countrywide, issued the loan. (*Id.* at 2; Compl. ¶ 11.) [4] Defendant BAC services the loan. (Mot. Br. 1; Compl. ¶ 12.)

**II. STANDARD**

*HN1* "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." *Fed. R. Civ. P. 8(a)(2)*. To avoid dismissal of a case for failure to state a claim under [*3] *Rule 12(b)(6)*, the complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

> *HN2* While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id. at 555* (alteration in original) (citations omitted).

---

[1] There is no evidence that the remaining three Defendants have been served: they did not join in the removal, the complaint does not indicate service, nor have they had attorneys enter appearances. The [*2] use of "Defendants" in this order will refer only to BANA and BAC unless otherwise noted.

[2] The first paragraph 11. This paragraph erroneously states "Defendant Comerica" refinanced Plaintiffs' loan; the court assumes, as do Defendants, that the complaint intended to refer to "Defendant Countrywide" here.

[3] The final expected monthly payment was slightly less than the regular amount.

[4] The second paragraph 11.

Ziyad Hermiz

5:14-cv-10266-JEL-DRG   Doc # 45-14   Filed 04/07/14   Pg 29 of 121   Pg ID 938

Page 4 of 8
2011 U.S. Dist. LEXIS 61443, *3

The Court elaborated on the standard in *Ashcroft v. Iqbal*:

> Two working principles underlie our decision in *Twombly*. First, **HN3** the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining [*4] whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."

> In keeping with these principles **HN4** a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009)* (alteration in original) (citations omitted). Therefore, under the pleading standard outlined in *Twombly*, **HN5** the court assumes the *facts* recited in the complaint are true, "construe[s] the complaint in the light most favorable to plaintiff," and determines whether a plaintiff has stated a *plausible* [*5] claim. *Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010)* (internal quotation marks and citation omitted).

**HN6** In a diversity case, the court applies state law to substantive issues, and federal law to procedural issues. *Legg v. Chopra, 286 F.3d 286, 289 (6th Cir. 2002)* (citing *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)); Webster v. Edward D. Jones & Co., L.P., 197 F.3d 815, 818 (6th Cir. 1999)*.

## III. DISCUSSION

The removed complaint asserts ten counts. Not one survives Defendants' motion to dismiss.

### A. Count I: Fraudulent Misrepresentations

Plaintiffs' first claim is that Defendants made certain fraudulent misrepresentations. Plaintiffs contend Defendants intentionally represented that "[t]he rate of refinance would initially be 6.125%," the property would appraise for more than the value of the loan, "the interest rates and settlement charges described . . . were lawful and the best available to Plaintiffs," and all terms and conditions had been adequately disclosed. (Compl. ¶ 26.) These representations were fraudulent, asserts the complaint, because "the true rate charged was intentionally hidden," the appraisal had certain shortcomings, and Defendants failed to make certain disclosures [*6] they were required to make by law. (*Id.* ¶ 27.)

Defendants attack this first count with six arguments. Defendants contend: 1) as a matter of fact, Plaintiffs confuse the 6.125% interest rate with the 6.271% annual percentage rate; 2) Plaintiffs fail to state a claim for fraud with sufficient particularity; 3) the statute of frauds precludes any claim based on oral representations; 4) "opinions are not actionable as fraud"; 5) Plaintiffs "have not pled (nor could they ever prove) that they acted with reasonable reliance"; and 6) Plaintiffs cannot recover in tort for damages flowing from a breach of contract according to the economic loss doctrine. (Mot. Br. 5-10.)

**HN7** A claim of fraud must be pleaded as a special matter under the Federal Rules of Civil Procedure. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b)*.

> **HN8** [A]ny fraud claim[] must satisfy the particularity pleading requirements of *Rule 9(b)*. *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681, 91 Fed. Appx. 418 (6th Cir. 2004)*. Accordingly, Plaintiffs' complaint must "(1) specify [*7] the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Gupta v. Terra Nitrogen Corp., 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)*. At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied. *Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir.1984)*.

*Frank v. Dana Corp., 547 F.3d 564, 569-70 (6th Cir. 2008)*.

The court will grant Defendants' motion on Count I for failure to satisfy the pleading requirements of *Rule 9(b)*,

Ziyad Hermiz

and therefore need not reach the other arguments presented. The complaint does not state with particularity the second or third elements that must be pleaded according to *Rule 9(b)*. [5] Count I does not disclose where or when the fraudulent statements were made, or by whom; instead, the complaint states only that "Defendants" made the allegedly fraudulent statements. There are five Defendants in this suit, all of which are corporate entities. Because it is implausible that all Defendants made all of the purportedly fraudulent statements, and further because even if they did, the complaint [*8] nevertheless does not state with particularity which of Defendants' agents made the statements, the Plaintiff has not "state[d] with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. Therefore, this count will be dismissed as to these Defendants.

**B. Count II: Violation of Mortgage Brokers, Lenders, and Servicers Licensing Act**

The second count of the complaint alleges violations of Michigan's Mortgage Brokers, Lenders, and Servicers Licensing Act, *Mich. Comp. Laws §§ 445.1651-.1684*. However, the complaint fails to state a claim upon which relief can be granted against Defendants, because *HN9* the statute does not apply to:

> A depository financial institution whether or not the depository financial institution is acting in a capacity of a trustee or fiduciary.
>
> . . . .
>
> A mortgage broker, mortgage lender, or a mortgage servicer that is a subsidiary or affiliate of a depository financial institution or a subsidiary or affiliate of a holding company of a depository financial institution, if the depository financial institution maintains its [*9] main office or a branch office in this state.

*Mich. Comp. Laws § 445.1675(a), (m)*. A "depository financial institution" is "a state or nationally chartered bank, a state or federally chartered savings and loan association, savings bank, or credit union, or an entity of the federally chartered farm credit system." *Mich. Comp. Laws § 445.1651a(f)*.

Defendant BANA is a depository financial institution within the meaning of the statute. (*See* Mot. Ex. J.) Defendant BAC is a subsidiary or affiliate of BANA's

holding company, Bank of America Corporation. (Mot. Br. 11.) Therefore, Count II will be dismissed as to these Defendants.

**C. Count III: Breach of Contract**

The complaint's third count asserts breach of contract. *HN10* To state a claim for breach of contract in Michigan, a plaintiff is required to allege: 1) the existence of a valid contract, 2) the terms of the contract, 3) breach of the contract, and 4) an injury caused by the breach. *See In re Brown, 342 F.3d 620, 628 (6th Cir. 2003)*; *Webster, 197 F.3d at 819*.

Defendants argue that Plaintiffs have "fail[ed] to allege any of the elements of a breach of contract claim." (Mot. Br. 12.) The court disagrees. Plaintiffs have stated the existence of [*10] a mortgage and promissory note, (Compl. ¶ 40), they have attached those documents and have therefore provided the contract terms, (*id.* Ex. 1), they have alleged a breach, (*id.* ¶ 41), and they have pleaded proximately caused damages, (*id.* ¶ 42). Thus, there is no flaw in Plaintiffs' recitation of a cause of action for breach of contract.

However, *HN11* "a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555*. Plaintiffs' allegation of a breach is lacking because it is unaccompanied by facts that support the claim, and is therefore implausible. Plaintiffs allege that Defendants failed to disclose material facts, made false and misleading statements, and led Plaintiffs to rely on an inflated appraisal. (Compl. ¶ 41.) While the court assumes on review of a motion to dismiss that these allegations are true, nowhere do Plaintiffs plead which provisions of the mortgage or note are violated by these false statements or material omissions. It is the obligation of Plaintiffs to provide "a short and plain statement of the claim showing that [they are] entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Attaching the mortgage and note and alleging a breach of some [*11] provision of twelve pages of finely printed and dense legalese is neither "short" nor "plain," and as a result the complaint has not shown the court that Plaintiffs are entitled to relief. Because Plaintiffs have not properly pleaded this third element of the third count, the court will dismiss the breach of contract claim.

**D. Count IV: Violation of the Real Estate Settlement Procedures Act ("RESPA") and the Truth in Lending Act ("TILA")**

Next, the complaint alleges violations of RESPA, *12 U.S.C. §§ 2601-2617*, and TILA, *15 U.S.C. §§ 1601-1667f*. Defendants assert these claims are barred by the applicable statutes of limitations. The court agrees.

---

[5]   The court also doubts whether the complaint specifies with the requisite precision which statements were allegedly fraudulent.

2011 U.S. Dist. LEXIS 61443, *11

*1. RESPA*

*HN12* Under RESPA, the court has jurisdiction only over actions filed pursuant to *12 U.S.C. §§ 2605, 2607-2608. 12 U.S.C. § 2614.* Consequently, the court will construe Plaintiffs' Count IV as alleging a violation of one of those sections. *HN13* The statute of limitations is one year for actions under *§§ 2607-2608,* and three years for actions under *§ 2605. Id.* The claim accrues on "the date of the occurrence of the violation." *Id.* "Courts have held that the 'date of the occurrence' language in *§ 2614* refers to the date of the closing." *Chen v. Bell-Smith, 768 F. Supp. 2d 121, 2011 U.S. Dist. LEXIS 22994, No. 08-0999, 2011 WL 781555, at *22 (D.D.C. Mar. 8, 2011)* [*12] (citing *Snow v. First Am. Title Ins. Co., 332 F.3d 356, 359 (5th Cir. 2003)); see Mullinax v. Radian Guar. Inc., 199 F. Supp. 2d 311, 324 (M.D.N.C. 2002)* ("RESPA's statute of limitations period . . . run[s] from the date of the violation itself, not from the date of discovery [of the facts supporting a claim] . . . .").

The relevant date in this case is the date of refinancing, the latest time at which Defendants would have to have made all required disclosures. Plaintiffs refinanced their loan on March 6, 2008. [6] Plaintiffs filed this action on March 7, 2011, three years and one day after the suspect loan was refinanced. Therefore, Plaintiffs' claims are barred under either the three-year or one-year limitations period.

*2. TILA*

Plaintiffs' TILA claim is similarly time-barred. *HN14* TILA sets forth a one-year statute of limitations that also [*13] runs "from the date of the occurrence of the violation." *15 U.S.C. § 1640(e).* Therefore, for the reasons set forth above with respect to Plaintiffs' RESPA claims, Plaintiffs' TILA claims are also precluded as untimely.

The court will dismiss Count IV as to these Defendants. [7]

**E. Count V: Malpractice**

The fifth count of the complaint alleges malpractice against the appraiser. Defendants assert that, according to

the complaint, the party that appraised of the property in this case is Defendant Hais Corporation. (Mot. Br. 16 (citing Compl. ¶¶ 49-50).) Thus, Count V contains no allegations of wrongdoing against Defendants BANA or BAC, and therefore the count will be dismissed as to these Defendants.

**F. Count VI: Violation of** *15 U.S.C. § 1639*

The complaint next alleges violations of *subsections (f)* and *(h) of 15 U.S.C. § 1639.* However, *HN16 § 1639* cases may be filed only by "the appropriate State attorney general," and in any case, "not later than 3 years after the date on which the violation occurs." *15 U.S.C. § 1640(e).* Because Plaintiffs are neither the Michigan Attorney General, nor did they file the action within three years of the violation, this count will also be dismissed.

**G. Count VII: Predatory Lending**

Plaintiffs also claim they were the victims of "predatory lending" at the hands of Defendants. Under Count VII, however, Plaintiffs [*15] cite no statute, leaving the court searching for the legal foundation underlying Plaintiffs' cause.

Courts that have ventured to search for a "predatory lending" cause of action in Michigan have returned from the search wanting. *See, e.g., O'Brien v. BAC Home Loan Servicing, LP, No. 10-15136, 2011 U.S. Dist. LEXIS 33390, 2011 WL 1193659, at *4 (E.D. Mich. Mar. 28, 2011)* (Cohn, J.) ("Michigan does not recognize a claim for predatory lending."); *Mazur v. Wash. Mut. Bank, F.A., No. 09-13371, 2011 U.S. Dist. LEXIS 1911, 2011 WL 108926, at *9 (E.D. Mich. Jan. 10, 2011)* (O'Meara, J.) ("[I]t is well-settled in this district that predatory lending is not a viable cause of action under Michigan law."); *Jaafar v. Homefield Fin., Inc., No. 09-12832, 2009 U.S. Dist. LEXIS 99713, 2009 WL 3602091, at *2 n.3 (E.D. Mich. Oct. 27, 2009)* (Duggan, J.) ("Plaintiff's counsel . . . conceded [at the hearing] that 'predatory lending' is not a viable claim."); *Saleh v. Home Loan Servs., Inc., No. 09-10033, 2009 U.S. Dist. LEXIS 72399, 2009 WL 2496682, at *2 n.1*

---

[6]  Plaintiffs appear to have modified their loan on April 1, 2010. (Compl. ¶ 20 & Ex. 3.) This modification does not affect the relevant date for calculating the statute of limitations, however, because a fair reading of the complaint reveals that Plaintiffs' allegations are directed at the disclosures surrounding the refinancing rather than the modification.

[7]  Although Plaintiffs have not filed a response, the complaint anticipates the statute of limitations argument, and asserts that it should be "subject to equitable tolling because the Loan intentionally violates state and federal laws." (Compl. ¶ 23.) But a showing of "intentional violation" is not sufficient to toll the statutes here. *See Egerer v. Woodland Realty, Inc., 556 F.3d 415, 421-24 (6th Cir. 2009)* (enumerating the three-part test for equitable tolling but leaving open the question of whether tolling is available in RESPA actions); *Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1041 (6th Cir. 1984)* ("[W]e hold that *HN15* [§ 1640(e)] is subject to equitable tolling. For application of the doctrine of fraudulent concealment, the one year period will begin to run when the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation."). Because Plaintiffs have not [*14] filed a response asserting why the statute should be tolled under the proper standard, the court does not consider that possibility here.

Ziyad Hermiz

*(E.D. Mich. Aug. 17, 2009)* (Duggan, J.) ("Michigan has not recognized a claim of 'predatory lending' and, even if such a claim were recognized, the undisputed facts do not support such a claim."); *Beydoun v. Countrywide Home Loans, Inc., No. 09-10445, 2009 U.S. Dist. LEXIS 53309, 2009 WL 1803198, at *4 (E.D. Mich. June 23, 2009)* [*16] (Zatkoff, J.) ("[B]ecause Michigan has no statute entitled 'Predatory Lending,' the Court assumes that Plaintiff brings this claim under either the TILA or the Home Ownership and Equity Protection Act ("HOEPA"), *15 U.S.C. § 1639*.").

The court has conducted its own search of Michigan case law and Michigan statutes, and has found no reference to a common law or statutory "predatory lending" cause of action. As observed previously, Plaintiffs' counsel has not found this or any other count worthy of defending against Defendants' motion. This court will not be as generous as the court in *Beydoun*, and will not go to lengths to construe Plaintiffs' count to state some hypothetical claim. *HN17* It is Plaintiffs' burden to clearly state a claim upon which relief can be granted, and where Plaintiffs have failed to do so, it is the court's obligation to dismiss the claims. Count VII for "predatory lending" will be disposed of in such a fashion.

**H. Count VIII: Quiet Title**

The eighth count asserts an action for quiet title. *HN18* A person who claims an interest in land may bring a quiet title action in Michigan. *Mich. Comp. Laws § 600.2932(1).*

> *HN19* If the plaintiff established his title to the lands, the defendant [*17] shall be ordered to release to the plaintiff all claims thereto. In an appropriate case the court may issue a writ of possession or restitution to the sheriff or other proper officer of any county in this state in which the premises recovered are situated.
>
> . . . .
>
> Actions under this section are equitable in nature.

*Mich. Comp. Laws § 600.2932(3), (5).*

"Plaintiffs have premised their quiet title claim on their fraud claims." *Smith v. Bank of Am. Corp., No. 10-14161, 2011 U.S. Dist. LEXIS 14446, 2011 WL 653642, at *5 (E.D. Mich. Feb. 14, 2011)* (Edmunds, J.). They allege that they were "induced" to obtain the loan as a result of false statements and material omissions. (Compl. ¶ 68.) As

Defendants properly observe, this language in the complaint, fairly read, characterizes Plaintiffs' quiet title action as being founded on a fraud in the inducement charge. (Mot. Br. 19; *see* Compl. ¶¶ 68-69.) As already described here, fraud allegations invoke special pleading requirements. Therefore, this count, too, must be dismissed for failure to comply with *Rule 9(b)*, for the reasons stated above with respect to Count I. *See Smith, 2011 U.S. Dist. LEXIS 14446, 2011 WL 653642, at *6*.

**I. Count IX: Violation of *Mich. Comp. Laws § 600.3205a*[8]**

Plaintiffs' final allegation of wrongdoing is that the foreclosure notice mailed to them did not satisfy *Mich. Comp. Laws § 600.3205a*. *HN20 Section 3205a* sets forth numerous items that must be included in a written notice served on the borrower under certain circumstances prior to a foreclosure sale under Michigan's foreclosure by advertisement statute.

Defendants aver that a notice was mailed to Plaintiffs pursuant to that section. Indeed, the notice itself begins: "This notice is being sent to the borrowers and/or mortgagors pursuant to *MCL 600.3205a(1)* . . . ." (Mot. Ex. M.) The notice discloses it was sent on January 26, 2011, and Defendants advise that foreclosure proceedings have not yet been initiated against Plaintiffs. (*Id.* & Br. 20.)

This count will be dismissed because it asserts only in the most conclusory fashion that the statute was violated, without saying how—that is, by providing factual allegations in support of the claim. Such an allegation does not meet the standard set forth by *Iqbal* [*19] and *Twombly*, because it does not elevate the claim "above the speculative level." *Twombly, 550 U.S. at 555; see Iqbal, 129 S. Ct. at 1949-50.*

**J. Count X: Injunctive Relief**

As this count is not in fact a count that states an independent basis for relief, but rather is a prayer for a certain type of relief, the court need not dismiss it independently. Instead, the court will construe it as part of the section of the complaint requesting relief.

**IV. CONCLUSION**

Accordingly, IT IS ORDERED that Defendants Countrywide Bank, FSB, and BAC Home Loans Servicing, LP's "Motion to Dismiss" [Dkt. # 5] is GRANTED. These two Defendants are DISMISSED from the case.

---

[8]   Although the count as [*18] recited in the complaint is entitled "Violation of *MCL 600.3204, et seq.*," it contains only an allegation that the foreclosure notice "fail[ed] to comply with *MCL 600.3205a*." (Compl. ¶ 73.)

2011 U.S. Dist. LEXIS 61443, *19

/s/ Robert H. Cleland                                UNITED STATES DISTRICT JUDGE

ROBERT H. CLELAND                              Dated: June 8, 2011

Ziyad Hermiz



Cited
As of: April 4, 2014 4:55 PM EDT

# Hanover Exch. v. Metro Equity Group LLC

United States District Court for the Eastern District of Michigan, Southern Division
July 14, 2009, Decided; July 14, 2009, Filed
Case No. 2:08-cv-14897

**Reporter:** 2009 U.S. Dist. LEXIS 59992; 2009 WL 2143866

HANOVER EXCHANGE, Plaintiff, v. METRO EQUITY GROUP LLC, EXCEL ESCROW SERVICES LLC, EXCEL TITLE AGENCY LLC, COREY HOWARD, and JANEL CHIPMAN, Defendants.

### Core Terms

escrow, misrepresent, excel, negligent misrepresentation, unjust enrichment, promissory estoppel, conversion, fraudulent, civil conspiracy, defraud, escrow fund, negotiate, induce, conspiracy, conspire, deposit, negligent misrepresentation claim

**Counsel:** [*1] For Hanover Exchange, Plaintiff: Matthew B. Woodworth, Howard & Howard Attorneys, P.C., Royal Oak, MI; Patrick M. McCarthy, Howard & Howard, Ann Arbor, MI.

For Metro Equity Group Limited Liability Company, Corey Howard, Defendants: Jonathan B. Frank, Jackier, Gould, Bloomfield Hills, MI.

For Janel Chipman, Defendant: Suzanna Kostovski, Detroit, MI.

**Judges:** HONORABLE STEPHEN J. MURPHY, III, United States District Judge.

**Opinion by:** STEPHEN J. MURPHY, III

### Opinion

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** (document nos. 9 & 33) **AND ADJOURNING THE SCHEDULING CONFERENCE** (document no. 40)

### INTRODUCTION

In this case, plaintiff Hanover Exchange ("Hanover") alleges that it entered a contract with defendant Metro Equity Group, LLC ("Metro"), whereby Metro would purchase, on behalf of Hanover, several dozen residential properties in New Jersey. Defendant Corey Howard acted as Metro's agent, and appears to have been the principal or perhaps even the only employee of Metro who Hanover dealt with. The contract allegedly called for Hanover to deliver an escrow deposit of just over $ 125,000 to defendant Excel Title Agency ("Excel Title"), a title company operated by defendant Janel Chipman. [*2] According to the complaint, however, Metro never delivered a single title to Hanover, but instead prevailed upon Chipman and Excel Title to transfer the escrow funds without Hanover's consent or any other authorization, first to defendant Excel Escrow Services ("Excel Escrow"), and later to Metro, which then allegedly used the funds for purposes not authorized by the contract.

The complaint asserts ten counts, all under Michigan law. Count I, against all defendants, is for conversion of the escrow funds. Count II, also against all defendants, alleges a civil conspiracy to defraud Hanover out of the escrow money. Count III, against Chipman and Excel Title only, asserts a breach of their fiduciary duties as escrow agents. Count IV asserts that Metro breached the contract with Hanover. Count V, pleaded in the alternative against all defendants, is for unjust enrichment. Count VI seeks a declaratory judgment that the contract binds the defendants and that the escrow funds belong to Hanover. Count VII is a claim for promissory estoppel, asserted against all defendants. Count VIII is an attempt to rescind the contract based on fraud in the inducement. Count IX, also against all the defendants, [*3] is for negligent misrepresentation. Count X simply seeks injunctive relief based on the other grounds for liability.

Before the Court are two motions filed pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, each of which seeks to several of these counts, or portions thereof, for failure to state a claim on which relief can be granted. One of the motions is by defendants Howard and Metro; the other is by Chipman, Excel Title, and Excel Escrow. Both motions purport to request dismissal of all the claims against the applicable individual defendant, but neither actually addresses all of the claims asserted by the complaint against Howard or Chipman. The Court will discuss only those claims against which defendants offer argument.

### LEGAL STANDARD

2009 U.S. Dist. LEXIS 59992, *3

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929; 550 U.S. 544, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007)* (citations omitted). Accordingly, *Federal Rule of Civil Procedure 12(b)(6)* allows a defendant to test whether, as a matter of law, the plaintiff **[*4]** is entitled to legal relief even if everything alleged in the complaint is true. *See Minger v. Green, 239 F.3d 793, 797 (6th Cir. 2001)* (citations omitted).

In assessing a motion brought pursuant to *Rule 12(b)(6)*, the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Bishop v. Lucent Techs., Inc., 520 F.3d 516, 519 (6th Cir. 2008)*. To determine whether Plaintiff has stated a claim, the Court will examine the complaint and any written instruments that are attached as exhibits to the pleading. *Fed. R. Civ. P. 12(b)(6)* & *10(c)*. Although the pleading standard is liberal, bare assertions of legal conclusions will not enable a complaint to survive a motion pursuant to *Rule 12(b)(6)*. *In re DeLorean Motor Co., 991 F. 2d 1236, 1240 (6th Cir. 1993)*. The Court will not presume the truthfulness of any legal conclusion, opinion, or deduction, even if it is couched as a factual allegation. *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)*.

The Federal Rules of Civil Procedure

> do not require a claimant to set out in detail the facts upon which he bases his claim. **[*5]** To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. This standard requires the claimant only to put forth "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the requisite elements of the claim]." *Bell Atlantic, 127 S. Ct. at 1965*. Thus, although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007)* (quoting *Bell Atlantic, 550 U.S. at 555*). Therefore, the Court will grant a motion for dismissal pursuant to *Rule 12(b)(6)* only in cases

where there are simply not "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic, 550 U.S. at 570*.

## ANALYSIS

### I. Count I-- Conversion

Hanover's first claim is that the defendants have converted the $ 125,000 escrow deposit. In Michigan, conversion is **[*6]** "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales, Inc.,, 360 Mich. 434, 438, 104 N.W.2d 360 (1960)* (quoted in *Priesman v. Meridian Mutual Ins. Co., 441 Mich. 60, 74 n.19, 490 N.W.2d 314 (1992))*. Howard levels three arguments as to why the facts alleged by Hanover do not support such a claim.

First, Howard correctly notes that failure to pay a debt, without more, does not amount to conversion of the unpaid funds. According to the Michigan Supreme Court, "conversion is maintainable for money when trover would lie under the former practice," and "[t]rover is not maintainable for money unless there be an obligation on the part of the defendant to return the specific money intrusted to his care." *Garras v. Bekiares, 315 Mich. 141, 148, 23 N.W.2d 239 (1946)* (quoting *Alfred Shrimpton & Sons v. Culver, 109 Mich. 577, 580, 67 N.W. 907 (1896))*. The Court is satisfied, however, that by alleging that defendants used the money in the escrow account for unauthorized purposes when in fact they were duty bound to return the funds, Hanover has brought its claim within the "specific money" exception to this rule. The Michigan Supreme Court has held **[*7]** that "[a]n action for conversion lies where an individual cashes a check and retains the full amount of the check when he is entitled to only a portion of that amount," *Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc., 178 Mich. App. 570, 576, 444 N.W.2d 210 (1989)* (citing *Hogue v. Wells, 180 Mich. 19, 23, 146 N.W. 369 (1914))*, and has even specifically held that the misuse of escrow funds can constitute unlawful conversion. *Cozadd v. Healy, 338 Mich. 157, 160, 61 N.W.2d 20 (1953)*. The case cited by Howard, *Head v. Phillips Camper Sales & Rental, Inc., 234 Mich. App. 94, 593 N.W.2d 595 (1999)*, is not to the contrary. There the defendants refused to return the purchase price of a defective product even after the buyer lawfully revoked her acceptance of the product. The Court of Appeals held that as a matter of law this was not conversion of the purchase price by the defendants, "because they were under no obligation to return the specific money entrusted to them." *Id. at 112*. The court even reiterated the rule noted above, that under Michigan law an action does lie "where the defendant cashes a check as the plaintiff's

agent or bailor and retains an amount to which he was not entitled." *Id. n.3*. [1]

Second, Howard appears to argue that he cannot have converted the money because he is under no obligation to return it until and unless the Court orders him to do so after resolving all the claims in this case. Howard cites no authority in support of this bizarre and nonsensical argument, which would make conversion a mere method of enforcing judgments entered on other legal theories and eliminate its viability as an independent legal claim. The Court will not consider it further.

Finally, Howard argues that neither he nor Metro have exercised dominion over the funds, and thus that a conversion claim properly lies only against Chipman, Excel Title, and Excel Escrow, who have actual custody of the deposit. This is simply a misstatement [*9] of the allegations of the complaint, which specifically alleges that "ETA, EES and Defendant Chipman have allowed MEG to use escrowed funds to pay . . . amounts greater than authorized by Plaintiff in the Contracts." Compl., document no. I, P 40. Obviously then, Metro and/or Howard are alleged to have exercised dominion over at least some of the funds, and the complaint therefore fairly states a conversion claim against them.

II. Counts II and VIII-- Civil Conspiracy to Defraud and Fraud in the Inducement

In Count II of its complaint, Hanover alleges that all the defendants participated in a civil conspiracy to defraud it by misrepresenting their intent to use the funds as agreed between the parties. In Michigan, "[a] civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Casualty Ins. Co., 194 Mich. App. 300, 313, 486 N.W.2d 351 (1992)* (citations omitted). The 'unlawful purpose' element means that "a claim for civil conspiracy may not exist in the air; rather it is necessary to prove a separate, actionable tort." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 257 Mich. App. 365, 384, 670 N.W.2d 569 (2003)* [*10] (quoting *Early Detection Ctr., PC v. N.Y. Life Ins. Co., 157 Mich. App. 618, 632, 403 N.W.2d 830 (1986)*). Here, defendants attack the sufficiency of the complaint's allegations both in regard to the existence of a "combination," and in regard to the underlying tort of fraud.

First, Howard notes that "an agent or employee cannot be considered a separate entity from his principal or corporate employer, respectively, as 'long as the agent or employee acts only within the scope of his agency or [sic] employment." *Blair v. Checker Cab Co., 219 Mich. App. 667, 674, 558 N.W.2d 439 (1996)* (quoting *Metro Club, Inc. v. Schostak Bros. & Co., 89 Mich. App. 417, 420, 280 N.W.2d 553 (1979)*) (alteration in original). This is because "a corporation acts only through those persons and conspiring with those persons would be like conspiring with itself." *Id.* (quoting *Schostak, 89 Mich. App. at 420*).

It appears the Michigan courts have adopted an exception to this rule, however, for cases "where the directors have an independent personal stake in a particular action, and therefore, are actually acting on their own behalf." *Id. at 674-75* (citations omitted). The defendant in *Blair* was the Checker Cab Company, a corporation consisting of Detroit taxicab [*11] owners. The Company was in the business of providing, among other things, centralized dispatch services for Detroit area cab drivers. The plaintiff alleged that the Company and some of its directors and officers, who were also cab owners, conspired to restrain trade in the taxicab industry by preventing member-owners from soliciting each others' cab drivers. In reversing a grant of summary disposition on the complaint, the court found that because the plaintiff had alleged that the officers and directors personally benefitted from the artificially high fees they were able to collect from their drivers due to the collusion, her complaint fell within the independent-interest exception to the general rule. *Id. at 675-76*.

Here, Hanover does not deny that Howard was an agent of Metro, but argues that his actions fall within the "independent personal stake" exception because he stood to benefit personally from the alleged scam. The Court agrees with Howard that Hanover has not alleged facts that fit within this exception. First, the complaint does not in fact allege that Howard benefitted from the escrow deposit in any way. Second, even if Howard is a member of Metro as both parties seem [*12] to concede, this would be unlikely to confer upon him a truly independent stake in the conspiracy, because his stake in the outcome would be entirely derivative of Metro's own.

As Howard was Metro's agent, then, the two were unable to conspire with each other to defraud Hanover. This alone is insufficient to defeat the conspiracy claim, however, because Hanover does not allege a conspiracy only between Howard and Metro (or between Chipman and Excel Title or Excel Escrow, for that matter). Instead, the complaint states that *all* the defendants conspired with

---

[1] Howard makes what the Court regards as [*8] the subsidiary argument that a check deposited in escrow is the property of the payee -- here Metro -- rather than the payor, and so cannot be converted by the payee. This may be true, but it does not prevent Hanover from alleging, as it has here, that when defendants deposited the check and used the resultant fund of money for unauthorized purposes, they converted the money itself. This is precisely the type of claim authorized by the cases cited above.

2009 U.S. Dist. LEXIS 59992, *12

each other to commit the fraud. There is no indication that Howard was an agent of Excel Title or Excel Escrow, or that Chipman was an agent of Metro. Accordingly, it is legally possible for these persons to conspire with each other. Nevertheless, Howard also argues that the complaint does not allege the "concerted action" element of civil conspiracy, because it does not offer any material allegation that they worked in concert to actually commit the misrepresentations that constituted the fraud. The Court cannot agree. The complaint alleges that "Defendant Chipman and [Metro's] principals were in communications regarding the Agreement [*13] nearly two weeks before the agreement was ever executed," Compl., document no. 1, P 38, and that defendants "engaged in extensive telephone and e-mail communications with Plaintiff's representatives to negotiate the Agreement and discuss the status of attempted purchases," *id.* at P 29. It was during the course of these negotiations that Howard's first fraudulent misrepresentations allegedly occurred. *Id.* at PP 11-12, 86, 88. Hanover further alleges that Chipman falsely promised to hold the escrow monies properly, *id.* PP 87, 89, 104, and that while the contract was being performed, both defendants frequently misled Hanover as to the status of the funds and the property sale negotiations, *id.* PP 50-51, 94-95, 98. It is true that the complaint pleads the existence of an agreement to make these misrepresentations only in conclusory fashion. *Id.* PP 48, 52. Nevertheless, given the inherent plausibility of an allegation of a conspiracy between a middleman and an escrow agent to loot the escrow account for their own benefit, the Court finds that the complaint sufficiently alleges the existence of a combination and concerted action in this regard.

Whether the complaint has also sufficiently [*14] alleged the underlying fraud is another question. Under Michigan law the elements of common-law fraud are

(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976)* (quoted in *Cooper v. Auto Club Ins. Ass'n, 481 Mich. 399, 408, 751 N.W.2d 443 (2008))* (citation omitted). Pursuant to *Federal Rule of Civil Procedure 9(b)*, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake." In this Sixth Circuit, this requires a plaintiff "at a minimum, to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Coffey v. Foamex LP, 2 F.3d 157, 161-62 (6th Cir. 1993).* This standard applies to both Count II, alleging civil [*15] conspiracy to defraud, and Count VIII, alleging fraud in the inducement of the contract between Hanover and Metro.

In regard to the alleged fraud, Hanover's complaint contains the following allegations:

P 11: "Defendant Howard represented that he was able to deliver residential property in the New Jersey area by purchasing it at a significant discount from his contacts in the real estate market."

P 12: "[I]n the summer of 2008, Plaintiff was told by Defendant Howard that Defendant Howard was able to obtain significant discounts upon numerous properties in New Jersey."

P 50: "In furtherance of the civil conspiracy amongst the Defendants, the Defendants have in fact defrauded Plaintiff on many occasions by misrepresenting to Plaintiff the status of funds in the escrow account(s) and the uses of said funds."

P 51: "Defendants have further defrauded Plaintiff by representing to Plaintiff that specific agreements to purchase specific properties had been executed (Exh. J) when such no such [sic] agreements had been reached with the properties' owners. Exhibit K.

[Exhibit J is an email from Brian Kinsley of Metro Equity, dated 9/26 /2008. It states: "Hanover and Home 911: There are the properties [*16] that are locked and scheduled for close on Thursday:

39 Atno

217 Autumn

86 Prospect

. . . .

Exhibit K is an email from a bank representative, dated 11/18 2008, and stating that "there was never a fully executed contract

Ziyad Hermiz

for 86 Prospect St., Jersey City, NJ with Metro Equity LLC. The contract was signed by the Buyer but never the Seller."]

P 53: "Plaintiff has incurred damages due to Defendnats' civil conspiracy [to defraud.]

P 86: "As set forth herein, Defendant Howard represented to Plaintiff that Defendant Howard and [Metro] could secure properties for a fraction of the list price."

P 87: "As set forth herein, Defendant Chipman, EES and ETA received plaintiff[']s escrowed funds in a result [sic] of Defendant Chipman's representations that the same would be held in escrow and distributed pursuant to the Agreement."

P 88: "Each of the representations made by Defendant Howard was false."

P 89: "Each of the representations made by Defendant Chipman was false."

P 93: "Unbeknownst to Plaintiff, Defendants harbored an undisclosed plan to use Plaintiff[']s funds for reasons other than those provided to Plaintiff."

P 94: MEG made false representations in writing of an existing material fact, i.e., that [*17] it would sell real property to Plaintiff at only 45.5% of the prices at which those properties were offered in the marketplace."

P 95: "MEG made false representations in writing of an existing material fact, that it had reached agreements to purchase specific properties identified within the Agreement, when, in fact, no such agreements had been reached."

P 96: "The false representations made by [Metro] were made to Plaintiff for the purpose of inducing Plaintiff to enter into the Agreement and, as well, keep sending money for more properties so that [Metro] could use those funds to pay higher prices for those properties to the . . . Sellers,

P 98: "[Metro's] representations to induce the Agreement were false promises to do acts (specifically, to deliver properties for only 45.5% of their listed prices ) and to surrender deeds to the properties to Plaintiff."

P 100: "[Metro] made such promises with no intention of fulfilling them."

P 101: "Said promises were made to Plaintiff for the purpose of inducing Plaintiff to tender funds to defendants, and those promises were relied on by Plaintiff in conveying those funds to defendants."

Most of these allegations do not satisfy the requirements of [*18] particularity, as articulated in *Coffey,* because they do not include the time or place of the assertedly fraudulent statements. The lone exception is Paragraph 51 of the complaint, which alleges that a specific, identified email (Exhibit J) fraudulently stated that Metro had three named properties under contract, when in fact it did not. Unfortunately for Hanover, with respect to these alleged misrepresentations the complaint does not allege fraudulent intent. Paragraph 96 does allege something of a scheme, but the complaint is devoid of any allegation that any of the defendants knew that the September 26th, 2008 email contained false statements of fact, or were reckless as to whether it did. Paragraph 100 of the complaint alleges fraudulent intent as to misrepresentations of defendant's intention to perform on the contract at the time they promised to do so, but that is not relevant to defendants' intentions as to statements made in the course of performing the contract. The Court will thus grant defendants' motion to dismiss the conspiracy/fraud claim. Because none of the alleged fraudulent statements that occurred before the formation of the contract are pleaded with the requisite [*19] specificity, the Court will also dismiss Hanover's fraud in the inducement claim.

Hanover has requested that it be granted leave to amend its complaint, should the Court dismiss these claims. That leave will be granted, and defendants will be free to move to file a renewed motion to dismiss the amended complaint. In this light, although the Court need not definitively reach the other arguments asserted by defendants in support of dismissal, it will briefly note that they do not clearly render any amendment futile. Defendants correctly state the rule that "[a]n action for fraudulent misrepresentation must be predicated upon a statement of past or existing fact. A mere broken promise does not constitute fraud, nor is it evidence of fraud. . . . [F]uture promises [are] contractual and cannot be the basis of an action for fraud." *Marrero v. McDonnell Douglas Capital Corp., 200 Mich. App. 438, 444, 505 N.W.2d 275 (1993)* (citations omitted). Defendants argue that Hanover's allegations as to their statements about how the escrow funds would be used therefore state only a contract claim.

This argument does not apply to the portion of Hanover's civil conspiracy to defraud claim which is grounded in Metro's alleged [*20] misrepresentations as to the then-current status of the escrow funds or the negotiations

Ziyad Hermiz

to purchase specific properties. With respect to any aspects of the false-promises claim that may appear in an amended complaint, however, the Court notes Hanover's rejoinder that under an exception to the general Michigan rule, "a fraudulent misrepresentation may be based upon a promise made in bad faith without intention of performance." *Hi-Way Motor, 398 Mich. at 337; Gorman v. Soble, 120 Mich. App. 831, 840, 328 N.W.2d 119 (1982)* (citing *Danto v. Charles C. Robbins, Inc., 250 Mich. 419, 425, 230 N.W. 188 (1930)* ("If at the time the representation was made there was no present intent to carry it out, however, the representation constitutes fraud."); *see also Marrero, 200 Mich. App. at 444* (discussing an exception for a defendant's statements about his intentions that he "knew at the time were false").

Metro appears to argue that notwithstanding these cases, Hanover's proper remedy is solely in contract insofar as it alleges that defendants falsely promised to take actions that they had an independent contractual duty to perform. The briefing on this issue has been sparse at best. [2] Rather than ruling on the issue now, the [*21] Court will content itself to note an apparent inconsistency in the Michigan cases as to whether a fraud claim can be grounded solely in a promise to perform an action that was also the defendant's contractual duty. *Compare Addy Machinery Co. v. Vantage Industries LLC, Nos. 279326 & 280526, 2008 Mich. App. LEXIS 2318, 2008 WL 4958688, *4-*5 (Mich. App. Nov. 20, 2008)* (permitting such a claim) *with Flagstar Bank v. Harbor Northwestern-30800, No. 266198, 2006 Mich. App. LEXIS 1151, 2006 WL 954155, *4 (Mich. App. Apr. 13, 2006)* (disallowing a similar misrepresentation claim). In the Court's view it will be better resolved on a motion to dismiss the amended complaint, should one be filed.

### III. Counts V and VII-- Unjust Enrichment and Promissory Estoppel

No defendant named in Counts III (breach of fiduciary duty), IV (breach of contract) and VI (declaratory judgment) offers any argumentation as to why those counts should be dismissed. [3] In Count V, Hanover [*22] asserts that all defendants were unjustly enriched when Hanover wired them money only to have the defendants fail to do what they promised to do.

Under Michigan law,

> [i]n order to sustain the claim of unjust enrichment, plaintiff must establish (1) the

receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. If this is established, the law will imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter.

*Belle Isle Grill Corp. v City of Detroit, 256 Mich. App. 463, 478, 666 N.W.2d 271 (2003)* (citations omitted). Somewhat similarly,

> [t]he elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances [*23] such that the promise must be enforced if injustice is to be avoided.

*McMath v. Ford Motor Co., 77 Mich. App. 721, 725, 259 N.W.2d 140* (citations omitted). As with a claim for unjust enrichment, "if the performance which satisfied the detrimental reliance requirement of the promissory estoppel theory is the same performance which represents consideration for the written contract, the doctrine of promissory estoppel does not apply." *McCartney v. Lakeside Community Bank, No. 272131, 2007 Mich. App. LEXIS 915, 2007 WL 914664, at *2 (Mich. App. Mar. 27, 2007).*

Here, defendants note that Hanover has alleged the existence of a contract between it and Metro, and that its entire alleged detrimental reliance on defendants' promises -- depositing the escrow money -- was a portion of its performance on the contract. This, defendants argue, should preclude claims for unjust enrichment or promissory estoppel. Hanover responds that the existence of a contract with Metro does not prevent it from recovering in unjust enrichment or promissory estoppel from defendants who were not parties to the contract. In general, Hanover's argument is a correct statement of Michigan law. In *Morris Pumps v. Centerline Piping, Inc., 273 Mich. App. 187, 199-200, 729 N.W.2d 898 (2006),* [*24] the Michigan Supreme Court stated that "we perceive no reason why a plaintiff should not be allowed

---

[2]   This is the first of several areas in which the briefs barely identify, let alone explain, the legal theories and caselaw on which defendants seek dismissal. Should the complaint be amended and the defendants file renewed motions to dismiss, it is the Court's hope that this will be rectified.

[3]   The individual defendants, Chipman and Howard, do make arguments as to why contract claims cannot be brought against them. But the complaint does not assert a contract claim against either Chipman or Howard.

Ziyad Hermiz

to simultaneously and alternatively assert a contract claim against one defendant with whom an express contract exists and a quantum meruit claim against a *different* defendant with whom no express contract exists." Although the Court is aware of no Michigan case establishing an analogous rule in the promissory estoppel context, it agrees that such a rule exists in that context-- that is, that in general there is no obstacle to a single act by a plaintiff qualifying as both performance on a contract with one defendant, and detrimental reliance on a promise by another defendant.

Hanover's claims against Chipman, Excel Title, and Excel Escrow fall squarely under these rules. The claims against Metro, of course, do not, because Hanover does allege a contract with Metro, and the deposit of the escrow money was in fact performance on that contract. Howard argues that the contract also precludes claims against him personally for unjust enrichment and promissory estoppel, on the theory that as an agent of Metro, his duties to Hanover were also defined by the contract. The Court is inclined to [*25] agree with Howard's argument in this regard, but need not rule on the matter, because even if Hanover could not recover from both Metro (in contract) and Howard (in unjust enrichment or promissory estoppel), the Court regards the unjust enrichment claims against both Metro and Howard as acceptable alternative pleading under *Federal Rule of Civil Procedure 8(c)(3)*. Hanover alleges that it reached an agreement with Metro, pursuant to which Hanover parted ways with some of its money. As a matter of law, either this agreement was a legally binding contract, or it was not. If the former, Hanover's proper claim to recover its money is in contract; if the latter, Hanover can assert unjust enrichment and promissory estoppel claims. Under *Rule 8(c)(3)*, the inconsistency of these theories does not prevent their simultaneous assertion.

## V. Count IX-- Negligent Misrepresentation

Hanover's final theory of liability is that if defendants' misrepresentations were not fraudulent, they at least amounted to tortious negligent misrepresentation. A claim of negligent misrepresentation "requires plaintiff to prove 'that a party justifiably relied to his detriment on information prepared without reasonable [*26] care by one who owed the relying party a duty of care.'" *Marble Cleary Trust v. Edward-Marlah Muzyl Trust, 262 Mich. App. 485, 502, 686 N.W.2d 770 (2004)*. In addition, the misrepresentation must have been "of facts that can be independently verified." *Id.* (citing *City Nat'l Bank v. Rodgers, 155 Mich. App. 318, 323-24, 399 N.W.2d 505 (1986)*). As a result, statements of opinion cannot give rise to liability for negligent misrepresentation, even if the opinion ultimately turns out to be incorrect. *City Nat'l Bank, 155 Mich. App. at 323-25* (attorney's legal opinion was not actionable on a theory of negligence).

As an initial matter, the Court concludes that a claim of negligent misrepresentation under Michigan law is not subject to the heightened pleading requirement of *Rule 9(b)*. Although the Court is unaware of any Sixth Circuit precedent dealing with this question, the Fourth, Fifth, Seventh, Eighth and Ninth Circuits, at least, have held that negligent misrepresentation is not "fraud" within the meaning of the rule. *See Baltimore County v. Cigna Healthcare, 238 F. App'x 914, 921 (4th Cir. 2007)*; *Gen. Electric Capital Corp. v. Posey, 415 F.3d 391, 396-97 (5th Cir. 2005)*; *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 833 (7th Cir. 2007)*; [*27] *In re NationsMart Corp. Securities Litigation, 130 F.3d 309, 315 (8th Cir. 1997)*; *Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003)*. It is true that the Fifth Circuit has created an exception to this rule, and applied the *Rule 9(b)* standard to negligent misrepresentation claims where the plaintiff's "fraud and negligent misrepresentation claims are based on the same set of alleged facts" and the parties themselves do not "urge a separate focus on the negligent misrepresentation claims." *Benchmark Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 723 (5th Cir. 2003)*. In the Court's view, however, a negligent misrepresentation claim can easily be pleaded in the alternative to a fraud claim on a single set of facts, without itself somehow being transformed into an allegation of fraud subject to *Rule 9(b)*. Moreover, the Court concludes that a plaintiff's failure to "urge a separate focus" on a particular claim cannot operate as a waiver of the notice pleading standards of the Federal Rules. Accordingly, the Court holds that in order to state a claim for negligent misrepresentation under Michigan law, Hanover need simply plead "a short and plain statement of the claim [*28] showing that [it] is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*.

Howard argues in conclusory fashion that Hanover has failed to allege facts establishing that he owed Hanover any duty of care. Hanover has, however, adequately pleaded that it negotiated and signed a contract with Metro Equity, with Howard acting on Metro's behalf. The Court has little difficulty in concluding that persons negotiating or performing a contract may be held to have a duty of care in representing to each other their intentions with regard to the contract and the actual status of their performance.

Howard also maintains that Hanover has not alleged that he misrepresented any independently verifiable facts. To the extent that Hanover's misrepresentation claim is grounded in defendants' representations as to the then-current status of the escrow funds and the purchase

2009 U.S. Dist. LEXIS 59992, *28

agreements, *see, e.g.*, Compl., document no. 1 PP 50-51, this argument must fail. Moreover, because these allegations need not be pleaded with particularity in order to state a claim for negligent misrepresentation, as opposed to fraud, they are sufficient even with respect to the alleged misrepresentations that are not specifically identified [*29] by time, place, and content.

To the extent that Hanover's negligent misrepresentation claim is predicated on defendants' misrepresentations of their intentions in the course of negotiating the agreement, however, the Court agrees that it is an untenable attempt to fit a round peg into a square hole. As Michigan law recognizes in the context of fraud, a promise to do something (or not do something) in the future can be false only if at the time it is made the promisor actually has no intention of following through. If such a misrepresentation is intentional, it is actionable fraud and not negligent misrepresentation. As a practical matter, this leaves little room for an independent tort of negligent misrepresentation of one's present intentions. Although it is perhaps not completely impossible, it would be a very rare case in which a person could misrepresent his own present intentions without doing so knowingly. At any rate, there is absolutely nothing in the complaint to indicate that was the situation here. [4] Accordingly, the Court need not decide whether there might be a very narrow slice of cases in which a plaintiff could recover for a defendant's negligent misrepresentation of [*30] the defendant's own intentions: even if there are such cases, this is not one of them. Insofar as it is based on allegations that defendants falsely promised to take action in the future, Hanover's claim for negligent misrepresentation must therefore be dismissed.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that:

Defendants' motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**;

Counts II and VIII of the complaint are **DISMISSED WITHOUT PREJUDICE**;

Count IX of the complaint is **DISMISSED WITH PREJUDICE**, insofar as it alleges a negligent misrepresentation of defendants' then-current intentions; and Within 20 days of the entry of this order, plaintiff may file an amended complaint addressing the deficiencies noted herein and reasserting [*31] the claims that were dismissed without prejudice;

The scheduling conference in this matter, currently set for August 12th, 2009, is **AJOURNED**. If no amended complaint is filed, the conference will be rescheduled after the deadline for filing the amendment has passed. If an amendment is filed, the conference will be rescheduled after an answer to the amendment is filed.

**SO ORDERED.**

/s/ Stephen J. Murphy, III

STEPHEN J. MURPHY, III

United States District Judge

Dated: July 14, 2009

---

[4] Nor does there appear to be any meaningful distinction to be drawn in this case between the element of duty, in negligent misrepresentation, and the corresponding but perhaps not identical element of intent to induce reliance, in fraud. The complaint makes it crystal clear that Howard did in fact intend to induce reliance, and it is impossible to conceive of any set of facts consistent with the complaint that would allow Hanover to recover without proving this element.

Ziyad Hermiz



Positive
As of: April 4, 2014 4:55 PM EDT

# Vickers Stock Research Corp. v. Quotron Sys.

United States District Court for the Southern District of New York
July 22, 1997, Decided ; July 25, 1997, FILED
96 Civ. 2269 (HB)

**Reporter:** 1997 U.S. Dist. LEXIS 10837

VICKERS STOCK RESEARCH CORPORATION and
ARGUS RESEARCH CORPORATION, Plaintiffs,
-against- QUOTRON SYSTEMS, INC., Defendant.

**Disposition:** [*1] Quotron's motion for summary
judgment with respect to plaintiffs' RICO claim
GRANTED. Plaintiffs' remaining claims dismissed.

---

**Core Terms**

subscriber, summary judgment, customer, motion to
dismiss, plaintiff's claim, moving party, genuine issue,
breezeway

---

**LexisNexis® Headnotes**

Civil Procedure > ... > Responses > Defenses, Demurrers &
Objections > Motions to Dismiss

Civil Procedure > ... > Summary Judgment > Motions for Summary
Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials >
General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials >
Affidavits

Evidence > Types of Evidence > Documentary Evidence > Affidavits

***HN1*** When the parties submit to the court materials
outside the pleadings in a motion to dismiss pursuant to
*Fed. R. Civ. P. 12(b)(6)*, the court is required to either
exclude that material and decide the motion based solely
on the complaint or to convert the motion to one for
summary judgment under *Fed. R. Civ. P. 56*. If the court
decides to convert the motion to dismiss into one for
summary judgment, the parties must be given reasonable
opportunity to present all materials made pertinent to such
a motion by *Rule 56*. A party cannot complain of lack of
a reasonable opportunity to file relevant material if both
sides have already filed with the court affidavits or other
evidence admissible at trial.

Civil Procedure > ... > Summary Judgment > Burdens of Proof >
General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof >
Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of
Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of
Law > Genuine Disputes

Evidence > Burdens of Proof > Initial Burden of Persuasion

***HN2*** Pursuant to *Fed. R. Civ. P. 56*, a claim must be
dismissed where there is no genuine issue as to any
material fact and the moving party is entitled to summary
judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The
moving party bears the initial burden of proving the
absence of a genuine issue of material fact, which can be
met by pointing out that there is an absence of evidence to
support plaintiff's case. Once the moving party establishes
that there is no genuine issue of material fact, the burden
shifts to the non-movant to set forth facts that clearly
demonstrate the presence of genuine issues for trial.

Criminal Law & Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations Act > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations Act > Elements

***HN3*** *18 U.S.C.S. § 1962(c)* provides: It shall be unlawful
for any person employed by or associated with any
enterprise engaged in, or the activities of which affect,
interstate or foreign commerce, to conduct or participate,
directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity or
collection of unlawful debt.

Criminal Law & Procedure > ... > Bribery > Public Officials >
General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations Act > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations Act > Elements

***HN4*** The United States Supreme Court has interpreted the
term "conduct or participate" to require a showing that the
defendant participated in the operation or management of
the enterprise itself. In determining whether or not a
defendant participated in the operation or management of
the Racketeer and Influenced and Corrupt Organizations
Act (RICO) enterprise, the court should focus on the
degree of control the defendant exerted over the enterprise
rather than the amount of defendant's involvement in the
enterprise. Consequently, an outsider not involved in the

Ziyad Hermiz

1997 U.S. Dist. LEXIS 10837, *1

day-to-day operation of the enterprise may exert the requisite control over that enterprise through bribery because the insider taking the bribes acts under the direction of the outsider giving the bribes in conducting the affairs of the RICO enterprise. While a defendant need not be involved in the day-to-day operations of the enterprise in order to be liable under *18 U.S.C.S. § 1962(c)*, a defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys substantial persuasive power to induce the alleged enterprise to take certain actions. Moreover, RICO liability will not be imposed upon a defendant simply because he provides goods and services that benefit the RICO enterprise.

**Counsel:** Appearances:

For plaintiffs: Joshua Friedman, New York, New York.

For defendant: William G. Ballaine, Landman Corsi Ballaine & Ford, P.C., New York, New York.

**Judges:** Harold Baer, Jr., U.S.D.J.

**Opinion by:** Harold Baer, Jr.

---

| Opinion |
| --- |

OPINION AND ORDER

**Hon. Harold Baer, Jr., District Judge:**

Plaintiffs' cause of action alleges a violation of the Racketeer and Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1961, et seq.*, as well as claims for breach of contract and unjust enrichment. Defendant moves to dismiss or, in the alternative, for summary judgment. For the reasons stated below, defendant's motion for summary judgment is granted.

I. Background

Vickers Stock Research Corporation ("Vickers") and Argus Research Corporation ("Argus") are privately held corporations [1] that conduct financial industry research and publish some of that research via on-line electronic services. Quotron Systems, Inc. ("Quotron") is a privately held corporation that provides financial information to its customers via computer located at the customers' [*2] offices. Quotron provides both contemporaneous stock price information as well as other financial information purchased from third-party vendors such as Vickers and Argus.

In February 1977, Vickers entered into an agreement with Quotron whereby Vickers agreed to sell financial research

information to Quotron, who would offer that information to its customers (defined by plaintiffs as the "De Facto Agreement"). Ballaine Aff. Ex. 1. Under this agreement, Quotron agreed to pay Vickers for the information on a per "subscriber" basis *i.e.*, by office/branch that received Vickers' information. Dorsey Aff. P 3. Vickers was to receive $ 150 per subscriber for the first 20 subscribers, the greater of $ 100 per subscriber or $ 3,500 once the number of subscribers was greater than 20 but less than 50, and the greater of $ 90 per subscriber or $ 5,000 once the number of subscribers exceeded 50. Dorsey Aff. P 3. Plaintiffs allege that the parties agreed some time [*3] later in 1977 that Quotron would instead pay Vickers for its information on a per "controller" basis *i.e.*, by terminal able to access the information. The theory behind the change was that the per subscriber arrangement did not provide adequate compensation for situations where one subscriber had multiple controllers, with many people able to access Vickers' information. Plaintiffs claim the parties did not use the word "controller" for the new arrangement. Plaintiffs submitted a November 4, 1977 letter from Quotron noting that the parties had "clarified" and "translated" the word "subscriber" in the De Facto Agreement to mean "controller." Dorsey Aff. P 14 and Ex. C.

Plaintiffs claim that Quotron paid Vickers per controller as agreed under the De Facto Agreement until 1981, but that sometime in or after 1982 Quotron reverted to its old practice and paid Vickers per subscriber. Plaintiffs allege that as subscribers added controllers to their branches, Quotron continued to pay Vickers for only one controller per branch, while billing the subscriber for each controller able to access Vickers' information. Plaintiffs also allege that Quotron concealed from Vickers the number of controllers [*4] that could access Vickers' information. Plaintiffs claim that because the billing statements from Quotron remained unchanged, plaintiffs were unaware that Quotron had changed its method of calculating payment until Vickers hired a former Quotron employee in 1992 who alerted plaintiffs to the alleged underpayment.

In 1981, Vickers and Quotron entered into another contract whereby more sophisticated data would be supplied to Quotron's customers. Argus entered into a similar contract with Quotron in 1983 (together, the "DSS Agreements"). Under the DSS Agreements, Quotron agreed to market Vickers' information and make it available to its subscribers. Dorsey Aff. Exs. B and F. Quotron was also responsible for the billing and collection of fees from all subscribers and was to pay plaintiffs for their information on a monthly basis. Id. In exchange, plaintiffs agreed to provide Quotron with access to their financial data. Id. The

---

[1]   Vickers and Argus are owned by the same parent company.

1997 U.S. Dist. LEXIS 10837, *4

contract had a term of five years, with an automatic one year renewal term. _Id._ Plaintiffs allege that payment under these contracts was to be on a "per controller" basis. The agreement did not purport to form a partnership; the word "partner" or "partnership [*5] agreement" is never mentioned and Vickers is identified simply as "Vendor."

As with the De Facto Agreement, plaintiffs claim that Quotron also underpaid them for the amount due under the DSS Agreements. Here, however, plaintiffs claim that although Quotron's DSS software allowed _all_ of Quotron's subscribers free, unlimited access to plaintiffs' information, Quotron did not pay plaintiffs for these subscribers. Quotron allegedly concealed this underpayment by making monthly statements to plaintiffs which reported only a small fraction of the total number of Quotron's subscribers actually able to access plaintiffs' financial information through the DSS software. Again, plaintiffs claim they were unaware of this until 1992.

Plaintiffs allege that Quotron's actions violate RICO and that its false monthly reports by virtue of their dissemination through the mail and its use of the telephone lines to transmit Vickers' and Argus' information to customers constituted mail fraud and wire fraud so as to satisfy that aspect of the statutory requirements.

Quotron, for its part, disputes plaintiffs' allegation that the parties agreed that plaintiffs were to be paid per controller under the [*6] contracts. Instead, Quotron contends that in correspondence formalizing the De Facto Agreement and in subsequent correspondence the parties referred to the payment terms as being on a "per subscriber" basis (meaning "per subscriber" not "per controller") and that there was no question among the parties as to how payments to the plaintiffs were to be calculated under either the De Facto Agreement and the DSS Agreements. Furthermore, Quotron argues that plaintiffs' complaint must be dismissed because: (1) plaintiffs cannot meet RICO's operation or management test, (2) the statute of limitations bars plaintiffs' RICO and contract claims, and (3) plaintiffs' claim for unjust enrichment cannot stand because the parties are bound by contract.

## II. Discussion

_HN1_ When the parties submit to the court materials outside the pleadings in a motion to dismiss pursuant to _Fed. R. Civ. P. 12(b)(6)_, the court is required to either exclude that material and decide the motion based solely on the complaint or to convert the motion to one for summary judgment under _Fed. R. Civ. P. 56_. _Goyette v. DCA Advertising, Inc., 830 F. Supp. 737, 741 (S.D.N.Y. 1993)_. If the court decides to convert the motion [*7] to dismiss into one for summary judgment, the parties must be given "reasonable opportunity to present all materials

made pertinent to such a motion by _Rule 56_." _G. & A. Books, Inc. v. Stern, 770 F.2d 288, 295 (2d Cir. 1985)_. "A party cannot complain of lack of a reasonable opportunity to file relevant material if both sides have already filed with the Court affidavits . . . or other evidence admissible at trial." _Goyette, 830 F. Supp. at 741_ (citing _G. & A. Books, 770 F.2d at 295_). Here, both parties submitted affidavits and other documents in support of and in opposition to defendants' motion to dismiss or, in the alternative for summary judgment. The parties can hardly be taken unawares when the court reads the materials they submitted. Therefore, I treat defendants' motion to dismiss as one motion for summary judgment. See _Kennedy v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 592 (2d Cir. 1993)_.

_HN2_ Pursuant to _Fed. R. Civ. P. 56_, a claim must be dismissed where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. _Fed. R. Civ. P. 56(c)_; _Celotex Corp. v. Catrett, 477 U.S. 317, 328, [*8] 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)_. The moving party bears the initial burden of proving the absence of a genuine issue of material fact, which can be met by pointing out that there is an absence of evidence to support plaintiff's case. See _Celotex, 477 U.S. at 323-25_. Once the moving party establishes that there is no genuine issue of material fact, the burden shifts to the non-movant to set forth facts that clearly demonstrate the presence of genuine issues for trial. _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)_.

_HN3 Section 1962(c) of Title 18 of the United States Code_ provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

_18 U.S.C. § 1962(c)_. _HN4_ The Supreme Court has interpreted the term "conduct or participate" to require a showing that the defendant "participated in the operation or management of the enterprise itself." [*9] _Reves v. Ernst & Young, 507 U.S. 170, 185, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993)_. In determining whether or not a defendant participated in the operation or management of the RICO enterprise, the court should focus on the _degree of control_ the defendant exerted over the enterprise rather than the _amount_ of defendant's involvement

1997 U.S. Dist. LEXIS 10837, *9

in the enterprise. *Department of Economic Development v. Arthur Andersen, 924 F. Supp. 449, 466-67 (S.D.N.Y. 1996)* (emphasis added). Consequently, an outsider not involved in the day-to-day operation of the enterprise may exert the requisite control over that enterprise through bribery "because the insider taking the bribes acts under the direction of the outsider giving [the bribes] in conducting the affairs of the RICO enterprise." *Id.* While a defendant need not be involved in the day-to-day operations of the enterprise in order to be liable under *§ 1962(c)*, *131Main Street Assocs. v. Manko, 897 F. Supp. 1507, 1527-28 (S.D.N.Y. 1995)*, a defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys "substantial persuasive power to induce the alleged enterprise to take certain **[*10]** actions." *Morin v. Trupin, 835 F. Supp. 126, 135 (S.D.N.Y. 1993)*; *Strong & Fisher Ltd. v. Maxima Leather, Inc., 1993 U.S. Dist. LEXIS 10080, 1993 WL 27705* *1 (S.D.N.Y. July 22, 1993). Moreover, RICO liability will not be imposed upon a defendant simply because he provides goods and services that benefit the RICO enterprise. *University of Maryland v. Peat Marwick, 996 F.2d 1534, 1539 (3d Cir. 1993).*

Here, plaintiffs allege that Vickers and Argus are the RICO enterprises. Compl. P 64. While plaintiffs argue that they were partners with Quotron, the record does not support such a conclusion. The parties never entered into a joint venture agreement or a partnership agreement, nor did they ever consider sharing profits or losses in any way. Instead, theirs was a business relationship pure and simple, and based on plaintiffs selling to Quotron information that Quotron was in the business of selling to third parties.

Plaintiffs further allege that Quotron participated in the operation and management of the entities' affairs because: (1) Quotron transmitted plaintiffs' data to its subscribers; (2) Quotron participated with plaintiffs in creating an on-line data base; (3) Quotron helped plan the content of **[*11]** Vickers' data base, the style of presentation of the information, the marketing strategy, etc.; (4) Quotron marketed plaintiffs' products to its customers; (5) Quotron billed plaintiffs' customers directly; and (6) Quotron

helped plan changes in plaintiffs' service when necessary. Compl. PP 67-73. Here, Quotron's activities with Vickers' and Argus' business arise directly from their contractual relationship. For example, under the De Facto Agreement and the DSS Agreements, Quotron agreed to transmit plaintiffs' data to its subscribers in exchange for access to plaintiffs' information. DSS Agreement Art. 2.1. If Quotron did not do such things as that and "market plaintiffs' products to its customers," plaintiffs would have a cause of action in contract. *See Bibeau v. Ward, 228 A.D.2d 943, 645 N.Y.S.2d 107, 109 (App. Div. 1996)* or, in the worst case scenario, fraud. All that seems discernable from the record before me is that any persuasive power Quotron may have possessed to induce plaintiffs to take certain actions with respect to its research information spring from their contractual relationship. [2] This, however, does not lead to the conclusion that Quotron, a distributor of **[*12]** plaintiffs' information, directed the management of plaintiffs' affairs like one who gives bribes. *See Morin, 835 F. Supp. at 135.* To hold that Quotron's acts constitute control for RICO purposes would be to "RICO-ize" contract claims where the parties had worked closely together to realize contractual goals. *See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639, 286 U.S. App. D.C. 182, 913 F.2d 948 (D.C.Cir. 1990).*

**[*13]** A search of the record leads ineluctably to the conclusion that there is no genuine issue of fact. Therefore, Quotron's motion for summary judgment is granted. [3]

III. Conclusion

For the reasons stated above, Quotron's motion for summary judgment with respect to plaintiffs' RICO claim is GRANTED. Because I decline to exercise supplemental jurisdiction, plaintiffs' remaining claims also dismissed. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

New York, New York

July 22, 1997

Harold Baer, Jr.

U.S.D.J.

---

[2]   For example, plaintiffs allege that Quotron participated in the design and implementation of plaintiffs' products and therefore controlled the management of the enterprises. Compl. PP 67-70. However, the DSS Agreements specify that Quotron may perform technical and marketing services related to plaintiffs' data. DSS Agreements Art. 2.2. As to plaintiffs' allegations that Quotron changed the way that they conducted their businesses because Quotron marketed and delivered finished data products to their customers, as mentioned above, these were Quotron's contractual obligations. DSS Agreements Art. 2.1.

[3]   Because I find this issue dispositive, I do not address the parties' other arguments.

Ziyad Hermiz



Neutral
As of: April 4, 2014 4:55 PM EDT

# Vickers Stock Research Corp. v. Quotron Sys.

United States Court of Appeals for the Second Circuit
August 24, 1998, Decided
97-9114

**Reporter:** 1998 U.S. App. LEXIS 22046

VICKERS STOCK RESEARCH CORP. and ARGUS RESEARCH CORP., Plaintiffs-Appellants, -v.- QUOTRON SYSTEMS, INC., Defendant-Appellee.

**Notice:** [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Prior History:** Appeal from the United States District Court for the Southern District of New York (Baer, J.). This cause came on to be heard on the transcript of record from the United States District Court for the Southern District of New York (Baer, J.) and was argued by counsel.

**Disposition:** AFFIRMED.

---

**Core Terms**

enterprise, participate, claim, district court, insufficient, directions, management, requirement, operation, judgment, pattern of racketeering activity, federal jurisdiction, persuasive power, employed person, organization, information, performance, third-party, necessary, indirectly, interstate, racketeer, satisfied, contract, customer, purchase, services, unlawful, affairs, corrupt

---

**LexisNexis® Headnotes**

Business & Corporate Law > Distributorships & Franchises > Causes of Action > Fraud & Misrepresentation

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > Elements

*HN1* The Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.S. § 1962(c)*, makes it unlawful for any person employed by or associated with an interstate enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. This participation requirement must be satisfied by a showing that the defendant

participated in the operation or management of the enterprise itself. The simple taking of directions and performance of tasks that are "necessary or helpful" to the enterprise, without more, is insufficient to bring a defendant within the scope of *§ 1962(c)*. It is similarly insufficient to show that the defendant has persuasive power to induce the management to take certain actions.

**Counsel:** APPEARING FOR APPELLANT: JOSHUA FRIEDMAN, New York, NY.

APPEARING FOR APPELLEE: WILLIAM G. BALLAINE, Landman Corsi Ballaine & Ford P.C., New York, NY.

**Judges:** PRESENT: HON. JON O. NEWMAN, HON. DENNIS JACOBS, HON. FRED I. PARKER, Circuit Judges.

---

**Opinion**

*SUMMARY ORDER*

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court is **AFFIRMED.**

Vickers Stock Research Corp. and Argus Research Corp. are corporations that provide research services; Quotron Systems, Inc. is an entirely separate corporation that provides contemporaneous stock prices and other financial information to its customers via computers located at the customers' offices. Quotron purchases this [*2] information from third-party vendors, including Vickers and Argus. The essence of the plaintiffs' claims is that over a period of several years, Quotron "systematically underpaid" them amounts due under a series of agreements.

The plaintiffs alleged a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1961 et seq.*, as well as breach of contract and unjust enrichment claims under state law. Plaintiffs relied solely on their RICO claim to support federal jurisdiction.

1998 U.S. App. LEXIS 22046, *2

Vickers and Argus appeal from a decision of the United States District Court for the Southern District of New York (Baer, J.) granting summary judgment to defendant Quotron.

**HN1** RICO § 1962 (c) makes it unlawful "for any person employed by or associated with [an interstate] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." This participation requirement, the Supreme Court has held, must be satisfied by a showing that the defendant "participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 1173, 122 L. Ed. 2d 525 (1993)*. **[*3]** This requirement makes it unlikely that an "outsider" such as Quotron could be subjected to RICO liability. For example, we have previously indicated that "the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States v. Viola, 35 F.3d 37, 41 (2d Cir. 1994)*, cert. denied, *513 U.S.*

*1198, 131 L. Ed. 2d 148, 115 S. Ct. 1270 (1995)*. It is similarly insufficient to show that the defendant has persuasive power to induce the management to take certain actions. *Madanes v. Madanes, 981 F. Supp. 241, 257 (S.D.N.Y. 1997)*.

Here, Vickers and Argus have alleged that they themselves are the RICO enterprise. However, as the district court correctly found, they utterly failed to demonstrate that Quotron, a third-party purchaser of their services, had control over their operations any greater than Quotron's ability to take its business elsewhere. The district court properly rejected plaintiffs' efforts to "RICO-ize" a garden-variety contract claim. Because the RICO claim was the only basis for federal jurisdiction, **[*4]** dismissal of the remaining claims was also proper.

We have considered appellants' further arguments and find them to be without merit. For the reasons set forth above, the judgment of the district court is hereby **AFFIRMED**.

Ziyad Hermiz



Positive
As of: April 4, 2014 4:55 PM EDT

# Melton v. Blankenship

United States Court of Appeals for the Sixth Circuit
January 13, 2009, Filed
No. 08-5346

**Reporter:** 2009 U.S. App. LEXIS 686; 2009 FED App. 0025N (6th Cir.); 2009 WL 87472

LARRY S. MELTON, JOHN MELTON, AMERICAN HOME FINANCIAL SERVICES, et al., Plaintiffs-Appellants, v. HAROLD WALDEN BLANKENSHIP, FRANKIE K. STANFILL, DIANE TUCKER, RICHARD WALKER, et al., Defendants-Appellees.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** [*1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE.

## Core Terms

district court, claim, filed, motion to dismiss, summary judgment motion, motion, walker, predicate act, counterclaim, legal, prosecution, malicious, racketeering activity, district, convert, abuse, party, mail, law, abuse of process, statement, document, engaged, advice, failed, fraud, law firm, jurisdiction, bankruptcy, litigation

## LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1* An appellate court reviews de novo a district court's grant of a motion to dismiss. A complaint requires a "short and plain statement of the claim" showing that the pleader is entitled to relief. However, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

When considering a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation.

Antitrust & Trade Law > ... > Racketeer Influenced & Corrupt Organizations > Claims > General Overview

*HN2* To state a civil Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961 et seq.*, claim, a plaintiff must establish four elements: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. Plaintiffs must establish that the defendants engaged in a "pattern of racketeering activity" consisting of at least two predicate acts of racketeering activity occurring within a 10-year period. *18 U.S.C.S. § 1961(5)*. Specifically, the plaintiffs must establish a predicate act enumerated in *18 U.S.C.S. § 1961(1)*.

Antitrust & Trade Law > ... > Racketeer Influenced & Corrupt Organizations > Claims > General Overview

*HN3* With regard to a civil Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961 et seq.*, action, plaintiffs must assert predicate acts described in *18 U.S.C.S. § 1961(1)*.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

*HN4* It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of a plaintiff's right.

Civil Procedure > Dismissal > Involuntary Dismissals > General Overview

*HN5* A district court should proceed with great caution when dismissing a claim sua sponte.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN6* A district court's denial of a motion to amend is reviewed for an abuse of discretion. A district court abuses its discretion when an appellate court is left with the

2009 U.S. App. LEXIS 686, *1

definite and firm conviction that its conclusion was a clear error of judgment.

*Civil Procedure > Appeals > Notice of Appeal*

*HN7* *Fed. R. App. P. 3(c)(1)(B)* requires the parties to designate the judgment, order, or part thereof being appealed in the notice of appeal.

*Civil Procedure > Appeals > Notice of Appeal*

*HN8* The United States Supreme Court holds that *Fed. R. App. P. 3*'s dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review. *Rule 3*'s requirements are mandatory and jurisdictional in nature. Congress has limited an appellate court's appellate review to issues designated in the notice of appeal. Where a notice of appeal specifies a particular order, only the specified issues related to that order may be raised on appeal.

*Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss*

*Civil Procedure > Judgments > Summary Judgment > General Overview*

*HN9* Generally a district court must convert a motion to dismiss into a motion for summary judgment if it considers material outside of the pleadings.

*Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss*

*Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint*

*HN10* While a plaintiff is under no obligation to attach to his complaint documents upon which his action is based, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.

*Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss*

*Civil Procedure > Judgments > Summary Judgment > General Overview*

*HN11* A party who itself referred to evidence outside the record cannot claim unfair surprise when the district court treats the motion to dismiss as a motion for summary judgment.

**Counsel:** For LARRY S. MELTON, JOHN MELTON, AMERICAN HOME FINANCIAL SERVICES, Plaintiffs - Appellants: G. Kline Preston, Nashville, TN.

For FRANKIE K. STANFILL, DIANE TUCKER, Defendants - Appellees: Tim Edwards, Glassman, Edwards, Wade & Wyatt, Memphis, TN.

For RICHARD WALKER, Defendant - Appellee: Stephen W. Elliott, Howell & Fisher, Nashville, TN.

For WALKER, WALKER & WALKER, PLC, KEN WALKER, Defendants - Appellees: Darrell G. Townsend, Stephen W. Elliott, Howell & Fisher, Nashville, TN.

**Judges:** BEFORE: GUY and GRIFFIN, Circuit Judges; and WATSON, District Judge. *

**Opinion by:** GRIFFIN

---
**Opinion**
---

GRIFFIN, Circuit Judge.

Plaintiffs filed a civil RICO claim against defendants, arguing that defendants conspired against them in a previous suit by maliciously filing a counterclaim that lacked a factual basis. Because we conclude that the remedy for this alleged injury lies in state law claims of malicious prosecution and abuse of process, and because neither of these acts are RICO predicates, we affirm the district court's judgment [*2] dismissing all claims as to all defendants.

I.

The present dispute arose from two separate lawsuits: *Melton v. Bank of Lexington, et al.*, 02-1152 (W.D. Tenn. filed June 21, 2002) (hereinafter "*Melton I*"), a civil action; and *In re Harold Walden Blankenship*, 06-11119 (Bankr. W.D. Tenn. filed May 23, 2006). Plaintiffs in the case at bar were plaintiffs in *Melton I*. Harold Walden Blankenship, one of the defendants in *Melton I*, was represented by Kevin Carter, Frankie K. Stanfill, and Bradley Kirk, attorneys affiliated with the law firm of Carter, Stanfill & Kirk, PLLC. The three attorneys and the law firm were defendants themselves in *Melton I* and are defendants in this action ("Stanfill Defendants").

The present appeal is in reaction to a counterclaim that Blankenship filed against the *Melton I* plaintiffs. Plaintiffs argue that defendant Carter informed Blankenship that the *Melton I* plaintiffs intended to settle their claims with all of the *Melton I* defendants, except for those involving Blankenship, Blankenship's father, and the Stanfill Defendants, and that Blankenship needed to file a counterclaim to prevent this settlement from occurring. Plaintiffs allege that Blankenship and the Stanfill [*3] Defendants "conspired, planned and endeavored to cause harm to the Plaintiffs' property and business by bringing a counterclaim in [*Melton I*] . . . without probable cause and based on false representations in an attempt to

---

* The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

deceive and defraud the Plaintiffs herein through the federal court system." Plaintiffs note that defendants "used the United States mails and wires in their scheme to deceive and defraud . . . ." Plaintiffs allege that the Stanfill Defendants used "Blankenship, to pursue their own purposes with the aid and assistance of Defendant, Diane Tucker." The counterclaim was filed on August 5, 2004. Plaintiffs argue further that on May 23, 2006, the Stanfill Defendants, in cooperation with defendants Ken Walker, Richard Walker, and Walker, Walker & Walker, PLC ("Walker Defendants"), filed a bankruptcy petition in Blankenship's name that contained fraudulent allegations. The heart of plaintiffs' complaint is that they relied to their detriment on the fraudulent representations contained in the counterclaim and bankruptcy petition. Blankenship, through his attorney Ken Walker, voluntarily withdrew the bankruptcy petition.

Blankenship attempted to end his participation in the [*4] lawsuit during July 2006, when he spoke with Johnny and Larry Melton and drafted an affidavit stating that he filed the counterclaim because the Stanfill Defendants convinced him that it was the only way to protect his interests and prevent the *Melton I* plaintiffs from settling with the remaining *Melton I* defendants. Blankenship stated that the Stanfill Defendants "were my attorneys and I depended on them for the proper legal advice in dealing with this litigation." The district court eventually terminated the countersuit in favor of the *Melton I* plaintiffs.

Following the district court's dismissal of the counterclaim, plaintiffs filed the instant action in the United States District Court for the Western District of Tennessee against Blankenship, the Stanfill Defendants, the Walker Defendants, and John Does 1-5. Plaintiffs allege that defendants "conspired, planned and endeavored to cause harm to the Plaintiffs' property and business" and that they utilized the United States mails and wires as part of this scheme. The four-count complaint alleges that: (1) defendants engaged in a pattern of racketeering activity in violation of the Racketeer Influence and Corrupt Organizations Act [*5] ("RICO"), *18 U.S.C. § 1962(c)*; (2) defendants conspired to engage in racketeering activity in violation of RICO, *18 U.S.C. § 1962(d)*; (3) defendants filed a "frivolous, baseless case against them" causing them damages and amounting to malicious prosecution; and (4) defendants' actions constituted the common law tort of abuse of process.

Defendant Diane Tucker filed a motion to dismiss for failure to state a claim upon which relief could be granted. Plaintiffs responded, and the Stanfill Defendants filed a reply joining the motion. The district court granted defendants' motion to dismiss, dismissed plaintiffs' RICO

claims, and declined to exercise jurisdiction over defendants' remaining state law claims. Plaintiffs timely appealed.

II.

Plaintiffs argue that the district court erred in ruling that they failed to state a RICO claim. *HN1* We review de novo a district court's grant of a motion to dismiss. *Doe v. Bredesen, 507 F.3d 998, 1002* (citing *United States v. Bowman, 173 F.3d 595, 597 (6th Cir. 1999))*. A complaint requires a "short and plain statement of the claim" showing that the pleader is entitled to relief. *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. However, "a plaintiff's obligation [*6] to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)* (citation omitted). When considering a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)* (citations omitted).

*HN2* To state a civil RICO claim, a plaintiff must establish four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006)* (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985))*. Plaintiffs must establish that defendants "engaged in a 'pattern of racketeering activity' consisting of at least two predicate acts of racketeering activity occurring within a ten-year period." *Id.* (quoting *18 U.S.C. § 1961(5))*. Specifically, plaintiffs must establish a predicate act enumerated in *18 U.S.C. § 1961(1)*. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir. 1999)*.

Plaintiffs contend that defendants [*7] engaged in "fraud in association with litigation, mail and wire fraud, bankruptcy fraud, and tampering with a witness." However, a closer examination of plaintiffs' arguments reveals that plaintiffs are in effect alleging that defendants engaged in malicious prosecution and abuse of process, and that they used the mails and wires to do so by filing Blankenship's counterclaim and bankruptcy petition. Rather than deny this, plaintiffs argue that the case law "is clear that, in certain circumstances, an attorney and/or law firm can violate the mail and wire fraud statutes by perpetrating frauds involving litigation." To support their argument, plaintiffs rely on cases from other circuits in which the attorneys involved did far more than simply render legal advice and file documents in the course of litigation.

For example, in plaintiffs' lead case, *Handeen v. Lemaire, 112 F.3d 1339 (8th Cir. 1997)*, the defendant law firm went

2009 U.S. App. LEXIS 686, *7

well beyond merely offering legal advice or filing legal documents. In *Handeen*, the defendant law firm conspired with the other defendants to mail checks to a defendant's parents so the parents could mail the checks to the Bankruptcy Trustee and hide the fact that [*8] the defendant had moved out of state to accept a higher paying job. *Id. at 1344*. Clearly, the attorneys in *Handeen* were involved in a level of fraud that far exceeded zealous advocacy.

The court in *Handeen* was careful to note that it would be "extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks (that is, by acting like an attorney)." *Id. at 1349*. The Eighth Circuit distinguished between criminal enterprises and the attorneys who represent them, holding that "[f]urnishing a client with ordinary professional assistance, even when the client happens to be a RICO enterprise, will not normally rise to the level of participation sufficient" to establish RICO liability. *Id. at 1348*. In the instant case, the district court ruled that "[d]efendants provided legal advice only to Blankenship, and those efforts and subsequent filings can not be considered RICO predicate acts." We agree. To the extent that defendants were overly zealous or malicious, the remedy lies in a state law action for malicious prosecution or abuse of process, not in a federal RICO claim. *HN3* Plaintiffs [*9] must assert predicate acts described in *18 U.S.C. § 1961(1)*, and they have not done so. Plaintiffs' assertion of predicate acts in their complaint is merely a "legal conclusion couched as a factual allegation," and thus not sufficient to survive a motion to dismiss. *Papasan, 478 U.S. at 286*.

Plaintiffs argue correctly that they have established conduct which states a claim for malicious prosecution and abuse of process under state law. But the district court did not hold otherwise; it merely refused to exercise supplemental jurisdiction over these state law claims because it had dismissed the claims that formed the basis for its original jurisdiction. It was not an error to do so. *See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)* (stating that, *HN4* "[i]t has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."). Thus, we affirm the dismissal of the RICO claims.

III.

Defendant Tucker filed the motion to dismiss, and the Stanfill Defendants joined it. Plaintiffs argue that the district court erred by dismissing the claims against all of the defendants, rather than limiting its order to those defendants who moved to dismiss. [*10] Specifically, defendants assert that the district court erred by dismissing the claims against the nonmoving defendants: Blankenship, the Walker Defendants, [1] and John Does 1-5. The district court dismissed the John Doe defendants in a separate order, holding that "[t]he allegations made against the Doe defendants are the same that were made against the other defendants and which have now been dismissed. Thus, the Doe defendants would have been dismissed in that order if they had been already [] named." Plaintiffs do not cite any authority for the proposition that a district court errs by dismissing nonmoving defendants when it determines that the complaint has failed to state a claim.

Plaintiffs have alleged the same RICO claims against all of the parties. [*11] Logically, if they have failed to state a RICO claim regarding the moving parties, they have also failed to state a claim against the nonmoving parties. It is true that *HN5* a "district court should proceed with great caution when dismissing a claim *sua sponte*." *Boddie v. Am. Broad. Cos., 731 F.2d 333, 336 n.2 (6th Cir. 1984)*. However, the district court did not *sua sponte* dismiss plaintiffs' *claim*; it *sua sponte* dismissed the nonmoving parties who were in the same factual and procedural posture as the moving parties. Plaintiffs had the opportunity to argue the sufficiency of their claim against the defendants; the failure of Blankenship and the Walker Defendants to file their own motion to dismiss does not cure the defects in plaintiffs' complaint that prevented it from surviving a motion to dismiss. Thus, we affirm the district court's judgment regarding the nonmoving defendants.

IV.

Next, plaintiffs allege that the district court erred in denying their motion to amend the complaint to include, *inter alia*, the Blankenship affidavit. *HN6* A district court's denial of a motion to amend is reviewed for an abuse of discretion. *Miller v. Admin. Office of Courts, 448 F.3d 887, 898 (6th Cir. 2006)*. [*12] We have held that a district court "abuses its discretion when we are left with the definite and firm conviction that its conclusion was a clear error of judgment." *Days Inns Worldwide, Inc. v. Patel, 445 F.3d 899, 906 (6th Cir. 2006)* (citing *In re Bever, 300 B.R. 262, 264 (B.A.P. 6th Cir. 2003)*). Plaintiffs argue that "the District Court abused its discretion by denying their motions to amend the Complaint because the Plaintiffs' motions were filed early in the litigation and the

---

[1]  The district court did not specifically mention Blankenship or the Walker Defendants in its order granting the motion to dismiss; it simply ruled that "[d]efendants' motions to dismiss are GRANTED, and Plaintiffs' claims under RICO are hereby dismissed." However, in issuing its order dismissing the John Doe defendants, the district court clarified that it had dismissed "all defendants, except the Doe defendants." (Emphasis added.)

Ziyad Hermiz

2009 U.S. App. LEXIS 686, *12

Defendants would not have been prejudiced at all by the Plaintiffs' amendment." This is not sufficient to demonstrate an abuse of discretion. At best, plaintiffs have shown that it would have been permissible for the district court to have granted their motion; they have not shown that the district court abused its discretion by refusing to do so. [2]

V.

Finally, plaintiffs argue that the district court improperly converted the motion to dismiss into a motion for summary judgment without notifying plaintiffs. Plaintiffs note correctly that *HN9* generally a district court must convert a motion to dismiss into a motion for summary judgment if it considers material outside of the pleadings. The district court undoubtedly referred to material outside of the pleadings. Specifically, the court referred to Blankenship's affidavit and deposition, both of which were submitted as exhibits to defendants' reply brief in support of the motion to dismiss. However, the district court did not explicitly convert the motion to dismiss to a motion for summary judgment. Thus, we must determine whether the district court properly considered the Blankenship statements in the context of a motion to dismiss, or whether the district court erred by converting the motion into a **[*15]** motion for summary judgment without giving proper notice to plaintiffs of its intention to do so.

Defendants note that we have identified circumstances in which a district court may consider non-record material without converting the motion to dismiss into a motion for summary judgment. In *Weiner v. Klais & Co., 108 F.3d 86, 89 (6th Cir. 1997)*, we held that *HN10* while "a plaintiff is under no obligation to attach to his complaint documents

upon which his action is based . . . a defendant may introduce certain pertinent documents if the plaintiff fails to do so." The present case differs from *Weiner* in that defendants did not file the Blankenship exhibits in response to plaintiffs' complaint; rather, they filed them in response to plaintiffs' supplemental brief. After defendants filed the motion to dismiss, the district court ordered supplemental briefing on the question of whether malicious prosecution and abuse of process can serve as a predicate act for purposes of RICO. In their supplemental brief, plaintiffs rely heavily on the Blankenship affidavit. Plaintiffs use the phrase "smoking gun" five times to describe the statement, but did not attach the statement as an exhibit. We conclude **[*16]** that allowing defendants to introduce the statement that plaintiffs relied upon is within the bounds of *Weiner* and that the district court could consider it without converting the motion to dismiss into a motion for summary judgment.

In the alternative, if the district court was required to treat the motion to dismiss as a motion for summary judgment, such error was harmless. Plaintiffs cannot claim to have lacked notice that the court would consider the Blankenship exhibits when plaintiffs themselves referred to the exhibits in their own brief. *See Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 393 (6th Cir. 1975)* (holding that *HN11* a party who itself referred to evidence outside the record cannot claim unfair surprise when the district court treats the motion to dismiss as a motion for summary judgment).

VI.

For the reasons stated above, we affirm the judgment of the district court.

---

[2] Furthermore, although not argued by the parties, we lack jurisdiction to resolve this issue because it was not raised in plaintiffs' notice of appeal. *HN7 Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure* requires the parties to "designate the judgment, order, or part thereof being appealed" in the notice of appeal. Plaintiffs' notice of appeal specifically **[*13]** states that they "are appealing the dismissal of this case by Order entered on the 6th day of March, 2008, docket # 58 . . . ." Docket # 58 is the district court's dismissal of the underlying claim. The district court denied plaintiffs' motion to amend with docket # 46, and their second motion to amend with docket # 53.

*HN8* The Supreme Court has held that "*Rule 3*'s dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review." *Smith v. Barry, 502 U.S. 244, 248, 112 S. Ct. 678, 116 L. Ed. 2d 678 (1992)*; *see also Isert v. Ford Motor Co., 461 F.3d 756, 759 (6th Cir. 2006)* (describing *Rule 3*'s requirements as "mandatory and jurisdictional in nature"). Plaintiffs' failure to reference the order denying their motion to amend in the notice of appeal prevents this court from reviewing it. "Congress has limited this Court's appellate review to issues designated in the notice of appeal." *United States v. Glover, 242 F.3d 333, 335 (6th Cir. 2001)*; *see also Brown v. Cassens Transport Co., 546 F.3d 347, 352 (6th Cir. 2008)* ("The plaintiffs filed a motion for leave to file an amended complaint, but they did not appeal the district court's denial of this motion in their Notice of Appeal. Therefore, **[*14]** that decision is not before us."); *Caldwell v. Moore, 968 F.2d 595, 596 (6th Cir. 1992)* ("where a notice of appeal specifies a particular order, only the specified issues related to that order may be raised on appeal."). Thus, we conclude that this issue is not properly before the court.

Ziyad Hermiz



Neutral
As of: April 4, 2014 4:55 PM EDT

# Yaldo v. Deutsche Bank Nat'l Trust Co.

United States District Court for the Eastern District of Michigan, Southern Division
November 30, 2010, Decided; November 30, 2010, Filed
Case No. 10-cv-11185

**Reporter:** 2010 U.S. Dist. LEXIS 125784; 2010 WL 4940024

JANATHAN YALDO, Plaintiff, v. DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee of IndyMac INDX Mortgage Loan Trust 2005-AR6, a foreign corporation, et al., Defendants.

**Prior History:** _Yaldo v. Deutsche Bank Nat'l Trust Co., 2010 U.S. Dist. LEXIS 85848 ( E.D. Mich., Aug. 20, 2010)_

---

| Core Terms |
| --- |

foreclosure, mortgage, quiet title, fraudulent, injunction, fraudulent misrepresentation, motion to dismiss, civil conspiracy, actual damage, conclusory

**Counsel:** [*1] For Janathan Yaldo, Plaintiff: Ziyad P. Kased, LEAD ATTORNEY, Troy, MI.

For Deutsche Bank National Trust Company, As Trustee of the IndyMac INDX Mortgage Loan Trust 2005-AR6, A foreign corporation, OneWest Bank, FSB, A foreign corporation, Electronic Registration Systems, Inc., A foreign corporation, Defendants: Kristina E. Janssens, Orlans Associates, PC, Troy, MI; Timothy B. Myers, Orlans Assoc., Troy, MI.

**Judges:** HONORABLE STEPHEN J. MURPHY, III, United States District Judge.

**Opinion by:** STEPHEN J. MURPHY, III

---

| Opinion |
| --- |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (docket no. 13)

Plaintiff Janathan Yaldo brought the present action in Macomb County Circuit Court on February 5, 2010

against OneWest Bank, FSB ("OneWest"); Deutsche Bank National Trust Company as trustee ("Deutsche Bank"); and Mortgage Electronic Registration Systems, Inc. ("MERS"), which was misidentified in the complaint as Electronic Registration Systems, Inc (collectively, "Defendants"). OneWest, with the concurrence of Deutsche Bank and MERS, removed the complaint to this Court on March 24, 2010. [1] Yaldo's complaint asserts claims for a temporary injunction against state law claims (Count I); declaratory relief that the named defendants are not holders [*2] of the mortgage and rendering the debt null and void (Count II); Quiet Title (Count III); Civil Conspiracy (Count IV); Fraudulent Misrepresentation (Count V); Fraudulent Conversion (Count VI); Promissory Estoppel (Count VII); Breach of Contract (Count VIII); Violation of the Real Estate Settlement Procedures Act ("RESPA"), _12 U.S.C. § 2605_ (Count IX); and Violations of the Fair Housing Act, _12 U.S.C. § 3601_ (Count X). Before the Court now is Defendants' Motion to Dismiss pursuant to _Fed. R. Civ. P. 12(b)(6)_. On October 18, 2010, the Court entered an order dispensing with oral argument pursuant to _Local Rule 7.1(f)(2)_. For the following reasons, the Court will grant Defendants' Motion to Dismiss.

## FACTS

The following facts, laid out in the complaint and incorporated in Defendants' motion, are undisputed. On March 1, 2005, Yaldo executed an Adjustable Rate Promissory Note ("the Note") with IndyMac Bank, FSB ("IndyMac"), assignors of Deutsche Bank, in the amount of $142,788.00. To secure the debt, Yaldo signed a mortgage ("the Mortgage") naming MERS as his mortgagee, as a nominee for IndyMac. As part of the loan origination process, Yaldo also executed a Uniform

---

[1] Comerica Bank was also named as a defendant in the action. Defendants asserted in the notice of removal that Comerica Bank had not appeared in the matter and "it is unknown whether they have been served." Yaldo has not disputed defendants' assertion in this regard and has not objected to removal. Since the Court lacks the power to challenge the propriety of removal based on suspected procedural defects, _see Page v. City of Southfield, 45 F.3d 128, 133 (6th Cir. 1995)_ ("Having found himself [*3] in federal court after removal, the plaintiff may want to stay there. . . .Thus, in the court's opinion, the power of _sua sponte_ remand could deprive both parties of their preferred forum."), the Court will enter a separate order for Yaldo to show cause why the claim against Comerica should not be dismissed for lack of prosecution.

2010 U.S. Dist. LEXIS 125784, *5

Residential Loan Application, which he verified and signed under penalty of perjury. [2]

On February 5, 2010, Yaldo commenced this case against Defendants and Comerica Bank. [3] Yaldo alleges that his loan originated from a loan application that inflated his income and understated expenses, liabilities, debt to income ratio and other non-disclosed items as required by federal law. Compl. ¶ 9. Yaldo also alleges that at the time of closing, he was not informed of charges that would later be assessed against him, and was never advised of the nature of the variable rate loan, his recision rights, or split charges and excess interest [*5] rate differentials. *Id.* ¶ 10. He further alleges that he was not informed of "various costs that were overinflated as shown on the HUD settlement statement including: origination fees, appraisal fees, Document preparation fees [sic], broker processing fees, lender underwriting fees, and a yield premium adjustment." *Id.*

Yaldo alleges that his "billing was sent with outrageous charges that were never disclosed and deductions from payments were made in a manner that kept adding on various late charges and other costs." *Id.* at ¶ 11. Finally, Yaldo asserts that in October, 2009 his agent sent out various administrative complaints, including a qualified written request ("QWR"), to Defendants and various federal agencies complaining of deceptive lending practices, and that he relied "upon the time provisions allowed by such a process that the foreclosure sale and eviction proceedings would be held in abeyance." *Id.* at ¶ 13. Yaldo also alleges that Deutsche Bank nevertheless initiated through counsel foreclosure proceedings on the property, which were set to take place on February 5, 2010. *Id.* [*6] ¶ 14.

**LEGAL STANDARD**

I. *Fed. R. Civ. P. 12(b)(6)*

Under *Rule 12(b)(6)*, "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed.*

*2d 929 (2007)* (citations omitted). In assessing a motion brought pursuant to *Rule 12(b)(6)*, the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Bishop v. Lucent Techs., Inc., 520 F.3d 516, 519 (6th Cir. 2008).*

"To survive a motion to dismiss under *Rule 12(b)(6)* motion, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Hunter v. Sec'y of the U.S. Army, 565 F.3d 986, 992 (6th Cir. 2009)* (quoting *Advocacy Org. for Patients and Providers v. Auto Club. Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999)).* Although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise [*7] a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007)* (quoting *Bell Atlantic, 550 U.S. at 555).* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1945, 173 L. Ed. 2d 868 (2009).* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id. at 1950* (quoting *Fed. R. Civ. P. 8(a)(2)).*

II. *Fed. R. Civ. P. 9(b)*

*Fed. R. Civ. P. 9(b)* requires that a party "state with particularity the circumstances constituting fraud." The Sixth Circuit has held that pursuant to *Rule 9(b)*, a plaintiff must "1) specify the statements that the plaintiff contends were fraudulent, 2) identify the speaker, 3) state where and when the statements were made, and 4) explain why the statements were fraudulent." *Frank v. Dana Corp., 547 F.3d 564, 569-70 (6th Cir. 2008)* (quoting *Gupta v. Terra Nitrogen Corp., 10 F. Supp. 2d 879, 883 (N.D. Oh. 1998)).* [*8] At a minimum, the plaintiff must allege the "time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Walburn v. Lockheed Martin Corp., 431*

---

[2]   Yaldo failed to include a copy of the Note, the Mortgage, or the loan application with his complaint. Defendants attached a copy of all three to their motion. When considering a motion to dismiss, the Court is generally limited to consideration of only the complaint and any exhibits attached the complaint. *Fed. R. Civ. P. 12(b)(6)* [*4] & *10(c).* When the "plaintiff fails to attach the written instrument upon which he relies" to his complaint, however, the defendant "may introduce the pertinent exhibit which becomes part of the pleadings." *Yopp v. United States DOJ DEA,* No. 10-10118 , 2010 Dist. LEXIS 85354 (E.D. Mich., Aug. 19, 2010) (quoting *Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 89 (6th Cir. 1997)). Because the Note, the Mortgage and the loan application are referred to in the complaint and are central to Yaldo's claims, the Court considers them part of the pleadings for purposes of this motion. *See Greenberg v. Life Ins. Co. Of Virginia,* 177 F.3d 507, 514 (6th Cir. 1999).

[3]   The claims against Comerica arise from a second position mortgage Yaldo executed on the property.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 125784, *8

*F.3d 966, 972 (6th Cir. 2005)*. "Allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Coffey v. Foamex LP, 2 F.3d 157, 161-62 (6th Cir. 1993)* (citation omitted).

## ANALYSIS

I. <u>Yaldo has voluntarily dismissed his claims for fraudulent conversion and promissory estoppel.</u>

Yaldo waived his claims for fraudulent conversion (Count VI) and promissory estoppel (VII) by stating in his response brief that he did not contest the elimination of these causes of action. The Court, therefore, dismisses these claims without analysis.

II. <u>Yaldo's Remaining Counts Fail to State Valid Claims</u>

A. <u>Fraudulent Misrepresentation and Civil Conspiracy</u>

Aside from his claim for fraudulent conversion, Yaldo asserts two other fraud claims for fraudulent misrepresentation and civil conspiracy. A claim of fraud requires the plaintiff [*9] to plead that: 1) the defendant made a material misrepresentation; 2) that it was false; 3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; 4) that he made it with the intention that it should be acted upon by Plaintiffs; 5) that Plaintiffs acted in reliance upon it; and 6) that he thereby suffered injury. *Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976)* (internal quotations omitted).

Yaldo's complaint fails to meet the standards set forth in *Rules 12(b)(6)* and *9(b)*. Yaldo's claim for fraudulent misrepresentation alleges that Defendant "inflated various figures on the original loan application including but not limited to (a) inflated income, (b) understated expenses, understated liabilities, understated debt to income ratio and other non-disclosed items as required by Federal law." Compl. ¶36. Yaldo's counsel employed almost the exact same language in three previous actions already dismissed in this District, including one dismissed by the undersigned. *See Abro v. JP Morgan Chase Bank, N.A., No. 10-11949, 2010 U.S. Dist. LEXIS 119684 (E.D. Mich. Nov. 10, 2010)* (Murphy, J.); *Battah v. Resmae Mortg. Corp., no. 10-11033, 746 F. Supp. 2d 869, 2010 U.S. Dist. LEXIS 114699, *11 (E.D. Mich. Oct. 28, 2010)* [*10] (Rosen, C.J.) ("Not surprisingly Plaintiff's counsel used this exact language in another action brought in this

District, and the District Court ordered dismissal..."); *Mekani v. Homecomings Fin., LLC; 10-10992, 2010 U.S. Dist. LEXIS 66822, *18-19 (E.D. Mich. July 6, 2010)* (Borman, J.). [4]

As was the case in these previous actions, Yaldo's "fraud claim contains conclusory allegations which merely restate the elements of fraudulent misrepresentation. Such a formulaic recitation of the elements is exactly what the Supreme Court deemed insufficient to survive a motion to dismiss." *Battah, 746 F. Supp. 2d 869, 2010 U.S. Dist. LEXIS 114699 at *11* (citing *Twombly, 550 U.S. at 555*). Further, Yaldo does not deny that he verified the information in his loan application under penalty of perjury and "it is difficult to see how Plaintiff can claim that he reasonably relied on his own misstatements, particularly, when as his counsel conceded . . . Plaintiff signed the application attesting to the [*11] fact that the statements as to his income and liabilities were true." *Mekani, 2010 U.S. Dist. LEXIS 66822 at *19.*

Yaldo's complaint further alleges that he was not informed of various charges that were later assessed against him, and that he was never advised of the nature of his variable rate interest loan or other provisions in the Note. *Id.* ¶ 37. Yet Yaldo "does not explain how any of these provisions were false, claiming only that he wasn't informed of them." *Mekani, 2010 U.S. Dist. LEXIS 66822 at *22.* Finally, as the plaintiff did in *Battah,* Yaldo attempts to save his claim by referencing an audit report in his response brief and asserting that it meets the requirements of *9(b).* Yaldo, however, does not offer any explanation for how the report supports the fraud claim. Therefore, the Court concludes that Yaldo has failed to properly allege a claim for fraudulent misrepresentation.

Moreover, a claim for civil conspiracy is not a cognizable claim by itself, but rather is defined by the tort that constitutes the underlying theory of liability. *Roche v. Blair, 305 Mich. 608, 614-616, 9 N.W.2d 861 (1978).* In all three actions previously dismissed in this District, the District Courts have found that [*12] the underlying theory of plaintiff's civil conspiracy claims was fraud. *See Battah, 2010 U.S. Dist. LEXIS 114699 at *13; Mekani, 2010 U.S. Dist. LEXIS 66822 at *9-*10 n. 2.* Because Yaldo has failed to establish the underlying tort of fraud, his civil conspiracy claim must also be dismissed. *See Battah, 746 F. Supp. 2d 869, 2010 U.S. Dist. LEXIS 114699 at *13.*

B. <u>Breach of Contract</u>

Yaldo's complaint also fails to state a valid claim for breach of contract. The complaint merely asserts in

---

[4]    The Court is not bound by the rulings in *Mekani* or *Battah,* but it finds them both persuasive and adopts their reasoning herein.

2010 U.S. Dist. LEXIS 125784, *12

conclusory terms that Yaldo was assessed illegal charges, and that he was assessed excessive interest rates, fees, penalties, and other illegal charges beyond "what was allowed for in the original contract." Compl. ¶¶ 58-59. Yaldo does not provide details as to what the original contract allowed nor does he state the nature of the interest rates, fees, penalties, or other charges which allegedly fall outside the scope of the original contract. *See Battah, 746 F. Supp. 2d 869, 2010 U.S. Dist. LEXIS 114699 at *15-*16* (internal citations omitted) ("Once again, the formulaic recitation of the elements of a claim [for breach of contract] without any supporting factual allegations is insufficient to survive a motion to dismiss."). Therefore, the Court dismisses [*13] Yaldo's contract claim as well. [5]

## C. RESPA

Yaldo alleges that Defendants violated RESPA by "fail[ing] to respond in a proper and timely manner to Plaintiff's written request for validation, written request for a QRW investigation and correction of their account in violation of *12 USC Section 2605(e),*" Compl. ¶ 67, [6] and by failing to allow proper time for investigation prior to initiating foreclosure, *id.* ¶ 68.

To successfully plead a claim under RESPA, a plaintiff must allege actual damages. *Mekani, 2010 U.S. Dist. LEXIS 66822 at *27.* Even assuming that the Defendants did fail to respond to Yaldo's QWR, Yaldo does not properly plead that he suffered any actual damages from the failure. Although he seeks actual damages in his complaint, he does not plead any factual content establishing actual damages, nor does he mention damages in his response brief. *Battah, 746 F. Supp. 2d 869, 2010 U.S. Dist. LEXIS 114699 at *16* ("The complete absence of alleged damages warrants dismissal of Plaintiff's RESPA claim); *Mekani, 2010 U.S. Dist. LEXIS 66822 at *27* ("Even if the Court were able to conclude that Plaintiff has adequately alleged that Defendant's responses were somehow inadequate, Plaintiff's RESPA claim fails for the additional reason that Plaintiff has alleged no actual damages attributable to Defendant's alleged failure to

respond."). Therefore, the Court dismisses Yaldo's RESPA claim.

## D. Fair Housing Act

Yaldo's claim that Defendants violated the Fair Housing Act is yet another claim identical to others previously dismissed by this and other judges in this District. [*15] Defendants assert that any allegations originating from the loan executed in 2005 are barred by the two year statute of limitations under the Fair Housing Act. *42 U.S. C. § 3613.* The section provides that:

> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

*Id.*

Yaldo asserts in his response brief that the two-year statute of limitations period should be based on a letter sent October 22, 2009 and not on the loan origination period. [7] This argument was rejected by the Chief Judge Rosen in *Battah,* where he stated that "a letter alleging violations by the Bank Defendants does not qualify as a conciliation agreement under the statute." *Battah, 746 F. Supp. 2d 869, 2010 U.S. Dist. LEXIS 114699 at *17.* The Court agrees, and finds that Yaldo's claim is time-barred to the extent that the allegations arise from the origination of the loan.

Further, even if the claims were not time-barred, the allegations would still fail as a matter of law because Yaldo provides no legal support for a theory of liability based on Defendants failure to respond to his QWRs. *Mekani, 2010 U.S. Dist. LEXIS 66822 at *31-*32* ("With respect to Plaintiff's claim that Defendant violated the [Fair Housing Act] by failing to respond to his QWRs,

---

[5]   The Court notes that Yaldo's counsel filed his response brief without a page 13, which presumably includes arguments in defense of the breach of contract and RESPA claims. It is counsel's responsibility to make sure that the response brief was properly docketed, but the Court further notes that Yaldo's complaint is deficient on its face regardless of any argument that may have been contained in page 13.

[6]   Plaintiff's response brief incorrectly identifies this statement as ¶ 63. The Court notes that the exact same allegation was included in ¶ 63 of the complaint at issue in *Mekani,* and that the argument contained in Yaldo's brief is identical to the argument rejected by the Court in *Mekani,* yet another indication that counsel simply copied and pasted into his response brief arguments [*14] unsuccessfully made to other judges in this District.

[7]   Yaldo's brief simply states [*16] that the two year period should begin running from the time that "the attached letter" was sent during 2009. The brief does not specify the date of the letter or the exhibit where the letter is attached. The Court assumes that the letter is the October 22, 2009 letter of non-compliance referenced in Yaldo's complaint.

Plaintiff provides no legal support for such a theory of liability."). Therefore, the Court dismisses Yaldo's claim for a violation of the Fair Housing Act.

### E. Quiet Title and Declaratory Relief

Yaldo's claim for quiet title also fails as a matter of law. At the outset the Court notes that Defendants assert in their brief, and Yaldo does not contest otherwise, that there has been no foreclosure, sheriff's sale, or any running of a redemption period that would legally divest Yaldo of title to his [*17] property. Because there are no competing claims to title, there is nothing to quiet. Moreover, the Court finds that Yaldo's claim fails to state a cause of action and adopts the ruling in *Mekani* that:

> Plaintiff in an action to quiet title bears the burden of establishing a prima facie case of title. Plaintiff has not sustained this burden. Plaintiff's claim to quiet title merely attacks the foreclosure process and does not address a legitimate title dispute. Plaintiff has cited no authority for his claim to quiet title under the facts of the case, and offers only the conclusory allegations that the Defendant is not the holder of the Note. . .and engaged in fraudulent activity at closing. . . .Plaintiff's failure to provide any legal or factual justification for his quiet title clam other than the conclusory allegations that the foreclosure was wrongful, invalid and voidable necessitates dismissal of his quiet title claim.

*Mekani, 2010 U.S. Dist. LEXIS 66822 at *29-*30* (internal citations and quotations omitted).

To the extent that the complaint in this case differs from the complaint at issue in *Mekani*, the Court finds that the discrepancies do not dictate a contrary result. The additional [*18] allegation in the instant complaint is that Defendants are attempting to foreclose on Yaldo's property by a claimed right under Michigan's Foreclosure by Advertisement Statute, Compl. ¶ 26, and that "Under Michigan's Foreclosure Statute the Defendants cannot enforce a security agreement not supported by the debt instrument in their possession," *id.* ¶ 27(b). The District Court for the Western District of Michigan recently found, however, that "the Court finds no provision [in the foreclosure by advertisement statute] . . . requiring the mortgagee to present the original promissory note to the mortgagor for the foreclosure to be valid." *Stanton v. Federal National Mortgage Assoc., 2010 U.S. Dist. LEXIS 15905 at *9-*10 (W.D. Mich. Feb. 23, 2010)*. The Court agrees and dismisses Yaldo's claim to quiet title.

Further, Yaldo's "wholly derivative claim for declaratory relief," which is a procedural device by which substantive claims are vindicated, also fails to state a cause of action. *Mekani, 2010 U.S. Dist. LEXIS 66822 at *30-*31 n.8*. In his response brief, Yaldo asserts that MERS admits they did not "own any indebtedness in the mortgage" and therefore any assignment to Deutsche Bank is [*19] void. Even if MERS did not own any indebtedness on the mortgage, Yaldo cites no authority supporting his proposition that assignment to Deutsche is void and pleads no factual content in his complaint supporting this theory of liability. Therefore, his claim for declaratory relief that Defendants are not holders of the note and that the debt is null and void is dismissed.

### G. Injunction

As Yaldo concedes in his brief, the claim for injunctive relief "incorporates all the allegations set forth in Plaintiff's complaint and is stated as a remedy to prevent irreparable harm from occurring through foreclosure and eviction activities while the merits of the case is [sic] being decided." Pl. Resp. Br. 15. "An injunction is an equitable remedy, the purpose of which is to maintain the relative positions of the parties until proceedings on the merits can be conducted." *Vittitow v. City of Upper Arlington, 43 F.3d 1100 (6th Cir. 1995)* (internal citations omitted). In the Court's Order Denying Defendant's Motion to Dissolve Temporary Restraining Order As Moot, the Court held that "if Plaintiff requests preliminary injunctive relief, he must file a motion seeking relief." See *E.D. Mich. LR 65.1* ("Requests [*20] for temporary restraining orders and preliminary injunctions must be made by a separate motion and not by order to show cause."). Further, the Court has already found that the other allegations in Yaldo's complaint on which the claim for injunction rests are deficient pursuant to *12(b)(6)*. Therefore, the Court dismisses Yaldo's claim for injunctive relief.

### ORDER

**WHEREFORE, it is hereby ORDERED** that Defendants' motion to dismiss (docket no. 13) is **GRANTED.**

**IT IS FURTHER ORDERED** that all claims against Defendants, OneWest Bank, FSB; Deutsche Bank National Trust Company as trustee ("Deutsche Bank"); and Mortgage Electronic Registration Systems, Inc. ("MERS"), which is misidentified in the complaint as Electronic Registration Systems, Inc, are **DISMISSED**, with prejudice.

### SO ORDERED.

/s/ Stephen J. Murphy, III

STEPHEN J. MURPHY, III

2010 U.S. Dist. LEXIS 125784, *20

United States District Judge                    Dated: November 30, 2010

Ziyad Hermiz

 LexisNexis·

**User Name:** Ziyad Hermiz
**Date and Time:** 04/04/2014 4:40 PM EDT
**Job Number:** 9156748

### Documents(9)

1. Ross v. MERS/MERSCORP Holdings, Inc, 2013 U.S. Dist. LEXIS 61329
   **Client/Matter:** 999999999-0500

2. Gentry v. Wayne County, 2010 U.S. Dist. LEXIS 123365
   **Client/Matter:** 999999999-0500

3. Matthews v. Mortg. Elec. Registration Sys., 2011 U.S. Dist. LEXIS 69501
   **Client/Matter:** 999999999-0500

4. Foster v. Argent Mortg. Co., L.L.S., 2010 U.S. Dist. LEXIS 27926
   **Client/Matter:** 999999999-0500

5. Boston v. Clark, 2012 U.S. Dist. LEXIS 130496
   **Client/Matter:** 999999999-0500

6. Carter v. Mich. Dep't of Corr., 2013 U.S. Dist. LEXIS 134781
   **Client/Matter:** 999999999-0500

7. Sanders v. Mich. First Credit Union Tellers, 2010 U.S. Dist. LEXIS 80908
   **Client/Matter:** 999999999-0500

8. Grossman v. DTE Energy Co., 2010 U.S. Dist. LEXIS 133572
   **Client/Matter:** 999999999-0500

9. Int'l Dairy Foods Ass'n v. Boggs, 2009 U.S. Dist. LEXIS 27074
   **Client/Matter:** 999999999-0500

No *Shepard's* Signal™
As of: April 4, 2014 4:40 PM EDT

# Ross v. MERS/MERSCORP Holdings, Inc

United States District Court for the Eastern District of Michigan, Southern Division
April 30, 2013, Decided; April 30, 2013, Filed
Civil Action No. 12-15205

**Reporter:** 2013 U.S. Dist. LEXIS 61329; 2013 WL 1821280

MIQUEL ROSS, Plaintiff, v. MERS/MERSCORP HOLDINGS, INC. and FLAGSTAR BANK, Defendants.

Core Terms

mortgage, redemption period, foreclosure proceeding, foreclose, limitations period, foreclosure

**Counsel:** [*1] Miquel Ross, Plaintiff, Pro se, Detroit, MI.

For MERS/MERSCORP Holdings, Incorporated, Flagstar Bank, a Federal Savings Bank, Defendants: John M. Allen, Allen Brothers, Detroit, MI.

**Judges:** HONORABLE Denise Page Hood, United States District Judge.

**Opinion by:** Denise Page Hood

Opinion

## ORDER GRANTING MOTION TO DISMISS AND ORDER DISMISSING ACTION

### I. BACKGROUND

On November 27, 2012, Plaintiff Miquel Ross, proceeding *pro se,* filed the instant action against Defendants Mortgage Electronic Registration Systems ("MERS")/ MERS Corp. and Flagstar Bank alleging four counts: Violation under Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1962(c)* (Count I); Void Foreclosure Sale due to Lack of Standing to Foreclose, *M.C.L. § 600.3204* (Count II); Quiet Title (Count III); and Breach of Covenant (Count IV).

On November 29, 2002, Plaintiff took out a mortgage with Flagstar, naming MERS as the Mortgagee, and a Promissory Note with a VA Assumption Rider. (Comp., ¶¶ 8-9). Plaintiff's property was sold and a Sheriff's Deed was executed against Plaintiff's property on March 3, 2004. (Comp., ¶ 10) On June 25, 2012, Plaintiff performed an investigation at the Wayne County Register of Deeds and discovered that there [*2] were no assignments of the mortgage recorded from November 2002 to June 4, 2012. (Comp., ¶ 11) Plaintiff obtained his credit report from all

the credit reporting agencies which did not contain Plaintiff's debt to Flagstar between June and August 2012. (Comp., ¶ 12) Plaintiff asserts that his property, commonly known as 14752 Mansfield, Detroit, Michigan, was seized illegally. (Comp., ¶ 13) Plaintiff states that through his investigation and research, he has discovered many illegalities respective of the illegal seizure of his property and a myriad of homes in Detroit, Michigan by MERS, Flagstar, JP Morgan Chase and Trott & Trott, PC, as well as other debt collectors. (Comp., ¶ 14) Plaintiff claims that Defendants are part of a criminal enterprise called the MERS scheme, which has been at the root of over 60 million homeowners foreclosed illegally. (Comp., ¶ 15) Plaintiff claims MERS improperly foreclosed on his property on March 3, 2004, in violation of *M.C.L. § 600.3204.* (Comp., ¶ 23)

In lieu of an Answer, Defendants failed the instant Motion to Dismiss. Plaintiff filed an affidavit in opposition to the motion and Defendants filed a reply to the affidavit/ response.

### II. ANALYSIS

#### A. Standard [*3] of Review

*Rule 12(b)(6)* of the Rules of Civil Procedure provides for a motion to dismiss based on failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* In *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007),* the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.] Factual allegations must be enough to raise a right to relief above the speculative level...." *Id. at 555* (internal citations omitted). Although not outright overruling the "notice pleading" requirement under *Rule 8(a)(2)* entirely, *Twombly* concluded that the "no set of facts" standard "is best forgotten as an incomplete negative gloss on an accepted pleading standard." *Id. at 563.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id. at 570.* A claim has facial plausibility when the plaintiff pleads factual content that

2013 U.S. Dist. LEXIS 61329, *3

allows the court to draw the reasonable inference that the defendant is liable for the [*4] misconduct alleged. *Id. at 556*. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id. at 557*. Such allegations are not to be discounted because they are "unrealistic or nonsensical," but rather because they do nothing more than state a legal conclusion-even if that conclusion is cast in the form of a factual allegation. *Ashcroft v. Iqbal, 556 U.S. 662, 681, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. In sum, for a complaint to survive a motion to dismiss, the non-conclusory "factual content" and the reasonable inferences from that content, must be "plausibly suggestive" of a claim entitling a plaintiff to relief. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not shown that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. The court primarily considers the allegations in the complaint, although matters of public record, [*5] orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001)*.

Federal courts hold the *pro se* complaint to a "less stringent standard" than those drafted by attorneys. *Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*. A *pro se* litigant "must conduct enough investigation to draft pleadings that meet the requirements of the federal rules." *Burnett v. Grattan, 468 U.S. 42, 50, 104 S. Ct. 2924, 82 L. Ed. 2d 36 (1984)*.

**B. Counts II (Foreclosure/Standing, III (Quiet Title) and IV (Breach of Covenant)**

Defendants assert that Plaintiff's claims seeking to challenge the 2004 foreclosure of the property is barred because the six month redemption period has passed. Plaintiff responds that because of deceptive practices by MERS and others and lack of standing by MERS to foreclose on the property, Plaintiff has stated a claim against Defendants. Plaintiff claims *M.C.L. § 600.5807(4)* provides a 10 years limitation period as to his claims and his lawsuit was filed within that period.

In Michigan, once the redemption period following foreclosure of a parcel real property has expired, the former owners' rights in and title to the [*6] property are extinguished. *Piotrowski v. State Land Office Bd., 302 Mich. 179, 187, 4 N.W.2d 514 (1942)*; *Goryoka v. Quicken Loan, Inc., 2013 U.S. App. LEXIS 5524, 2013 WL 1104991, * 1 (6th Cir. Mar. 18, 2013)*(citing, *Overton v.*

*Mortgage Electronic Registration Systems, 2009 Mich. App. LEXIS 1209, 2009 WL 1507342, *1 (Mich. App. 2009))*. "The right to redeem from a foreclosure sale is a statutory right that ... can neither be enlarged nor abridged by the courts." *Houston v. U.S. Bank Home Mortg. Wisconsin Servicing, 505 Fed. Appx. 543, 2012 U.S. App. LEXIS 24196, 2012 WL 5869918, * 5 (6th Cir. Nov. 20, 2012)*(quoting *Detroit Trust Co. v. Detroit City Serv. Co., 262 Mich. 14, 247 N.W. 76 (1933))*. Filing of a lawsuit does not toll the redemption period and once that period expired, the plaintiff lacked standing to challenge the foreclosure proceedings. *Overton, 2009 Mich. App. LEXIS 1209, 2009 WL 1507342 at *1*. A court may consider equitable remedies only if there is a clear showing of fraud or irregularity *as to the foreclosure proceeding itself*, and not simply as to any conduct by a defendant. *Houston, 2012 U.S. App. LEXIS 24196, 2012 WL 5869918 at *5* (citing, *Freeman v. Wozniak, 241 Mich. App. 633, 617 N.W.2d 46 (2000))*.

The Sheriff's Deed was issued after foreclosure proceeding on Plaintiff's property in March 2004. Plaintiff filed the instant suit in November 2012, more than eight [*7] years after the redemption period expired. Plaintiff's challenge to the foreclosure proceedings is barred. Plaintiff's Complaint fails to allege any fraud or irregularity, *as to the foreclosure proceeding itself*. Rather, Plaintiff alleges that MERS did not have the authority to foreclose on the property since MERS was not the owner of the indebtedness. However, the Michigan Supreme Court has made clear that under Michigan's foreclosure by advertisement statute, *M.C.L. § 600.3204(1)(d)*, a mortgage granted to MERS as nominee for the lender and lender's successors and assigns, is a valid and assignable mortgage. *Residential Funding Co., LLC v. Saurman, 490 Mich. 909, 910, 805 N.W.2d 183 (2011)*(MERS had an interest in the indebtedness as the record-holder of the mortgage which authorized MERS to foreclose by advertisement under the statute.). Even if MERS engaged in deceptive practices as to the assignment of mortgages or as to how it conducts business generally, such claims do not extend the redemption period since these allegations do not go the irregularity *as to the foreclosure proceeding itself*," but to MERS' actions as they relate to its business practices.

Regarding Plaintiff's claim that his claims [*8] are not time-barred based on the 10-year statute of limitations set forth in *M.C.L. § 600.5807(4)*("The period of limitations is 10 years for actions founded upon covenants in deeds and mortgage of real estate"), this limitation period does not apply to the claims in his Complaint. Plaintiff asserts in Count IV, Breach of Covenant, that Defendants violated Section 20 of the mortgage because he was not given notice of any change in the loan servicer. (Comp., ¶ 53)

2013 U.S. Dist. LEXIS 61329, *8

Cases that have addressed the 10 year statute of limitations in _M.C.L. § 600.5807(4)_ involved actions seeking payments under a mortgage. See _Visioneering Inc. Profit Sharing Trust v. Belle River Joint Venture, 149 Mich. App. 327, 386 N.W.2d 185 (1986)_. Those are not the facts in this case. As noted above, Plaintiff has lost all of his rights as to the property at issue. Any claims regarding any breach of the mortgage language are barred since Plaintiff did not raise the issue of any breach by Defendants as to the mortgage during the foreclosure proceedings or the redemption period. Plaintiff's interest as to the mortgage and the related property is now extinguished since he failed to act during the redemption period. Even viewing the claims [*9] in the Complaint liberally, Plaintiff has failed to state claims relating to his property since the redemption period has passed.

## C. Count I, RICO claim

### 1. RICO Statute of Limitations

Defendants assert that Plaintiff's RICO claim is time-barred under the RICO statute. The Supreme Court has imposed a four-year statute of limitations on RICO claims. _Agency Holding Corp. v. Malley-Duff & Associates, 483 U.S. 143, 156, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987)_. The four-year limitation period begins to run when a party knows, or through exercise of reasonable diligence should have discovered that the party was injured by a violation under RICO. _Rotella v. Wood, 528 U.S. 549, 553-55, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000)_. The latest date any RICO claim would have started to run was when Plaintiff's property was foreclosed in March 2004. At that time, and probably earlier when Plaintiff entered into the mortgage in 2002, noting MERS as the original recorded mortgagee, Plaintiff had knowledge that MERS was involved. As noted by Defendants, the same public records Plaintiff reviewed in 2012, were available for his review in 2002-2004. Courts have held that public records serve as constructive notice to all regarding claims and interests in real property. _McMurtry v. Smith, 320 Mich. 304, 30 N.W.2d 880 (1948)_. [*10] Even though Plaintiff did not investigate what was

in his credit records until 2012, Plaintiff's credit reports were available at his request well before 2012. Plaintiff's claims under RICO are barred by the four-year limitation period.

### 2. RICO/Rule 9(b)

Defendants argue that Plaintiff's RICO claims do not meet the pleading requirements under _Rule 9(b)_ of the Rules of Civil Procedure. Plaintiff's underlying RICO claims are based on mail fraud.

The Sixth Circuit has interpreted _Rule 9(b)_ as requiring a plaintiff to allege the time, place, and content of the alleged misrepresentation on which they relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud. See, _Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 563 (6th Cir. 2003)_.

Liberally construing Plaintiff's RICO claims based on fraud, Plaintiff's Complaint is void of any specific allegations as to what statements were made which were fraudulent, does not identify the speaker or when and where the statements were made, nor does Plaintiff allege why the statements were fraudulent. Because Plaintiff's Complaint fails to state with specificity any mail fraud claims, the RICO count must be [*11] dismissed for failure to state upon which relief may be granted.

## III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendants' Motion to Dismiss (**Doc. No. 5**) is GRANTED.

IT IS FURTHER ORDERED that this action is DISMISSED with prejudice.

/s/ Denise Page Hood

Denise Page Hood

United States District Judge

Dated: April 30, 2013



Neutral
As of: April 4, 2014 4:40 PM EDT

# Gentry v. Wayne County

United States District Court for the Eastern District of Michigan, Southern Division
November 22, 2010, Decided; November 22, 2010, Filed
Case No. 10-cv-11714

**Reporter:** 2010 U.S. Dist. LEXIS 123365; 2010 WL 4822749

DEON GENTRY, Plaintiff, v. WAYNE COUNTY, et al., Defendants.

**Subsequent History:** Related proceeding at *Gentry v. Carmona, 2011 Mich. App. LEXIS 1757 (Mich. Ct. App., Oct. 11, 2011)*
*Decision reached on appeal by, Appeal dismissed by Gentry v. County of Wayne, 2012 U.S. App. LEXIS 20623 (6th Cir.), 2012 FED App. 1043N (6th Cir.) (6th Cir. Mich., 2012)*

---

```
Core Terms
```

abstention, state court, lawsuit, federal case, weigh, state and federal courts, concurrent jurisdiction, cone, federal court, punitive, federal action

**Counsel:** [*1] For Deon Laron Gentry, Plaintiff: James J. Harrington, IV, Fieger, Fieger, Southfield, MI.

For County of Wayne, Daniel J. Carmona, Warren Evans, Robert Ficano, Daniel Phannes, Harold Cuerton, Lawrence Meyer, Michelle Garland, Larry Davis, Sergeant, Booth, Commander, Palmer Coleman, Jr, Sergeant, Richard Perkins, Officer, J Grysko, Lieutenant, Donald Cox, Defendants: Michael C. Lewis, Zausmer, Kaufman, Farmington Hills, MI.

**Judges:** HONORABLE STEPHEN J. MURPHY, III, United States District Judge.

**Opinion by:** STEPHEN J. MURPHY, III

---

```
Opinion
```

## ORDER DENYING DEFENDANTS' MOTION TO STAY PROCEEDINGS (docket no. 12)

Deon Gentry brought this federal civil rights case against various law enforcement officials and Wayne County pursuant to *42 U.S.C. § 1983*. Gentry presently has a lawsuit pending in state court as well that makes

allegations sounding in tort law against Sherrif's Deputy Daniel Carmona, the key defendant in the federal case. The Court now has before it a motion by the defendants to stay these federal court proceedings [1] under the doctrine of *Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*, until the state court case comes to a conclusion. In the alternative, the defendants ask the Court [*2] to stay this case under its inherent powers to control the docket and conserve judicial resources.

Abstention is the rare exception to the general rule for federal courts, which have a "virtually unflagging obligation . . . to exercise the jurisdiction given [it]." *Colo. River, 424 U.S. at 817*. The Court concludes that the federal and state cases in question here do not meet the threshold requirement under *Colorado River* for abstention. Moreover, even if the Court found the instant proceedings to be parallel with those in state court, the defendants fail to show that considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," so strongly counsel abstention as to meet the exception to the general rule about exercising jurisdiction. *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183, 72 S. Ct. 219, 96 L. Ed. 200, 1952 Dec. Comm'r Pat. 407 (1952)*. Finally, there are no exceptional circumstances in this case meriting a stay under the Court's inherent powers to manage its docket. Accordingly, the Court will deny the defendants' motion.

## BACKGROUND

On April 28, 2007, Carmona shot Gentry [*3] in the back while law enforcement officers attempted to remove Gentry from his girlfriend's apartment. Compl., Docket No. 1, at PP 25-38. The bullet severed Gentry's spinal cord, and he has permanently lost movement in his legs. *Id.* P 38. On June 13, 2008, Gentry brought a lawsuit in Wayne County Circuit Court against Carmona. Defs.' Mot., Docket No. 9, at 3. That suit raised only state tort law claims. *Id.* Carmona filed a motion for summary

---

[1]   Defendants Donald Watts and Richard Wolf did not join in the motion.

2010 U.S. Dist. LEXIS 123365, *3

disposition of the entire state court case after the parties conducted extensive discovery. *Id.* On February 1, 2010, the Circuit Court granted in part and denied in part Carmona's motion. *Id.* Carmona appealed that part of his motion which the court denied to the Michigan Court of Appeals, and that appeal is still pending. *Id.*

Gentry filed this lawsuit on April 27, 2010, against Carmona, Wayne County, and a variety of law enforcement officials who either allegedly instructed or supervised Carmona. Compl. at 1. All three of the claims in this case are *§ 1983* claims, with different theories of liability for Carmona, his supervisors and instructors, and Wayne County. *Id.* PP 58-89. Gentry believes that revelations in discovery showing a history of poor [*4] behavior by Carmona that supervisors in the sheriff's department and other agencies failed to notice or correct created the need for a federal lawsuit. Gentry's Resp., Docket No. 11, at 3-5. The defendants claim that Gentry's federal lawsuit represents "artful pleading" designed to avoid bringing his federal claims in state court, thereby risking removal of the entire action to federal court. Defs.' Mot. at 7. Carmona's personnel file, which defendants turned over to Gentry on June 30, 2009, and Carmona's July 8, 2009 deposition revealed all of the information necessary to bring the municipal liability claims against Wayne County and Carmona's supervisors and instructors, according to the defendants. Def.'s Resp., Docket No. 12, at 1. The timing of the filing of this case, the day before the running of the statute of limitations for *§ 1983* actions, [2] suggests that Gentry's lawsuits resulted from strategic gambits of counsel.

**ANALYSIS**

**I. Colorado River Abstention**

Under *Colorado River*, this Court has the power to abstain from exercising its jurisdiction over a case in deference to a parallel state-court proceeding if abstention will best promote the values of efficient dispute resolution and judicial economy. *Colo. River, 424 U.S. at 817-18; Romine v. Compuserve Corp., 160 F.3d 337, 339 (6th Cir. 1998)*. *Colorado River* abstention requires a two-part analysis. As a threshold matter, the Court must address the question of whether or not the two proceedings are parallel. *Romine, 160 F.3d at 340*. If the proceedings are found to be parallel, the Court next considers the balancing-test factors described in *Colorado River* to determine if abstention will actually serve the end of efficient court administration. *Id. at 340-41*. The Court concludes, for the reasons set forth below, that the state and federal proceedings in question here are not [*6] parallel. In addition, even if the Court were to answer this threshold question in the affirmative, only an overwhelming showing of need can justify *Colorado River* abstention, and such need is not present here.

**A. Are the State and Federal Proceedings Parallel**

State and federal court proceedings are "parallel" if they are "substantially similar." *Romine, 160 F.3d at 340* (finding two actions were parallel when "predicated on the same allegations as to the same material facts"); *see also Schneider Nat. Carriers, Inc. v. Carr, 903 F.2d 1154, 1156 (7th Cir. 1990)* ("Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in two fora."). Exact identity between the two cases is not required. *See Romine, 160 F.3d at 340* (rejecting additional claims and parties in the federal-court case as a reason for not abstaining, and finding "the argument that abstention is inappropriate because the federal cause of action included parties not present in the state proceedings 'is not relevant to *Colorado River* abstention.'" (quoting *Heitmanis v. Austin, 899 F.2d 521, 528 (6th Cir. 1990)*)).

The defendants argue that because both of Gentry's lawsuits [*7] are based on the same set of predicate facts, seek similar compensation, and were filed by the same plaintiff against the same principal defendant, they should be considered parallel proceedings. The Court does not agree that these similarities are sufficient, for two reasons. First, the theories of recovery in the two cases are different. In the typical case where *Colorado River* abstention is applied, the legal theories asserted in the two cases are more or less equivalent. For example, in *Romine*, the proceedings in both state and federal court alleged violations of federal securities law. *Romine, 160 F.3d at 338-39; see also Walbridge Aldinger Co. v. Aon Risk Servs., Inc. of Penn.*, No. 06-11161, 2006 WL 2376112, at *3-4 (E.D. Mich. Aug. 16, 2006) ("If the cases are truly parallel, then the state action will be a vehicle to resolve all issues raised in the federal action."). But when the state and federal cases present different theories of recovery, courts do not generally characterize the proceedings as "parallel." *See Baskin v. Bath Twp. Bd. of Zoning Appeals, 15 F.3d 569, 572 (6th Cir. 1994)* (state and federal cases that "each contest[ed] a different aspect" of zoning variance [*8] are not parallel proceedings); *Walbridge*

---

[2] April 27, 2010 was the last day Gentry could bring his *§ 1983* claims without losing them due to time bars. Congress did not provide for a statute of limitations when it enacted *§ 1983*, so courts apply the statute of limitations for personal injury actions in the [*5] relevant state for such claims. *Wilson v. Garcia, 471 U.S. 261, 276, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)*. In Michigan, the statute of limitations for personal injury actions is three years "after the time of the . . . injury." Mich. Comp. Laws § 600.5805(10); *Scott v. Ambani, 577 F.3d 642, 646 (6th Cir. 2009)*.

5:14-cv-10266-JEL-DRG   Doc # 45-14   Filed 04/07/14   Pg 65 of 121   Pg ID 974

Page 3 of 6
2010 U.S. Dist. LEXIS 123365, *8

*Aldinger*, 2006 WL 2376112, at *4 (state and federal court actions dealing with different contracts, one of which would "require finding facts beyond those implicated in the state action," were not parallel, and "the existence of different theories of recovery in the federal and state cases militates against a finding of parallelism").

In this case, Gentry's theories of recovery in the state and federal court actions have completely different legal bases — the state action raises only state law tort claims, while the federal action raises nothing but federal civil rights claims. In response, the defendants argue that Gentry "cannot proceed on the municipal and/or supervisor liability claims unless he first proves that Deputy Carmona violated his constitutional rights," but the defendants do not acknowledge that Gentry does not have to prove a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" to win his state court case. *42 U.S.C. § 1983*. Rather, he has to prove that Carmona committed either an intentional tort or gross negligence. *See* Gentry's Resp., Docket No. 11, at 2. There are serious differences between **[*9]** the standards of proof for state tort claims and federal civil rights that the Court would be remiss to overlook. *See generally Padilla v. City of Saginaw, 867 F. Supp. 1309, 1315-16 (E.D. Mich. 1994)* (declining to exercise supplemental jurisdiction pursuant to *28 U.S.C. § 1367* over a number of state tort claims — including assault and battery — which the plaintiff brought alongside a *§ 1983* claim due to differences between the requisite mental state, relevant immunity provisions, vicarious liability standards, and recoverable damages in state tort law and federal civil rights law).

While it is conceivable that Gentry could have brought his *§ 1983* claims in state court to recover punitive damages, the claims Gentry *could* have brought are irrelevant to the parallel proceedings analysis. Rather, the Court must look at the cases as Gentry filed them. *See Baskin, 15 F.3d at 572* ("[I]n deciding whether a state action is parallel for abstention purposes, the district court must compare the issues in the federal action to the issues *actually raised* in the state court action, not those that might have been raised."). The defendants cite no case in which a court deemed two actions "parallel" **[*10]** that lacked any symmetry in the legal arguments made by the plaintiff, and the Court will not make such an extension here.

Second, the Court does not accept defendants' argument that the similarities in facts and remedies between the two cases compel a finding of parallelism. The state lawsuit names Carmona as the only defendant, and addresses his role as a tortfeasor in Gentry's shooting. By contrast, the federal lawsuit makes broader accusations about the practices of Carmona's instructors and supervisors, who allegedly put Carmona in a position where he would be a danger to the community. The remedies Gentry seeks in his federal case also reflect this difference: while both suits seek money damages, only the federal civil rights case permits punitive damages. *Compare City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)* (holding that punitive damages are available against individuals in a *§ 1983* action, but not against municipal defendants) *with in re Disaster at Detroit Metro. Airport, 750 F. Supp. 793, 805 (E.D. Mich. 1989)* ("In Michigan, the courts of that State refuse to allow the recovery of punitive damages."). Defendants argue that the remedies sought are more of a **[*11]** distinction than a difference, but the standards and rationales for awarding punitive and compensatory damages are so different that some judges actively avoid trying *§1983* claims alongside state tort claims due to the risk of juror confusion. *See Padilla, 867 F. Supp. at 1316* (pointing to differences between punitive and compensatory damages as a "compelling reason" for denying pendant jurisdiction over state law tort claims when *§ 1983* serves as the basis for federal jurisdiction). Thus, even on those elements where there are admittedly similarities between these two cases, the Court has difficulty concluding that these similarities are "substantial."

In summary, state and federal actions are not "parallel" unless they are *substantially* similar in the legal theories they pursue, the facts they address, and the remedies they seek. In this case, the legal theories in the two cases are nothing alike, and the similarities in facts and remedies, while present, are not substantial. The Court cannot conclude that these cases are "parallel," and *Colorado River* abstention is therefore inappropriate.

**B.   Would Abstention Be in Accord With Principles of Wise Judicial Administration**

Even if the **[*12]** Court were to find that these proceedings are parallel, the Court does not agree with the defendants that this is a case where abstention would be appropriate. In *Colorado River* and its progeny, the Supreme Court set out a series of factors courts ought to consider when weighing abstention for reasons of "wise judicial administration." These factors, as recognized by the Sixth Circuit in *Romine*, are:

> (1) Whether the state court has assumed jurisdiction over any res or property;
>
> (2) Whether the federal forum is less convenient to the parties;
>
> (3) Avoidance of piecemeal litigation;
>
> (4) The order in which jurisdiction was obtained;

2010 U.S. Dist. LEXIS 123365, *12

(5) Whether the source of governing law is state or federal;

(6) The adequacy of the state court action to protect the federal plaintiff's rights;

(7) The relative progress of the state and federal proceedings;

(8) The presence or absence of concurrent jurisdiction.

*Romine, 160 F.3d at 340-41*. Despite the appearances, these factors "do not comprise a mechanical checklist." *Id. at 341*. Rather, "the decision whether to [stay] a federal action because of parallel state-court litigation . . . rest[s] . . . on a careful balancing of the important factors as they apply in [*13] a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)*.

The defendants concede that two of the eight factors suggest abstention is inappropriate. First, there is no "res or property" in dispute in this case. Second, there are no concerns about convenience raised by the choice of forum, as the Wayne County Circuit Court is only a few blocks away from the Theodore Levin United States Courthouse in Detroit. Nevertheless, it is the defendants' contention that all of the remaining *Colorado River* factors strongly counsel abstention, or, at the very least, do not counsel against abstention as strongly as it might appear on the surface.

The three factors of the *Colorado River* test that most strongly counsel abstention in this case are the desire to avoid piecemeal litigation, the relative progress of the proceedings in state and federal court, and the order in which the state and federal courts took jurisdiction over these claims. Gentry waited for nearly two years after he filed his state court suit, and ten months after receiving the documents that led to his municipal and supervisory [*14] civil rights claims, before filing his federal case. By this juncture, discovery was complete in the state court

case, and the court had ruled upon a motion for summary disposition. The case is now on appeal. The conspicuous timing of filing of the federal case by Gentry — the day before the statute of limitations on a *§ 1983* claim would have run — creates a strong inference that Gentry brought his lawsuits in stages for strategic purposes. The Court can conclude that all three of the above factors weigh significantly in favor of the defendants' request for abstention. [3] Nevertheless, while the Sixth Circuit has "focus[ed]" on the "relative progress of the state and federal proceedings" as an important factor in *Colorado River* analysis that often "justifies abstention," this case has features not present in other cases that take the Court in a different direction. [4] *Bates v. Van Buren Twp., 122 F. App'x 803, 807 (6th Cir. 2004)*.

The defendants make strenuous efforts to turn one of the considerations that weighs against them — the exclusively federal-law basis for Gentry's suit in federal court — into a positive, by focusing on the state courts' concurrent jurisdiction over *§ 1983* claims. The defendants must concede that, under [*16] Supreme Court precedent, "the presence of federal-law issues must always be a major consideration weighing against surrender" of federal jurisdiction. *Moses H. Cone, 460 U.S. at 26*. But in weighing the *Colorado River* factors, the Supreme Court also instructs that "the source-of-law factor has less significance . . . [where] the federal courts' jurisdiction to enforce [the law] is concurrent with that of state courts." *Moses H. Cone, 460 U.S. at 25; see also Romine, 160 F.3d at 342* (holding that state courts' concurrent jurisdiction over federal securities claims "seriously diminished" the importance of this factor). State courts have concurrent jurisdiction over *§ 1983* claims. *Martinez v. California, 444 U.S. 277, 284 n.7, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980)*. The defendants argue that the deliberate omission of *§ 1983* claims by Gentry, combined with the availability of jurisdiction over those claims in state court, means that the source-of-law factor should be weighed heavily in favor of the *defendants*, rather than Gentry.

While the Court must take the reality of concurrent jurisdiction into account, the defendants' argument reaches too far. First, the argument applies *Moses H. Cone* in an illogical manner. Concurrent [*17] jurisdiction may

---

[3]  In *Romine*, the state court case was already well into the discovery phase when the district court decided to stay the federal action. *Romine, 160 F.3d at 342*. In addition, the state court cases were filed months prior to the filing of the federal action. *Id.* [*15] *Romine* held that this delay, combined with the progress made in the state court, "counsel[ed] very strongly in favor of abstention." *Id.* The delay in this case is even greater than the delay in *Romine*.

[4]  In arguing these factors, the defendants also warn the Court that if Carmona wins in the Michigan Court of Appeals, claim preclusion principles might require the Court to dismiss this case because Gentry did not raise his *§ 1983* claims with reasonable diligence in the circuit court. This argument is speculative. The defendants' brief does not sufficiently discuss the likelihood of success on appeal, or the law that justifies their conclusions about the effects such a ruling would have on this case. While the defendants have every right to move to dismiss this case at a later date if the Michigan Court of Appeals ruling favors them, the Court finds that the present objection is premature.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 123365, *17

*alleviate* concerns about surrendering jurisdiction, but the presence of federal law *"always"* militates against abstention. *Moses H. Cone, 460 U.S. at 26* (emphasis added). Second, concurrent jurisdiction is less meaningful in this case because of the unique character of *§ 1983*. Unlike the McCarren Amendment (*Colorado River*), the Federal Arbitration Act (*Moses H. Cone*), [5] or federal securities law (*Romine*), *§ 1983* was expressly created to "open[ ] the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Mitchum v. Foster, 407 U.S. 225, 239, 92 S. Ct. 2151, 32 L. Ed. 2d 705 (1972); see also Epps v. Lauderdale Cnty., 139 F. Supp. 2d 859, 865 (W.D. Tenn. 2000)* ("*[Section] 1983* is substantively designed to interfere with state law and protocols, not defer to [them].")"). The drafters of *§ 1983* intended to avoid state courts that, at the time of enactment, "were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." *Mitchum, 407 U.S. at 240.* The exclusively federal nature of the claims in Gentry's federal [*18] case, along with the strongly federal character of *§ 1983* actions, largely cancels out the mitigating effect of concurrent jurisdiction, and thus, the factor weighs strongly against abstention.

In addition, consideration of the adequacy of the state court proceeding — factor six in the *Romine* list — suggests a stay is unwise. In the usual *Colorado River* abstention case, the federal law claims are before both the state and federal courts, and it is presumed [*19] that both systems are fully equipped to protect a plaintiff's federal rights, including constitutional rights. *See, e.g., Garter Belt, Inc. v. Van Buren Twp., 66 F. App'x 612, 615 (6th Cir. 2003)* (staying a case under *Colorado River* on assumption that state court was equally competent to federal court in considering *First Amendment* challenge to ordinance regulating clubs that feature nude dancing). That consideration is inapplicable here, because only the federal case contains federal constitutional claims, and it is not the Court's role to second-guess how Gentry structured his lawsuits. For much the same reasons that drove the Court's analysis of the "parallel proceedings" question, the Court finds that the differences between Gentry's federal and state cases suggest that the adequacy consideration weighs against abstention. *See Baskin, 15 F.3d at 572* (calling the "parallel proceedings" factor and the "availability of complete relief" or "adequacy" factor "identical," "for all practical purposes").

Viewed as a whole, the *Colorado River* factors which counsel for and against abstention are in equipoise. The Court finds the relative timing of the two lawsuits to be nettlesome, and under [*20] different circumstances, a stay might be appropriate on the basis of the lengthy delay between filings. But there are also important considerations pushing against abstention in this case, including the inadequacy of the state court proceedings; the distinctively federal character of the substantive law in the federal case; the presence of nothing but federal claims in the federal case; and the absence of other compelling reasons to stay the case, such as inconvenience to the parties or state-court jurisdiction over a "res or property" in dispute. This relative equality of factors actually makes the decision to abstain appropriate, because there cannot be *Colorado River* abstention in a close case. The Court's task "is not to find some substantial reason for the *exercise* of federal jurisdiction," but to "ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Moses H. Cone, 460 U.S. at 25-26.* The presumption of the Court must be "heavily weighted in favor of the exercise of jurisdiction." *Id. at 16.* Because the "clearest of justifications" is not present here, the [*21] Court concludes that a stay pursuant to *Colorado River* would be inappropriate in this case.

## II. Inherent Power to Stay Cases

In the alternative, the defendants ask the Court to use its "inherent power to stay proceedings" and 'to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants'" to stay the matter. *Stone v. INS, 514 U.S. 386, 411, 115 S. Ct. 1537, 131 L. Ed. 2d 465 (1995)* (quoting *Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936)).* The Court finds no need to stay the case. As explained above, the state court and federal court cases here do not "seek the same relief based upon the same factual allegations" as the defendants claim, and there is no reason they cannot be heard simultaneously. Defs.' Mot. at 12. In addition, the Court finds that neither of the two district-court cases cited by the defendants provide a persuasive justification for staying this action. In both cases, the moving party showed that a decision in the state court would completely wipe out the basis of the federal case; and no similar showing has not been made here. *See Summa Four, Inc. v. AT & T Wireless Servs., Inc., 994 F.*

---

[5]   In *Moses H. Cone,* the Court rejected the argument that because the Federal Arbitration Act ("FAA") is an "anomaly" in that it does not provide an independent basis for federal court jurisdiction, the "source of law" factor was less meaningful under Colorado River. *Moses H. Cone, 450 U.S. at 26 n.32* ("[A]lthough enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate."). If even a statute with as "weak" a jurisdictional claim as the FAA is a "major consideration weighing against surrender," surely a *§ 1983* claim cannot be casually thrown to the wayside merely because the state court is capable of hearing it. *Id. at 26.*

Ziyad Hermiz

2010 U.S. Dist. LEXIS 123365, *21

Supp. 575, 577 (D. Del. 1998) (granting stay of federal [*22] patent case while waiting for determination in state court about who owned patent in suit, despite finding that cases were not "parallel proceedings" under *Colorado River*); *Lerco Corp. v. Haley, 597 F. Supp. 517, 518-19 (W.D. Ky. 1983)* (same).

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the defendants' motion to stay this case (docket no. 9) is **DENIED**.

**SO ORDERED.**

/s/ STEPHEN J. MURPHY, III

STEPHEN J. MURPHY, III

United States District Judge

Dated: November 22, 2010

Ziyad Hermiz



Positive
As of: April 4, 2014 4:40 PM EDT

# Matthews v. Mortg. Elec. Registration Sys.

United States District Court for the Eastern District of Michigan, Southern Division
April 5, 2011, Decided; April 5, 2011, Filed
CIVIL ACTION NO. 10-13740

**Reporter:** 2011 U.S. Dist. LEXIS 69501; 2011 WL 2560329

SHEILA MATTHEWS, EUGENE MATTHEWS, Plaintiffs, v. MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendants.

### Core Terms

mortgage, foreclosure, advertize, foreclose, nominee, lender, notice, mortgage agreement, debt collector, deed, summary judgment, chain of title, default, amended complaint, redemption period, indebtedness, unjust enrichment, quicken, right to foreclose, security interest, cause of action, nonjudicial, racketeer, recommend, borough

**Counsel:** [*1] Sheila Matthews, Plaintiff, Pro se, Detroit, MI.

Eugene F Matthews, Plaintiff, Pro se, Detroit, MI.

For Mortgage Electronic Registration Systems, Inc., Federal National Mortgage Association, Defendants: Elizabeth M. Messing, Orlans Associates, P.C., Troy, MI.

**Judges:** MARK A. RANDON, UNITED STATES MAGISTRATE JUDGE. DISTRICT JUDGE STEPHEN J. MURPHY, III.

**Opinion by:** MARK A. RANDON

### Opinion

**REPORT AND RECOMMENDATION GRANTING DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY FOR SUMMARY JUDGMENT (DKT. NO. 5) AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT (DKT. NOS. 6, 7)**

Before the Court are Defendants Mortgage Electronic Registration Systems, Inc. and Federal National Mortgage Association's ("Defendants") motion to dismiss, or alternatively for summary judgment (Dkt. No. 5) and Plaintiffs' motion to for leave to file an amended complaint. (Dkt. Nos. 6, 7). Plaintiffs Sheila and Eugene Matthews allege that the foreclosure by advertisement of their residence was improper and the subsequent Sheriff's sale, therefore, void. Since the undersigned finds, as a matter of law, that Defendants did not violate Michigan's mortgage foreclosure by advertisement statute, IT IS RECOMMENDED that Defendants' motion [*2] be GRANTED, Plaintiffs' motion for leave to file a first amended complaint DENIED, and Plaintiffs' lawsuit dismissed with prejudice.

## I. FACTUAL BACKGROUND

On July 31, 2006, Plaintiffs executed a mortgage and note in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for lender Quicken Loans, Inc. (Dkt. No. 1, Ex. #2, Ex. B) to secure a $103,000.00 loan to purchase a home located at 20195 Tracey in Detroit, Michigan. On June 20, 2009, the mortgage and note were assigned to OneWest Bank FSB, and recorded in the Wayne County Register of Deeds on July 9, 2009. (Dkt. No. 5, Ex. 3). Plaintiffs defaulted on their loan, and OneWest Bank FSB subsequently initiated a foreclosure by advertisement. (Dkt. No. 1, Ex. #2, Ex. A). The advertised notice, provided, in pertinent part:

> Default has been made in the conditions of a mortgage made by **Sheila Matthews**, married woman, and **Eugene Matthews**, her husband, to **Mortgage Electronic Registration Systems, Inc.,** as nominee for lender and lender's successor and/or assigns, Mortgagee, dated **July 31, 2006 and recorded August 15, 2006** in Liber 45152, Page 1608, Wayne County Records, Michigan. **Said mortgage is now held by OneWest Bank** [*3] **FSB by assignment. There is claimed to be due at the date hereof the sum of One Hundred Eleven Thousand Five Hundred Thirty-Eight and 99/100 Dollars ($111,538.99)** including interest at 8.375% per annum. Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that

2011 U.S. Dist. LEXIS 69501, *3

said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public vendue at the Courtroom 1607, Wayne County Circuit Court Tower in the Coleman A. Young Municipal Center in Detroit in Wayne County, Michigan at 1:00 p.m. on JULY 22, 2009. Said premises are **located in the City of Detroit, Wayne County, Michigan, and are described as Lot 161, Darby Subdivision,** as recorded in Liber 38, Page 85 of Plats. The **redemption period shall be 6 months** from the date of such sale . . . (Emphasis added).

Federal National Mortgage Association ("FNMA") purchased the property at the foreclosure sale on November 18, 2009, subject to Plaintiffs' right to redeem within 6 months. (Dkt. No. 1, Ex. #2, Ex. A). Plaintiffs did not redeem the property.

After the expiration of the redemption period, Defendant FNMA commenced a state court eviction action [*4] in 36th District Court. On June 11, 2010, a hearing was held and Defendant, FNMA was granted possession of the property. In response, plaintiffs filed the instant suit in the Wayne County Circuit Court, which Defendants then removed to this Court.

Plaintiffs' Complaint contains four counts: (1) "Allegations Against MERS and Federal National Mortgage Association Resulting in a Causes of Action and Requests for Relief," (2) "Allegations of Material Breach of Contract Against MERS Resulting in a Cause of Action and Requests for Relief," (3) "Slander of Title," (4) "Equitable Relief to Set Aside Sheriff's Deed." Plaintiffs' seek leave to amend their complaint to add two additional defendants (Quicken Loans, Inc. and OneWest Bank FSB) and allege the following nine counts: (1) "Affirmative Action Under *UCC 9-625*," (2) "Violations and Breach of *MCL 600.3204* et. al," (3) "Civil RICO," (4) "Allegations Against FNMA, MERS, and OneWest Resulting in a Causes of Action and Requests for Relief," (5) "Slander of Title," (6) "Fair Debt Collection Practices Act," (7) "Equitable Relief to Set Aside Sheriff's Deed," (8) "Unjust Enrichment Allegations Against FNMA," and (9) "Breach of Contract Allegations [*5] Against OneWest." Since Plaintiffs' proposed amended complaint incorporates all of the original complaint allegations, the undersigned reviews the proposed pleading to determine both Defendants' dispositive motion and propriety of granting leave to amend.

## II. ANALYSIS

### A. Standard of Review

*Federal Rule of Civil Procedure 12(b)(6)* authorizes this Court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted." In deciding a motion brought under *Rule 12(b)(6)*, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. *See League of United Latin American Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007).* To withstand a motion to dismiss, however, a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).* The factual allegations, accepted as true, in the complaint "must be enough to raise a right to relief above the speculative level," and "state a claim to relief that is plausible on its face." *Id. at 570.* "A claim has facial plausibility when [*6] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S.662 , 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).*

The purpose of the summary judgment rule "is to isolate and dispose of factually unsupportable claims or defenses ...." *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Therefore, the entry of a summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* When assessing a request for the entry of a summary judgment, the Court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987).*

In order for a dispute to be genuine, it must contain evidence upon which a jury could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 560 (6th Cir. 2004).* Thus, a court must recognize that the moving party has the initial obligation of identifying [*7] those portions of the record which demonstrate the absence of any genuine issue of a material fact. *See Celotex, 477 U.S. at 323.* Thereafter, the nonmoving party must "come forward with some probative evidence to support its claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co., 948 F.2d 283, 285 (6th Cir. 1991); Anderson, 477 U.S. at 256.* The entry of a summary judgment is appropriate if the nonmoving party fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex, 477 U.S. at 322.*

### B. Plaintiffs' Claims

Ziyad Hermiz

2011 U.S. Dist. LEXIS 69501, *7

At the outset, it should be noted that Plaintiffs' claims fail because — once the redemption period following foreclosure of a property has expired — the former owner's rights in and title to the property are extinguished. At that point, the former owner loses standing to assert claims with respect to the property. Indeed, in *Piotrowski v. State Land Office Board, 302 Mich. 179, 4 N.W.2d 514 (1942)*, the Michigan Supreme Court held that the mortgagors: (1) had "lost all their right, title, and interest in and to the property at the expiration of their [*8] right of redemption;" and (2) could not assert the right of parties "having an interest in the land" to meet the highest bid at the scavenger sale. *Id. at 185*. The standard under *Piotrowski* has been applied by Michigan courts — and by federal courts applying Michigan law — to bar former owners from making any claims with respect to foreclosed property after the end of the redemption period. *See Stein v. U.S. Bancorp, 2011 U.S. Dist. LEXIS 18357, 2011 WL 740537 (E.D. Mich. Feb. 24, 2011)*; *Overton v. Mortg. Elec. Registration Sys., 2009 Mich. App. LEXIS 1209, 2009 WL 1507342 (Mich. App. May 28, 2009)* (dismissing former owner's claim of fraud where redemption period expired one month after litigation was initiated); *see also, e.g., Moriarty v. BNC Mortg., Inc., 2010 U.S. Dist. LEXIS 132576, 2010 WL 5173830 (E.D. Mich. Dec.15, 2010)* (dismissing action for declaratory judgment voiding foreclosure proceedings). Thus, Plaintiffs' do not have standing to bring the claims asserted in this suit. Furthermore, Plaintiffs' claims fail for additional reasons:

### (1) Affirmative Action Under UCC 9-625

Plaintiffs challenge the foreclosure by advertisement of their property by asserting that MERS and OneWest Bank FSB failed to have a valid security interest in the property and, as a result, [*9] violated Michigan's foreclosure by advertisement statute (*M.C.L. 600.3201, et. seq.*). Plaintiffs voluntarily entered into a mortgage agreement with MERS as nominee for lender Quicken Loans, Inc. on July 21, 2006 (Dkt. No. 1, Ex. #2, Ex. B). On June 20, 2009, MERS assigned their interest to OneWest Bank FSB with this assignment being recorded in the Wayne County Register of Deeds on July 9, 2009. (Dkt. No. 5, Ex. 3). As will be further discussed below, the ability to foreclose by advertisement extends beyond the owner of the indebtedness and, therefore, Defendants were within their rights to pursue foreclosure by advertisement and such a nonjudicial foreclosure is proper when the requirements of *M.C.L. 600.3201, et. seq.* are followed.

*M.C.L. 600.3201* states that:

> Every mortgage of real estate, which contains a power of sale, upon default being made in any condition of such mortgage, may be

foreclosed by advertisement, in the cases and in the manner specified in this chapter.

Plaintiffs' mortgage contained a power of sale which stated:

> Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but if necessary to comply [*10] with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property.

(Dkt. No. 1, Ex. #2, Ex. B). Accordingly, MERS assigned their interest OneWest Bank FSB who was entitled to foreclose Plaintiffs' property by advertisement upon default.

### (2) Violations and Breach of *MCL 600.3204* et. al

Plaintiffs attempt to find some discrepancy in the mortgage agreement between the terms "nominee" and "mortgagee." Plaintiffs argue that MERS is only a "putative nominee" and therefore does not have the right to exercise the power of sale which is allegedly only available to the "holders" of the mortgage. *M.C.L. 600.3204(1)(d)* requires that "[t]he party foreclosing the mortgage is either the owner of the indebtedness *or* of an interest in the indebtedness secured by the mortgage *or* the servicing agent of the mortgage." (Emphasis added). Several Michigan federal district court cases have examined the authority of MERS as nominee of the lender to foreclose under *M.C.L. 600.3204*, and found that such authority is proper. *See Corgan v. Deutsche Bank Nat'l Trust Co., 2010 U.S. Dist. LEXIS 73069, 2010 WL 2854421 (W.D. Mich. 2010)*; [*11] *English v. Flagstar Bank, 2009 U.S. Dist. LEXIS 97427, 2009 WL 3429674 (E.D. Mich. 2009)*; *Hilmon v. MERS, 2007 U.S. Dist. LEXIS 29578, 2007 WL 1218718 (E.D. Mich. 2007)*; *United States v. Garno, 974 F.Supp 628, 633 (E.D. Mich. 1997)*. Since Plaintiffs' mortgage with Quicken Loans, Inc. granted MERS authority to foreclose, Plaintiffs cannot now claim that MERS lacks such authority. MERS, as the nominee of the lender and mortgagee was a proper party to initiate foreclosure proceedings, as it exercises the same general rights and powers as any mortgagee. Plaintiffs offer no evidence or basis for this Court to reach a conclusion any different than those reached in *English*, *Hilmon*, and *Corgan*. Quite simply, MERS, as the nominee of the lender and mortgagee was a proper party to initiate foreclosure proceedings or assign the right to do so to a third party.

Ziyad Hermiz

Plaintiffs also argue that MERS has materially breached the mortgage agreement basing this assertion on the allegation that MERS is not the mortgagee to whom the property was mortgaged for three following "economic" reasons: (1) MERS does not fund any loans, (2) no homeowners promise to pay MERS any money, and (3) MERS is never entitled to any proceeds from a potential foreclosure sale. As already [*12] addressed, by the express terms of the mortgage agreement, MERS possesses the right to foreclose on the property and to exercise any or all of their interests as nominee for the lender, Quicken Loans, Inc. Therefore, as a matter of law, MERS has not materially breached the mortgage agreement by assigning the right to foreclose on the property by advertisement.

### (3) Racketeer Influenced and Corrupt Organization Act

Plaintiffs also reference the Racketeer Influenced and Corrupt Organization Act, *18 U.S.C. § 1961* ("RICO"). To state a RICO claim, plaintiffs must plead the following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).* Therefore, "[t]o establish a RICO violation under *§ 1962(c)*, a plaintiff must allege that the RICO enterprise engaged in a 'pattern of racketeering activity' consisting of at least two predicate acts of racketeering activity occurring within a ten-year period." *Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006).* "The alleged predicate acts may consist of offenses 'which are indictable' under any number of federal statutes," including the mail [*13] fraud statute, *18 U.S.C. § 1341. Id.*

In making their RICO claim, Plaintiffs allege that the recording of false documents with the Wayne County register of deeds deprived them of their interest in the property. In addition, Plaintiffs allege that both Defendants' lawyers, Orlans Associates, P.C. ("Orlans"), and OneWest Bank FSB used the United States Postal Service to commit mail fraud. Similar RICO claims have been brought before the court in prior cases and have been found to be unmeritorious. See *Geter v. MERS, 2011 U.S. Dist. LEXIS 13494, 2011 WL 589414 (E.D. Mich. 2011); Austin v. Countrywide Home Loans, Inc., 2008 U.S. Dist. LEXIS 62141, 2008 WL 3833269 (E.D. Mich. 2008).* As in *Moon*, Plaintiffs have failed to allege any "facts suggesting that the scheme would continue beyond the Defendants accomplishing their goal of terminating" Plaintiffs interest in the property. *Moon, 465 F.3d at 725.* Plaintiffs' claims of mail fraud against Orlans are similar to those seen in *Austin* and lack merit since Orlans was representing their clients in a proper legal action evidenced by the State

Court's grant of possession of the property to FNMA after Plaintiffs failed to redeem within the six-month redemption period. See *Austin, 2008 U.S. Dist. LEXIS 62141, 2008 WL 3833269, *6-7.* [*14] Other than Plaintiffs' legal conclusions, there is no evidence to support any improper activity by the Orlans or OneWest Bank FSB. This claim must be dismissed because "the origination and servicing of a single loan 'does not bear the markings of the "long-term criminal conduct" about which Congress was concerned when it enacted RICO.'" *Geter, 2011 U.S. Dist. LEXIS 13494, 2011 WL 589414, at *4* (quoting *Moon, 465 F.3d at 725-26).*

### (4) Allegations Against FNMA, MERS and OneWest Resulting in a Causes of Action and Requests for Relief

Plaintiffs argue that Defendants had no financial interest in the property and, therefore, had no power to sell as "nominee" for the lender. Plaintiffs also contend that Defendants lacked the legal right to foreclose on the property due to alleged irregularities in the chain of title. Michigan's foreclosure by advertisement statute, *M.C.L. 600.3201, et. seq.*, provides the requirements by which such a foreclosure is to take place.

Contrary to Plaintiffs' assertions, the ability to foreclose by advertisement extends beyond the owner of the indebtedness. The statute authorizes foreclosure by "either the owner of the indebtedness *or* of an interest in the indebtedness secured by the mortgage *or* [*15] the servicing agent of the mortgage." *M.C.L. 600.3204(1)(d).* (Emphasis added). In addition, Plaintiffs expressly agreed in their mortgage agreement that MERS held only legal title as nominee for the lender, Quicken Loans, Inc. The mortgage agreement reads, in pertinent part:

> Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender ...."

Plaintiffs cannot now argue that MERS does not hold the rights Plaintiffs expressly and willingly granted MERS in the mortgage agreement. See *English v. Flagstar Bank, 2009 U.S. Dist. LEXIS 97427, 2009 WL 3429674 (E.D. Mich. Oct. 21, 2009 ).*

Defendants' notice of foreclosure also complied with *M.C.L. 600.3212*, which requires:

2011 U.S. Dist. LEXIS 69501, *15

Sec. 3212. Every notice of foreclosure by advertisement shall include all of the following:

(a) The names of the mortgagor, the original mortgagee, and the foreclosing assignee, if any.

(b) The date of the [*16] mortgage and the date the mortgage was recorded.

(c) The amount claimed to be due on the mortgage on the date of the notice.

(d) A description of the mortgaged premises that substantially conforms with the description contained in the mortgage.

(e) For a mortgage executed on or after January 1, 1965, the length of the redemption period as determined under section 3240.

The advertised notice of foreclosure included each of the requirements outlined in *Section 3212* above, and nowhere in this section is the current owner of the mortgage required to be included in the advertisement.

Plaintiffs attempt to challenge the foreclosure by advertisement of the property by asserting that there exist irregularities in the chain of title and that Defendants lacked the right to foreclose as a result. *M.C.L. 600.3204(3)*, the portion of Michigan's foreclosure by advertisement statute which addresses record chain of title, states:

If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title shall exist prior to the date of sale under *section 3216* evidencing the assignment of the mortgage *to the party foreclosing the mortgage.* (Emphasis added)

Since MERS, the original [*17] mortgagee, was not the party foreclosing the mortgage by advertisement, *M.C.L. 600.3204(3)* requires a record chain of title in order to evidence the assignment of the mortgage to the foreclosing party, OneWest Bank FSB, in the instant case. The assignment of the mortgage to OneWest Bank FSB occurred on June 20, 2009 and was recorded on July 9, 2009 at the Wayne County Register of Deeds. The Sheriff's sale did not take place until November 18, 2009 and therefore a record chain of title existed prior to the date of sale. Accordingly, Defendants have complied with requirements set forth in Michigan's foreclosure by advertisement statute and no irregularities in the

chain of title exist which would effect Defendants' legal right to foreclose. See *Stein v. U.S. Bancorp, 2011 U.S. Dist. LEXIS 18357, 2011 WL 740537 (E.D. Mich. Feb. 24, 2011); Livonia Properties Holdings LLC . v. 12840-12976 Farmington Road Holdings, LLC, 399 Fed. Appx. 97, 2010 WL 4275305 (6th Cir. 2010); see also e.g., Gathing v. MERS, Inc., 2010 U.S. Dist. LEXIS 22149, 2010 WL 889945 (E.D. Mich. Mar. 10, 2010)* (rejecting borrower's claim that bank lacked standing to foreclose where assignment was recorded after first publication of foreclosure notice, and noting that, under the current [*18] version of *§ 600.3204(3)*, record chain of title only needs to exist as of the date of the foreclosure sale).

**(5) Slander of Title**

Plaintiffs aver that the Sheriff's deed is void and a slander of title claim arises based on the allegation that MERS does not have possession of the original promissory note. As discussed above, Defendants have complied with Michigan's foreclosure by advertisement statute and accordingly the Sheriff's deed is valid. Plaintiffs have neglected to cite any portion of Michigan's foreclosure by advertisement statute which requires the production of the original promissory note to make such a foreclosure proper.

**(6) Fair Debt Collection Practices Act**

Plaintiffs also assert that Defendants' lawyers, Orlans Associates, P.C., violated the Fair Debt Collection Practices Act, *15 U.S.C. § 1692, et. seq.* This claim also fails. "The Fair Debt Collection Practices Act (FDCPA), *15 U.S.C. § 1692 et. seq.*, imposes civil liability on 'debt collector[s]' for certain prohibited debt collection practices." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 130 S.Ct. 1605, 1606, 176 L. Ed. 2d 519 (2010).* The Supreme Court has held that law firms may qualify as debt collectors for purposes of [*19] the FDCPA. See *Heintz v. Jenkins, 514 U.S. 291, 115 S. Ct. 1489, 131 L. Ed. 2d 395 (1995); see also Jerman, 130 S.Ct. 1605, 1618, 176 L. Ed. 2d 519 (2010).* A plaintiff pursuing a claim under the FDCPA, however, bears the burden of establishing by proof that the defendant is a debt collector. See *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 60 (2nd Cir. 2004); Passa v. City of Columbus, 748 F. Supp. 2d 804, 2010 WL 3825387, at *5 (S.D. Ohio 2010).* A "debt collector" includes people "who regularly collects or attempts to collect, directly or indirectly, debts owed [to] ... another." *15 U.S.C. § 1692a(6).* The statute excludes certain persons from the definition of "debt collector:"

any person collecting or attempting to collect any debt owed or due or asserted to be owed or

Ziyad Hermiz

2011 U.S. Dist. LEXIS 69501, *19

due another to the extent such activity (I) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

*15 U.S.C. § 1692a(6)(F)*. Several courts in this [*20] District have held that "[a]ttorneys who merely represent creditors and do not send demand letters to debtors do not act as 'debt collectors' under the FDCPA." *Claxton v. Orlans Associates, P.C., 2010 U.S. Dist. LEXIS 88028, 2010 WL 3385530 at * 3 (E.D. Mich. Aug.26, 2010)* (citing *Waller v. Life Bank, 2007 U.S. Dist. LEXIS 78053, 2007 WL 3104917 (E.D. Mich. Oct.22, 2007)*) (holding that "attorneys who represent debt collectors and do not send demand letters to debtors" are not governed by the FDCPA); *see also TerMarsch v. Fabrizio & Brook, P.C., 2006 U.S. Dist. LEXIS 86117, 2006 WL 3313744 (E.D. Mich., Nov. 15, 2006)* (defendant attorney and law firm who instituted nonjudicial foreclosure proceedings and never sent a demand letter were granted dismissal because they were retained to foreclose a mortgage and were not debt collectors); *McCall v. GMAC Mort. Corp., 2007 U.S. Dist. LEXIS 30614, 2007 WL 1201535 (E.D. Mich. April 6, 2007)* (uncontested that the defendant, Orlans Associates, P.C., was not a debt collector). In the pursuit of a foreclosure by advertisement for OneWest Bank FSB, Orlans was not acting as a "debt collector" as defined by the FDCPA. *See Gathing v. MERS, 2010 U.S. Dist. LEXIS 22149, 2010 WL 889945 (W.D. Mich. Mar. 10, 2010)* (defendants not debt collectors where they assisted in non-judicial foreclosure for [*21] bank); *Montgomery v. Huntington Bank, 346 F.3d 693 (6th Cir. 2003)* (court held that a party enforcing a security interest, such as an agency repossessing vehicles, "falls outside the ambit of the FDCPA for all purposes, except for the purposes of *§ 1692f(6)*").

Even though Defendants are not "debt collectors" as defined by the FDCPA, under *Montgomery*, a person enforcing a security interest through nonjudicial action cannot be subject to liability under FDCPA unless that person violates *§ 1692f(6)*. Plaintiffs argue that Orlans violated *section 1692f(6)* of the FDCPA "by threatening to interfere with the business interests of the Plaintiffs, where no present right to possession existed as collateral through an enforceable security interest." (Dkt. No. 6-7). *Section 1692f(6)* prohibits a person enforcing a security interest

from "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if:

> (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;
>
> (B) there is no present intention to take possession of the property; or
>
> (C) the property is exempt by law from such dispossession or [*22] disablement.

The record does not support a 1692f(6) claim against the Defendants arising from the nonjudicial foreclosure of Plaintiffs' property. Defendants commenced foreclosure proceedings on June 22, 2009, two days after MERS assigned Plaintiffs' mortgage to OneWest Bank FSB. (Dkt. No. 5, Ex. 3-4). As discussed above, the foreclosure notice complied with the requirements set forth in *M.C.L. 600.3212* and Plaintiffs have presented no evidence to contest the fact that their mortgage was in default on that date.

### (7) Equitable Relief to Set Aside Sheriff's Deed

Plaintiffs once again argue that the Sheriff's sale was void and that it should be set aside restating many of the allegations already discussed above. Plaintiffs argue that MERS cannot be both "mortgagee" and "nominee" and that MERS does not have the power to foreclose on the property. Since MERS has complied with Michigan's foreclosure by advertisement statute and the mortgage agreement expressly granted such rights to MERS, the foreclosure was proper and no equitable relief is warranted.

### (8) Unjust Enrichment Allegations Against FNMA

"The doctrine of unjust enrichment provides an equitable remedy imposed to prevent injustice." *Andersons, Inc. v. Consol. Inc., 348 F.3d 496, 502 (6th Cir. 2003)* [*23] (internal quotes omitted). A properly pleaded claim for unjust enrichment must include allegations that "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Id. at 501* (internal quotes omitted).

Plaintiffs' claim for unjust enrichment should be rejected. The amended complaint pleads the requisite elements of unjust enrichment in a conclusory fashion and Plaintiffs' base their argument essentially on the assertion that the

2011 U.S. Dist. LEXIS 69501, *23

foreclosure by advertisement was improper. Once again, Plaintiffs argue that FNMA was not a good faith purchaser and MERS did not own the mortgage for Plaintiffs' property. As discussed above, the ability to foreclose by advertisement extends beyond the owner of the indebtedness. In addition, since Michigan's foreclosure by advertisement statute was adhered to, the Sheriff's deed is valid and FNMA was a good faith purchaser of the property.

### (9) Breach of Contract Allegations Against OneWest

Plaintiffs allege that OneWest Bank FSB "failed to send Plaintiffs a notice of default or Notice with intent to accelerate [*24] the mortgage" and was therefore "in breach of the agreement as defaulting Servicer." (Dkt. No. 6-7). To state a breach of contract claim under Michigan law, a plaintiff must first establish the elements of a valid contract. See *Pawlak v. Redox Corp., 182 Mich. App. 758, 453 N.W.2d 304 (1990)*. The elements of a valid contract in Michigan are 1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation. *Thomas v. Leja, 187 Mich. App. 418, 468 N.W.2d 58 (1990)*. Once a valid contract has been established, a plaintiff seeking to recover on a breach of contract theory must then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breached caused the plaintiff's injury. See *Platsis v. E.F. Hutton & Co., Inc., 642 F. Supp. 1277, 1309 (W.D. Mich. 1986)*. Plaintiffs have failed to properly plead a breach of contract claim. Plaintiffs have provided no specific contract provision or identifiable term breached by the Defendants and have pled no facts showing breach of their mortgage agreement. See *Jarbo v. BAC Home Loan Servicing, 2010 U.S. Dist. LEXIS 132570, 2010 WL 5173825 (E.D. Mich. Dec. 15, 2010)*.

Furthermore, [*25] the Michigan Supreme Court has stated the law that is dispositive of such claims:

> Foreclosure sales by advertisement are defined and regulated by statute. Once the mortgagee elects to foreclose a mortgage by this method, the statute governs the prerequisites of the sale, notice of foreclosure and publication, mechanisms of the sale, and redemption.

*Senters v. Ottawa Savings Bank, FSB, 443 Mich. 45, 50, 503 N.W.2d 639 (1993)*. As already discussed, Defendants have followed Michigan's foreclosure by advertisement statute (*M.C.L. 600.3201, et. seq.*) and notice was provided in accordance with the requirements set forth in *M.C.L. 600.3212*.

### C. Leave to Amend Should be Denied.

Pursuant to *Fed. R. Civ. P. 15(a)(2)*, a party may amend its pleading by leave of the court and the court "should freely give leave when justice so requires." However, the grant of leave to amend is not a foregone conclusion. Appropriate factors to consider in determining whether to permit an amendment include: "the delay in filing, the lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and the futility of amendment." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 605 (6th Cir. 2001). [*26] Amendment is futile when the amendment is subject to dismissal under *Fed. R. Civ. P. 12(b)(6)*, that is, when it fails to state a claim on which relief may be granted. *Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417, 420-21 (6th Cir. 2000); Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 307 (6th Cir. 2000)*.

Since each of the counts in Plaintiffs' proposed amended complaint fail as a matter of law, leave to amend should be denied as futile.

### III. CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that Defendants' motion to dismiss, or alternatively for summary judgment be **GRANTED**, Plaintiffs' motion for leave to amend their complaint **DENIED**, and Plaintiffs' lawsuit **DISMISSED** with prejudice.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in *28 U.S.C. § 636(b)(1)* and *Fed.R.Civ.P. 72(b)(2)*. Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981)*. [*27] The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987)*. Pursuant to *E.D. Mich. LR 72.1(d)(2)*, a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

Ziyad Hermiz

2011 U.S. Dist. LEXIS 69501, *27

Dated: April 5, 2011                           MARK A. RANDON

/s/ Mark A. Randon                             UNITED STATES MAGISTRATE JUDGE



Positive
As of: April 4, 2014 4:40 PM EDT

# Foster v. Argent Mortg. Co., L.L.S.

United States District Court for the Eastern District of Michigan, Southern Division
January 25, 2010, Decided; January 25, 2010, Filed
CASE NO. 07-CV-11250

**Reporter:** 2010 U.S. Dist. LEXIS 27926; 2010 WL 1136807

ARZEL L. FOSTER, III, Plaintiff, v. ARGENT MORTGAGE COMPANY, L.L.S.; AMC MORTGAGE COMPANY; AMERIQUEST MORTGAGE; COUNTRY WIDE HOME LOANS, INC.; BANK OF AMERICA, N.A.; FIRST CHOICE FINANCIAL; WELLS FARGO BANK, N.A.; TROTT & TROTT, P.C. and MERS; Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Complaint dismissed at, Motion denied by *Foster v. Argent Mortg. Co., L.L.S., 2010 U.S. Dist. LEXIS 27948 ( E.D. Mich., Mar. 24, 2010)*

**Prior History:** *Foster v. Ameriquest Mortg., 2009 U.S. Dist. LEXIS 68863 ( E.D. Mich., Aug. 6, 2009)*

---

**Core Terms**

---

unjust enrichment, mortgage, summary judgment motion, state court, disclosure, amended complaint, doctrine, merger clause, summary judgment, district court, misrepresent, inextricably intertwined, residential mortgage, foreclosure, report and recommendation, plaintiff's claim, fraud claim, emotional distress, loan transaction, nonmovant, estimate, notice

**Counsel:** [*1] Arzel L. Foster, III, Plaintiff, Pro se, Detroit, MI.

I. Recommendation
II. Report
A. Statement of Facts
B. Amended Complaint
C. Defendants' May 7, 2009 Motion for Summary Judgment
D. Standard: Fed. R. Civ. P. 56(c)
E. This Court Should Grant Defendants' Motion for Summary Judgment
1. Fraud Claim
2. Claim for Violation of Equal Credit Opportunity Act
3. Claim for Unjust Enrichment
4. Claim for Intentional Infliction of Emotion Distress
5. Claim for Violation of the Truth-In-Lending Act
6. Claim for Violation of Michigan Consumer Protection Act
III. Notice to Parties Regarding Objections

For Argent Mortgage Company, L. L. C., AMC Mortgage Company, Ameriquest Mortgage, Defendants: David A. Breuch, Clark Hill (Detroit), Detroit, MI.

For Country Wide Home Loans, Incorporated, Wells Fargo Bank, N. A., Defendants: Alicia B. Chandler, Michelle T. Thomas, Bodman, Detroit, MI; Brian C. Summerfield, Bodman, Troy, MI.

For Bank of America, MERS, Defendants: Alicia B. Chandler, Michelle T. Thomas, Bodman, Detroit, MI.

**Judges:** PAUL J. KOMIVES, UNITED STATES MAGISTRATE JUDGE. JUDGE PAUL D. BORMAN.

**Opinion by:** PAUL J. KOMIVES

---

**Opinion**

---

**REPORT AND RECOMMENDATION REGARDING DEFENDANTS ARGENT MORTGAGE COMPANY, LLC, AMC MORTGAGE SERVICES, INC., AND AMERIQUEST MORTGAGE COMPANY'S MAY 7, 2009 MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 60)**

**Table of Contents**

---

2010 U.S. Dist. LEXIS 27926, *3

**I.   [*2] RECOMMENDATION:** This Court should grant defendants' summary judgment motion as to all Counts I, II, IV, V, VI, and VIII. A separate report and recommendation is filed this date regarding defendants Countrywide and Wells Fargo's July 2, 2009 motion to dismiss the first amended complaint.

**II. REPORT:**

**A. Statement of Facts**

In April 2005, plaintiff retained a mortgage brokerage firm, First Choice Financial, to assist him in securing a residential mortgage loan for a property located on 19165 Midway, Southfield, Michigan 48076. Doc. Ent. 60-3. On April 8, 2005, the broker provided plaintiff with a variety of required disclosures, including a Good Faith Estimate, Truth-In-Lending Disclosure Statement and Servicing Disclosure Statement. Doc. Ent. 60-4. Further, in an effort to secure the residential mortgage loan, plaintiff authorized the broker to release information contained in his loan application or other documents required in connection with the loan. Doc. Ent. 60-5.

On or about April 11, 2005, plaintiff's broker submitted a loan request on his behalf to Argent. Doc. Ent. 60-7. Subsequently, Argent mailed plaintiff several documents showing the estimated cost of credit for the property   [*3] and enclosed several significant documents and disclosures. Doc. Ent. 60-8. Included were a Real Estate Settlement Procedures Act (RESPA) Servicing Disclosure indicating that servicing would be assigned to AMC Mortgage Services, Inc., a letter labeled 'Understanding Your Loan' which explains the loan process, a disclosure explaining variable rate loans, a Consumer Caution and Home Ownership Counseling Notice which advises the borrower about the risks of borrowing, and a Borrower *Bill of Rights* as required by Michigan law. Doc. Ent. 60-8.

On April 28, 2005, plaintiff entered in a mortgage with Argent. Doc. Ent. 60-9. The mortgage set forth the loan amount and plaintiff executed an 'Adjustable Rate Rider.' Doc. Ent. 60-9. During this transaction, plaintiff also signed a 'Truth-in-Lending Disclosure Statement.' Doc. Ent. 60-11. This Statement provided plaintiff with notice that the loan has a variable rate feature and a variable rate feature. Doc. Ent. 60-11. On April 28, 2005, plaintiff also signed the RESPA Servicing Disclosure identifying AMC as the servicer of the loan (Doc. Ent. 60-14) and a Joint Notification Letter Notice of Assignment, Sale or Transfer of Servicing Rights, which   [*4] again advised of the serving transfer from Argent to AMC (Doc. Ent. 60-20).

On April 30, 2005, the mortgage was duly assigned to Wells Fargo Bank, resulting in Countrywide Home Loans assuming responsibilities as servicer. Doc. Ent. 69-6. On August 22, 2006, Wells Fargo foreclosed the mortgage on the property and

purchased the property at the foreclosure sale. Doc. Ent. 69-7. The redemption period came and went and as plaintiff failed to redeem property, title vested in Wells Fargo. On or before March 26, 2007, Wells Fargo filed suit against plaintiff to obtain possession of the property. Doc. Ent. 69-8. The district court entered a favorable judgment for Wells Fargo which entitled it to possession of the property. Doc. 69-9.

**B. Amended Complaint**

On January 15, 2009, plaintiff filed an amended complaint in this Court alleging an illegal foreclosure on property located at 19165 Midway Road, Southfield, Michigan 48075. Doc. Ent. 49.

The caption of the complaint lists the defendants as Argent Mortgage Company, LLC; AMC Mortgage Company; Ameriquest Mortgage; Countrywide Home Loans, Inc.; Bank of America; First Choice Financial; Wells Fargo Bank; Trott & Trott and MERS. Doc. Ent. 49 at 1. However,   [*5] on June 24, 2009, Judge Borman dismissed the complaints against defendants First Choice Financial Group Inc., Trott & Trott, MERS, and Bank of America for failure to effect proper service. Doc. Ent. 66. On May 7, 2009, defendants Argent Mortgage, AMC Mortgage, and Ameriquest filed a motion for summary judgment. Doc. Ent. 60-1. The motion for summary judgment was referred to me for entry of a report and recommendation and is the subject of this Report and Recommendation. Doc. Ent. 61. On May 8, 2009, the remaining defendants Countrywide and Wells Fargo filed a motion to dismiss. Doc. 69. Plaintiff's amended complaint contains eight (8) counts of which only six (6) identify defendants Argent, AMC, and Ameriquest. [1] Doc. Ent. 49.

**C. Defendants' June 2, 2009 Motion for Summary Judgment.**

On May 7, 2009, defendants Argent, Ameriquest, and AMC filed a *Fed. R. Civ. P. 56* motion for summary judgment. Doc. Ent. 60-1. Defendants seek dismissal of plaintiff's claims and argue that "(i) the claim for Fraud in Count I does not allege a misrepresentation by any of these defendants; (ii) plaintiff's timely receipt of a Good Faith Estimate and other required disclosures eviscerates Count II, which alleges a violation of the Truth in Lending Act and Regulation Z, and which claims are otherwise barred by the applicable statute of limitations; (iii) there is no factual basis to allege in Count IV that Plaintiff was discriminated against in violation of the Equal Credit Opportunity Act; (iv) the Michigan Consumer Protection Act, the basis for Counts V, does not apply to residential mortgage transactions; (v) the presence of an express contract bars the claim for Unjust Enrichment in Count VI; and (vi) there is no factual   [*7] basis to allege in Count VIII that any conduct by these Defendants would give rise to a Intentional Infliction of Emotional Distress claim." Doc. Ent. 60-1 at 5.

On May 8, 2009, Judge Borman referred this motion to me for entry of a report and recommendation. Doc. Ent. 61. On May 11,

---

[1]   Counts I, II, IV, V, VI, and VIII identify Argent, AMC, and Ameriquest as defendants. Count I alleges fraud against Countrywide, Bank of America, Wells Fargo, Trott & Trott, First Choice Financial Group, Argent, Ameriquest, and AMC. Doc. Ent. 49 at 1. Count II alleges a violation of the Truth-in-Lending Act. Doc. Ent. 49 at 2. Count IV alleges a violation of the Equal Credit Opportunity Act by all defendants including Argent, AMC, and Ameriquest. Doc. Ent. [*6] 49 at 3-4. Count V alleges the defendants violated the Michigan Consumer Protection act. Doc. Ent. 49 at 4. Count VII alleges the conduct of all defendants caused plaintiff emotional distress. Doc. Ent. 49 at 5.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 27926, *7

2009, I entered an order setting a response deadline for plaintiff of June 30, 2009. Doc. Ent. 62. In this order, I also affirmed that the motion for summary judgment would be "decided upon the papers without being scheduled for oral argument." Doc. Ent. 62. Subsequently, on June 22, 2009, plaintiff filed an ex parte emergency motion for extension of time to file a response to defendants' motion for summary judgment. Doc. Ent. 65. Notwithstanding this motion, plaintiff filed his response on June 30, 2009. Doc. Ent. 67. However, I granted plaintiff's request for an extension of time to allow him additional time to supplement his answer and respond to the motion for summary judgment. Doc. Ent. 71. On September 31, 2009, plaintiff filed supplemental answers to motion for summary judgment. Doc. Ent. 75. Defendants Argent, Ameriquest, and AMC filed a reply brief in support of their motion for summary judgment on September [*8] 14, 2009. Doc. Ent. 81.

**D. Standard:** _Fed. R. Civ. P. 56_

Under _Federal Rule of Civil Procedure 56(c)_, summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. _See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)._ There are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)._ Under _Rule 56_, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. _Celotex Corp., 477 U.S. at 323_ (quoting _Anderson, 477 U.S. at 255_); _Matsushita Elec. Indus. Co., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)._ However, a mere scintilla of evidence in support of the nonmovant's position does not create a genuine issue of material fact. _Anderson, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)._ In fact, once the movant has carried his burden under _Rule 56(c)_, [*9] the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts" in order to avoid summary judgment. _Matsushita, 475 U.S. at 586._

**E. This Court Should Grant the Defendants' Summary Judgment Motion.**

**1. Fraud Claim**

Plaintiff asserts a claim for Fraud in Count I of the amended complaint. To show an actionable fraud claim, plaintiff must show: "(1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." _Martell v. Turcheck, No. 07-CV-14068, 2008 U.S. Dist. LEXIS 51966, 2008 WL 2714210, at * 4, (E.D. Mich. July, 7, 2008)_ citing _Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 247 N.W.2d 813, 816 (Mich. 1976)._ The absence of any of these

elements is "fatal to a recovery." _Hi-Way Motor Co., 247 N.W.2d at 816._

As an initial matter, defendants contend this Court should dismiss Count I because plaintiff has not alleged that a false representation was made by the moving defendants. [*10] Under _Federal Rule of Civil Procedure 12(b)(6)_, a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a _Rule 12(b)(6)_ motion to dismiss, plaintiff must allege "enough facts to state a claim [for] relief that is plausible on its face." _Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)_ (citations and quotations omitted). While plaintiff's amended complaint states that "Countrywide/Bank of America and Wells Fargo made false material misrepresentations," there is no specific mention of the moving defendants or any alleged misrepresentation by them. Plaintiff's failure to allege misrepresentation by defendants should entitle them to a _Rule 12(b)(6)_ dismissal for failure to state a claim.

Further, even if plaintiff subsequently alleges a misrepresentation by the moving defendants, the defendants should be entitled to summary judgment because plaintiff's failure to show reliance on any misrepresentations is fatal to this claim. The record shows that plaintiff signed a mortgage, which contained a valid merger clause, and this merger clause makes it unreasonable for plaintiff to rely on any representations not included in [*11] the mortgage. In _UAW-GM Human Resources Center v. KSL Recreation Corp., 228 Mich. App. 486, 579 N.W.2d 411 (1998)_, the court held that "when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that would invalidates the entire contract including the merger clause." The court further asserted that "the merger clause made it unreasonable for the plaintiff's agent to rely on any representations not included in the letter agreement." _Id. at 504._

In this case, plaintiff signed the 'Important Notice to Borrowers', which contained a valid merger clause. Doc. Ent. 60-21. The Notice provided that "[t]o protect [the parties] from misunderstanding or disappointments" the entire agreement "was contained in the loan documents . . . signed today." Doc. Ent. 60-21. Further the Notice provided that "[a]ny subsequent agreement between [the parties] regarding this loan transaction must also be a signed writing to be legally enforceable." Doc. Ent. 60-21. Under the rule set forth in _KSL Recreation Corp._, the existence of this merger agreement makes it unreasonable for plaintiff [*12] to rely on any representation not included in the mortgage. Accordingly, plaintiff cannot maintain a claim for fraud against the defendants because the valid merger clause renders reliance on representations that are not included in the agreement unreasonable.

If this Court does not agree with my _Rule 12(b)_ and _Rule 56(c)_ assessment above, plaintiff's claim should still be barred by the _Rooker-Feldman_ doctrine. The Rooker-Feldman doctrine "stands for the simple . . . proposition that lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to

Ziyad Hermiz

correct state court judgments." *Gottfried v. Med. Planning Servs., 142 F.3d 326, 330 (6th Cir.1998).*

This rule is bolstered by the negative inference drawn from *28 U.S.C. § 1257(a),* which states that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari." *See District of Columbia Ct. of Appeals v. Feldman, 460 U.S. 462, 476, 103 S. Ct. 1303, 75 L. Ed. 2d 206, (1983)* (citing *§ 1257* in support of its decision to abstain). Therefore, when a district court is presented with claims [*13] that are "inextricably intertwined" with the judgment of a state court, the federal court "does not have jurisdiction over these elements of the . . . complaints." *Id. at 486-87.*

In *Feldman,* the two plaintiffs, who had been denied permission to sit for the bar examination by the highest court of the District of Columbia, sued that court in federal district court. The defendants challenged both the specific decisions denying them admission to the exam and the constitutionality of the underlying local statutes authorizing the denials. In affirming the dismissal of the former claims, the Supreme Court reasoned that the "allegations that the District of Columbia Court of Appeals acted arbitrarily and capriciously in denying [plaintiffs'] petitions for waiver [of the bar examination requirements] . . . are inextricably intertwined with the District of Columbia Court of Appeals' decisions." *Id. at 486-87.* The latter claims, however, challenging the bar examination rules themselves, were permitted to go forward, because the issue presented to the district court would not be the correctness of the District of Columbia Court of Appeals' decision, but would instead be the constitutionality of [*14] the rule that the District of Columbia court applied. *Id. at 487.*

In a later case, Justice Marshall succinctly restated the Rooker-Feldman doctrine when he reasoned as follows:

> While the question whether a federal constitutional challenge is inextricably intertwined with the merits of a state-court judgment may sometimes be difficult to answer, it is apparent, as a first step, that the federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.

*Pennzoil Co. v. Texaco, Inc. 481 U.S. 1, 25, 107 S. Ct. 1519, 95 L. Ed. 2d 1 (1987)* (Marshall, J., concurring); *see also Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S. Ct. 149, 68 L. Ed. 362 (1923)* (dismissing a complaint that a judgment of the Supreme Court of Indiana violated several federal constitutional provisions, because "[t]o do [*15] so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original."). Courts applying the Rooker-Feldman doctrine

have done so in two types of cases: (1) cases that constitute a direct attack on the substance of the state court opinion, and (2) cases that challenge the procedures by which a state court arrived at its decision. *See Catz v. Chalker, 142 F.3d 279, 294-95 (6th Cir.1998).*

Applying the Rooker-Feldman doctrine to plaintiff's case, this Court should dismiss the fraud claim. Plaintiff's claim that defendants misrepresented the amount plaintiff owed during the foreclosure is "inextricably intertwined" with the state court's judgment that the foreclosure was proper. Further, this claim is an attempt by plaintiff to directly attack the substance of the state court opinion. As such, Count I of plaintiff's complaint is barred by the Rooker-Feldman doctrine.

**2. Claim for Violation of the Equal Credit Opportunity Act**

The Equal Credit Opportunity Act provides that:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--
>
> (1) on the basis of race, color, religion, [*16] national origin, sex or marital status, or age (provided that applicant has the capacity to contract);
>
> (2) because all or part of the applicant's income derives from any public assistance program; or
>
> (3) because the applicant has in good faith exercised any right under this chapter.

*15 U.S.C. § 1691(a).* "Plaintiff can establish a prima facie case of credit discrimination by showing: (1) Plaintiff was a member of a protected class; (2) Plaintiff applied for credit from Defendants; (3) Plaintiff was qualified for the credit; and (4) despite Plaintiff's qualification, Defendants denied her credit application." *Charlotte Mays v. Buckeye Rural Electric Cooperative, Inc., 277 F.3d 873 (6th Cir. 2002).*

Defendants contend that plaintiff's amended complaint should be dismissed because "[p]laintiff's pleading is deficient under *Fed. R. Civ. P. 8.*" Doc. Ent. 60-1 at 8. *Rule 8* provides that a party's claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Defendants' assertion is correct as plaintiff failed to plead the third and fourth elements of a credit discrimination claim. Plaintiff's failure to allege that he qualified for the [*17] credit and more importantly that defendants denied his credit application despite his qualifications should prompt this Court to dismiss his complaint. In fact, the record before this Court reveals that credit *was* extended to Plaintiff. Therefore, even if plaintiff properly alleges the elements of a credit discrimination claim, the facts in the record could not lead rational trier of fact to find for plaintiff because plaintiff was not denied credit by defendants. Accordingly, this court should grant the defendants' summary judgment as to Count IV.

Ziyad Hermiz

### 3. Claim for Unjust Enrichment

"The doctrine of unjust enrichment provides an equitable remedy imposed to prevent injustice." *Andersons, Inc. v. Consol. Inc., 348 F.3d 496, 502 (6th Cir. 2003)* (internal quotes omitted). A properly pleaded claim for unjust enrichment must include allegations that "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Id. at 501* (internal quotes omitted).

As an initial matter, plaintiff's complaint for unjust enrichment should be dismissed for failure to [*18] state a claim. Under *Federal Rule of Civil Procedure 12(b)(6)*, a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a *Rule 12(b)(6)* motion to dismiss, plaintiff must allege "enough facts to state a claim [for] relief that is plausible on its face." *Twombly, 127 S.Ct. at 1974.* Plaintiff's amended complaint pleads the requisite elements of unjust enrichment in a conclusory fashion. That is, plaintiff does not allege what benefit was received by defendants. Further, the complaint does not meet the requirements of *Rule 9(b).* "It matters not whether a claim is grounded in fraud or some other legal theory. Rather, if an allegation in a pleading contains 'an avermant of fraud,' whether as part of a fraud claim or an element of a non-fraud claim, the "averment of fraud" must be stated with the requisite particularity." *Brege v. Lakes Shipping Company, Inc., 225 F.R.D. 546, 549 (E.D. Mich. Dec. 29, 2004).* Plaintiff's unjust enrichment claim is premised on the alleged misrepresentation by defendants. As stated in Section 1 of this report, plaintiff's amended complaint does not meet the threshold of *Rule 9(b)* as it does [*19] not even allege a particular misrepresentation by defendants.

Additionally, defendants contend that the "parties' written contract precludes a claim for unjust enrichment." Doc. Ent. 60-1 at 8. In *King v. Ford Motor Credit Co., 257 Mich. App. 303, 327-28, 668 N.W.2d 357 (2003)*, the court held that a plaintiff's unjust enrichment claim failed because where a written agreement governs the parties transaction, a contract will not be implied under the doctrine of unjust enrichment. In *Noel v. Fleet Finance, Inc., 971 F. Supp. 1102, 1113-14 (E.D. Mich. 1991)*, the plaintiffs alleged a claim for unjust enrichment based on the defendant's receipt of certain premiums in loan transactions. Because the plaintiffs entered into express loan contract, which contained the terms of the loan, the unjust enrichment claim could not be maintained. *Id.* "There cannot be an express and implied contract covering the same subject matter at the same time." *Id.* Again, in *King v. Ford Motor Credit Co., 257 Mich. App. 303, 327-28, 668 N.W.2d 357 (2003)*, the [*20] court held that a plaintiff's unjust enrichment claim failed because where a written agreement governs the parties transaction, a contract will not be implied under the doctrine of unjust enrichment.

In this case, plaintiff alleges that defendants were unjustly enriched because they received mortgage payments and plaintiff's property was subsequently foreclosed. Plaintiff and defendants entered into an express mortgage loan contract, which specified the terms and payments to be made. Because the

transaction was governed by a written agreement, plaintiff cannot rely on a claim of unjust enrichment and defendants are entitled to summary judgment as a matter of law.

Further, this Court should find that plaintiff's unjust enrichment claim is barred by the *Rooker-Feldman* doctrine because the issue is "inextricably intertwined" with the judgment of a state court. Plaintiff states "Defendant's, although have [sic] received his mortgage payments, have foreclosed his property" and received a benefit. Doc. Ent. 49 at 3 P 32. Thus, plaintiff's unjust enrichment claim is predicated on the allegation that the state court foreclosure was improper. The state court's finding that the foreclosure was [*21] proper is inextricably intertwined with the unjust enrichment claim, and this Court should therefore grant summary judgment as to Count VI of plaintiff's complaint.

### 4. Claim for intentional infliction of emotional distress

Under Michigan law, to properly establish a prima facie case for intentional infliction of emotion distress, a plaintiff must allege: "1) extreme and outrageous conduct; 2) intent or recklessness; 3) causation; and 4) severe emotional distress." *Pratt v. Brown Machine Co., 855 F.2d 1225, 1239 (6th Cir. 1988)* (quoting *Margita v. Diamond Mortgage Corp., 159 Mich. App. 181, 187-88, 406 N.W.2d 268 (Mich. Ct. App. 1987)).* The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* Plaintiff alleges that the defendants' behavior in "withholding information and providing false information is extreme and outrageous;" however the state court has already upheld the validity of the foreclosure. Doc. Ent. 49 at 3 P 37. Moreover, plaintiff does not show how the action of foreclosing the mortgage on his home meets the elements of intentional infliction of emotional distress.

Additionally, [*22] in plaintiff's response he states "the defendant's breached the contract, and this cause [sic] intentional infliction of emotion distress." Doc. Ent. 77 at 8. Defendants contend that the mere failure to meet a contractual obligation, without more, does not amount to outrageous conduct for purposes of this claim. *See Roberts v. Auto-Owners Ins. Co., 422 Mich. 594, 602, 374 N.W.2d 905 (1985); Wedit v. Auto-Owners Ins. Co., 156 Mich. App. 19, 25, 401 N.W.2d 375 (Mich. App. 1986).* Plaintiff does not allege any negligent, willful or intentional conduct on behalf of defendants to satisfy the pleading threshold of this tort. Therefore, defendants are entitled to summary judgment.

### 5. Claim for violation of the Truth-In-Lending Act.

The Truth-In-Lending Act was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him" *15 U.S.C § 1601(a).* It further states that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." *15 U.S.C. § 1640(e).* Plaintiff alleges that defendants "failed to give [*23] any TILA disclosures, failed to disclose whom the servicer was going to be, failed to give a good faith estimate and failed to provide a HUD-1." Doc. Ent. 49 at 3 P 14.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 27926, *23

The record clearly shows that plaintiff's assertions are incorrect. The record indicates that on April 11, 2005, defendants mailed plaintiff its own Good Faith Estimate and Truth-In-Lending disclosures. Doc. Ent. 60-8. Further on April 28, 2005, plaintiff signed the Truth-In-Lending Disclosure Statement. Doc. Ent. 60-11. On this same date, plaintiff also signed the RESPA Servicing Disclosure identifying AMC as the servicer of the loan (Doc. Ent. 60-14) and a Joint Notification Letter Notice of Assignment, Sale or Transfer of Servicing Rights, which also advised of the servicing transfer from Argent to AMC (Doc. Ent. 60-20). During this transaction, plaintiff also signed the HUD-1 dated April 28, 2005. Doc. Ent. 60-13. Plaintiff simply does not have a colorable claim against defendants for any violation of the Truth-In-Lending Act as he timely received the disclosure documents.

Further, the one-year statute of limitation found in the statute bars plaintiff's claim. Plaintiff closed his loan on April 28, 2005 and filed [*24] suit on March 23, 2007, nearly two years later. Plaintiff's claim was filed after the statute's one-year statute of limitations had run and therefore this court should grant defendants' motion for summary judgment as to Count II.

**6. Violation for the Michigan Consumer Protection Act**

Count V of plaintiff's amended complaint alleges violations of the Michigan Consumer Protection Act. This court should grant defendants motion for summary judgment because the Michigan Consumer Protection Act does not apply to residential mortgage transactions. In _Newton v. West, 262 Mich. App. 434, 439, 686 N.W.2d 491 (Mich. App. 2004),_ the court held that residential mortgage loan transactions are exempt from the Act. Accordingly, plaintiff's claims under the Michigan Consumer Protection Act should fail "as a matter of law because the residential mortgage loan transactions are exempt." _Id. at 442;_ see also _Cowles v. Bank West, 263 Mich. App. 213, 219, 687 N.W.2d 603 (Mich. App. 2004)_ (relying on _Newton_ and holding that residential mortgage loan transactions at issue were not covered by the Act).

**III. NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation, but are [*25] required to act within fourteen (14) days of service of a copy hereof as provided for in _28 U.S.C. § 636(b)(1)_ and _E.D. Mich. LR 72.1(d)(2)._ Failure to file specific objections constitutes a waiver of any further right of appeal. _Thomas v. Arn, 474 U.S. 140, 147-48, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Howard v. Secretary of Health & Human Servs., 932 F.2d 505, 508-09 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)._ Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. _Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995)._ Pursuant to _E.D. Mich. LR 72.1(d)(2),_ a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

/s/ Paul J. Komives

PAUL J. KOMIVES

UNITED STATES MAGISTRATE JUDGE

Dated: 1/25/10

Ziyad Hermiz

No *Shepard's* Signal™
As of: April 4, 2014 4:40 PM EDT

# Boston v. Clark

United States District Court for the Eastern District of Michigan, Southern Division
September 13, 2012, Decided; September 13, 2012, Filed
Case No. 11-14935

**Reporter:** 2012 U.S. Dist. LEXIS 130496; 2012 WL 4048877

Renea A. Boston, Plaintiff, v. The Estate of James E. Clark, Jr., et al., Defendants.

---

**Core Terms**

---

motion to dismiss, child support, factual allegations, racketeer, conspiracy, unjust enrichment, cause of action, predicate act, fraudulent, racketeering activity, pleading requirements, marital assets, misrepresent, survive, gamble, unpaid, hide

**Counsel:** [*1] For Renea' A Boston, Plaintiff: Darryl J. Chimko, Duncan H. Brown, Chimko & Associates, P.C., Royal Oak, MI.

For The Estate of James E. Clark, Jr., Kimberly Lee Clark, Defendants: Thomas N. Strauch, Detroit, MI.

For Deidre Sain, also known as Deidre S Birch, also known as Deidre Simone-Burch, also known as Didra Burch, also known as Deidre S Perry, Defendant: Robert S. Vanderford, R. Scott Vanderford, P.C., Redford, MI.

**Judges:** Honorable Nancy G. Edmunds, United States District Judge.

**Opinion by:** Nancy G. Edmunds

---

**Opinion**

---

**ORDER GRANTING DEFENDANT SAIN'S MOTION TO DISMISS [35]**

Before the Court is Defendant Deidre Sain's motion to dismiss Plaintiff Renea A. Boston's RICO (Racketeering Influenced and Corrupt Organizations Act, *18 U.S.C. § 1961, et seq.*), fraudulent transfer, fraud, and unjust enrichment claims against her. (Dkt. 35.) Having reviewed the pleadings, the Court finds that a hearing is unnecessary and disposes of one pursuant to *Eastern District of Michigan Local Rule 7.1(f)(2)*.

Because the Court finds that Plaintiff's recovery of unpaid child support claims are not actionable through a RICO

claim, and even if they were, Plaintiff still has failed to plead factual allegations that would create a plausible right [*2] to relief, the Court dismisses Plaintiff's RICO claims. The Court dismisses the remaining state law claims, as well, because Plaintiff fails to plead those causes of action with the required specificity to raise a plausible right to relief. The Court therefore dismisses the complaint as to the remaining defendants in this case. [1]

## I. Facts

### A. The parties

Plaintiff Renea A. Boston has filed this lawsuit to recover unpaid child support by James E. Clark Jr. (JEC), now deceased. Plaintiff sues JEC's estate, JEC's alleged former companion, Deidre Sain, JEC's mother's estate (the Estate of Wu Yon Lee Clark), Kimberly Lee Clark, and Ryan Clark. Plaintiff seeks to recover the unpaid child support from these defendants.

Plaintiff also seeks to recover from two limited liability companies, although those LLCs are not listed as defendants: Semaj & Dee Investment Group, LLC (SDIG) and Semaj Group Construction, LLC (SGC). (Compl. ¶¶ 2, 3.)

### B. Plaintiff's allegations

Plaintiff states that, on September 5, 1997, she gave birth to a daughter, Neakeeya, whom [*3] she conceived out of wedlock with James E. Clark Jr. (JEC) (Comp. ¶ 11.) Plaintiff has attached the Michigan state court order determining that JEC was the father of her daughter. (Compl., Ex. C.) That order also provided, as Plaintiff maintains, that JEC would pay child support until Neakeeya's eighteenth birthday. (Compl. ¶ 12, Ex. C.)

Plaintiff alleges that JEC never honored the child support order. (Compl. ¶ 12.) Plaintiff states that she sought assistance from the Wayne County Friend of the Court for the years until Neakeeya turned eighteen. (*Id.* ¶ 13.) Plaintiff states that the Friend of the Court stated that it

---

[1] On June 20, 2012, the Court granted Plaintiff's request for default judgment as to Ryan Clark and The Estate of Wu Yon Lee Clark as to liability only.

2012 U.S. Dist. LEXIS 130496, *3

was unable to assist her, because it was unable to garnish JEC's wages because he was self-employed. (*Id.* ¶ 14.)

Plaintiff adds that the Friend of the Court indicated that it was frustrated because, although JEC appeared to be the "true owner" of SDIG and SGC, it was unable to attach JEC's obligation to the assets or entities "because the only member of each LLC . . . is Defendant Deidre Sain aka: Deidre S. Birch; aka: Deidre Samon Burch; aka: Didra Burch; aka: Deidre S. Perry." (Compl. ¶ 15.)

Plaintiff articulates that JEC purposefully frustrated Plaintiff's attempts to  [*4] have him pay the required child support. (Compl. ¶ 16.) She alleges that he stated, "You will never see a dime from me for child support[.]" (*Id.*) Plaintiff further alleges that "most if not all Defendants herein were informed by JEC of the same." (*Id.*)

Plaintiff states that, although Defendant Sain was listed as the resident agent and sole member of SDIG and SGC, JEC "represented himself to be the owner of both." (Compl. ¶ 18.) Plaintiff attaches JEC's obituary, which she offers to show that JEC represented himself as owner of SGC. (*Id.*)

Plaintiff adds that "JEC originally operated and was either the original sole proprietor, or sole member, of the two [LLCs]" before he transferred the LLCs to Defendant Sain. (Compl. ¶ 19.) She alleges that Sain did not pay any consideration to JEC for the LLC transfers. (*Id.* ¶ 20.)

Plaintiff then alleges that JEC held property that he transferred to Defendant Sain to prevent her from having him pay child support. She states that he was the deed holder to real property located at 9325 Stahelin, Detroit, Michigan. (Compl. ¶ 22.) She adds that, on December 9, 2010, JEC transferred the Stahelin property to Defendant Sain, by quit claim deed, for one dollar. [*5] (*Id.* ¶¶ 23, 24.) Plaintiff provides that, a year prior to the transfer, JEC purchased that property for $98,000.00. (*Id.* ¶ 25.) Plaintiff alleges that JEC held another property, at 24859 River Heights Street, in Southfield, Michigan, since 1991. (Compl. ¶ 26.) Plaintiff maintains that this property was foreclosed upon and then that JEC repurchased the property for $27,900.00. (*Id.* ¶ 27.) Plaintiff further maintains that Defendant Sain "paid the sum of one dollar . . . to obtain [an] interest in the River Heights Street property from JEC[.]" (*Id.* ¶ 28.)

Plaintiff alleges that JEC made further purchases: a 2001 Kia Sportage automobile and a 1987 yacht. (Compl. ¶¶ 30, 31.) Plaintiff also states that JEC's mother had an estate worth around two million dollars at the time of her death and that JEC was the sole heir of the estate. (*Id.* ¶ 32.)

Plaintiff states that JEC, on the "eve" of his death, "contacted Plaintiff for the apparent purpose of heckling Plaintiff by advising her that he was the recipient of 'one of [his] mom's checks indicating that he had become at least one million dollars . . . wealthier than he was before due to the death of his mother[.]" (*Id.*)

In support of her RICO claim,  [*6] Plaintiff states that JEC, "in concert" with the other defendants, carried on at least an eighteen year "enterprise by purchasing and selling assets, earning income in every manner available to JEC and all of the named Defendants taking great care in secreting JEC's assets for the purpose of defeating the rights of Plaintiff, all of JEC's other Creditors and to circumvent Federal, State and local laws." (Compl. ¶ 34.) Plaintiff further alleges that the "actions of JEC and all of the [d]efendants constitute racketeering and the operation of an enterprise specifically designed and operated to circumvent [the law.]" (*Id.* ¶ 35.)

Plaintiff claims JEC, and now his estate, owe $38,938.44 in child support. (Compl. ¶ 37.) Plaintiff maintains that, since she has alleged a violation of RICO, she is entitled to treble damages; she therefore seeks $116,815.32, plus costs, including reasonable attorneys' fees. (*Id.* ¶ 39.)

## II. *Rule 12(b)(6)* motion to dismiss standard

A motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are true and determine [*7] whether the complaint states a valid claim for relief. See *Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)*; *Bower v. Fed. Express Corp., 96 F.3d 200, 203 (6th Cir. 1996)*. To survive a *Rule 12(b)(6)* motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal citations and emphasis omitted). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007)*.

"[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id. at 679* (internal quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

Ziyad Hermiz

2012 U.S. Dist. LEXIS 130496, *7

Determining whether a complaint states a plausible claim for [*8] relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief.

*Id.* (internal quotation marks and citation omitted). Thus:

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id. at 678* (internal quotation marks and citation omitted).

### III. Analysis

The Court finds that it must dismiss Plaintiff's RICO claims for two reasons. First, a RICO claim does [*9] not contemplate an action as the one alleged here-a claim to recover unpaid child support from an alleged conspiracy. Second, Plaintiff has not set forth any factual allegations in support of her RICO predicate acts that would make the claim plausible. The Court also dismisses Plaintiff's state law claims. The Court finds that Plaintiff has not pleaded the claims with the required particularity to survive a *Rule 12(b)(6)* motion to dismiss.

### A. RICO does not contemplate unpaid child custody recovery

Plaintiff alleges that Defendants engaged in an enterprise to deprive her of child support. Federal courts around the country have found similar marital assets recovery RICO claims fail because these types of cases do not satisfy the RICO enterprise requirement and cannot present the type of racketeering activity contemplated by RICO. The Court agrees with these cases and finds that Plaintiff has not

alleged an enterprise that rises to what RICO requires an enterprise to be.

RICO makes it "unlawful for a person employed by or associated with an enterprise engaged in" activities affecting "interstate or foreign commerce . . . to conduct or participate, directly or indirectly, in the conduct of [*10] such enterprise's affairs through a pattern of racketeering activity." *18 U.S.C. § 1962(c)*. To state a claim under *subsection 1962(c)*, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Fremont Reorganizing Corp. v. Duke, 811 F.Supp.2d 1323, 1335 (E.D.Mich. 2011)* (citations omitted).

"RICO defines an 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity.'" *Fremont, 811 F.Supp.2d at 1336* (quoting *18 U.S.C. § 1961(4)*). "To make out a claim under *section 1962(c)*, the plaintiff must plead that 'the 'enterprise' is the instrument through which illegal activity is conducted.'" *Id.* (citations omitted). The plaintiff must therefore establish:

1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; 2) that the members of the enterprise functioned as a continuing unit with established duties; and 3) that the enterprise was separated and distinct from the pattern of racketeering activity in which it engaged.

*Id.* (citation omitted). "This enterprise must have an [*11] existence apart from the pattern of racketeering, must be an ongoing organization, and must function as a continuing unit as shown by a hierarchical or consensual decision-making structure." *Martinez v. Martinez, 207 F.Supp.2d 1303, 1306 (D.N.M. 2002)* aff'd in pertinent part and vacated in part on grounds not applicable here, *62 F.App'x 309 (10th Cir. 2003)* (citations omitted). "The purpose of this [enterprise] requirement is to satisfy Congressional intent in enacting RICO; RICO was not intended to simply create another form of conspiracy, but was aimed at preventing criminal organization from taking over legitimate businesses or engaging in a pattern of racketeering acts." *Martinez, 207 F.Supp.2d at 1306* (citation omitted).

In *Martinez*, the plaintiff filed a RICO suit alleging that her husband had entered into a conspiracy to deprive her of her portion of marital assets. The court stated,

Ziyad Hermiz

2012 U.S. Dist. LEXIS 130496, *11

[The plaintiff's] complaint does not allege that Defendants were organized into a separate enterprise. At most, it may be read to allege that Defendants conspired together to hide Defendant Martinez' income and property from the state court, in order to prevent Plaintiff from receiving her proper [*12] share of the community assets. [H]owever, simply alleging a conspiracy or concerted action between defendants is not sufficient to meet the 'enterprise' requirement of a civil RICO claim. Nor are Plaintiff's claims of a conspiracy to deprive her of marital assets sufficient to meet the 'continuity' factor that is part of the 'enterprise' requirement-that is, that the claimed enterprise have sufficient indicia of continuity to warrant treatment under the RICO statute.

*Id.* (citation omitted).

Other federal courts have also found that RICO was not an appropriate cause of action for a plaintiff seeking to recover marital assets or spousal support. In *Rosner v. Rosner, 766 F.Supp.2d 422 (E.D.N.Y. 2011)* the court held that RICO was not the appropriate means by which to recover marital property. The court stated:

However, regardless of the number and span of the alleged predicate acts, the plaintiff alleges a single goal of all of this activity: to hide marital property from her. In the Court's view, this does not rise to the level of alleged wrongdoing required to state a valid RICO claim. There is only one victim in this alleged scheme-namely, the plaintiff-and the alleged societal effect [*13] here is minimal. The plaintiff is not the first person involved in a matrimonial case to attempt to bring a RICO claim against a spouse for allegedly hiding marital assets. The courts that have previously addressed this type of allegation have almost universally found such claims to be a misuse of the RICO statute.

*Rosner v. Rosner, 766 F.Supp.2d 422, 425-26 (E.D.N.Y. 2011)* (and citing cases for the proposition that plaintiffs attempting to recover or discover monetary property cannot use the RICO statute.).

*Ruttenberg v. Ruttenberg, 08-4898, 2009 U.S. Dist. LEXIS 12450, 2009 WL 424548 (N.D.Ill. Feb. 18, 2009)* also supports the holding that a marital property recovery is not actionable through RICO. There, the court found that the

plaintiff could not satisfy the pattern requirement of RICO. The court held:

Where [the plaintiff's] RICO claims runs into trouble is the pattern requirement. Congress passed RICO to 'eradicate organized, long-term criminal activity.' Despite 'widespread abuse' of civil RICO, RICO 'has not federalized every state common-law cause of action available to remedy business deals gone sour.' 'Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual [*14] criminal activity.' It is not surprising, then, that a number of courts have concluded that the sort of fraud involved in hiding assets in connection with a divorce does not constitute a pattern of racketeering for purposes of RICO.

*Ruttenberg v. Ruttenberg, 08-4898, 2009 U.S. Dist. LEXIS 12450, 2009 WL 424548, at *4 (N.D.Ill. Feb. 18, 2009)* (citations omitted). In *Ruttenberg*, the court held that the "scheme with a single goal" of hiding the husband's income so that it would not be awarded to the wife in a divorce proceeding" was not actionable under RICO. *2009 U.S. Dist. LEXIS 12450, [WL] at *5*. The *Ruttenberg* court further held that the "alleged conduct is distasteful, but it does not amount to a RICO violation. RICO is not meant to turn common-law fraud into a federal claim; it is aimed at longterm, organized crime." *Id.*

The Court agrees with these cases that have found RICO inappropriate for the type of acts put forth by Plaintiff. Here, Plaintiff has not alleged a RICO enterprise. She has not pleaded a separate enterprise apart from the pattern of racketeering. She has not alleged a continuing unit with a decision-making structure. She, at most, has alleged a conspiracy. That pleaded conspiracy does not satisfy the pleading requirements [*15] necessary for a RICO enterprise. Plaintiff's RICO cause of action therefore fails to state a claim at the enterprise element.

**B. Plaintiff's complaint does not assert factual allegations that create a plausible right to relief**

Plaintiff's complaint also fails because she has not alleged facts supporting any of the predicate acts.

As to pleading a pattern of racketeering activity, "the plaintiff must allege at least two predicate acts, although [even alleging two acts] may not necessarily be sufficient." *Fremont, 811 F.Supp.2d at 1336* (citation omitted). "To sustain a RICO claim beyond the pleading stage, [a

Ziyad Hermiz

plaintiff] must allege specific facts establishing each and every element of the claim." *Heaton v. Bank of America Corp., 10-12394, 2011 U.S. Dist. LEXIS 81376, 2011 WL 3112325, at *6 (E.D.Mich. July 26, 2011)* (Cohn, J.) (citing *Sedima S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985))*.

Here, Plaintiff has pleaded predicate acts, but she offers no factual allegations to support the acts and often misreads or misconstrues the predicate acts statutes

Plaintiff first alleges that Defendants violated *18 U.S.C. § 1511*. This section provides that:

> It shall be unlawful for two or more persons to conspire to obstruct [*16] the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if - - (1) one or more of such persons does any act to effect the object of such a conspiracy; (2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and (3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

*18 U.S.C. § 1511*. Plaintiff has made no allegations with respect to gambling. Since *18 U.S.C. § 1511* relates to gambling, and Plaintiff has not made any gambling allegations, the Court dismisses this claim.

Plaintiff next alleges that Defendants violated *18 U.S.C. § 1546*, which relates to fraud and the misuse of visas, permits, and other documents concerning naturalization and immigration. Plaintiff has not made any allegations that relate to this statute, which addresses fraud and misuse of visas, permits, and other documents in relation to immigration and naturalization. *18 U.S.C. § 1546*. The Court therefore grants Defendant Sain's motion to dismiss with respect to this claim.

Plaintiff [*17] alleges that Defendants violated *18 U.S.C. § 1503*, which addresses the influencing or injuring or officers or jurors generally, not obstruction of justice as Plaintiff claims. Plaintiff has not made any allegations that Defendants violated this statute by influencing or injuring an officer or juror. The Court therefore grants Defendant Sain's motion to dismiss with respect to this claim.

Plaintiff finally alleges a violation of *18 U.S.C. § 1951*, which touches upon the interference with commerce by threats or violence. The statute provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement

of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

Plaintiff has not made any allegations that Defendants violated this statute by using robbery, extortion, or physical violence or by conspiring to rob, extort, or commit physical violence. The Court therefore grants Defendant Sain's motion to [*18] dismiss with respect to this claim.

### C. Plaintiff's complaint does not assert factual allegations that create a plausible right to relief as to her state claims

The remaining claims in Plaintiff's complaint are: violations of *Michigan Compiled Laws § 566.31, et seq.*, the Michigan Uniform Fraudulent Transfer Act; unjust enrichment; intentional fraud; and negligent fraud. These are all state claims that Plaintiff alleges in connection with the overarching RICO child support evading racketeering cause of action.

### 1. Plaintiff's fraud claims fail

In Counts IV through VI, Plaintiff alleges violations of Michigan's Uniform Fraudulent Transfer Act. Plaintiff alleges that Defendants intentionally and fraudulently transferred assets and real property to avoid JEC's child support allegations. Plaintiff has also alleged that Defendants committed both intentional and negligent fraud.

These claims are all subject to *Federal Rule of Civil Procedure 9(b)*'s heightened pleading requirements. *See IN re NM Holdings Co., LLC, 407 B.R. 232, 260-61 (Bankr. E.D.Mich. 2009)* (surveying case law supporting the holding that intentional fraudulent transfer claims are subject to *Rule 9(b)*'s pleading standards.). *See* [*19] *also Smith v. Bank of Am. Corp., 11-1406, 485 Fed. Appx. 749, 2012 U.S. App. LEXIS 12504, 2012 WL 2301645, at *2 (6th Cir. June 18, 2012)* (applying *Rule 9(b)*'s pleading requirements on negligent/innocent misrepresentation and finding that a complaint that fails to put a defendant on notice "as to the time, place, and content of the alleged misrepresentations" cannot survive a *Rule 12(b)(6)* motion to dismiss.).

*Rule 9(b)* requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud[.]" *Fremont, 811 F.Supp.2d at 1336-37* (quoting *Fed.R.Civ.P.*

*9(b)*.) The plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]' and the injury resulting from the fraud." *Id. at 1337.* "The complaint also must identify the person making the alleged misrepresentations or involved in the alleged predicate acts." *Id.* (citations omitted).

Here, Plaintiff has failed to allege the time, place, and content of any alleged misrepresentation. Plaintiff has not put any defendant on notice of fraud. These claims therefore fail to meet *Rule 9(b)*'s pleading requirements and therefore fail. The Court dismisses [*20] these claims.

## 2. Plaintiff's unjust enrichment claim fails

Plaintiff's last claim is a claim of unjust enrichment against Defendants, "on which [she] can only succeed by proving that [Defendants] received and retained a benefit from [Plaintiff] to [Plaintiff's] detriment." *Smith, 485 Fed. Appx. 749, 2012 U.S. App. LEXIS 12504, 2012 WL 2301645, at *4* (citation omitted). Plaintiff has only offered conclusory allegations in support of this claim. She states that, if Defendants are permitted to retain the allegedly fraudulently transferred assets and properties, Defendants would be unjustly enriched to her detriment. (Compl. ¶ 66.) She adds that Defendants "acted knowingly

to the detriment of Plaintiff." (*Id.* ¶ 67.) Given that this unjust enrichment claim stems from the alleged fraudulent activity, and Plaintiff's statement that Defendants acted knowingly towards Plaintiff and caused her a detriment, the Court finds that the unjust enrichment claim is grounded in fraud and must meet *Rule 9(b)*'s pleading requirements. Here, Plaintiff's allegations do not meet *Rule 9(b)*'s requirements-she fails to allege any time, place, or content of alleged statements or acts. The Court dismisses this claim.

## VI. Conclusion

For the above-stated reasons, [*21] the Court GRANTS Defendant Sain's motion to dismiss and dismisses the complaint against her and the remaining defendants with prejudice.

## SO ORDERED.

/s/ Nancy G. Edmunds

Nancy G. Edmunds

United States District Judge

Dated: September 13, 2012

Ziyad Hermiz



Positive
As of: April 4, 2014 4:40 PM EDT

# Carter v. Mich. Dep't of Corr.

United States District Court for the Eastern District of Michigan, Southern Division
July 11, 2013, Decided; July 11, 2013, Filed
CASE NO. 2:12-CV-12621

**Reporter:** 2013 U.S. Dist. LEXIS 134781

JOEL CARTER, Plaintiff, v. MICHIGAN DEPARTMENT OF CORRECTIONS, et al., Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Motion denied by, Injunction denied by, Summary judgment granted by *Carter v. Mich. Dep't of Corr., 2013 U.S. Dist. LEXIS 133838 ( E.D. Mich., Sept. 19, 2013)*

**Prior History:** *Carter v. Mich. Dep't of Corr., 2013 U.S. Dist. LEXIS 19940 ( E.D. Mich., Jan. 10, 2013)*

---

**Core Terms**

preliminary injunction, summary judgment, injunction, deliberate indifference, amended complaint, futile, prison, deprive, pain, supplemental jurisdiction, leave to amend, conspiracy, non-moving, summary judgment motion, inflict, sua sponte, indifferent, inmate, serious medical needs, district court, irreparable, genuine, deliberately, disability, prescribe, recommend, farmer, wanton, confinement, northern

**Counsel:** [*1] Joel Carter, Plaintiff, Pro se, IONIA, MI.

For Haresh Pandya, Regional Medical Officer, Jeffrey Stieve, Doctor, Defendants: Allan J. Soros, Michigan Department of Attorney General, Corrections Division, Lansing, MI.

**Judges:** PAUL J. KOMIVES, UNITED STATES MAGISTRATE JUDGE. JUDGE STEPHEN J. MURPHY, III.

**Opinion by:** PAUL J. KOMIVES

---

**Opinion**

REPORT AND RECOMMENDATION ON: (1) PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT (docket #27); (2) DEFENDANT STIEVE AND PANDYA'S MOTION FOR SUMMARY JUDGMENT (docket #28); (3) PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (docket #32); and (4) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (docket #33)

I. **RECOMMENDATION**
II. **REPORT**
A. *Background*
B. *Cross-Motions for Summary Judgment*
1. *Legal Standard*
2. *Eighth Amendment Claims*
a. Eighth Amendment Standard
b. Analysis
3. *ADA Claims*
4. *Claims Against the MDOC and John/Jane Doe Defendants*
C. *Plaintiff's Motion for Injunctive Relief*
1. *Legal Standard*
2. *Analysis*
D. *Plaintiff's Motion for Leave to Amend*
1. *Legal Standard*
2. *Analysis*
a. State Law Claims
b. Federal Conspiracy Claims
c. Additional Defendants
d. Additional Factual Allegations

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *1

E. *Conclusion*
III. NOTICE TO PARTIES REGARDING OBJECTIONS

I. RECOMMENDATION: The Court should grant defendants' motion [*2] for summary judgment and deny plaintiff's motion for summary judgment, should grant summary judgment to the moving defendants on plaintiff's *Eighth Amendment* claims, *sua sponte* grant summary judgment to the non-moving defendants on plaintiff's *Eighth Amendment* claims, and *sua sponte* dismiss plaintiff's ADA claims against all defendants. The Court should also deny plaintiff's motions for leave to file an amended complaint and for injunctive relief.

II. REPORT:

A. *Background*

Plaintiff Joel Carter, a state prisoner, commenced this action by filing a *pro se* civil rights complaint pursuant to *42 U.S.C. § 1983* and Title II of the Americans with Disabilities Act (ADA). At the times relevant to his complaint, plaintiff was incarcerated at the Marquette Branch Prison and the Gus Harrison Correctional Facility. Named as defendants are the Michigan Department of Corrections, Regional Medical Officer Dr. Haresh Pandya, and John/Jane Does 1-5, members of the "Pain Committee." Subsequent to the filing of plaintiff's complaint, I entered an Order requiring the Michigan Department of Corrections to provide the names and addresses of the members of the Pain Management Committee to the Marshal so service [*3] could be effected on these defendants. As a result of this Order service was effected on one additional defendant, Chief Medical Officer Dr. Jeffrey Stieve.

In his complaint, plaintiff alleges that he suffers from multiple sclerosis (MS), a degenerative nerve condition. In 2004, as a result of this condition, he was prescribed daily injections of Copaxone. *See* Compl., ¶¶ 13-14. On June 11, 2011, while incarcerated at the Marquette Branch Prison, he experienced neurological symptoms consisting of intense burning pain in his spinal cord, hips, and legs, and tingling pain in his feet. He was examined by Physician's Assistant Kocha, who indicated that he was seeking approval from defendant Panday or the Pain Management Committee for a neuro-transmitted medication such as Neurontin or Dilantin. *See id.*, ¶ 15. On June 16, he was transferred to the Gus Harrison Correctional Facility. On June 27, his prescriptions for Copaxone and Elavil expired. Physician Assistant Jindell submitted a request to defendant Pandya for approval of plaintiff's medication. *See id.*, ¶ 16. Plaintiff alleges that neither defendant Pandya nor the pain committee responded to Kocha's request for a neuro-transmitted medication [*4] or Jindell's request for renewal of his existing medications. *See id.*, ¶¶ 15-16. Jindell submitted additional requests on June 30 and July 5. On July 6, defendant Pandya approved the Elavil prescription but did not address the Copaxone prescription. Plaintiff received his final Copaxone injection on July 10. On August 15, after plaintiff filed a complaint with the Michigan Department of Community Health, defendant Pandya approved plaintiff's Copaxone prescription, and plaintiff began receiving his daily injections on August 17. *See id.*, ¶¶ 17-18. On August 16, 2011, Jindell submitted another request to the Pain

Management Committee for a neuro-transmitted pain medication. As of the date of his complaint, this request had not been approved. *See id.*, ¶ 19.

Plaintiff's complaint asserts three causes of action. In Count I, he alleges that defendant Pandya's failure to approve his prescription for Copaxone constituted deliberate indifference to his serious medical needs in violation of the *Eighth Amendment*. In Count II, plaintiff alleges that the Pain Management Committee members' denial of his requested medications constituted deliberate indifference to his serious medical needs. Finally, [*5] in Count III, plaintiff alleges that defendants' failure to provide him appropriate medical treatment violated Title II of the ADA. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

The matter is currently before the Court on several motions filed by the parties. First, on March 1, 2013, plaintiff filed a motion for leave to file an amended complaint. In this motion, plaintiff seeks to: (1) add state law claims of gross negligence and intentional infliction of emotional distress; (2) add federal claims of conspiracy to deprive plaintiff of his civil rights pursuant to *42 U.S.C. §§ 1985(3), 1986*; (3) add Daniel Heyns, Director of MDOC, as a defendant in his official capacity; (4) add William Borgerding, a member of the Pain Management Committee, as a defendant; and (5) add additional factual allegations regarding the treatment of his condition. Defendants have not filed a response to this motion. Second, on March 20, 2013, defendants Pandya and Stieve filed a motion to dismiss or for summary judgment. Defendants argue that plaintiff failed to exhaust his administrative remedies, and that he cannot establish a violation of his *Eighth Amendment* [*6] rights. On May 6, 2013, plaintiff filed a combined motion for summary judgment and response to defendants' motion. Finally, also on May 6, 2013, plaintiff filed a motion for a temporary restraining order and preliminary injunction. Plaintiff seeks an injunction preventing defendants from subjecting plaintiff to the unnecessary infliction of pain and requiring them to provide appropriate medication for his medical condition. Defendants Pandya and Stieve filed a response to this motion on June 7, 2013.

B. *Cross-Motions for Summary Judgment*

1. *Legal Standard*

Under *Rule 56*, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A fact is material only if its resolution will affect [*7] the outcome of the lawsuit." *Hedrick, 355 F.3d at 451-52* (citing *Anderson, 477 U.S.*

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *7

*at 248*). In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor. *See Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603, 613 (6th Cir. 2003)*; *Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003)*.

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case." *Hedrick, 355 F.3d at 451* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*). To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is" an absence of evidence to support the non-moving party's case." *Celotex Corp., 477 U.S. at 325*. "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453 (6th Cir. 2001)* [*8] (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*); *see also, FED. R. CIV. P. 56(e)*.

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue. As the Supreme Court has explained, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50*. (citations omitted); *see Celotex Corp., 477 U.S. at 322-23*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland, 344 F.3d at 613*.

To establish a viable *§ 1983* claim, a plaintiff must show that: (1) he was deprived of a right, privilege or immunity secured by the Federal Constitution or the laws of the United States; and (2) the deprivation was caused by a person while [*9] acting under color of state law. *See Doe v. Wigginton, 21 F.3d 733, 738 (6th Cir. 1994)*. It is well established that liability in a *§ 1983* action cannot be based on a theory of *respondeat superior*. *See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009)*; *Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. "To recover damages under *42 U.S.C. § 1983*, a plaintiff must establish a defendant's personal responsibility for the claimed deprivation of a constitutional right." *Diebitz v. Arreola, 834 F. Supp. 298, 304 (E.D. Wis. 1993)*. "Because vicarious liability is inapplicable to *Bivens* and *§ 1983* suits, a plaintiff must plead that each Government-official defendant, through the official's own conduct, has violated the Constitution." *Iqbal, 129 S. Ct. at 1948*. In other words, in order to state a claim under *§ 1983* "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under *§ 1983* must be based on the personal involvement of the defendant." *Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998)* (per curiam); *see also, Carr v. Parker, No. 98-6395, 1999 U.S. App. LEXIS 32688, 1999 WL 1206879, at *1 (6th Cir. Dec. 9, 1999)*; [*10] *Salehpour v. University of Tennessee, 159 F.3d 199, 206 (6th Cir. 1998)*.

### 2. *Eighth Amendment* Claims

Plaintiff alleges that defendants violated his *Eighth Amendment* right to be free from cruel and unusual punishment by denying him needed prescriptions.

### a. *Eighth Amendment* Standard

The *Eighth Amendment* provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const. amend. VIII*. In its purest sense, the *Eighth Amendment* proscribes cruel and unusual punishment meted out in a penal or disciplinary sense. In its application by the courts, the amendment actually protects a wide assortment of interests. It proscribes disproportionate punishments, *see Weems v. United States, 217 U.S. 349, 366-67, 30 S. Ct. 544, 54 L. Ed. 793 (1910)*, "unnecessary and wanton infliction of pain," *Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)* (plurality opinion), and conduct repugnant to "evolving standards of decency," *Trop v. Dulles, 356 U.S. 86, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)* (plurality opinion). *See generally, Parrish v. Johnson, 800 F.2d 600, 609 (6th Cir. 1986)*.

The Constitution "does not mandate comfortable prisons." *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*. On the other hand, it does not permit [*11] inhumane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the *Eighth Amendment*." *Helling v. McKinney, 509 U.S. 25, 31, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)*; *see also, Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. The amendment imposes affirmative duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* (quoting *Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)*). If the offending conduct is not a criminal penalty, then it must reflect an "'unnecessary and wanton infliction of pain'" to come within the *Eighth Amendment's* prohibition on cruel and unusual punishment. *Ingraham v. Wright, 430 U.S. 651, 670, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)* (quoting *Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*). Such claims must satisfy both an objective and a subjective test. *See Farmer, 511 U.S. at 834*; *Wilson v. Seiter, 501 U.S. 294, 297-300, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)*. Under this analysis, what constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the [*12] alleged constitutional violation. *Hudson v. McMillian, 503 U.S. 1, 5, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)*; *Brooks v. Celeste, 39 F.3d 125, 128 (6th Cir. 1994)*. The plaintiff bears the burden of proving these elements by a preponderance of the evidence. *See Brooks, 39 F.3d at 127-28*.

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *12

The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant *Eighth Amendment* protection. See *McMillian, 503 U.S. at 8-9*; *Rhodes, 452 U.S. at 349 (1981)*. To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities." *Rhodes, 452 U.S. at 349*. The objective component is contextually driven and is responsive to "'contemporary standards of decency.'" *McMillian, 503 U.S. at 8* (quoting *Estelle, 429 U.S. at 103*). The subjective prong asks whether the officials acted with a sufficiently culpable state of mind; that is, was the conduct "wanton." *Wilson, 501 U.S. at 302*; *Moore v. Holbrook, 2 F.3d 697, 700 (6th Cir. 1993)*. In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson, 501 U.S. at 302-03*; see *Estelle, 429 U.S. at 104-06*. Under this "deliberate indifference" standard, "a prison official **[*13]** may be held liable under the *Eighth Amendment* for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer, 511 U.S. at 847*. A prison official is not free to ignore obvious dangers to inmates, and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate. See *id. at 843-44*. However, prison officials may escape liability if they show that they in fact did not know of the obvious risk to the inmate's health or safety, or knowing of it, they acted reasonably under the circumstances. See *id. at 844-45*. In short, "'[d]eliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice." *Wright v. Taylor, 79 Fed. Appx. 829, 831 (6th Cir. 2003)* (citing *Farmer, 511 U.S. at 835-36*; *Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999)* (en banc)).

Plaintiff's claims that defendants denied medically necessary treatment are governed by these objective and subjective tests, as explained by the Supreme Court in *Estelle, supra*. In *Estelle*, **[*14]** the Court held that "[r]egardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under *§ 1983*." *Estelle, 429 U.S. at 105*. Thus, a court faced with failure to treat claims has a two-fold inquiry: (1) does the plaintiff's complaint involve "serious illness or injury"?-*i.e*, the objective prong of the *Eighth Amendment* analysis; and (2) if so, were the defendants deliberately indifferent to this serious illness or injury?-*i.e.*, the subjective prong of the *Eighth Amendment* analysis. See generally, *Durham v. Nu'Man, 97 F.3d 862, 868-69 (6th Cir. 1996)*.

*b. Analysis*

There is no question that plaintiff's MS and the related symptoms constitute a serious medical need. Thus, the only question is whether plaintiff has established a genuine issue of material fact with respect to whether defendants were deliberately indifferent to that need. The Court should conclude that he has not.

In his affidavit, defendant Pandya avers that he was the Regional Medical Officer (RMO) for the Southern Region. See Br. in Supp. of Def.s' Mot., Ex. G, Aff. of Haresh Pandya, M.D., ¶ 4 [hereinafter "Pandya Aff."]. He avers that at the time of the June 11, 2011, **[*15]** request for medication, plaintiff was housed in

the Northern Region, and thus his request for medication was handled by the Northern Region RMO (the defendant plaintiff seeks to add in his proposed amended complaint, William Borgerding). See *id.*, ¶ 7 & Attachment 1. He further avers that he was on annual leave from June 20 through July 5, 2011, and that the Northern Region RMO covered his duties during that time. Thus, the Northern Region RMO responded to the July 1 request. See *id.*, ¶¶ 9-11 & Attachment 2. The July 1 request for Copaxone was not brought to his attention until after a utilization review was completed, and he approved the request for Copaxone and Elavil, shortly after, on August 12. See *id.* With respect to the pain medication requests, Pandya avers that the request was not received by the Pain Management Committee (PMC) until August 16, and was reviewed by the PMC on August 31. See *id.*, ¶¶ 12-13 & Attachment 4. Defendant Stieve, whose role was limited to his membership on the PMC, similarly avers that the consult, although completed by the onsite practitioner on June 6, was not received by the PMC until August 16, and was reviewed on August 31. See *id.*, Ex. H, Aff. **[*16]** of Jeffrey Stieve, M.D., ¶¶ 7-8 & Attachment 1. There is no dispute that plaintiff received constant treatment for his medical condition. Nor is there any dispute that defendants gave consideration to plaintiff's medical needs, approving various medications to treat both his neurological symptoms and his pain. Plaintiff's claim faults defendants for not acting more quickly on his requests, and for not prescribing the specific pain medication requested by his treating providers, specifically Neurontin. However, the record shows that defendants gave due consideration to the requests for Neurontin. This medication was first requested by Mr. Czop on March 15, 2010, who noted that the medication plaintiff was then taking, Baclofen, was no longer effective. Pandya deferred that request, indicating that plaintiff should first be placed on a different medication, Tegretol. Plaintiff indicated to Dr. Czop that he was "not eager" to try Tegretol, and requested a stronger dosage of Baclofen instead. See Def.'s' Resp. to Pl.'s Mot. for Prelim. Inj., Exs. B-C. Neurontin was again requested by P.A. Kocha on June 6, 2011, who recommended a temporary trial of the drug. Borgerding deferred the recommendation **[*17]** pending review by the PMC, and instead directed that Dilantin be tried on a trial basis. See *id.*, Exs. D-E.

The foregoing record falls far short of establishing that defendants acted with deliberate indifference to plaintiff's serious medical needs. With respect to the renewal of plaintiff's prescriptions of Copaxone and Elavil, the record shows at most that defendants may not have handled these requests as quickly as they could have, resulting in plaintiff being off Copaxone for 37 days. However, plaintiff has failed to offer any evidence to show that defendants' failure to act more quickly on these requests was the result of a deliberately indifferent state of mind, as opposed to mere negligence or the defendants' reliance on the normal operation of the PMC review process. As the Supreme Court made clear in *Estelle*, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106*. "[A]n inadvertent failure to provide adequate medical care (such **[*18]** as medical malpractice) cannot be said to constitute 'an unnecessary and wanton

2013 U.S. Dist. LEXIS 134781, *18

infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle, 429 U.S. at 107*. In the medical context, therefore, mere negligence, or even gross negligence, is insufficient to establish an *Eighth Amendment* violation. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas, 537 F.2d 857, 860-61 n.5 (6th Cir. 1976)*. Thus, allegations of "an inadvertent failure to provide medical care . . . [or of] negligen[ce] in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the *Eighth Amendment*." *Estelle, 429 U.S. at 105-06; see also, Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. Aug. 4, 1999)* (en banc). As the Seventh Circuit has explained, "'[d]eliberate indifference' means *recklessness* in a criminal, subjective sense: disregarding a risk of danger so substantial that knowledge of the danger can be inferred. Such disregard is tantamount to [*19] intending that the injury occur." *James v. Milwaukee County, 956 F.2d 696, 700 (7th Cir. 1992)* (quoting *McGill v. Duckworth, 944 F.2d 344, 348 (7th Cir. 1991)* (citations omitted); *accord Farmer, 511 U.S. at 836* (equating "deliberate indifference" to the "recklessness" standard under criminal law); *Brooks v. Celeste, 39 F.3d 125, 129 (6th Cir. 1994)* (negligence insufficient to establish deliberate indifference); *McGhee v. Foltz, 852 F.2d 876, 881 (6th Cir. 1988)* (gross negligence insufficient). The record evidence does not create a genuine issue of material fact with respect to whether defendants acted with this culpable mental state.

Further, to show that the delay in receiving Copaxone rose to a constitutional violation, plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County, Ky., 238 F.3d 739, 742 (6th Cir. 2001)* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994))*. Plaintiff has not placed any such evidence in the record. Thus, because "plaintiff has not submitted medical evidence that he suffered any harm," his deliberate indifference [*20] claim fails on this basis as well. *Hardy v. 3 Unknown Agents, 690 F. Supp. 2d 1074, 1099 (C.D. Cal. 2010)*.

With respect to the failure to approve Neurontin, plaintiff likewise cannot show that defendants acted with deliberate indifference to his medical needs. The record shows that defendants considered these requests. Defendants did not, as plaintiff alleges, ignore these requests. Rather, defendants prescribed alternative courses of treatment. Defendants thus exercised their professional medical judgment regarding the appropriate course of treatment. Even if these decisions were wrong or negligent, they do not show deliberate indifference to plaintiff's serious medical needs. This conclusion is not altered by the fact that defendants' treatment plan differed from that of plaintiff's treating medical providers. "A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs." *Acosta v. Naphcare, No.2:09-cv-1998, 2010 U.S. Dist. LEXIS 98784, 2010 WL 3522356, at *5 (D. Nev. Sept. 2, 2010))* (citing *Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989))*; *see also, Douglas v. Stanwick, 93 F. Supp. 2d 320, 325*

*(W.D.N.Y. 2000)*; [*21] *Brewer v. Blackwell, 836 F. Supp. 631, 644 (S.D. Iowa 1993)*.

Because plaintiff cannot show that defendants acted with the requisite subjective mental state of deliberate indifference, the Court should grant defendants' motion for summary judgment and deny plaintiff's motion for summary judgment.

*3. ADA Claims*

The Court should also dismiss plaintiff's claim under Title II of the ADA. The *in forma pauperis* statute, pursuant to which plaintiff is proceeding, provides that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." *28 U.S.C. § 1915(e)(2)(B)(ii)-(iii)*. The Prison Litigation Reform Act (PLRA) provides that a court may *sua sponte* "dismiss any action brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon [*22] which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." *42 U.S.C. § 1997e(c)(1)*. Where an *in forma pauperis* complaint fails to state a claim, dismissal under *§ 1915(e)(2)(b)* is mandatory. *See Bilal v. Driver, 251 F.3d 1346, 1348 (11th Cir. 2001); Rogler v. United States Dep't of Health & Human Servs., 620 F. Supp. 2d 123, 128 (D.D.C. 2009); Johnson v. U.K. Government, 608 F. Supp. 2d 291, 293 (D. Conn. 2009); Banks v. County of Allegheny, 568 F. Supp. 2d 579, 588 (W.D. Pa. 2008)*.

Here, plaintiff's ADA claim fails to state a claim upon which relief may be granted. With respect to the individual defendants, individual defendants are not proper parties under the ADA. Title II of the ADA provides, in relevant part, that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *42 U.S.C. § 12132*. The ADA further provides, however, that "[t]he term 'public entity' means-(A) any State or local government; [*23] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in *section 24102(4) of Title 49)*." *42 U.S.C. § 12131(1)*. By its terms, the statute does not apply to individuals, and thus "public entity" under the Act does not include an individual prison official. Accordingly, plaintiff's complaint fails to state a claim against the individual defendants under the ADA. *See Lee v. Michigan Parole Bd., 104 Fed. Appx. 490, 493 (6th Cir. 2004); Tanney v. Boles, 400 F. Supp. 2d 1027, 1044 (E.D. Mich. 2005)* (Roberts, J.); *Damron v. North Dakota Comm'r of Corrections, 299 F. Supp. 2d 970, 976 (D.N.D. 2004), aff'd, 127 Fed. Appx. 909 (8th Cir. 2005)*.

Further, with respect to both the individual defendants and the MDOC, the Court should conclude that plaintiff's claim fails as

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *23

a matter of law. To establish a Title II violation, plaintiff must allege and show that (1) he has a disability; (2) he is otherwise qualified to receive the benefit or service at issue; and (3) he is being excluded from participation in, being denied the benefit of, or being [*24] subjected to discrimination in the provision of, the services, programs, or activities of the public entity because of their disability. *See Dillery v. City of Sandusky, 398 F.3d 562, 567 (6th Cir. 2005).* Here, plaintiff has failed to allege that he is being excluded from participation in or being denied the benefit of any prison programs, services, or activities because of his disability. Plaintiff does not allege any discrimination on the basis of his disability. Rather, he claims that he is being denied proper medical care for his medical condition. Such challenges to the extent or quality of the medical care he received do not state a claim under the ADA or *Section 504. See Breedlove v. Costner, 405 Fed. Appx. 338, 341 (10th Cir. 2010); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996); Elbert v. New York Dep't of Correctional Servs., 751 F. Supp. 2d 590, 596 (S.D.N.Y. 2010); Althouse v. Roe, 542 F. Supp. 2d 543, 547 (E.D. Tex. 2008); Carrion v. Wilkinson, 309 F. Supp. 2d 1007, 1016 (N.D. Ohio 2004).* Accordingly, the Court should conclude that defendants are entitled to dismissal of plaintiff's ADA claim.

### 4. Claims Against the MDOC and John/Jane Doe Defendants

The Court should [*25] likewise grant summary judgment *sua sponte* to the remaining defendants who have not yet been served. In addition to the Court's power to grant dismissal *sua sponte* provided by the PLRA and the *in forma pauperis* statute, it is well established that "[a] court may grant a motion to dismiss even as to nonmoving defendants where the nonmoving defendants are in a position similar to that of moving defendants or where the claims against all defendants are integrally related." *Bonny v. Society of Lloyd's, 3 F.3d 156, 162 (7th Cir. 1993);* see also, *Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 743 (9th Cir. 2008).* A court dismissing a plaintiff's claims against moving defendants may *sua sponte* dismiss non-moving defendants as well where "it is clear that the same ruling would inevitably apply to each of the defendants." *Rose v. Arkansas Valley Envtl. & Utility Auth., 562 F. Supp. 1180, 1189 n.11 (W.D. Mo. 1983).* The same rule applies in the summary judgment context. *See Zinna v. Cook, 428 Fed. Appx. 838, 841 (10th Cir. 2011); Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371, 384-85 (7th Cir. 2008); Stepnes v. Ritschel, 771 F. Supp. 2d 1019, 1048 (D. Minn. 2011).*

Here, [*26] it is clear that the same ruling on plaintiff's *Eighth Amendment* claims would apply equally to the other named defendants. For the reasons explained above, the record fails to show that the members of the PMC, and by extension the MDOC, acted with deliberate indifference to plaintiff's serious medical needs. Rather, defendants provided medical treatment based on their exercise of professional medical judgment. Even if this care was erroneous or negligent, the medical records submitted by the moving defendants establish that none of the defendants acted with a sufficiently culpable mental state to rise to the level of deliberate indifference. Further, with respect to the MDOC, "[b]ecause the MDOC is a state agency and the State of Michigan has not consented to civil rights suits in the federal courts, the MDOC is entitled to *Eleventh Amendment* immunity."

*Sims v. Michigan Dep't of Corrections, 23 Fed. Appx. 214, 215 (6th Cir. 2001).* Accordingly, the Court should *sua sponte* grant summary judgment to the non-moving defendants.

### C. Plaintiff's Motion for Injunctive Relief

In his motion for a temporary restraining order and preliminary injunction, plaintiff seeks an injunction preventing defendants [*27] from subjecting him to unnecessary infliction of pain and requiring them to provide appropriate medication for his medical condition. The Court should deny this motion.

### 1. Legal Standard

"In the exercise of its discretion with respect to a motion for preliminary injunction, a district court must give consideration to four factors: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" *American Civil Liberties Union of Ky. v. McCreary County, Ky., 354 F.3d 438, 445 (6th Cir. 2003)* (quoting *Rock and Roll Hall of Fame & Museum, Inc. v. Gentile Prods., 134 F.3d 749, 753 (6th Cir.1998)); see also, Taubman Co. v. Webfeats, 319 F.3d 770, 774 (6th Cir. 2003).*

"'The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met.'" *Hamad v. Woodcrest Condominium Ass'n, 328 F.3d 224, 230 (6th Cir. 2003)* (quoting *Michigan Bell Tel. Co. v. Engler, 257 F.3d 587, 592 (6th Cir.2001));* [*28] *see also, Taubman Co., 319 F.3d at 774.* Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors predominate the preliminary injunction inquiry. Thus, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Bd. of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000); see also, Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997)* ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed."). Further, plaintiff bears the burden of demonstrating his entitlement to a preliminary injunction, and his burden is a heavy one. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002).* "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required [*29] to survive a summary judgment motion." *Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000).* Thus, plaintiff may not merely point to genuine issues of material fact which exist, but must affirmatively demonstrate his entitlement to injunctive relief.

This already stringent burden is even more difficult to meet where, as here, a plaintiff seeks an injunction not merely to maintain the status quo pending resolution of the case but to

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *29

obtain affirmative relief. As the Supreme Court has explained, the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)*. Because of this, courts have identified three types of particularly disfavored preliminary injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that [he] could recover at the conclusion of a full trial on the merits." *Schrier v. University of Colorado, 427 F.3d 1253, 1259 (10th Cir. 2005)*. Motions seeking such preliminary injunctive relief most be more closely scrutinized [*30] than the already-disfavored motion for preliminary injunction which seeks to maintain the status quo. *See id.*; *Johnson v. Kay, 860 F.2d 529, 540 (2d Cir. 1988)*. With respect to the likelihood of success factor, plaintiff need not show that he is sure to prevail on any of his claims. However, he must, "at a minimum, show[] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc., 119 F.3d 393, 400 (6th Cir. 1997)* (internal quotation omitted); *see also, Gaston Drugs, Inc. v. Metropolitan Life Ins. Co., 823 F.2d 984, 988 & n.2 (6th Cir. 1987)*. With respect to the harm factor, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. As the Supreme Court has noted,

> "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily [*31] against a claim of irreparable harm."

*Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)* (quoting *Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 924, 104 U.S. App. D.C. 106 (D.C. 1958)*). In short, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet, 305 F.3d at 578*. In evaluating the harm facing the plaintiffs, the Court must evaluate three factors: "(1) the substantiality of the injury alleged, (2) the likelihood of its occurrence, and (3) the adequacy of the proof provided." *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n, 812 F.2d 288, 290 (6th Cir. 1987)*. Finally, in addition to these four factors which govern all preliminary injunctions, plaintiff's suit challenging the conditions of confinement is subject to § 802 of the Prison Litigation Reform Act, which in relevant part provides:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct

the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice [*32] system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

*18 U.S.C. § 3626(a)(2)*. [1]

### 2. Analysis

Here, plaintiff has not met the stringent standards necessary to show his entitlement to a preliminary injunction which grants him affirmative relief. As explained above, defendants are entitled to summary judgment on plaintiff's claims, and thus plaintiff cannot show a likelihood of success on the merits. "For injunctive relief, the plaintiff[] must show that the defendants were, at the time of the suit, 'knowingly and unreasonably disregarding an objectively intolerable risk of harm and that they will continue [*33] to do so.'" *Laube v. Haley, 234 F. Supp. 2d 1227, 1242 (M.D. Ala. 2002)* (quoting *Farmer, 511 U.S. at 846*). Thus, it is not enough for plaintiff to merely show that defendants were, during the course of his treatment, deliberately indifferent to his medical needs. To be entitled to injunctive relief, plaintiff must also show that they continue to be deliberately indifferent, such that defendants' acts or omissions are likely to cause him *future* harm. It is well-established that "[a] preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent *future* irreparable harm." *Fisher v. Goord, 981 F. Supp. 140, 168 (W.D.N.Y. 1997)*.

With respect to plaintiff's general request for an injunction requiring defendants to provide him with appropriate treatment, plaintiff has failed to establish a likelihood of success on a claim that defendants' current treatment is deliberately indifferent. As explained above, the record currently before the Court shows that plaintiff has received, and continues to receive, medical care, treatment, and medications from defendants, and that defendants were not deliberately indifferent to his serious medical needs. [*34] Thus,

> the record shows [plaintiff] is receiving medical treatment from Defendants. He appears to simply disagree with the course of his treatment. This disagreement does not state an *Eighth Amendment* claim. *Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir.1999)* ("[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."). Therefore, [plaintiff] has not shown a substantial likelihood of success on the merits.

*White v. Goff, 348 Fed. Appx. 366, 369-70 (10th Cir.*

---

[1]   The referenced principles of comity prevent a court from ordering "any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless–(i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the relief is necessary to correct the violation of a Federal right; and (iii) no other relief will correct the violation of the Federal right." *18 U.S.C. § 3626(a)(1)(B)*.

2013 U.S. Dist. LEXIS 134781, *34

2009). With respect to his request for a specific medication, as another court has recently explained:

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000)*. An inmate's claims against members of a prison medical department are not viable under *§ 1983* where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*. [*35] Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004)* (citations omitted).

*Williams v. Correctional Medical Servs., 629 F. Supp. 2d 360, 372 (D. Del. 2009)*. In short, "[a]lthough [plaintiff] has raised some very serious allegations about his medical care, [he] is currently . . . receiving medical treatment. He has not sufficiently demonstrated that he is currently receiving a level of care that would violate constitutional standards such that he is entitled to preliminary injunctive relief." *McSorley v. Northern Nev. Correctional Ctr., 225 Fed. Appx. 448, 449 (9th Cir. 2007)*. Accordingly, the Court should deny plaintiff's motion for a preliminary injunction.

D. *Plaintiff's Motion for Leave to Amend*

Finally, plaintiff seeks leave to amend his complaint. Because amendment would be futile, the Court should deny plaintiff's motion. [2]

1. *Legal Standard*

Ordinarily, leave to amend a complaint or other pleading "shall be freely granted when justice so requires." *Fed. R. Civ. P. 15(a)*. Generally, courts have shown "a strong liberality . . . in allowing amendments under *Rule 15(a)*." *Tahir Erk v. Glenn L. Martin Co., 116 F.2d 865 (4th Cir. 1941)*. As the Supreme Court has stated:

In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be "freely given." Of course, the grant

or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*. Thus, "[w]hen there is a lack [*37] of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is abuse of discretion to deny [the] motion." *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Indus. of S. Cal., 648 F.2d 1252, 1254 (9th Cir. 1981)*. In short, courts should construe liberally *Rule 15(a)* in favor of permitting amendment. *See Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 522 (6th Cir. 1999)*; *Marks v. Shell Oil Co., 830 F.2d 68, 69 (6th Cir. 1987)*.

Nevertheless, as *Foman* makes clear there are certain situations in which it is appropriate to deny leave to amend. One such circumstance is when amendment would be "futil[e]." *Foman, 371 U.S. at 182*; see also, *Moss v. United States, 323 F.3d 445, 476 (6th Cir. 2003)*. Amendment is futile when the proposed amendment is subject to dismissal under *Rule 12(b)(6)*, that is, when the proposed amendment fails to state a claim upon which relief may be granted. *See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002)*; *Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 307 (6th Cir. 2000)*; *Rose v. Hartford Underwriters Ins. Co., 203 F.3d 417, 420-21 (6th Cir. 2000)*. When, [*38] as is the case here, the motion to amend is made in response to a motion for summary judgment, the Court may properly look to the affidavits and other evidence in the record. In such a case, "[p]laced with the affidavits and documentary evidence filed by the defendants in support of summary judgment, the Court cannot assess the proposed amended complaint as if that evidence does not exist." *Smith v. Chrysler Corp., 938 F. Supp. 1406, 1414 (S.D. Ind. 1996)*. In such a case, the proposed amended complaint is futile under *Rule 15(a)* not only if it would fail to survive a motion to dismiss for failure to state a claim, but also if the amended pleading could not survive a previously filed motion for summary judgment. *See Bauchman v. West High Sch., 132 F.3d 542, 561-62 (10th Cir. 1997)*; *Wilson v. American Trans Air, Inc., 874 F.2d 386, 392 (7th Cir. 1989)*; *Smith, 938 F. Supp. at 1414*.

2. *Analysis*

Here, plaintiff seeks to amend his complaint to add: (1) state tort claims of gross negligence and intentional infliction of emotional distress; (2) a claim that defendants conspired to deprive him of his civil rights under *42 U.S.C. §§ 1985(3), 1986*; (3) MDOC Director Daniel Heyns as a defendant; [*39] (4) the identities of the John/Jane Doe defendants; (5) William Borgerding as a defendant; and (6) additional factual allegations. Leave to amend in all these respects would be futile.

---

[2]   Although I have authority to hear and determine plaintiff's motion for leave to amend pursuant to *28 U.S.C. § 636(b)(1)(A)*, the resolution of this motion is intertwined with the resolution of the parties' summary judgment motions. Accordingly, [*36] I include plaintiff's motion to amend in this Report rather than resolving it by Order.

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *39

a. State Law Claims

Leave to amend to add the proposed state law claims would be futile because the Court should decline to exercise supplemental jurisdiction over these claims. Congress has provided for limited, supplemental jurisdiction over state law claims that are related to federal claims over which a court has original jurisdiction:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. . . .

*28 U.S.C. § 1367(a)*. However, Congress has also provided that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under *subsection (a)* if . . . the district court has dismissed all claims over which [*40] it has original jurisdiction." *28 U.S.C. § 1367(c)(3)*. In determining whether to exercise supplemental jurisdiction, courts should consider the following factors: judicial economy, convenience, fairness to litigants, and comity. *See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)*; see also, *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)*. But, when "federal law claims are eliminated before trial, the balance of these factors will point toward declining to exercise jurisdiction over the remaining state-law claims." *Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1251 (7th Cir. 1994)*; see also, *Gibbs, 383 U.S. at 726* ("if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well"); *Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1307 (9th Cir. 1992)*; *Morse v. University of Vermont, 973 F.2d 122, 127-28 (2d Cir. 1992)*; *Reynolds v. Mercy Hosp., 861 F. Supp. 214 (W.D.N.Y. 1994)*; *Heller v. CACL Federal Credit Union, 775 F. Supp. 839, 843 (E.D. Pa. 1991)*.

Thus, "federal courts, absent exceptional circumstances, should abstain from exercising [supplemental] jurisdiction when federal claims in a case can be disposed of [*41] by summary judgment." *Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d Cir. 1986)*. Accordingly, federal courts routinely decline to exercise supplemental jurisdiction over state law claims where the plaintiffs' federal civil rights claims are dismissed. *E.g., Martinez v. Colon, 54 F.3d 980, 990-91 (1st Cir. 1995)*; *Rhyne v. Henderson County, 973 F.2d 386, 395 (5th Cir. 1992)*; *Wynn v. Morgan, 861 F. Supp. 622, 637 (E.D. Tenn. 1994)*; *Stera v. Hunt*

*Real Estate Corp., 859 F. Supp. 661, 668 (W.D.N.Y 1994)*; *Mark v. Borough of Hatboro, 856 F. Supp. 966, 976-77 (E.D. Pa. 1994)*, aff'd, *51 F.3d 1137 (3d Cir. 1995)*; *Wexley v. Michigan State Univ., 821 F. Supp. 479, 487 (W.D. Mich. 1993)*, aff'd, *25 F.3d 1052 (6th Cir. 1994)*; *Cruz v. City of Wilmington, 814 F. Supp. 405, 413-14 (D. Del. 1993)*; *Lahaza v. Azeff, 790 F. Supp. 88, 93-94 (E.D. Pa. 1992)*; *Procopio v. Johnson, 785 F. Supp. 1317, 1320 (N.D. Ill. 1992)*, aff'd, *994 F.2d 325 (7th Cir. 1993)*. Here, as explained above, plaintiff's federal claims are all subject to dismissal or summary judgment, and thus the Court should decline to exercise supplemental jurisdiction over plaintiff's purported state law claim.

Further, Congress has also provided [*42] that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under *subsection (a)*" if there are compelling reasons for doing so. *28 U.S.C. § 1367(c)(4)*. In determining whether to exercise supplemental jurisdiction, courts should consider the following factors: judicial economy, convenience, fairness to litigants, and comity. *United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)*; see also, *Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)*. Here, comity counsels in favor of declining to exercise supplemental jurisdiction. Michigan has established a thorough and complex set of procedures for asserting medical malpractice claim.[3] Under *§ 1367*, "interests of comity weigh against the exercise of supplemental jurisdiction given the procedural requirements in Michigan for filing a medical malpractice claim." *Getter v. Doe, No. 11-12021, 2012 U.S. Dist. LEXIS 33656, 2012 WL 834556, at *6 (E.D. Mich. Mar. 13, 2012)* (Cohn, J.); see also, *Reed-Bey v. Pramstallar, No. 06-10934, 2012 U.S. Dist. LEXIS 39805, 2012 WL 987830, at *6 (Feb. 15, 2012)* (Whalen, M.J.), *magistrate judge's report and recommendation adopted, 2012 U.S. Dist. LEXIS 39802, 2012 WL 987854 (E.D. Mich. Mar. 23, 2012)* (Roberts, J.). Accordingly, because the Court should [*43] decline to exercise supplemental jurisdiction over plaintiff's state law claims, leave to amend to add these claims would be futile.

b. Federal Conspiracy Claims

In his proposed amended complaint, plaintiff alleges "conspiracy to deprive the plaintiff of civil rights, in contravention of *42 U.S.C. § 1985(3)* and *§ 1986*." Pl.'s Proposed 1st Amend. Compl., ¶ 1. The amended complaint makes no further mention of these statutes or of a conspiracy.

*Section 1985(3)* provides:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the [*44] equal protection of the laws, or of equal privileges and immunities under the laws; or

---

[3]  Although plaintiff's claims are based on gross negligence and intentional infliction of emotional distress, they are based on his assertion that he was denied adequate medical treatment. It is well established under Michigan law that "'a complaint cannot avoid the application of the procedural requirements of a malpractice action by couching its cause of action in terms of ordinary negligence.'" *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 43, 594 N.W.2d 455 (1999) (quoting *McLeod v. Plymouth Court Nursing Home, 957 F.Supp. 113, 115 (E.D.Mich., 1997)*).

Ziyad Hermiz

2013 U.S. Dist. LEXIS 134781, *44

for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). In *Griffin v. Breckenridge, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971)*, the Court concluded, after an examination of the legislative history of the 1871 Ku Klux Klan Act upon which § 1985(3) is based, that the section reaches not only conspiracies formed under color of law, but also purely private conspiracies. *Id. at 101*. Wary that this might establish a general federal tort, the Court went on to state:

> The constitutional [*45] shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.

*Id. at 102*. Thus, in order to state a cause of action under § 1985(3), "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.; see also, Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-69, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993); United Bhd. of Carpenters & Joiners of Am. v. Scott, 463 U.S. 825, 833-35, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983); Lucero v. Operation Rescue of Birmingham, 954 F.2d 624, 627-28 (11th Cir. 1992); Volunteer Medical Clinic, Inc. v. Operation Rescue, 948 F.2d 218, 223-24 (6th Cir. 1991)*. This requirement must be met regardless of whether the conspiracy is purely private or involves state actors. *Cf. Trerice v. Pedersen, 769 F.2d 1398, 1402 (9th Cir. 1985); Harrison v. Brooks, 519 F.2d 1358, 1359-60 (1st Cir. 1975)*.

Plaintiff has not alleged in his proposed amended complaint that the defendants' actions were based on some racial or other [*46] invidiously discriminatory animus. Thus, he has failed to state a claim under § 1985(3). Further, because as noted above the defendants' actions "fail to implicate a constitutional right, a conspiracy that has as its purpose the very same non-cognizable [purpose] also fails to state a legal claim." *Mazloum v. District of Columbia, 442 F. Supp. 2d 1, 10 (D.D.C. 2006); see also, Lara v. City of Chicago, 968 F. Supp. 1278, 1292 (N.D. Ill. 1997)*. Plaintiff's related claim under § 1986 fails for the same reason. As another court has explained, § 1986

"provides the claimant with a cause of action against any person who, knowing that a violation of § 1985 is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution." *Rogin v. Bensalem Township, 616 F.2d 680, 696 (3d Cir.1980)*. Because § 1986 claims depend on an underlying violation of § 1985, "if the claimant does not set forth a cause of action under the latter, its claim under the former must fail also." *Id.* Because there is no conspiracy claim under § 1985(3), the defendants' motion for summary judgment under § 1986 for neglecting to prevent a conspiracy is granted.

*Burgos v. Canino, 641 F. Supp. 2d 443, 458 (E.D. Pa. 2009)*. [*47] Accordingly, the Court should conclude that leave to amend to add a conspiracy claim under §§ 1985(3) and 1986 would be futile.

*c. Additional Defendants*

Likewise, the Court should conclude that leave to amend to add additional defendants would be futile. Plaintiff seeks to add as defendants three members of the PMC. As explained above, however, plaintiff's claims against the unnamed PMC members are subject to summary judgment. Thus, amending the complaint to specifically name the individuals in the place of their previous John/Jane Doe designation would be futile. Likewise, leave to amend to add MDOC Director Daniel Heyns would be futile. As explained above, it is well established that liability in a § 1983 action cannot be based on a theory of *respondeat superior. See Iqbal, 129 S. Ct. at 1948 (2009); Monell, 436 U.S. at 691*. "To recover damages under 42 U.S.C. § 1983, a plaintiff must establish a defendant's personal responsibility for the claimed deprivation of a constitutional right." *Diebitz, 834 F. Supp. at 304*. "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own conduct, [*48] has violated the Constitution." *Iqbal, 129 S. Ct. at 1948*. In other words, in order to state a claim under § 1983 "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant." *Barren, 152 F.3d at 1194; see also, Carr, No. 98-6395, 1999 U.S. App. LEXIS 32688, 1999 WL 1206879, at *1; Salehpour, 159 F.3d at 206*. Plaintiff's proposed amended complaint does not set forth any allegations against Heyns or suggest that he was in any way personally involved in plaintiff's medical care. Thus, leave to amend to add Heyns as a defendant would be futile.

*d. Additional Factual Allegations*

Finally, plaintiff seeks leave to amend to add further factual allegations. The only additional factual allegations asserted in the proposed amended complaint relate to the March 2010 request for Neurontin made by Dr. Czop. As explained above, however, Pandya's denial of this request and provision of alternative medication did not rise to the level of deliberate indifference.

2013 U.S. Dist. LEXIS 134781, *48

Thus, leave to amend to add these factual allegations would be futile.

E. *Conclusion*

In view of the [*49] foregoing, the Court should grant defendants' motion for summary judgment and deny plaintiff's motion for summary judgment. Specifically, the Court should grant summary judgment to defendants Pandya and Stieve on plaintiff's *Eighth Amendment* claims, *sua sponte* grant summary judgment on these claims to the remaining defendants, and *sua sponte* dismiss plaintiff's ADA claims. The Court should also conclude that leave to amend plaintiff's complaint would be futile, and the Court should therefore deny plaintiff's motion for leave to amend. Finally, the Court should deny plaintiff's motion for a temporary restraining order and preliminary injunction.

III. NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in *Fed. R. Civ. P. 72(b)*. Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *Howard v. Secretary of Health & Human Servs., 932 F.2d 505 (6th Cir.*

*1991)*; *United States v. Walters, 638 F.2d 947 (6th Cir. 1981)*. Filing of objections which raise some [*50] issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs., 931 F.2d 390, 401 (6th Cir. 1991)*; *Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987)*. Pursuant to *E.D. Mich. LR 72.1(d)(2)*, a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

/s/ Paul J. Komives

PAUL J. KOMIVES

UNITED STATES MAGISTRATE JUDGE

Dated: July 11, 2013

Ziyad Hermiz



Cited
As of: April 4, 2014 4:40 PM EDT

## Sanders v. Mich. First Credit Union Tellers

United States District Court for the Eastern District of Michigan, Southern Division
August 10, 2010, Decided; August 10, 2010, Filed
Case No. 10-cv-12517

**Reporter:** 2010 U.S. Dist. LEXIS 80908; 2010 WL 3168636

HOWARD JAMAL SANDERS, Plaintiff, v. MICHIGAN FIRST CREDIT UNION TELLERS, STANLY SKIP PRUSS, MICHIGAN FIRST CREDIT UNION, MICHAEL D. POULOS, MARK SEBASTIN, STANLY POLLITT, and THE NATIONAL CREDIT UNION ADMINISTRATION, Defendants.

---
**Core Terms**
---

patriot

**Counsel:** [*1] Howard Sanders, Plaintiff, Pro se, DETROIT, MI.

**Judges:** HONORABLE STEPHEN J. MURPHY, III, United States District Judge.

**Opinion by:** STEPHEN J. MURPHY, III

---
**Opinion**
---

### ORDER GRANTING PLAINTIFF'S MOTION TO PROCEED IN FORMA PAUPERIS AND DISMISSING COMPLAINT

Plaintiff Howard Jamal Sanders filed a pro se complaint and an application to proceed without payment of the filing fee, or *in forma pauperis* ("IFP"), on June 24, 2010. Upon review of the IFP application, the Court agrees that Sanders is unable to pay the filing fee, and will grant his application.

Pursuant to *28 U.S.C. § 1915(e)(2)(B)(ii)*, however, the Court will dismiss Sanders's complaint sua sponte because it fails to state a claim for relief. *See McGore v. Wrigglesworth, 114 F.3d 601, 612 (6th Cir. 1997)*, overruled on other grounds by *Jones v. Bock, 549 U.S. 199, 212, 127 L. Ct. 910, 166 L. Ed. 2d 798 (2007)* (court must dismiss case when the action satisfies *section 1915(e)(2)(B)* and has no discretion to permit amendment to avoid sua sponte dismissal).

*Rule 12(b)(6) of the Federal Rules of Civil Procedure* is the procedural vehicle for disposing of claims that fail to state a claim upon which relief can be granted. It allows a defendant, or a Court in the context of *28 U.S.C. § 1915*, to test whether, [*2] as a matter of law, the plaintiff is entitled to the legal relief even if everything alleged in the complaint is true. *Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993)*. To state a valid claim for relief, the plaintiff's factual allegations must demonstrate a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. To be "plausible," the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007)* (quoting *Bell Atl., 550 U.S. at 555*).

Sanders's original complaint is poorly drafted and his amended complaint adds nothing except to further specify the amount of damages he seeks from Defendants.[1] As far as the Court can tell from its review of the complaint and attachments thereto, an unknown person withdrew money from Sanders's bank account at Michigan First Credit Union ("the Bank") without his permission. When Sanders learned of this, he contacted the Bank, which later told him that according to the terms of his account agreement and current law, he was [*3] required to raise disputes in his monthly banking statements within 60 days from the time the statement was mailed. The Bank denied his complaint because he filed his inquiry more than 60 days after the account statement reflecting the unauthorized withdrawals was mailed. Sanders then filed a complaint against the Bank with the Michigan Office of Financial and Insurance Regulation ("Office") which later concluded that no wrongdoing on the part of the Bank had occurred.

Sanders appears to assert two federal claims against two sets of defendants. He first claims that the Bank, through one of its tellers, released funds in his bank account before requesting to see a "valid unexpired goverment-issued

---
[1] All citations herein are to the original complaint.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 80908, *3

[sic] identification bearing a photograph." Compl. 5. [2] He asserts that this failure constitutes a violation of the Patriot Act. Sanders does not direct the Court to any provision of the Patriot Act, or any other federal authority for that matter, that requires banks to dispense money to customers only after having reviewed government-issued photo identification. Nor has the Court found any such statutory or regulatory requirement in the course [*4] of its independent research. The Patriot Act *does* require the Treasury Secretary to promulgate regulations that require banks to implement procedures for "verifying the identity of any person seeking to *open* an account to the extent reasonable and practicable" and for "maintaining records of the information used to verify a person's identity, including name, address, and other identifying information." *31 U.S.C. § 5318(l)(2)(A), (B)* (emphasis added); *see also 31 C.F.R. § 103.121(b)* (implementing regulations). The statute and implementing regulations, however, stop short of requiring banks to request photo identification from a person simply wishing to make withdrawals from his or her bank account.

But even if the Patriot Act and implementing regulations did require banks to review photo identification before allowing withdrawals, Sanders's claim would still fail because, as various courts have routinely held, the Patriot Act does not provide for a private right of action for its enforcement. *See, e.g., Hanninen v. Fedoravitch, 583 F. Supp. 2d 322, 326 (D. Conn. 2008);* [*5] *Med. Supply Chain, Inc. v. Neoforma, Inc., 419 F. Supp. 2d 1316, 1330 (D. Kan. 2006)* (dismissing plaintiff's Patriot Act claims under *28 U.S.C. § 1915(e)(2)(B)* for failure to state a claim); *Drake v. Enyart, No. 06-217, 2006 U.S. Dist. LEXIS 88381, 2006 WL 3524109 (W.D. Ky. Dec. 4, 2006); Med. Supply Chain, Inc. v. U.S. Bancorp, NA, No. 02-2539, 2003 U.S. Dist. LEXIS 10787, 2003 WL 21479192 (D. Kan. June 16, 2003), aff'd, 112 Fed. Appx. 730 (10th Cir. 2004).*

Moreover, applying general separation of powers principles, federal courts may not imply a private right of action to enforce a federal statute in the absence of clear congressional intent embodied in the text of the statute itself. As the Supreme Court recently stated:

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is

determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Raising up causes [*6] of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

*Alexander v. Sandoval, 532 U.S. 275, 286, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)* (internal citations and quotation marks omitted). The Court can discern from the text no statutory intent to create a private right of action to enforce the Patriot Act and will not imply one. Therefore, even assuming the facts in the complaint are true, Sanders has not stated a claim for relief under the Patriot Act and the claim must be dismissed.

Sanders next asserts that the Bank and its agents denied him due process of law when it advised him that his claim for reimbursement was denied because of his failure to raise the issue within 60 days of the date the relevant bank statement was mailed. He asserts that due to equivocation by the Bank in the use of the reasons for its denial of liability, going back and forth between relying on "current law" and "the account agreement," Sanders was denied due process. Compl. 4. Insofar as he attempts to state a claim of violation of due process against the Bank, his claim fails because the Due Process Clause of the Fourteenth Amendment, like the remainder of the Amendment, [*7] applies only to state actors, which the Bank is not. *See United States v. Morrison, 529 U.S. 598, 621, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000);* Civil Rights Cases, *109 U.S. 3, 11, 3 S. Ct. 18, 27 L. Ed. 835 (1883)* ("It is state action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the amendment."). Since the Bank and its agents are not state actors, Sanders's due process claim against them fails and must be dismissed.

Sanders also appears to be claiming that the Michigan Office of Financial and Insurance Regulation ("Office") violated his due process rights during its investigation of his complaint regarding the Bank's conduct. He claims that because no witnesses were interviewed or tellers questioned, the Office failed to adequately investigate his claim, though he does acknowledge that the claim was actually investigated by the Office. Although the Office is a state actor whose actions must comply with due process requirements, Sanders's claim still fails, but for another reason. There is no constitutional right to the more

---

[2]   Because of Sanders's use of an odd method of page numbering, the Court's citations to pages in the complaint correspond with page numbering used by CM/ECF.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 80908, *7

rigorous investigation to which he claims entitlement. *Cf. Mitchell v. McNeil, 487 F.3d 374, 378-79 (6th Cir. 2007)* ("There is no statutory or common law [*8] right, must less a constitutional right, to [a police] investigation.") Nor does Sanders claim that the agency failed to follow any of its established rules for adjudicating claims. *See George Kabeller, Inc. v. Busey, 999 F.2d 1417, 1420 (11th Cir. 1993).* ("[I]t is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it." (quoting *Government of Canal Zone v. Brooks, 427 F.2d 346, 347 (5th Cir. 1970)).* Therefore, to the extent Sanders attempts to assert a due process claim against the Office, his claim fails and must be dismissed.

Finally, to the extent Sanders attempts to state a claim for breach of contract against the Bank arising out of his account agreement, his claim arises under state law and the Court lacks jurisdiction to hear it. Moreover, since the Court has dismissed all of his federal claims, it declines to exercise supplemental jurisdiction over the state law claim. *See 28 U.S.C. § 1367(c)(3); Brown v. Cassens Transport Co., 546 F.3d 347, 363 (6th Cir. 2008)* ("a federal court should typically decline to exercise pendent jurisdiction over a plaintiff's [*9] state-law claims after dismissing the plaintiff's federal claims.").

**WHEREFORE,** it is hereby **ORDERED** that Sanders's application to proceed *in forma pauperis* is **GRANTED.**

**IT IS FURTHER ORDERED THAT** Sanders's complaint is **DISMISSED** sua sponte pursuant to *28 U.S.C. § 1915(e)(2)(B)(ii)* for failure to state a claim. The state law claims are dismissed for lack of subject matter jurisdiction.

**IT IS FURTHER ORDERED THAT** Sanders's motions at docket nos. 4 & 5 are **DENIED** as moot.

**SO ORDERED.**

/s/ Stephen J. Murphy, III

STEPHEN J. MURPHY, III

United States District Judge

Dated: August 10, 2010

Ziyad Hermiz

No *Shepard's* Signal™
As of: April 4, 2014 4:40 PM EDT

# Grossman v. DTE Energy Co.

United States District Court for the Eastern District of Michigan, Southern Division

December 17, 2010, Decided; December 17, 2010, Filed

Case No. 10-cv-13712

**Reporter:** 2010 U.S. Dist. LEXIS 133572; 2010 WL 5279836

GORDON GROSSMAN, Plaintiff, v. DTE ENERGY CO. et al., Defendants.

Core Terms

law firm, motion to dismiss, district court

**Counsel:** [*1] For Gordon Grossman, Plaintiff: Maro E. Bush, Frank, Haron, Weiner and Navarro, Troy, MI.

For DTE Energy Company, Michigan Consolidated Gas Company, Fahey, Schultz, Burzych, Rhodes, PLC, Defendants: Stephen J. Rhodes, Fahey Schultz Burzych Rhodes PLC, Okemos, MI.

**Judges:** HONORABLE STEPHEN J. MURPHY, III, United States District Judge.

**Opinion by:** STEPHEN J. MURPHY, III

Opinion

## ORDER GRANTING MOTIONS TO DISMISS COMPLAINT (docket nos. 8 & 13) AND DENYING RULE 11 SANCTIONS (docket no. 14)

Gordon Grossman filed a complaint in this Court on September 17, 2010, seeking a declaratory judgment and damages pursuant to *42 U.S.C. § 1983* and the common law of Michigan against DTE Energy Co. ("DTE"), Michigan Consolidated Gas Company ("MichCon"), and the law firm of Fahey, Schultz, Burzych, Rhodes, PLC ("FSBR"). He has since amended the complaint to add a claim for sanctions against FSBR under *28 U.S.C. § 1927*. This dispute arises out of contested payments for utility services on property allegedly owned by Grossman. Grossman alleges that the defendant companies and their law firm made inconsistent arguments before the Oakland County Circuit Court and the Michigan Public Service Commission to dispose of Grossman's claims. The defendants [*2] have moved to dismiss all of Grossman's claims.

The Court agrees that the complaint does not present a legally cognizable claim under *§ 1983* or *§ 1927*, and because it otherwise lacks jurisdiction over the dispute, it will dismiss the complaint. Nevertheless, the Court does not agree that sanctions are warranted, and will not impose them. [1]

## FACTS AND PROCEDURAL HISTORY

Grossman, a Michigan resident, brought an action in Oakland County Circuit Court ("Circuit Court") against DTE on April 6, 2009. Oakland County Circuit Court Complaint, Docket No. 8, Ex. 2. He alleged that DTE wrongly assigned $4,800 worth of utility charges to him personally, rather than to his duly-registered Michigan corporation, the Gordon Grossman Construction Company. *Id.*, ¶ 6, 8-9. These charges affected Grossman's credit score and led to higher [*3] interest rates than he was entitled to on certain real estate loans. *Id.*, ¶ 14. DTE moved to dismiss this complaint, arguing that the Michigan Public Service Commission ("MPSC"), and not the Circuit Court, had primary jurisdiction over such disputes. The Circuit Court agreed, and dismissed Grossman's complaint. Oakland County Circuit Court Order, Docket No. 8, Ex. 4.

Grossman dutifully went to the MPSC and filed a new complaint against DTE and MichCon on December 2, 2009. The companies retained FSBR to represent them before the MPSC, and again moved to dismiss Grossman's complaint, this time on the basis that his utility charge claim was time-barred and sought certain remedies the MPSC could not provide. Grossman vehemently objected to this argument, arguing that under principles of so-called "judicial estoppel," DTE could not claim jurisdiction was proper before the MPSC in one action, and then deny its existence in another action. The gravamen of Grossman's claims is that these arguments amounted to a denial of procedural due process under the federal constitution, and an "abuse of process" under Michigan common law.

## STANDARD OF REVIEW

---

[1]   Because the Court does not believe a hearing will be helpful to the determination of this case, it will decide this case on the briefs. *See* E.D. Mich. LR 7.1(e)(2). Grossman failed to respond to the motion for sanctions and the amended motion to dismiss within the time limits provided by E.D. Mich. LR 7.1(e)(1)-(2). Therefore, the Court will rule on these motions as unopposed.

2010 U.S. Dist. LEXIS 133572, *3

*Rule 12(b)(6)* allows dismissal of actions that "fail [**4] to state a claim upon which relief can be granted." A district court should only grant a motion to dismiss "'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Minger v. Green, 239 F.3d 793, 797 (6th Cir. 2001)* (quoting *Sistrunk v. City of Strongsville, 99 F.3d 194, 197 (6th Cir. 1996)).* In evaluating a motion to dismiss, the court presumes the truth of all well-pled factual allegations. *Bishop v. Lucent Techs., 520 F.3d 516, 519 (6th Cir. 2006).* But see *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the element of a cause of action will not do.'" (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))).* All reasonable factual inferences are to be drawn in favor of the non-moving party. *Dubay v. Wells, 506 F.3d 422, 427 (6th Cir. 2007).* "Detailed factual allegations" are not required. *Twombly, 550 U.S. at 555.*

The defendants submitted court records, transcripts, and orders detailing the procedural history of Grossman's proceedings at the state level. Reliance on these documents does not convert this motion from a *Rule 12(b)(6)* [**5] motion to a summary judgment motion under *Rule 56.* When a defendant's motion to dismiss references documents of public record that are central to the plaintiff's claim but not included in the complaint, *Rule 12(b)(6)* remains the appropriate standard of review. *Helwig v. Vencor, Inc., 210 F.3d 612, 618 n.10 (6th Cir. 2000),* rev'd on other grounds, *251 F.3d 540 (6th Cir. 2001)* (en banc) (taking notice of SEC documents "does not require conversion of defendants' motion to dismiss to a motion for summary judgment"); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1366, at 185-86 (3d ed. 2004).

## ANALYSIS

### I. Grossman's Claims

#### A. *42 U.S.C. § 1983* Claim

Grossman's *§ 1983* claim falters because it does not properly allege that the defendants acted "under color of any statute, ordinance, regulation, custom or usage." *42 U.S.C. § 1983.* The Sixth Circuit recognizes three tests for determining whether or not conduct by private actors, like the utility companies and law firm in this case, is "fairly attributable to the state" under *§ 1983:* "the public function test, the state compulsion test, and the nexus test." *Ellison v. Garbarino, 48 F.3d 192, 195 (6th Cir. 1995).* Only [**6] the "nexus test" is relevant here. [2] In order to make

out a *§ 1983* claim under a nexus theory, the plaintiff must plead "a sufficiently close relationship (i.e., through state regulation or contract) between the state and the private actor so that the action taken may be attributed to the state." *Id.* For private litigants accused of acting "under color of law," the Court considers "the extent to which the actor relies on governmental assistance and benefits, whether the actor is performing a traditional governmental function, and whether the injury cased is aggravated in a unique way by the incidents of governmental authority." *Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621-22, 111 S. Ct. 2077, 114 L. Ed. 2d 660* (holding that preemptory challenges in a civil suit constitute "state action" for *§ 1983* purposes).

While judicial actions are undoubtedly state [**7] actions, steps taken by the litigants to obtain a ruling from a court are generally not deemed to be state action. *Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 54, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)* ("[A] private party's mere use of the State's dispute resolution machinery, without the 'overt, significant assistance of state officials,'" is not state action) (quoting *Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 486, 108 S. Ct. 1340, 99 L. Ed. 2d 565 (1988));* *Polk County v. Dodson, 454 U.S. 312, 324-25, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981)* (holding that public defenders whose role is limited to "performing a lawyer's traditional function[ ] as counsel to a defendant in a criminal proceeding" is not a state actor under *§ 1983*); *Otworth v. Vanderploeg, 61 F. App'x 163, 165 (6th Cir. 2003)* ("A lawyer representing a client is not . . . a state actor under color of state law . . . ."). In those cases when a litigant's joint efforts with the state *were* deemed sufficient to trigger state action, the plaintiff alleged significant state intervention (as takes place, for instance, when lawyers aid the courts in empaneling juries); outright collusion between the litigants and the court; or deliberate bad faith on the part of the litigant in seeking court action that [**8] is unconstitutional. *See Edmonson, 500 U.S. at 621-22* (preemptory challenges during jury selection); *Dennis v. Sparks, 449 U.S. 24, 31-32, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980)* (conspiracy between judge and defendants); *Gottfried v. Med. Planning Servs., Inc., 280 F.3d 684, 692 (6th Cir. 2002)* (dismissing complaint against parties who obtained a state-court injunction, in part, for failure to allege "bad faith" or "knowledge that obtaining an injunction would be unconstitutional").

In this case, Grossman only alleges that the defendants made "inconsistent" and "disingenuous" arguments in front of the Circuit Court and the MPSC. These accusations are mere labels that cannot move this case past

---

[2]  The "public function" test is not applicable because the defendants have not been accused of taking over a traditionally state function, like operating an election. The "state compulsion" test is also irrelevant because there is no suggestion that the state somehow put the defendants up to the arguments they made in the state courts. *See Ellison, 48 F.3d at 195.*

Ziyad Hermiz

2010 U.S. Dist. LEXIS 133572, *8

the motion-to-dismiss stage. The defendants made legitimate jurisdictional arguments before both the Circuit Court and the MPSC, which those bodies accepted as a basis for judgment. Even if the Court were to accept such labels on their face value, these are not the sorts allegations that can render private litigants or law firms "state actors." Because no set of facts Grossman could prove on these pleadings will permit the Court to grant relief to Grossman on a *§ 1983* theory, it will dismiss this claim.

The Court's confidence [*9] in its conclusion is bolstered by the *Rooker-Feldman* doctrine. *Rooker-Feldman* reflects Congress's default rule that the Supreme Court is the only federal judicial body capable of reviewing a state-court judgment directly. See *28 U.S.C. § 1257*. District courts lack such jurisdiction unless Congress has explicitly conferred it upon them. Absent such a conferral of authority, "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgment" cannot be heard by a district court. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 161 L. Ed. 2d 454. While the Supreme Court has scaled back *Rooker-Feldman* in recent decisions, it continues to apply when "the source of injury is the state court decision." *McCormick v. Braverman*, 451 F.3d 382, 393.

Grossman's claim of a constitutional violation amounts to an accusation that the defendants arguments before the various state courts were wrong, and that the acceptance of those arguments in the Circuit Court and MPSC harmed him. For the Court to eventually conclude that the defendants' actions were captured [*10] by *§ 1983*, it would have to "evaluate state court judgments to determine if they violated . . . constitutional rights," which *§ 1257* and *Rooker-Feldman* prohibit. *Johnson v. Ohio Sup. Ct.*, 156 F. App'x 779, 783 (6th Cir. 2005) (rejecting *§ 1983* action predicated on a split of authority between two intermediate courts of appeal in Ohio on *Rooker-Feldman* grounds). Grossman's claim appears to fall within the limited class of cases that *Rooker-Feldman* bars. Even if one were to presume the defendants' actions could be the subject of a *§ 1983* action, the Court doubts it could exercise jurisdiction over the matter.

B. *28 U.S.C. § 1927* Claim

Grossman amended his complaint to seek sanctions under *§ 1927* for "multipl[ying] proceedings in [a] case unreasonably and vexatiously." *28 U.S.C. § 1927*. Such sanctions are not allowed in this action. The only defendant against whom the charges have been brought, FSBR, is a law firm, rather than an individual attorney. The Sixth Circuit has held that law firms cannot be sanctioned under *§ 1927*. See *BDT Prods., Inc. v. Lexmark Intern., Inc.*, 602 F.3d 742, 750-51 (6th Cir. 2010). Therefore, Grossman's attempt to seek damages under *§ 1927* is unavailing.

C. Jurisdiction [*11] over "Abuse of Process" Claim Under Michigan Law

Because Grossman's federal claims lack merit, the Court need not pass on his remaining "abuse of process" claim under Michigan common law, because there is no separate basis of jurisdiction for the state law claim. While no party has raised the issue of jurisdiction, the Court is obliged to dismiss a civil action if it "determines at any time that it lacks subject matter jurisdiction." *Fed. R. Civ. P. 12(h)(3)*. Since Grossman has raised no federal claims other than the ones discussed above, diversity jurisdiction is the only method by which his case can remain in federal court. [3] Diversity jurisdiction under *28 U.S.C. § 1332* requires complete diversity, meaning that no plaintiff can share a domicile with any defendant. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806). Grossman, DTE, and MichCon are all Michigan citizens. [4] With no federal claims and no grounds for diversity jurisdiction, the Court cannot consider Grossman's remaining claim and must dismiss this case.

II. Sanctions Under Rule 11

When an attorney signs a filing with the Court, he or she warrants that it comports with the standards of *Fed. R. Civ. P. 11(b)* "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." If a lawyer fails to comply with these standards, the Court "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." *Id. 11(c)(1)*. These sanctions can include "payment to the movant of part or all of the reasonable attorney's [*13] fees and

---

[3]   The Court declines to exercise supplemental jurisdiction over this matter because all federal claims in this case have been dismissed. Since this case is still at the [*12] motion-to-dismiss stage, there is no good cause for retaining jurisdiction. See *28 U.S.C. § 1367(c)(3)*; *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims . . . .").

[4]   FSBR is an LLC, which means its citizenship is defined by the residence of its members, rather than the state where it is registered. The Court need not address this issue because jurisdiction is already inapposite given the shared Michigan citizenship of Grossman and the two corporations.

Ziyad Hermiz

2010 U.S. Dist. LEXIS 133572, *13

other expenses directly resulting from the violation." *Id. 11(c)(4)*. In this case, the defendants have asked the Court to award them costs and attorney's fees on the grounds that it violates *Rule 11(b)(2)*[5] and *(b)(3)*.[6] A district court's decision to grant or deny sanctions is discretionary, and can only be reversed if that discretion is abused. *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers, 613 F.3d 609, 626 (6th Cir. 2010)*.

As the language of the rule suggests, *Rule 11* is not intended to punish attorneys who are merely mistaken after the adversarial process has demonstrated they are in error. *Merritt, 613 F.3d at 626* ("The conduct of counsel who are the subject of a sanction request is measured by an objective [*14] standard of reasonableness under the circumstances."); *Fed. R. Civ. P. 11* advisory committee's note (1983) ("The Court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring into what was reasonable to believe at the time the pleading, motion, or other paper was submitted."). Not every easy case merits sanctions. Even if a complaint is swiftly dismissed, sanctions should not be imposed if the plaintiff made "some prefiling inquiry" that was reasonable at the time. 1983 Advisory Committee Notes. *Fed. R. Civ. P. 11* advisory committee's note (1983).

The Court does not believe that sanctions are merited in this case. The defendants label Grossman's entire complaint "frivolous," "unsupportable," and "egregious," but they fail to make specific allegations that would demonstrate that Grossman's counsel acted in an objectively unreasonable fashion under the circumstances. *See Fed. R. Civ. P. 11(c)(2)* (requiring allegations of "specific conduct"). As his response brief demonstrates, Grossman made a reasonable effort to satisfy the elements of all the claims he brought in his complaint, even though none of them presented a challenging issue for the [*15] Court to decide.[7] Furthermore, while the defendant

undoubtedly disagrees with Grossman's characterization of the facts in this case, the Court's examination of the filings does not show that Grossman made any deliberate misrepresentations, nor have the defendants directed the Court's attention to such a misrepresentation. In conclusion, while this is a case in which the plaintiff's "legal theories must be rejected as thinly supported by the facts," the case lacks the sort of pointed allegations of misconduct that justify sanctions. *Hartleip v. McNeilab, Inc., 83 F.3d 767, 778-79 (6th Cir. 1996)* (upholding district court's denial of Rule 11 sanctions in a discrimination case where the claims, while very weak, were a legitimate effort to link evidence to a legal theory).

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the defendants' motions to dismiss the complaint (docket no. 8) and the amended complaint (docket no. 13) are **GRANTED**. Grossman's § 1983 [*16] and *§ 1927* claims are **DISMISSED WITH PREJUDICE**. Grossman's state law "abuse of process" claim is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the defendants' motion for sanctions (docket no. 14) is **DENIED**.

**SO ORDERED.**

/s/ Stephen J. Murphy, III

STEPHEN J. MURPHY, III

United States District Judge

Dated: December 17, 2010

---

[5]   All filings must have legal arguments that are "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *Fed. R. Civ. P. 12(b)(2)*.

[6]   The factual contentions in every legal document must "have evidentiary support or, if specifically so identified, [be likely to] have evidentiary support after a reasonable opportunity for further investigation or discovery." *Fed. R. Civ. P. 12(b)(3)*.

[7]   In particular, the limitation on *§ 1927* sanctions to attorneys was only resolved definitively by the Sixth Circuit in April, and is the subject of a circuit split. *BDP Prods., 602 F.3d 742, 750-51*. A reasonable investigation could have missed this change in the law.

Ziyad Hermiz



Warning
As of: April 4, 2014 4:40 PM EDT

# Int'l Dairy Foods Ass'n v. Boggs

United States District Court for the Southern District of Ohio, Eastern Division
April 2, 2009, Decided; April 2, 2009, Filed
Case No. 2:08-CV-628; Case No. 2:08-CV-629

**Reporter:** 2009 U.S. Dist. LEXIS 27074; 2009 WL 937045

INTERNATIONAL DAIRY FOODS ASSOCIATION, and ORGANIC TRADE ASSOCIATION, Plaintiffs, v. ROBERT J. BOGGS, Director, Ohio Department of Agriculture, Defendant.

**Subsequent History:** Affirmed in part and reversed in part by, Remanded by *Int'l Dairy Foods Ass'n v. Boggs, 2010 U.S. App. LEXIS 20184 (6th Cir.) (6th Cir. Ohio, 2010)*

---

**Core Terms**

mislead, label, milk, rbst, cows, dairy, hormone, consumer, composite, dairy product, processor, deceive, disclaimer, food, interstate commerce, ballot, commerce clause, preempt, bst, burdensome, summary judgment motion, artificial, vagueness, significant difference, prophylactic, certificate, unduly, commercial speech, occupational, disclosure

**Counsel:** [*1] For International Dairy Foods Association, Plaintiff: John Cooper McDonald, LEAD ATTORNEY, Schottenstein Zox & Dunn - 2, Columbus, OH; Charles M English, Jr., PRO HAC VICE, Ober Kaler Grimes & Shriver, PC, Washington, DC; Clayton Hough, PRO HAC VICE, International Dairy Foods Association, Washington, DC; John Patrick Gilligan, Schottenstein Zox & Dunn Co., L.P.A., Columbus, OH; Wendy M Yoviene, PRO HAC VICE, Ober Kaler Grimes & Shriver PC, Washington, DC.

For Robert J Boggs, Solely in his official capacity as Ohio Director of Agriculture, Defendant: James Robert Patterson, LEAD ATTORNEY, Reynoldsburg, OH; William J Cole, Ohio Attorney General - 2, Executive Agencies Section, Columbus, OH.

For The Center for Food Safety, Amicus: David G Cox, LEAD ATTORNEY, Columbus, OH; Joseph Mendelson, III, PRO HAC VICE, National Wildlife Federation, Washington, DC; Kevin S Golden, PRO HAC VICE, San Francisco, CA.

For Food and Water Watch, Ohio Ecological Food and Farm Association, Physicians for Social Responsibility, Oregon Chapter, Amicus: David G Cox, LEAD ATTORNEY, Columbus, OH; Joseph Mendelson, III, PRO HAC VICE, National Wildlife Federation, Washington, DC.

For Ohio Farm Bureau Federation, Ohio [*2] Dairy Producers Association, Amicus: Gregory R Flax, LEAD ATTORNEY, Baker & Hostetler, Columbus, OH.

**Judges:** JAMES L. GRAHAM, United States District Judge. MAGISTRATE JUDGE KING.

**Opinion by:** JAMES L. GRAHAM

---

**Opinion**

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiffs, two food associations whose members are engaged in the processing of dairy products, seek a declaratory judgment and preliminary and permanent injunction to prevent the Director of the Ohio Department of Agriculture ("ODA") from enforcing Ohio Administrative Code provision 901:11-8-01, which regulates the labeling of dairy products in Ohio. The matter is before the court for decision on all parties' motions for summary judgment. [1]

### II. STATEMENT OF FACTS

In 1993, the United States Food and Drug Administration ("FDA") approved the use of the hormone recombinant bovine somatotropin, or rbST, in dairy cows. The hormone is also known as recombinant bovine growth hormone, or rbGH. When used in dairy cows, rbST combines with naturally occurring bovine growth hormone, or bGH, to increase cows' milk production by up to ten percent. The FDA determined [*3] that the use of rbST is safe, that there is "no significant difference between milk from

---

[1] Two briefs of Amici Curiae, one in support of plaintiffs and one in support of defendant, were also filed and considered.

Ziyad Hermiz

2009 U.S. Dist. LEXIS 27074, *3

treated and untreated cows . . ." and "there is currently no way to differentiate analytically between naturally occurring bST and recombinant bST in milk, nor are there any measurable compositional differences between milk from cows that receive supplemental bST and milk from cows that do not." _59 Fed. Reg. 6279, 6280._

Despite the FDA finding, consumers, dairy producers and retailers continue to have differing opinions about the use of rbST. Due to increased demand for products from cows not treated with rbST, some dairy processors have begun to label their products with statements such as "rbST free" or "artificial hormone free." Dairy producers that use rbST have objected to these labels, arguing that these phrases are misleading because, despite FDA findings to the contrary, they imply that milk from cows supplemented with rbST is different from or inferior to milk from cows not supplemented with rbST.

On February 10, 1994 the FDA published interim guidance on the labeling of milk and milk products from cows that have not been treated with rbST. _59 Fed. Reg. 6279._ The FDA guidance provides that [*4] food companies that do not use milk from cows supplemented with rbST can voluntarily inform consumers of that fact in their product labels, provided that such statements are truthful and not misleading. The FDA determined that the term "rbST free" "may imply a compositional difference between milk from treated and untreated cows rather than a difference in the way the milk is produced. Instead, the concept would be better formulated as 'from cows not treated with rbST' or in other similar ways." _59 Fed. Reg. 6279._ Thus, the FDA guidance suggests that it is preferable to discuss how the milk is produced, rather than the composition of the milk.

The FDA also found that even such a statement, which asserts that rbST has not been used in milk production, has the potential to be misunderstood by consumers without proper context because such unqualified statements may imply that milk from untreated cows is safer or of higher quality than milk from treated cows. According to the FDA, "[s]uch an implication would be false and misleading." _Id._ Thus, the FDA guidance states that these misleading implications can be best avoided by use of accompanying contextual information, such as accompanying [*5] the production claim "from cows not treated with rbST" with a disclaimer such as "no significant difference has been shown between milk derived from rbST-treated and non-rbST-treated cows." _Id._

The FDA noted that given the traditional role of the States in overseeing milk production, it intended to rely primarily on the States to ensure that rbST labeling claims were truthful and not misleading. Because there is no way to differentiate analytically between naturally occurring bST and synthetic rbST in milk, the FDA found that to ensure claims that milk comes from untreated cows are valid, States could require firms using such claims establish a plan and maintain records to substantiate the claims and make those records available for inspection.

In a letter dated July 27, 1994 from the FDA to the Director, Division of Milk Control for the State of New York, the FDA indicated that interim guidance was developed to "provide all states with the same starting point for their efforts in this area" and the intent was to "assure as much uniformity as possible among state regulations." IDFA App. 0003. However, the letter pointed out that the FDA guidance is not a regulation and therefore does [*6] not by itself legally bind states or manufacturers, but simply gives guidance to what the agency might determine is "truthful and not misleading" in accordance with the FDA's statute.

On February 7, 2008, Ohio Governor Ted Strickland issued Executive Order 2008-03S. The Order authorized ODA to immediately adopt a rule on what constitutes false and misleading labels on dairy products, require dairy producers who claim they do not use rbST to submit appropriate documentation for ODA review, and create labels consistent with the FDA's findings on rbST.

In response to this executive order, the Director solicited comments from consumers, producers, scientists and other interested parties. He convened a listening session to discuss dairy labeling, appointed an advisory committee on dairy labeling, conducted a public hearing to receive public comments on the emergency rule, made certain changes to the proposed rule and submitted it to the Ohio Joint Committee on Agency Rule Review ("JCARR"). He then conducted a second public hearing for comments on the proposed rule and after revision, the Director sent the modified rule to JCARR for review. When arguing for the rule in front of JCARR, Director [*7] Boggs stated the rule does not try to favor the use of rbST in dairy production or to oppose it, but simply tries to provide the consumer with accurate information. IDFA App. II 583. The Director also obtained estimates from large, medium-sized, and small dairy processors of the anticipated costs they would incur in complying with the rule. The Director issued a final, revised version of the rule that was adopted on May 12, 2008 and became effective May 22, 2008. The final rule is published at _Ohio Admin. Code 901:11-8-01._

The full text of the rule is as follows:

(A) Pursuant to _sections 917.05_ and _3715.60 of the Revised Code_, dairy products will be deemed to be misbranded if they contain a statement which is false or misleading.

Ziyad Hermiz

2009 U.S. Dist. LEXIS 27074, *7

(B) A dairy label which contains a production claim that "this milk is from cows not supplemented with rbST" (or a substantially equivalent claim) may be considered misleading on the basis of such language, unless:

(1) The labeling entity has verified that the claim is accurate, and proper documents, including, but not limited to, producer signed affidavits, farm weight tickets and plant audit trails, to support the claim, are made readily available to ODA for [*8] inspection; and

(2) The label contains, in the same label panel, in exactly the same font, style, case, and color and at least half the size (but no smaller than seven point font) as the foregoing representation, the following contiguous additional statement (or a substantially equivalent statement): "The FDA has determined that no significant difference has been shown between milk derived from rbST-supplemented and non-rbST-supplemented cows."

(C) Making claims regarding the composition of milk with respect to hormones, such as "No Hormones", "Hormone Free", "rbST Free", "rbGH Free", "No Artificial Hormones" and "bST Free", is false and misleading. ODA will not permit such statements on any dairy product labels.

(D) Statements may be considered to be false or misleading if they indicate the absence of a compound not permitted by the United States food and drug administration to be present in any dairy product, including, but not limited to antibiotics or pesticides. Except as otherwise provided in this rule, accurate production claims will not be deemed false or misleading.

(E) All dairy product labels must meet the requirements of this rule no later than one hundred twenty days after [*9] its effective date.

(F) The provisions of this rule shall not be construed to prohibit seals or marks referenced in and specifically authorized by a federal law or Ohio statute.

All parties to this case have filed motions for summary judgment which are now ripe for decision. Plaintiffs bring this case against Robert J. Boggs, the Director of the ODA ("Director"). Plaintiff International Dairy Foods Association ("IDFA") is a trade association whose members represent more than 85 percent of the milk, cultured products, cheese and frozen desserts produced in the United States. Plaintiff Organic Trade Association ("OTA") is a membership-based business association for the organic industry in North America. According to OTA's website, organic products are those produced

based on a system of farming that maintains and replenishes soil fertility without the use of toxic and persistent pesticides and fertilizers. Organically produced foods also must be produced without the use of antibiotics, synthetic hormones, genetic engineering and other excluded practices, sewage sludge, or irradiation. Cloning animals or using their products would be considered inconsistent with organic practices. Organic [*10] foods are minimally processed without artificial ingredients, preservatives, or irradiation to maintain the integrity of the food. [2]

Plaintiffs argue that the Ohio rule is unconstitutional because it infringes on their *First Amendment* right of free speech and violates the dormant *Commerce Clause*. [3] OTA's motion also argues the rule is preempted by the Organic Foods Production Act (OFPA) and is void for vagueness. For the reasons discussed below in this opinion, this court grants in part and denies in part the Director's motion for summary judgment and denies the plaintiffs' motions for summary judgment.

## III. DISCUSSION

### A. Standard of Review

Under *Fed. R. Civ. P. 56(c)*, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue [*11] as to any material fact and that the movant is entitled to judgment as a matter of law." See *Daugherty v.*

---

[2] OTA.com, Quick Overview Organic Agriculture and Production, http://www.ota.com/definition/quickoverview.html (last visited April 1, 2009).

[3] IDFA has included in its complaint a Fourteenth Amendment Equal Protection claim, but no party has moved for summary judgment on that claim or argued they are entitled to a preliminary injunction on that claim and thus, it remains pending.

2009 U.S. Dist. LEXIS 27074, *13

*Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993)*. The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, *LaPointe, 8 F.3d at 378*, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005); Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993)*. In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)*. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* [*12] (emphasis in original); *see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989)*. Thus, "[o]nly disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty, 544 F.3d at 702* (quoting *Anderson, 477 U.S. at 248*).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994)*. Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson, 477 U.S. at 251-52*. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)*. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's

[*13] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009)*.

**B.** *First Amendment* Freedom of Speech
The parties do not dispute the FDA's findings that there is "no significant difference between milk from treated and untreated cows . . ." and "there is currently no way to differentiate analytically between naturally occurring bST and recombinant bST in milk, nor are there any measurable compositional differences between milk from cows that receive supplemental bST and milk from cows that do not." *59 Fed. Reg. 6279, 6280*. At the inception of this case, the court held a initial preliminary injunction conference with all parties. (See Transcript for case no. 2:08-cv-628, Doc. 19). The court inquired what evidence the parties intended to rely on in making their cases. In response, the Director indicated that he believed they may need an expert on the science behind rbST and why it has the clear potential to mislead consumers. In response, both plaintiffs assured the court that such testimony would likely not be necessary. [4] Plaintiffs do not [*14] attack or dispute the science behind the FDA findings in their motions for summary judgment. Thus, for purposes of this case, the FDA findings are not in dispute.

To resolve this case under the *First Amendment* protection for free speech, this court must apply *First Amendment* law to two separate parts of the Ohio rule [5] - composition claims and production claims. "Composition" claims concern the content of the final dairy product itself and certain composition claims are [*15] subject to a prophylactic ban by the Ohio rule. *Ohio Admin. Code § 901:11-8-01(C) and (D)*. "Production" claims concern the manner in which the milk was produced, including products given, or not given, to the dairy cows which produced the milk and, while permitted by the Ohio rule, are subject to certain restrictions such as accompanying the production claim with a disclaimer that must be in a specific location, font, style, case, color, and size. *Ohio Admin. Code § 901:11-8-01 (B)*.

**1. The Prophylactic Ban On Certain Composition Claims**
The Ohio rule bans certain composition claims, such as "rbST" free" and other similar terms. Both parties concede

---

[4] At the conference, counsel for the Director indicated "I believe that there probably will be the need for at least one expert witness . . . to deal with some of the science issues related to rbST, what it means or doesn't mean in the production of milk and why, from a scientific standpoint, it has the clear potential to mislead consumers." (Case no. 2:08-cv-628, Doc. 19, p. 32). In response, Counsel for IDFA stated he thought the issues were largely legal and there may be some "factual red herrings about what the science is. We think that's irrelevant." (Id. at 33). Likewise, counsel for OTA stated "I don't think we are taking on the science issue directly as [the Director's counsel] seemed to indicate." (Id. at 34).

[5] *First Amendment* applies to the states through the Due Process Clause of the 14th amendment. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 749 n.1, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976)*.

5:14-cv-10266-JEL-DRG   Doc # 45-14   Filed 04/07/14   Pg 111 of 121   Pg ID 1020

Page 5 of 15
2009 U.S. Dist. LEXIS 27074, *15

that the speech at issue here is commercial speech and under the *First Amendment*, commercial speech is entitled to protection that is somewhat less extensive than that afforded noncommercial speech. *Zauderer v. Office of Disciplinary Counsel of Supreme Court, 471 U.S. 626, 637, 105 S. Ct. 2265, 85 L. Ed. 2d 652, 17 Ohio B. 315 (1985).* "The States and the Federal Government are free to prevent the dissemination [*16] of commercial speech that is false, deceptive, or misleading . . ." *Id. at 638.* Misleading commercial speech may be prohibited entirely. *Peel v. Att'y Registration & Disciplinary Comm'n, 496 U.S. 91, 100, 110 S. Ct. 2281, 110 L. Ed. 2d 83 (1990).*

When evaluating a prophylactic ban, where commercial speech is *not* false, deceptive, or misleading it may be restricted only in the service of a substantial government interest and only through means that directly advance that state interest. *Zauderer, 471 U.S. at 638. Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)* lays out a four-part analysis applied to commercial speech to determine whether a prophylactic ban violates the *First Amendment.* Step one of the test is to determine whether speech is false, deceptive, or misleading. *Central Hudson, 447 U.S. at 566.* If it is, the analysis ends at the first step and the speech is not entitled to *First Amendment* protection.

In order to ban terms as misleading, the Supreme Court has stated that the terms must be *either* 1) inherently misleading or 2) have been shown to be misleading based on a history of deception. *In re R. M. J., 455 U.S. 191, 202, 102 S. Ct. 929, 71 L. Ed. 2d 64 (1982).* Inherently misleading phrases are those "inherently [*17] likely to deceive . . ." *Id.* Even if truthful, speech can still be misleading if its *implication* is misleading. In *Zauderer,* the Court found speech restrictions justified where an attorney advertised that all "fees" would be reimbursed but failed to mention that the client was responsible for costs. *Zauderer, 471 U.S. at 652.* The Court held that such an advertisement would suggest that employing the attorney would be entirely free of charge. *Id.* Given that members of the public are usually unaware of the technical meanings of terms such as "fees" and "costs" and that in ordinary usage, those terms might be perceived as interchangeable, the Court found the advertisement was

deceptive and the possibility of deception was "self-evident." *Id.* [6]

Conversely, in *Peel,* the Court found that an implication was not sufficient to render a statement inherently misleading where that statement was "true and verifiable." *Peel, 496 U.S. at 100.* In *Peel,* a trial attorney sought to hold himself out as a "Certified Civil [*18] Trial Specialist" and the Illinois Supreme Court found that such a claim was inherently misleading because it implied the attorney's skills were superior to those not so designated. *Id. at 101.* The Supreme Court disagreed, stating that "[a] lawyer's certification by NBTA is a verifiable fact, as is the predicate requirements for that certification." *Id.* In *Peel,* the court noted that had the certification been issued by an organization that made no inquiry into the petitioner's fitness, or one that issued certificates indiscriminately for a price, the statement, even if true, could be misleading. *Id. at 102.*

In this case, the Director argues that the terms "rbST Free", "rbGH Free", and "No Artificial Hormones," are inherently misleading because they are not verifiable and because they imply a compositional difference between milk so labeled and other milk not so labeled, which is untrue. [7] The plaintiffs argue that the terms are only *potentially* misleading and that this potential can be resolved by using contextual language. *Peel, 496 U.S. at 110.*

The court agrees that the phrases "rbST Free", "rbGH Free", and "No Artificial Hormones" are inherently misleading. They are inherently likely to deceive because they all imply that the product is "free" of rbST or other hormones. In other words, they imply a compositional difference between those products that are produced with rbGH and those that are not. But in fact there is "no significant difference between milk from treated and untreated cows . . ." and "there is currently no way to differentiate analytically between naturally occurring bST and recombinant bST in milk, nor are there any measurable [*20] compositional differences between milk from cows that receive supplemental bST and milk from cows that do not." *59 Fed. Reg. 6279, 6280.* Thus, any implication that there is a difference between the two products is a misleading implication.

Plaintiffs argue that the terms "rbST Free", "No Artificial Hormones", and "rbGH Free" are not misleading because

---

[6]  In *Zauderer,* this implication was resolved with contextual language. As discussed below, contextual language will not resolve the misleading implication of the language at issue here.

[7]  Plaintiffs argue that the Director did not have the purpose of preventing misleading information, but instead stated in a press [*19] release that the purpose was to give "balanced information" and in a separate letter to give "only the most accurate" information. IDFA App. 105, 438. The Director has attached an affidavit to his motion that specifically states that the rule is "intended to ensure that Ohio consumers receive truthful and non-misleading label information . . ." The fact that the Director did not use specific legal terminology in his prior statements is not determinative. Those statements were equivalent to the Director stating the aim of the rule was to prevent dissemination of misleading information.

5:14-cv-10266-JEL-DRG   Doc # 45-14   Filed 04/07/14   Pg 112 of 121   Pg ID 1021

Page 6 of 15
2009 U.S. Dist. LEXIS 27074, *20

they can be verified based on farmer and processor production certifications because milk not produced with rbST could not possibly contain rbST. But such verification would not work to verify the composition claim, that the product is "free" of a particular substance, but instead would verify only an accurate production claim, that the product is not produced with rbST. Such an accurate production claim is expressly permitted by the rule. Even if milk labeled "rbST Free" does not contain rbST, the phrase is misleading because it implies that other products not so labeled do contain the hormone and are compositionally different.

Here, the situation is akin to the hypothetical described in _Peel, 496 U.S. at 102_. There the court said that a statement claiming that an attorney was certified by an organization would be misleading, even if true,   [*21] if the organization made no inquiry into his fitness or issued certificates indiscriminately for a price because it would imply that the attorney had different or additional skills when in fact he did not. Id. Similarly, here, claims that a dairy product is "free" of a particular substance implies that the composition of the product is different than other products when in fact, the composition of that dairy product is no different than any other dairy product on the shelves.

Plaintiffs argue that the terms banned by the Ohio rule are at most only _potentially_ misleading and that potential can be resolved by simply requiring the use of contextual language. _Id. at 109_ (where information is only potentially misleading, there is a presumption favoring disclosure over concealment). Plaintiffs' have offered a variety of contextual language that amounts to simply adding a production claim, such as "produced from cows not supplemented with rbST" alongside a term such as "rbST Free." But simply adding language that milk was produced from cows not treated with rbST does not cure the misleading nature of a term such as "rbST Free" because it still implies some compositional difference in the milk,   [*22] regardless of how the milk is produced. Similarly, adding the "no significant difference . . ." language from the rule would also not serve to dispel any misleading implications. Adding such a statement would only serve to confuse a consumer because the label would contain contradictory information- it would say a product is "free" of rbST, but at the same time state that there is no rbST in other products, which defeats the purpose of making the claim in the first place.

In addition to the prophylactic ban on terms regarding the absence of hormones, the Ohio rule also places a prophylactic ban on terms that indicate the absence of a compound not permitted by the FDA to be present in any dairy product, including, but not limited to antibiotics or pesticides. _Ohio Admin. Code 901:11-8-01(D)_. These statements, like composition claims regarding hormones such as "rbST Free," are also inherently misleading because of their implication. These terms likewise imply a compositional difference between products so labeled and those not so labeled. These statements imply that other products have antibiotics or pesticides in them when they do not because such compounds are prohibited by the FDA.   [*23] [8]

Finally, the Ohio rule bans terms such as "No Hormones", "bST free", or "Hormone Free." These phrases are false because all dairy products contain some natural hormones. Because the prophylactic ban at issue in the statute bans terms that are inherently misleading or false, those terms are not entitled to _First Amendment_ protection and this court need not address the remaining _Central Hudson_ factors.

### 2. Disclaimer Imposed on Production Claims

In addition to an outright prophylactic ban on certain terms, the Ohio rule also requires that production claims be accompanied by a disclaimer. Specifically, the Ohio rule requires that when a processor makes a production claim on its label, such as "this milk is from cows not supplemented with rbST," [9] that claim may be considered misleading unless the labeling entity has verified the claim is accurate with proper documentation and the label contains the statement: "The FDA has determined that no significant difference has been shown between milk derived       from       rbST-supplemented       and non-rbST-supplemented cows." _Ohio Admin. Code § 901:11-8-01(B)(2)._   [*24] The disclaimer must be on the same label panel as, and contiguous to, the production claim and must be in exactly the same font, style, case, and color and at least half the size (but no smaller than seven point font).

Although the four part _Central Hudson_ test is used to evaluate bans on speech, a more lenient approach is taken when evaluating a state's requirement that a disclosure be made. _Zauderer, 471 U.S. at 650-651._ [10] Disclosure requirements, unlike prophylactic bans, do not attempt to prevent a speaker from conveying information to the public, but rather require them to provide more information than they might otherwise be inclined to

---

[8]   The parties do not dispute that dairy products are not permitted to have antibiotics or pesticides in them.

[9]   Under the Ohio rule, substantially equivalent claims are also permitted.

[10]   This court finds the Second Circuit's reasoning in _Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 115 (2d Cir. 2001)_ (holding the _Central Hudson_ test was not applicable in disclosure cases) a more persuasive reading and application of _Zauderer_

5:14-cv-10266-JEL-DRG   Doc # 45-14   Filed 04/07/14   Pg 113 of 121   Pg ID 1022

Page 7 of 15
2009 U.S. Dist. LEXIS 27074, *24

present. Id. Because disclosure requirements are not as intrusive on *First Amendment* rights as are prohibitions, the Supreme Court has held that an advertiser's rights are adequately protected as long as disclosure requirements are "reasonably related to the State's interest in preventing deception of consumers." *Id. at 651*. To demonstrate that use of a disclaimer is an appropriately-tailored check against deception or confusion, the State must show that it seeks to prevent [*25] a harm that is "potentially real, not purely hypothetical." *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, 512 U.S. 136, 146, 114 S. Ct. 2084, 129 L. Ed. 2d 118 (1994)*. However, disclosure requirements still implicate *First Amendment* rights, and thus, unjustified or unduly burdensome disclosure requirements might offend the *First Amendment* by chilling protected commercial speech. *Zauderer, 471 U.S. at 651*.

a. *Reasonably Related to State's Interest*

Here, the Director's interest in requiring the disclaimer is to prevent the dissemination of potentially misleading information. Just like the composition claims discussed above, the accurate production claim at issue here has a misleading implication because it implies that those processors that do use rbST have an inferior or unsafe product or that it is compositionally different. [*26] Therefore, in order to prevent consumer confusion, the "no significant difference..." disclaimer is reasonable. [11]*See Zauderer, 471 U.S. at 651* (holding that warnings or disclaimers may be appropriately required in order to dissipate the possibility of consumer confusion or deception).

Plaintiffs argue that the rule is unjustified because the Director has not shown the deception is "potentially real, not purely hypothetical." *Ibanez, 512 U.S. at 146-147*. But the Director is not required to produce exhaustive evidence to justify its rule. As stated in *Zauderer* "when the possibility of deception is as self-evident as it is in this case, we need not require the state to conduct a survey of the public before it may determine that the advertisement [*27] had a tendency to mislead." *Zauderer, 471 U.S. at 652-653* (internal quotations omitted).

Plaintiffs argue that language from *Ibanez* effectively overrules this part of the Court's ruling in *Zauderer* so that the Director is required to provide evidence of actual deception. Plaintiffs read *Ibanez* too broadly. In *Ibanez*, the Florida board of accountancy issued a complaint

against Ibanez, an attorney, charging her with violating the board's administrative regulations prohibiting false, deceptive, or misleading advertising because she appended the CFP designation (Certified Financial Planner) after her name, when such designation had not been approved by the board as a specialty designation. The Court held that, absent evidence of consumer confusion, there was no reason to believe that such a designation, if truthful, was misleading, particularly in light of *Peel*. The Court specifically stated that they expressed "no opinion whether, *in other situations* or on a different record, the Board's insistence on a disclaimer might serve as an appropriately tailored check against deception or confusion." *Ibanez, 512 U.S. at 146* (emphasis added).

The Ohio Supreme Court also declined to read *Ibanez* as [*28] broadly as plaintiffs suggest. In *In re Complaint Against Harper*, the court stated that they did not read *Ibanez* "as requiring the state to offer evidence of public opinion polls, nor do we believe that the state must offer testimony from witnesses who claim to have been misled." *77 Ohio St. 3d 211, 673 N.E.2d 1253, 1259 (Ohio 1996)*. Evidence of instances of actual consumer confusion or deception is not required where "the language used is readily susceptible of interpretation by an objective observer without resort to proof from members of the public." *Id*.

Ohio's conclusion that production claims without a disclaimer are potentially misleading or confusing has the support of the FDA as well as a number of other states. The FDA guidance specifically states:

> [E]ven such a statement, which asserts that rbST has not been used in the production of the subject milk, has the potential to be misunderstood by consumers. Without proper context, such statements could be misleading. Such unqualified statements may imply that milk from untreated cows is safer or of higher quality than milk from treated cows. Such an implication would be false and misleading. . . .[A]ccompanying the statement "from cows not treated [*29] with rbST" with the statement that "No significant difference has been shown between milk derived from rbST-treated and nonrbST-treated cows" would put the claim in proper context.

---

than the Eleventh Circuit's reasoning in Borgner v. Brooks, 284 F.3d 1204, 1214 (11th Cir. 2002) and Mason v. Fla. Bar, 208 F.3d 952, 958 (11th Cir. 2000).

[11] Plaintiffs' attempt to relate this case to Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67 (2d Cir. 1996) is not persuasive. The Vermont regulation at issue in Amestoy had nothing to do with preventing consumer deception and was later limited to "cases in which a state disclosure requirement is supported by no interest other than the gratification of 'consumer curiosity.'" See Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 114 (2d Cir. 2001).

2009 U.S. Dist. LEXIS 27074, *29

*59 Fed. Reg. 6279*. Alaska, Wisconsin, Illinois, and Pennsylvania have also issued standards requiring that the "no significant difference" language accompany production claims. See *Alaska Stat. § 17.20.013*; Wis. Admin. Code ATCP § 83.02; Illinois Dep't of Public Health, Technical Information Bulletin/Dairy # 2 (November 2, 2007); Pennsylvania Dep't of Agriculture, Milk Labeling Standards 2.0.1.17.08 (January 17, 2008).

This court finds that the Ohio rule, using the FDA guidance as a roadmap, strikes the right balance between preventing misleading information and providing enough information for consumers to make an informed choice. The Ohio rule appropriately prohibits misleading information by banning misleading composition claims, and encourages dissemination of accurate non-misleading production claims. The rule accommodates the interests of processors who want to appeal to the organic market and consumers who want to avoid milk from cows treated with artificial hormones while at the same time protecting [*30] producers of milk from cows treated with artificial hormones from consumer confusion.

*b. Unduly Burdensome*

Plaintiffs argue that even if the disclaimer requirement is reasonably related to the State's interest in preventing deception of consumers, it still violates the *First Amendment* because it is unduly burdensome. Plaintiffs assert two grounds for their argument- first, that the cost of compliance with the Ohio rule renders it unduly burdensome, and second, that the formatting restrictions in the Ohio rule render it unduly burdensome, particularly on small containers. The court finds no merit in plaintiffs' first argument and concludes that it cannot decide the issues surrounding the second argument on summary judgment.

In support of their argument, plaintiffs have submitted affidavits from various processors that contain estimates of how much it would cost for each processor to change their labels. Ben & Jerry's, for example, estimates it could cost up to $ 250,000 in order to comply with the Ohio rule. But the affidavit fails to demonstrate how this estimate relates to their total production costs or what percentage it is of their regular marketing budget. It is a matter of common [*31] knowledge that product labels are often changed in the regular course of business. Plaintiffs have given this court no context by which it can decide whether the cost of compliance is an undue burden. Because plaintiffs have failed to produce any evidence from which it could conclude that the Ohio rule causes a financial burden so undue as to chill their right to make an accurate production claim, they have failed to raise a genuine issue of material fact on this issue.

Analysis of plaintiffs' second argument, that the Ohio rule's formatting requirements are unduly burdensome, is less straightforward. Plaintiffs argue that the rule is unduly burdensome because it requires the disclaimer language to be contiguous to and in exactly the same font, style, case, and color and at least half the size (but no smaller than seven point font) as the production claim. In response to plaintiffs' argument, the Director has submitted a number of labels from processors who have complied with the rule, demonstrating its ease of compliance. But plaintiffs claim this evidence is insufficient because it does not take into account the actual size of the container. According to plaintiff, in instances involving [*32] small containers, such as yogurt, it is impossible to comply with the Ohio rule.

In *Ibanez*, the Court found that where the disclaimer required so much detail that it effectively ruled out the protected speech entirely, it was unduly burdensome. *Ibanez, 512 U.S. at 146-147*. Here, if plaintiffs can demonstrate that the Ohio rule effectively rules out their ability to make an accurate production claim, then the rule would be unduly burdensome. However, based on the evidence submitted with the parties' motions it is impossible for this court to determine whether or not the required disclosure can fit on a "small" dairy container or what particular label and design qualifies as "small." Because this court finds that it is not possible to determine, based on the submitted evidence, whether the disclaimer requirement is unduly burdensome due to its formatting requirements on "small" containers, summary judgment on this issue is denied to all parties.

*C. Commerce Clause*

Plaintiffs offer two theories of why the Ohio rule violates the dormant *Commerce Clause of the U.S. Constitution. U.S. Const., Art. I, § 8, cl. 3*. First, they argue that the rule is "per se" invalid as either a "direct" local [*33] regulation of interstate commerce or a discriminatory regulation. Second, they argue that under the balancing test of *Pike v. Bruce Church, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970)*, the burdens that the Ohio rule imposes on interstate commerce "clearly exceed [its] putative local benefits." Neither theory is persuasive.

*1. The "Direct Regulation" Theory*

As recently noted by the Sixth Circuit "[w]hat counts as a 'direct' burden on interstate commerce has long been a matter of difficulty for courts, and, presumably due to its questionable value as an analytical device, the 'direct/ incidental' distinction has fallen out of use in dormant *commerce clause* analysis." *Tenn. Scrap Recyclers Ass'n v. Bredesen, 556 F.3d 442, 448-49, 2009 U.S. App. LEXIS*

2009 U.S. Dist. LEXIS 27074, *33

*2744, at \*9-10 (6th Cir. February 13, 2009)* citing *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 390, 103 S. Ct, 1905, 76 L. Ed. 2d 1 (1983)* ("[I]t is difficult to square the mechanical line . . . based on a supposedly precise division between 'direct' and 'indirect' effects on interstate commerce, with the general trend in our modern *Commerce Clause* jurisprudence to look in every case to 'the nature of the state regulation involved, the objective of the state, and the effect of [*34] the regulation upon the national interest in the commerce.'") (citations omitted). Thus, the Sixth Circuit has concluded that the direct regulation doctrine "appears to have been repudiated" and that Supreme Court precedent dictates analyzing the dormant *Commerce Clause* under two separate prongs. *Tenn. Scrap Recyclers Ass'n, 556 F.3d 442, 2009 U.S. App. LEXIS 2744, at \*10*. First, if the law is protectionist, one that benefits in-state interests and burdens out-of-state interests, the law will be struck down. *Id. at \*12*; *Granholm v. Heald, 544 U.S. 460, 487, 125 S. Ct. 1885, 161 L. Ed. 2d 796 (2005)*. If, however, the Court determines that the law is not "protectionist," it should then apply the deferential *Pike* balancing test. *Tenn. Scrap Recyclers Ass'n, 556 F.3d 442, 2009 U.S. App. LEXIS 2744, at \*12*.

### 2. Protectionist Purpose Theory

Plaintiffs have failed to show how the Ohio rule discriminates against out-of-state interests. In order to show that a law discriminates in practical effect, plaintiffs must show "both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *Cherry Hill Vineyards, LLC v. Lilly, 553 F.3d 423, 432 (6th Cir. 2008)* (quoting *Eastern Ky. Resources v. Fiscal Court, 127 F.3d 532, 543 (6th Cir. 1997)*).

Plaintiffs [*35] have failed to show how local economic actors are favored by the Ohio rule. [12] The Ohio rule is not discriminatory because it does not treat Ohio dairy producers more favorably than other dairy producers throughout the country. The plaintiffs argue that the rule is discriminatory because it imposes greater burdens on out-of-state national labels, but any Ohio producer who wants to make a non-use of rbST claim is equally affected by this law. All dairy producers, in Ohio and elsewhere, are subject to the Ohio labeling requirements and there is no evidence that such labeling requirements work to the benefit of Ohio dairy producers at the detriment of out-of-state dairy producers. Plaintiffs' argument is more akin to stating that the law discriminates against dairy producers that do not use rbST as opposed to dairy

producers that do use rbST. But the *Commerce Clause* "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Minn. v. Clover Leaf Creamery Co., 449 U.S. 456, 474, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981)*. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate [*36] commerce." *Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 126, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978)*.

Plaintiffs argue that Ohio's protectionist intent can be determined from the fact that Ohio dairy producers were behind the enactment of the Ohio rule, citing comments from dairy farmers at a public hearing that they were in support of the rule. But the fact that some Ohio producers testified in favor of the Ohio rule does not render the rule protectionist when it is not protectionist in effect.

### 3. The "Undue Burden" Theory

Because the Ohio rule is not protectionist, it must be analyzed under the second prong of the modern test, the *Pike* balancing test. *Tenn. Scrap Recyclers Ass'n, 556 F.3d 442, 2009 U.S. App. LEXIS 2744, at \*12*. Under the deferential *Pike* test, the court will uphold the Ohio rule unless the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike, 397 U.S. at 142*. "[T]he extent of the burden that will [*37] be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate commerce." *Id.*

#### a. Burden On Interstate Commerce

The *Commerce Clause* protects only interstate markets, not particular interstate firms, from prohibitive or burdensome regulations. *Exxon Corp., 437 U.S. at 127-128*; *See also Tenn. Scrap Recyclers Ass'n, 556 F.3d 442, 2009 U.S. App. LEXIS 2744, at \*15-17* (holding that a "tag and hold" ordinance was a local law with local effect that imposed only a temporary burden on the shipment of scrap metal by Memphis dealers and as such, the law did not regulate the national scrap metal industry but only the small part of that industry that operated in Memphis). The Ohio rule's effect on the individual firms making up IDFA or OTA is relevant for *commerce clause* purposes only to the extent that it burdens the national market. *See Tenn. Scrap Recyclers Ass'n, 556 F.3d 442, 2009 U.S. App. LEXIS 2744 at \*16*. "Absent a showing of harm to the national . . . market, the [plaintiffs'] dormant

---

[12] This fact distinguishes this case from *Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)*, where the Court found that the law, though neutral on its face, benefitted the state of North Carolina to the detriment of the state of Washington.

Ziyad Hermiz

2009 U.S. Dist. LEXIS 27074, *37

*commerce clause* claim must fail." *Id. at *16-17.* "Although evidence regarding a particular company may be suggestive, the benefit-to-burden [*38] calculation is based on the overall benefits and burdens that the statutory provision may create, not on the benefits and burdens with respect to a particular company or transaction." *Quik Payday, Inc. v. Stork, 549 F.3d 1302, 1309 (10th Cir. 2008).*

When discussing the applicable markets at issue in this case, IDFA's brief refers to "dairy products" while OTA's brief refers to "organic dairy products." Plaintiffs have failed to demonstrate that the Ohio rule places a burden on either market. Although IDFA says that its members produce over 85 percent of the milk, cultured products, cheese and frozen desserts produced in the United States, it has provided no evidence detailing what percentage of its membership wishes to label their products as produced without rbST. Nor has it provided any evidence that those processors would withdraw from the market given the restrictions of the Ohio rule. Similarly, OTA has not demonstrated what percentage of its membership, if any, would withdraw from the market when faced with compliance with the Ohio rule.

Plaintiffs' evidence supporting their theory of undue burden consists of affidavits from some of their members analyzing the effect they believe [*39] the Ohio rule will have on their individual firms. [13] Those affidavits state that due to distribution limitations, the processors are unable to re-label their products for Ohio only and thus, they are left with two choices: change all their labels nationally to comply with the Ohio rule or withdraw from the Ohio market altogether. But neither plaintiff presented evidence that, in fact, any of these processors would withdraw from the market rather than re-label their products.

To the extent the Ohio rule may be said to "force" dairy processors to create one label for all states, it is only [*40] because those processors will not modify their production and distribution systems to differentiate between Ohio bound and non-Ohio bound dairy products.

[14] *See e.g. Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 110 (2d Cir. 2001).* But the Court has rejected the notion that the *Commerce Clause* protects particular structure or methods of operation in the retail market. *Exxon Corp., 437 U.S. at 127.*

Even if some processors choose [*41] to withdraw from the market, that information would not be sufficient to raise a genuine issue of material fact without knowing how many would make this choice or how widespread the impact would be. *See Exxon Corp., 437 U.S. at 127* (holding that even if some refiners stop selling in Maryland, that does not necessitate a finding that the statute impermissibly burdens interstate commerce). Plaintiffs have essentially provided the court with no evidence of the impact *on the market*, rather than on individual firms.

Plaintiffs' argue the Ohio rule has the "practical effect" of regulating conduct beyond Ohio's borders, citing *Edgar v. Mite Corp., 457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982), Healy v. Beer Inst., 491 U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989)* and *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986).* But Brown-Forman and Healy involved price affirmation statutes that directly tied their labeling laws to products sold out of state and Edgar involved an Illinois law that regulated transactions which took place across state lines. Here, the Ohio rule only regulates labels on products sold in Ohio. The fact that the Ohio rule has some effect outside Ohio's borders is not determinative. "Every state police [*42] statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce." *Milk Control Bd. v. Eisenberg Farm Prods., 306 U.S. 346, 351, 59 S. Ct. 528, 83 L. Ed. 752 (1939).* The Ohio rule does not regulate the national dairy market nor the national organic market, but simply regulates what labels can be used in Ohio.

Plaintiffs also argue that if Ohio can impose such a strict labeling rule, so could other states, thereby stifling

---

[13]   Although not properly authenticated evidence, IDFA submitted a power point entitled "rbGH Labeling" produced by the Ohio Ecological Food and Farm Association, which states that nationwide only 15.2 percent of dairy operations use rbGH. IDFA App. II p. 609-622. However, this document only purports to tell the court the number of dairy operations that use rbGH without stating how this translates to the number of dairy processors that want to label their products as coming from dairy cows not treated with rbGH or what percentage of these processors will withdraw from the market because of the Ohio rule.

[14]   Plaintiffs have failed to raise a genuine dispute of fact regarding whether the cost of compliance to change their labels is an undue burden on commerce. Plaintiffs' have submitted cost estimates from individual firms ranging between $ 27,000 for smaller processors to $ 250,000 for the largest processors. But again, plaintiffs have produced no context for the court on how these numbers will impact the market, rather than individual firms, and no processor has indicated these costs to be so high they will withdraw from the market. The Ohio rule's effect on the individual firms making up IDFA or OTA is relevant for *commerce clause* purposes only to the extent that it burdens the national market. *See Tenn. Scrap Recyclers Ass'n, 556 F.3d 442, 2009 U.S. App. LEXIS 2744 at *16.*

Ziyad Hermiz

interstate commerce. While it is true that other states have regulated labeling of dairy products that come from cows not treated with rbST, plaintiffs have not demonstrated that any of these other laws conflict with the Ohio rule. In fact, plaintiffs do not dispute Ohio's law is the strictest and that compliance with Ohio's labeling restrictions would keep them in compliance with the laws in other states. While plaintiffs argue that there is no guarantee Ohio law will be the strictest for long, this is nothing more than speculation. See *Sorrell, 272 F.3d at 112* (holding there must be an actual conflict, rather than just a risk, between [*43] the challenged regulation and regulations in other states in order to violate the *Commerce Clause*). "The idea that there is a general interest in [regulatory] uniformity is inconsistent with our [society's] decision to have separate states with separate legislative competencies, including separate competencies to regulate commerce." *Id. at 113* quoting Donald H. Regan, Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Doctrine; (II) Extraterritorial State Legislation, *85 Mich. L. Rev. 1865, 1883 (1987)*.

b. *The Putative Local Benefits of the Ohio Rule*

As discussed in more detail in the *First Amendment* portion of this opinion, the Ohio rule has an important local benefit-preventing the dissemination of misleading labeling on dairy products. The Court has recognized that the States have always possessed a legitimate interest in "'the protection of . . . [their] people against fraud and deception in the sale of food products' at retail markets within their borders." *Florida Lime & Avocado Growers, 373 U.S. at 144* (quoting *Plumley v. Massachusetts, 155 U.S. 461, 472, 15 S. Ct. 154, 39 L. Ed. 223 (1894)*).

c. *Balancing of the Pike Factors*

Because this court finds that plaintiffs have failed to [*44] show that the Ohio rule burdens interstate commerce and because it is a valuable tool to prevent dissemination of misleading information, [15] the burden it imposes on interstate commerce is not "clearly excessive in relation to its putative local benefits." *Pike, 397 U.S. at 142.* [16] Accordingly, this court grants summary judgment to the Director on plaintiffs' *Commerce Clause* claims.

**D. Preemption**

OTA asserts that the Ohio rule is preempted by the Organic Foods Production Act (OFPA), *7 U.S.C. § 6501 et seq.*, and attendant National Organic Program regulations (NOP), *7 C.F.R. § 205 et seq.* OTA argues that the OFPA occupies the field of organic labeling or alternatively that the Ohio rule stands as an obstacle to the purposes of the OFPA. The court finds neither argument persuasive.

The OFPA and NOP establish national standards for production and handling of foods labeled "organic." The OFPA sets forth its purposes, which are:

> (1) to establish national standards governing the marketing of certain agricultural products as organically produced products; (2) to assure consumers that organically produced products meet a consistent standard; and (3) to facilitate interstate commerce in fresh and processed food that is organically produced.

*7 U.S.C. § 6501.* The OFPA prohibits a person from selling or labeling an agricultural product as "organically produced" unless the product was produced and handled in accordance with the Act. *7 U.S.C. § 6505.*

The OFPA authorizes the Secretary of Agriculture to [*46] promulgate regulations to carry out the OFPA and to establish a National List of approved and prohibited substances for use in products to be sold or labeled as "organically produced." *7 U.S.C. § 6521; 7 U.S.C. § 6517.* Recombinant DNA technology, such as rbST, is not permitted to be used in organic dairy. *7 C.F.R. § 205.2* (listing recombinant DNA technology as an excluded method); *7 C.F.R. 205.105(e).* Subpart D of the NOP specifically regulates labels, labeling and marketing information for use of the term "organic" on labels. *7 C.F.R. §§ 205.300-205.311.*

The OFPA allows states to create a plan for the establishment of a State organic program only if the plan is submitted to and approved by the Secretary of Agriculture. *7 U.S.C. § 6507.* Such a plan may contain more restrictive requirements governing the organic certification of farms and handling operations and the production and handling of agricultural products that are

---

[15]   In Lever Bros. Co. v. Maurer, 712 F. Supp. 645 (S.D. Ohio 1989), this court was confronted with an Ohio law that precluded the use of the word "butter" in labeling or advertising any product made to imitate or substitute for butter. In Lever Brothers, the statute prevented consumers from knowing that butter was in plaintiffs' butter product. This court held there is nothing inherently misleading about the use of the word "butter." Thus, Lever Brothers is clearly distinguishable from the instant case.

[16]   The extent of the burden that will be tolerated will of course depend whether a rule can be promoted as well with a lesser impact on interstate activities. Minn. v. Clover Leaf Creamery Co., 449 U.S. 456, 471, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981). Because plaintiffs have failed to show any impact the Ohio rule has on interstate commerce, [*45] this court cannot determine whether a different rule would have a lesser impact.

2009 U.S. Dist. LEXIS 27074, *46

to be sold or labeled as organically produced and must further the purposes of the Act, not be inconsistent with the Act, and not be discriminatory towards agricultural commodities organically produced in other States. *7 U.S.C. § 6507; See also7 C.F.R. § 205.620.*

The **[*47]** Supreme Court has held that under Article VI of the United States Constitution state laws that conflict with federal laws are without effect. *Altria Group, Inc. v. Good, U.S. , 129 S. Ct. 538, 543, 172 L. Ed. 2d 398 (2008).* Absent express preemption in the statute, the Supreme Court has recognized two other types of preemption: "field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992)*(citations omitted). When addressing questions of preemption, the analysis begins with the assumption that "the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Group, Inc., 129 S. Ct. at 543* quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947).* "That assumption applies with particular force **[*48]** when Congress has legislated in a field traditionally occupied by the States." *Altria Group, Inc., 129 S. Ct. at 543.*

1. Field Preemption

Where a law is so "pervasive that there is a reasonable inference that Congress left no room for the States to supplement it" that law will preempt the entire field. *Gade, 505 U.S. at 98.* The Court will look to the purpose of Congress in the legislative history and text of the statute to determine if Congress intended a comprehensive congressional design. *See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 147-148, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963).*

OTA argues the OFPA preempts the field of organic labeling and prevents Ohio and other states from unilaterally imposing labeling requirements on organic dairy operations because the OFPA provides a comprehensive statutory and regulatory scheme that

governs the production, distribution, and marketing of organic food products and is made up of over 20 statutes and over 600 regulations.

While it is true that the OFPA's purpose is to "establish national standards governing the marketing of certain agricultural products as organically produced products" and to have a "consistent standard" (*7 U.S.C. § 6501*), this purpose only **[*49]** illustrates Congress's intent to regulate the field of marketing products that hold themselves out to be "organic," not to regulate the field of organic products that have misleading information on their labels. The Ohio rule does not govern the labeling or marketing of organic products, but governs all dairy products that make misleading claims on their labels. The purpose of the OFPA is to ensure that organic foods are properly labeled as organic and does not govern the contents of the entire label.

In Gade, the Court analyzed whether or not an Illinois statute was preempted by the Occupational Safety and Health Act (OSH Act). *505 U.S. at 107.* The Court held that only those regulations that directly, substantially, and specifically regulated occupational safety and health were occupational safety and health standards within the meaning of the Act. Id. In its discussion, the Court stated that while some safety laws of general applicability may have a "direct and substantial" effect on worker safety, they could not fairly be characterized as "occupational" and therefore preempted by OSHA because they regulated workers simply as members of the general public. *Gade, 505 U.S. at 107.* Here, **[*50]** the Ohio rule is more like a law of general applicability, that just happens to have an effect on organic products in addition to other types of dairy products. Not all dairy products that do not contain artificial hormones are organic. The Ohio rule does not change the way a product is certified or labeled as being organic. It only affects the label on an organic product if it is a dairy label that contains misleading information regarding artificial hormones or other misleading information.

Here, OFPA points this court to legislative history from the Act that "organic certification standards should be national in scope, tough and fully enforced" (135 Cong. Rec. 29411 (1989)) and "the organic industry is encouraged to inform consumers about all material used in organic production" (S. Rep. No. 101-357, at 300 (1990)). [17] However, this only establishes a legislative intent that certification of organic products be national, a purpose not related to

---

[17]   By unopposed motion, OTA has moved this court to take judicial notice of the Congressional Record and Senate Report of the 101st Congress, 2d session, which contains some of the legislative history of the OFPA and the document titled "Organic Dairy and the Role of Pasture" by the Natural Marketing Institute, commissioned by the United States Department of Agriculture. Judicial notice, under *Fed. R. Evid. 201*, may be taken when a fact is not subject to reasonable dispute in that it is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources

2009 U.S. Dist. LEXIS 27074, *50

whether or not a dairy label that happens to be for an organic product will be permitted to contain misleading information. Moreover, the Ohio rule does not prevent organic producers from informing consumers about the materials used in organic [*51] production. Rather, the Ohio rule specifically permits production claims as long as they are not misleading.

The Court has recognized that the States have always possessed a legitimate interest in "'the protection of . . . [their] people against fraud and deception in the sale of food products' at retail markets within their borders." *Florida Lime & Avocado Growers, 373 U.S. at 144* (quoting *Plumley v. Massachusetts, 155 U.S. 461, 472, 15 S. Ct. 154, 39 L. Ed. 223 (1894))*. While OFPA prohibits the use of certain hormones and chemicals in organic production, OTA does not cite anything in the OFPA or its regulations demonstrating that there is no room for states to exercise their traditional police powers to regulate false and misleading labeling when referring to these hormones or chemicals. Thus, this court finds that the OFPA did not preempt the field of labeling on all organic products.

## 2. Conflict Preemption

OTA also argues that the Ohio rule "stands as an obstacle" to the full implementation of the OFPA. In order to be an obstacle to a federal law, it is not enough that the goal of both federal and state law are the same. Rather a state law is preempted "if it interferes with the methods by which the federal statute was designed to reach that goal." *Gade, 505 U.S. at 103*.

As [*53] previously noted, the OFPA's purpose was to establish national standards governing the marketing of organically produced products, to assure consumers that organically produced products meet a consistent standard, and to facilitate interstate commerce in organically produced food. *7 U.S.C. § 6501*. But the Ohio rule does not stand as an obstacle to these purposes. The Ohio rule does not hinder the national marketing of products labeled "organic," does not change the consistent standard of organic products established by the OFPA, and does not interfere with interstate commerce of organic products.

Citing *Gade*, OTA argues that because the OFPA contains a provision for a Secretary-approved state plan, then the Ohio rule is impliedly preempted. In *Gade*, the Court found that the state of Illinois' interim occupational safety and health regulations were preempted by the OSH Act because those regulations were promulgated without receiving the approval of the Secretary of Labor for a state

plan as required by the OSH Act. The Court found it significant that the OSH Act specifically required the state to submit a plan if it wished to "assume responsibility" for the "development and enforcement [*54] . . . of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal Standard has been promulgated." *Id. at 99*. The Court held that such a provision implied that the state first had to get approval for a state plan before regulating the occupational health and safety within the state. *Id. at 103*. Because the state regulation at issue was not approved and had the purpose of regulating occupational safety and health, that state law was preempted. "To allow a State selectively to 'supplement' certain federal regulations with ostensibly nonconflicting standards would be inconsistent with this federal scheme of establishing uniform federal standards, on the one hand, and encouraging States to assume full responsibility for development and enforcement of their own OSH programs, on the other." *Id.*

OTA argues that the OFPA preempts the Ohio rule because, as in <u>Gade</u>, states are only allowed to regulate organic production to the extent that such a regulatory plan is approved by the Secretary of Agriculture in accordance with the provisions of the Act. *7 U.S.C. § 6507*. Only then can the states impose requirements that are more restrictive [*55] than the Act. *7 U.S.C. § 6507*. But Ohio is not required under the OFPA to obtain approval of the Ohio rule because the rule regulates false or misleading dairy labeling and does not regulate organic production or labeling products as "organic." Thus, the situation here is different from that in Gade because Ohio is not attempting to regulate an area for which the OFPA specifically requires an approved state plan.

OTA argues the Ohio rule is an obstacle to the purposes of the OFPA because it prevents organic food processors from notifying consumers that the processors are in compliance with organic regulations, such as the prohibition on the use of antibiotics, synthetic hormones, and pesticides. But the Ohio rule specifically makes exception for accurate production claims and does not prevent OTA's members from communicating their message to consumers. Nothing in the Ohio rule would prevent a producer from labeling the product as "organic."

Thus, the Ohio rule is not preempted by the OFPA under either the theory of field preemption or obstacle

---

whose accuracy cannot reasonably be questioned. Excerpts from the legislative history of the OFPA are facts that are not subject to reasonable dispute and thus, judicial notice of the legislative history of the OFPA is granted. However, the findings by the Natural Marketing Institute are not facts which are either "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and [*52] therefore, judicial notice of this document is denied.

Ziyad Hermiz

preemption and the Director's motion for summary judgment is granted on OTA's preemption claim. [18]

## E. Vagueness

OTA has argued that the Ohio rule is void for vagueness because its use of the word "may" necessarily gives the Director the ability to enforce the statute in a discriminatory and arbitrary manner. The court disagrees.

Because the Ohio rule has yet to be enforced in any manner, OTA is essentially bringing a facial challenge to the regulation on vagueness grounds. A plaintiff is permitted to make a facial challenge to a law on vagueness grounds when that law implicates plaintiff's *First Amendment* rights. See *Belle Maer Harbor v. Charter Twp. of Harrison, 170 F.3d 553, 557 (6th Cir. 1999)*. Here, plaintiff challenges the use of the word "may" in sections (B) and (D) of the Ohio rule. Although this court ultimately concludes that in large part section (B) of the Ohio rule does not violate plaintiffs' *First Amendment* rights, it still implicates those rights because it requires plaintiffs to speak when they rather would not. Section (D), on the other hand, does not implicate plaintiffs' *First Amendment* rights because [*57] section (D) prohibits composition claims that are inherently misleading and as such that speech is not entitled to any *First Amendment* protection whatsoever. *Cent. Hudson Gas & Elec. Corp., 447 U.S. at 566* (holding that in order for commercial speech to be protected by the *First Amendment* it must at least concern lawful activity and not be misleading). Because Section (D) does not even implicate plaintiffs' *First Amendment* rights, OTA cannot bring a facial challenge to that section of the rule and this court will only consider OTA's facial attack on section (B) of the regulations.

An ordinance is void-for-vagueness under the *Due Process Clauses of the Fifth* and Fourteenth Amendments if it fails, (1) to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct, and (2) to establish standards to permit law enforcement to enforce the law in a non-arbitrary, non-discriminatory manner. See *Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)*. Where a statute reaches expression sheltered by the *First Amendment*, the doctrine demands a greater degree of specificity than in other contexts. See *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)*; [*58] *Belle Maer Harbor, 170 F.3d at 559 (6th Cir. 1999)*. However, courts do not require "mathematical certainty" from the language of a statute (*Grayned v. City of Rockford, 408 U.S. 104, 110, 92*

*S. Ct. 2294, 33 L. Ed. 2d 222 (1972)*) and perfect clarity and precise guidance has never been required (*United States v. Williams, ___ U.S. ___, 128 S. Ct. 1830, 1845, 170 L. Ed. 2d 650 (2008)*).

"A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned, 408 U.S. at 108-109 (1972)*. Where statutory language imposes a "standardless sweep" that allows "policemen, prosecutors, and juries to pursue their personal predilections" the law will be considered impermissibly vague. See *Smith v. Goguen, 415 U.S. 566, 575, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974)*. "Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law." See *Smith, 415 U.S. at 575*.

OTA argues that Section (B) of the Ohio rule is unconstitutionally vague because of its use of the word "may." The rule states: "a dairy label which contains a production claim that 'this milk is from cows not supplemented with rbST' (or a substantially [*59] equivalent claim) *may* be considered misleading on the basis of such language" if the verification requirements are not satisfied and the disclaimer language not used. *Ohio Admin. Code 901:11-8-01(B)*(emphasis added). OTA argues that the use of "may" gives the Director unfettered discretion to enforce the rule in an arbitrary manner and therefore violates the vagueness doctrine.

The Court finds that section (B) of the Ohio rule is not vague. It states that production claims may be misleading, but then creates a safe harbor, giving processors clear guidance on what they can do to avoid violating the rule. The rule specifically states that a production claim may be misleading "unless" the processor satisfies the verification requirements and includes a proper disclaimer on the label. Thus, Section (B) provides notice of the standards to which processors must conform when they wish to make a production claim on their labels. At the same time, it establishes a guideline to govern enforcement of the law. The Court has recognized that there are some "areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision." *Smith, 415 U.S. at 581*. [*60] Obviously, here, the Ohio rule could not provide an example of every semantic construction rendering a label misleading. If it attempted to do so, the regulation would run on indefinitely. Instead, they have provided a clear instruction as to what is not misleading.

OTA argues in this context whether or not a statement "may be misleading" refers to whether the Director finds

[18]   IDFA argued that if the Ohio rule was preempted, [*56] it was not severable and the entire Ohio rule failed. Because this court finds the Ohio rule was not preempted, it need not reach IDFA's argument regarding severability.

2009 U.S. Dist. LEXIS 27074, *60

the statement misleading. In fact, the term "may be misleading" refers to whether or not consumers will find the statement misleading. Obviously, not everyone will find the statement misleading, particularly depending on their knowledge of the scientific data behind rbST. But because it is likely many people will be misled, the Director has promulgated a rule to protect those consumers.

Thus, the use of the term "may" in the statute does not impose a "standardless sweep" that allows arbitrary enforcement, but rather seeks to give additional guidance when a dairy processor seeks to make a production claim about rbST. It specifically defines what is *not* misleading. Thus, the Director's motion for summary judgment is granted as to the OTA's claims of vagueness.

**IV. Conclusion**

For the reasons set forth above, plaintiffs' **[*61]** motions for summary judgment are DENIED (Doc. 21 in case 2:08-cv-628, Doc. 18 in case 2:08-cv-629) and the Director's motion for summary judgment is GRANTED in part and DENIED in part (Doc. 36 in case 2:08-cv-628, Doc. 25 in case 2:08-cv-629). The plaintiffs have not shown a strong likelihood of success on the merits such that granting a preliminary injunction would be appropriate and the court therefore DENIES both plaintiffs' motions for preliminary injunction (Doc. 5 in case 2:08-cv-628, Doc. 5 in case 2:08-cv-629).

It is so ORDERED.

/s/ James L. Graham

JAMES L. GRAHAM

United States District Judge

DATE: April 2, 2009

Ziyad Hermiz